CRTR2709-CR

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

**2384CV00728 Doe, For Herself And The Class, Jane vs. Lawrence General Hospital**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Business Litigation | **FILE DATE:** | 03/27/2023 |
| **ACTION CODE:** | BE1 | **CASE TRACK:** | B - Special Track (BLS) |
| **DESCRIPTION:** | Fraud, Business Torts, etc. | | |
| **CASE DISPOSITION DATE:** | 01/17/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 01/17/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

**PARTIES**

| | |
|---|---|
| **Plaintiff**<br>Doe, For Herself And The Class, Jane | **Attorney** **215620**<br>Edward F Haber<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 03/30/2023<br>**Attorney** **549049**<br>Michelle H Blauner<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Boston, MA 02108<br>Work Phone (617) 208-4713<br>Added Date: 03/27/2023<br>**Attorney** **663866**<br>Patrick Vallely<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 03/30/2023 |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

**Defendant**
Lawrence General Hospital
1 General St
Lawrence, MA 01841

**Attorney** **666841**
Lisa Oliver White
Shook, Hardy and Bacon L.L.P.
Shook, Hardy and Bacon L.L.P.
One Federal St
Suite 2620
Boston, MA 02110
Work Phone (617) 531-1411
Added Date: 03/22/2024

**Attorney** **704156**
Emyr Remy
Shook, Hardy and Bacon L.L.P.
Shook, Hardy and Bacon L.L.P.
One Federal St
Suite 2620
Boston, MA 02110
Work Phone (617) 531-1411
Added Date: 05/02/2023

**Attorney** **PHV321887CA**
Jessica N. Wahl
Shook, Hardy & Bacon, LLP
2049 Century Park East
#3000
Los Angeles, CA 90067
Work Phone (424) 324-3477
Added Date: 11/29/2023

**Other interested party**
Anna A. Gadberry (PHV atty for Defendant Lawrence General Hospital)
Anna A. Gadberry
Shook, Hardy and Bacon LLP
2555 Grand BLVD.
Kansas City, MO 64108

**Other interested party**
Frederick S. Rudesheim, III( PHV atty for Lawrence General Hospital)
Frederick S. Rudescheim, III
1800 K Street NW
Suite 1000
Washington, DC 20006

**Other interested party**
Patrick Gregory (PHV atty for Defendant Lawrence General Hospital)
Patrick Gregory
Shook, Hardy and
555 Mission Street, Suite 2300
San Francisco, CA 94105

| | |
|---|---|
| **Other interested party**<br>Tammy B. Webb (PHV atty for Defenfant Lawrence General Hospital)<br>Tammy B. Webb<br>Shook, Hardy and Bacon LLP<br>555 Mission Street, Suite 2300<br>San Francisco, CA 94101 | |

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 03/27/2023 | Civil Filing Fee (per Plaintiff) Receipt: 39001 Date: 03/27/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 03/27/2023 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 39001 Date: 03/27/2023 | 20.00 | 20.00 | 0.00 | 0.00 |
| 03/27/2023 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 39001 Date: 03/27/2023 | 15.00 | 15.00 | 0.00 | 0.00 |
| 03/27/2023 | Civil Filing Fee (per Plaintiff) Receipt: 39001 Date: 03/27/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 03/27/2023 | Fee for Blank Subpoena for One (1) or More Witnesses MGL 262 sec. 4b Receipt: 39001 Date: 03/27/2023 SUMMONS | 5.00 | 5.00 | 0.00 | 0.00 |
| | **Total** | **520.00** | **520.00** | **0.00** | **0.00** |

I HEREBY ATTEST AND CERTIFY ON
January 17, 2025 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M Beachley
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|---|---|---|---|
| 03/27/2023 | 1 | Complaint electronically filed. | |
| 03/27/2023 | 2 | Civil action cover sheet filed. | |
| 03/27/2023 | 3 | Plaintiff Jane Doe, For Herself And The Class's Motion to proceed under a pseudonym | |
| 03/27/2023 | 4 | Affidavit | |
| 03/30/2023 | | Attorney appearance<br>On this date Edward F Haber, Esq. added for Plaintiff Jane Doe, For Herself And The Class | |
| 03/30/2023 | | Attorney appearance<br>On this date Patrick Vallely, Esq. added for Plaintiff Jane Doe, For Herself And The Class | |
| 03/30/2023 | 5 | General correspondence regarding NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION "BLS1"<br>This matter has been accepted into Business Litigation Session. It has been assigned to BLS1. Dated: March 27, 2023 Notice sent 3/30/23 (See P#5 for complete notice) | Salinger |
| 03/30/2023 | | Endorsement on Motion to Proceed in Pseudonym (#3.0): ALLOWED<br>Plaintiff shall file a notice with the court disclosing plaintiff's true name and address. The notice shall be Impounded in the interest of justice until the completion of this case or further order of the court, and plaintiff shall serve the notice on defendant with the complaint (or provide it to defense counsel if the complaint has already been served). Dated: 3/28/23 Notice sent 3/30/23 | Krupp |
| 04/03/2023 | | Docket Note: Impounded Notice of Plaintiff's True Identity Received by Court | |
| 04/28/2023 | 6 | Service Returned for<br><br>Applies To: Lawrence General Hospital (Defendant) | |
| 05/02/2023 | | Attorney appearance electronically filed. | |
| 05/02/2023 | | Attorney appearance electronically filed. | |
| 05/02/2023 | 7 | Defendant Lawrence General Hospital's Assented to Motion for Extension Of Time To Respond To Plaintiff 's Complaint | |
| 05/11/2023 | | Endorsement on Motion for Extension of Time to Respond to Complaint (#7.0): ALLOWED<br>Defendant shall answer or otherwise respond to the complaint by 5/31/23 (dated 5/8/23) notice sent 5/11/23 | Krupp |
| 05/18/2023 | 8 | Defendant Lawrence General Hospital's Assented to Motion for Extension Of Time To Respond To Plaintiff 's Complaint | |
| 05/19/2023 | | Attorney appearance electronically filed. | |
| 05/19/2023 | | Attorney appearance<br>On this date Alan Ye-Hung Wong, Esq. dismissed/withdrawn for Defendant Lawrence General Hospital | |

| | | | |
|---|---|---|---|
| 05/25/2023 | | Endorsement on Motion for extensions of time to respond to Plaintiff's complaint (#8.0): ALLOWED<br>(Dated 5/22/2023) Notice sent 5/25/2023 | Krupp |
| 06/12/2023 | | Defendant Lawrence General Hospital's Notice of<br>Motion To Dismiss Plaintiff's Complaint | |
| 06/21/2023 | 9 | Plaintiff Jane Doe, For Herself And The Class, Lawrence General Hospital's Joint Motion to<br>Set Briefing Schedule on Motions to Dismiss | |
| 06/30/2023 | 10 | Plaintiff, Defendant Jane Doe, For Herself And The Class, Lawrence General Hospital's Joint Motion of<br>Regarding Page Limits for Opposition and Reply on Motion to Dismiss | |
| 07/12/2023 | | Endorsement on Motion to Set Briefing Schedule on Motion to Dismiss (#9.0): ALLOWED<br>Dated 7/10/23<br>Notice sent 7/12/23 | Kazanjian |
| 07/28/2023 | | Endorsement on Motion in Regarding Page Limits for Opposition and Reply on Motion to Dismiss (#10.0): DENIED<br>(Dated: 7/26/23) Notice Sent 07/28/23 | Kazanjian |
| 08/15/2023 | 11 | Defendant Lawrence General Hospital's Motion to dismiss<br>plaintiff's complaint | |
| 08/15/2023 | 12 | Lawrence General Hospital's Memorandum in support of<br>Motion to Dismiss plaintiff's complaint | |
| 08/15/2023 | 13 | Opposition to defendant's Motion to Dismiss filed by Jane Doe, For Herself And The Class | |
| 08/15/2023 | 14 | Reply/Sur-reply<br><br>Reply in support of defendant Lawrence General Hospital's Motion to Dismiss plaintiff's complaint | |
| 08/15/2023 | | Defendant Lawrence General Hospital's Notice of<br>filing and Superior Court Rule 9A List of Documents filed | |
| 09/12/2023 | 15 | Defendant Lawrence General Hospital's Assented to Motion for<br>Leave To Admit Anna A . Gadberry Pro Hac Vice | |
| 09/12/2023 | 16 | Defendant Lawrence General Hospital's Assented to Motion for<br>Leave To Admit Patrick Gregory Pro Hac Vice | |
| 09/12/2023 | 17 | Defendant Lawrence General Hospital's Motion for<br>Leave To Admit Tammy B . Webb Pro Hac Vice | |
| 09/19/2023 | | Endorsement on Motion for Leave To Admit Anna A . Gadberry Pro Hac Vice (#15.0): ALLOWED<br>(Dated 9/14/2023)<br>Notice sent 9/21/23 | Kazanjian |
| 09/19/2023 | | Endorsement on Motion for Leave To Admit Patrick Gregory Pro Hac Vice (#16.0): ALLOWED<br>(Dated 9/14/2023)<br>Notice sent 9/21/23 | Kazanjian |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 09/19/2023 | | Endorsement on Motion for Leave To Admit Tammy B . Webb Pro Hac Vice (#17.0): ALLOWED<br>(Dated 9/14/2023)<br>Notice sent 9/21/23 | Kazanjian |
| 09/21/2023 | | EDocument sent:<br><br>Notice to Appear was generated and sent to:<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Plaintiff: Edward F Haber, Esq. ehaber@shulaw.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Other interested party: Anna A. Gadberry (PHV atty for Defendant Lawrence General Hospital) Anna A. Gadberry Shook, Hardy and Bacon LLP 2555 Grand BLVD., Kansas City, MO 64108<br>Other interested party: Patrick Gregory (PHV atty for Defendant Lawrence General Hospital) Patrick Gregory Shook, Hardy and 555 Mission Street, Suite 2300, San Francisco, CA 94105<br>Other interested party: Tammy B. Webb (PHV atty for Defenfant Lawrence General Hospital) Tammy B. Webb Shook, Hardy and Bacon LLP 555 Mission Street, Suite 2300, San Francisco, CA 94101<br>Sent On: 09/21/2023 10:03:21 | |
| 09/29/2023 | 18 | Defendant Lawrence General Hospital's Motion to Reschedule October 5, 2023 Hearing | |
| 10/04/2023 | | Event Result:: Rule 12 Hearing scheduled on:<br>10/05/2023 02:00 PM<br>Has been: Rescheduled For the following reason: Joint request of parties<br>Hon. Helene Kazanjian, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | Kazanjian |
| 10/05/2023 | | Endorsement on Motion to Reschedule October 5, 2023 Hearing (#18.0): ALLOWED<br>The Court is not available on October 20th or 23rd but the clerk will reschedule.<br>(Dated 10/3/2023)<br>Notice sent 10/6/23 | Kazanjian |
| 10/18/2023 | 19 | Defendant Lawrence General Hospital's Assented to Motion for leave to admit Frederick S. Rudesheim, III Pro Hac Vice | |
| 10/25/2023 | 20 | Defendant Lawrence General Hospital's Assented to Motion for Leave to Admit Tara D . Kennedy Pro Hac Vice | |
| 10/30/2023 | | Endorsement on Motion for leave to admit Frederick S. Rudesheim, III Pro Hac Vice (#19.0): ALLOWED<br>(Dated 10/26/2023)<br>Notice sent 10/31/23 | Ricciuti |
| 11/02/2023 | | Event Result:: Rule 12 Hearing scheduled on:<br>11/02/2023 02:00 PM<br>Has been: Rescheduled For the following reason: Joint request of parties<br>Hon. Helene Kazanjian, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | Kazanjian |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 11/09/2023 | | Proposed Filings/Orders<br><br>Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases | |
| 11/16/2023 | 21 | Defendant Lawrence General Hospital's Assented to Motion for Leave To Admit Jessica N . Wahl Pro Hac Vice | |
| 11/29/2023 | | Endorsement on Motion for Leave To Admit Jessica N . Wahl Pro Hac Vice (#21.0): ALLOWED<br>(Dated 11/20/2023) Notice sent 11/30/2023. | Kazanjian |
| 11/29/2023 | | Attorney appearance<br>On this date Jessica N. Wahl, Esq. added for Defendant Lawrence General Hospital | |
| 01/22/2024 | 22 | ORDER: Joint Stipulation and Proposed Order to Stay all proceedings pending Interlocutory Appeal in related cases<br>See paper #22<br>(Dated 1/19/2024) Notice sent 01/23/2024. | Krupp |
| 03/22/2024 | | Attorney appearance electronically filed. | |
| 12/30/2024 | 23 | Amended: amended complaint filed by Jane Doe, For Herself And The Class | |
| 01/06/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Edward F Haber, Esq. ehaber@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Jessica N. Wahl, Esq. 2049 Century Park East #3000, Los Angeles, CA 90067<br>Defendant: Lisa Oliver White, Esq. lowhite@shb.com<br>Other interested party: Anna A. Gadberry (PHV atty for Defendant Lawrence General Hospital) Anna A. Gadberry Shook, Hardy and Bacon LLP 2555 Grand BLVD., Kansas City, MO 64108<br>Other interested party: Patrick Gregory (PHV atty for Defendant Lawrence General Hospital) Patrick Gregory Shook, Hardy and 555 Mission Street, Suite 2300, San Francisco, CA 94105<br>Other interested party: Tammy B. Webb (PHV atty for Defenfant Lawrence General Hospital) Tammy B. Webb Shook, Hardy and Bacon LLP 555 Mission Street, Suite 2300, San Francisco, CA 94101<br>Other interested party: Frederick S. Rudesheim, III( PHV atty for Lawrence General Hospital) Frederick S. Rudescheim, III 1800 K Street NW Suite 1000, Washington, DC 20006<br>Sent On: 01/06/2025 13:07:03 | |
| 01/13/2025 | 24 | Defendant Lawrence General Hospital's Notice of Removal<br><br>(U.S. Dist. # 25cv-10081) | |
| 01/17/2025 | | REMOVED to the U.S. District Court Of Massachusetts | |
| 01/17/2025 | | Case transferred to another court. | |

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>For herself and the Class,<br><br>v.<br><br>LAWRENCE GENERAL HOSPITAL,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-728 BLS1<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

### Preliminary Statement

1. Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and the defendant, Lawrence General Hospital ("Lawrence General"). Specifically, Lawrence General aided in the interception of communications between Plaintiff and other Class Members (defined below) and Lawrence General through a website maintained by Lawrence General (the "Lawrence General Website").

2. Lawrence General aided Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies to secretly intercept healthcare consumers' communications with Lawrence General by injecting hidden code into the Lawrence General Website. That hidden code enabled Google, Facebook, and other third parties to secretly listen to the contents

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of Jane Doe. Ms. Doe's identity will be disclosed to counsel for the Defendant when agreements or court orders are in place that protect the privacy of Plaintiff and her children.

of healthcare consumers' communications with Lawrence General. Those third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals known to Google and Facebook. Google and Facebook could then use the contents of the intercepted communication for their own commercial purposes, such as serving personalized advertisements to healthcare consumers based on the contents of the secretly intercepted communications.

3. Healthcare consumers' wire communications with Lawrence General were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent. Lawrence General did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with Lawrence General, nor did Lawrence General seek or obtain their consent for such interception. On the contrary, Lawrence General **falsely** told (and continues to tell) healthcare consumers, through their published online privacy policy, that it does **not** share such information.

4. The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications over the internet between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party secretly records or intercepts the communication or aids another in recording or intercepting the communication without the knowledge or consent of the other party. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when

a. the identity of the parties to the communication;

b. the existence of the communication; **or**

c. any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5. The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Internet communications fall comfortably within the Act's express terms. The purposes for which the Massachusetts legislature enacted the Massachusetts Wiretap Act are highly significant in today's world, as technology companies continually chip away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance.

7. Moreover, although this case concerns communications between healthcare consumers and healthcare providers, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on the nature of the relationship between Plaintiff and Lawrence General. The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication.

8. The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

9. Lawrence General aided interceptions by Google, Facebook, and other third parties of healthcare consumers' communications with Lawrence General through the Lawrence General

Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act on her own behalf and for all other Massachusetts residents who accessed the Lawrence General Website.

## PARTIES

10. Plaintiff is a resident of Burlington, Massachusetts. Plaintiff is a patient of Lawrence General. Plaintiff regularly uses the Lawrence General Website to (i) obtain information about Lawrence General doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; (iii) obtain information about Lawrence General's locations; and (iv) obtain and review her medical records through the website's patient portal.

11. Defendant Lawrence General Hospital is a corporation that operates in Lawrence, Massachusetts, and the surrounding area. Its functions include providing healthcare services including at its main campus in Lawrence, Massachusetts. Lawrence General maintains and controls the content of the Lawrence General Website.

## JURISDICTION

12. The exercise of personal jurisdiction over Lawrence General is proper according to M.G.L. c. 223 § 3 because, among other things, Lawrence General is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of Lawrence General's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### Lawrence General and Its Website

13. Lawrence General operates a hospital in Lawrence, Massachusetts, and several outpatient service locations, including in Lawrence, Andover, and Methuen. Lawrence General offers inpatient and outpatient care to residents near Lawrence and surrounding communities north of Boston. Lawrence General provides healthcare across various specialties, including heart and vascular

care, orthopedics, cancer care, post-COVID recovery, surgery, obstetrics and gynecology, and trauma care.

14. Lawrence General maintains the Lawrence General Website for its hospital and outpatient facilities, found at https://www.lawrencegeneral.org/. Through that website, healthcare consumers can obtain information about the services Lawrence General provides, including information about doctors, services, and treatments provided by Lawrence General for particular medical conditions.

15. The Lawrence General Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The Lawrence General Website provides general information about Lawrence General.

(b) The Lawrence General Website provides information about healthcare services provided at Lawrence General, communicated through service-specific pages for a range of services such as "OB/GYN," "Cancer Center," "Stroke Care," and "Surgical Services," among many others.

(c) The Lawrence General Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(d) The Lawrence General Website permits healthcare consumers to access and pay bills online.

(e) The Lawrence General Website lets healthcare consumers access their private medical information online through the Patient Portal.

16. Because the Lawrence General Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the Lawrence General Website**

17. Healthcare consumers in Massachusetts have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Lawrence General Website.

18. Users of healthcare-related websites such as the Lawrence General Website have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as Lawrence General will not share with third parties their communications with Lawrence General without their consent.

19. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Lawrence General from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E.

20. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including Lawrence General, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

21. The expectations and understanding of users of the Lawrence General Website are informed by what Lawrence General tells them about how it handles their personal information.

22. The Lawrence General Notice of Privacy Rights and Practices specifically focuses on how Lawrence General treats "medical information" about patients, including the limited circumstances in which such information may be disclosed to third parties, such as "for law enforcement" and "to coroners, medical examiners and funeral directors." Lawrence General does

not disclose that it shares any information or communications (medical or otherwise) with technology or social media companies such as Google and Facebook.

23. The same policy states: "Except as otherwise permitted by law, all other uses and disclosures not described above will require your signed authorization." At no point has Lawrence General obtained any signed authorization from Plaintiff or other Class Members to share with technology and social media companies such as Google and Facebook the communications between Plaintiff and other Class Members and Lawrence General.

24. When a person visits the Lawrence General Website, a popup appears at the bottom of the page that says: "By continuing to browse, you consent to our use of cookies. To know more, please refer to our Privacy Policy." The linked "Privacy Policy," however, is the Notice of Privacy Rights and Practices described above. That notice does not discuss cookies, and it certainly does not discuss or disclose any third-party tracking technologies such as those described in this complaint. Moreover, as described more fully below, the tracking technologies described in this complaint, such as Google Analytics and Meta Pixel, are not "cookies."

25. Disclosure of the use of "cookies" does **not** implicitly or explicitly disclose that communications are intercepted or shared with any third parties. Many cookies do not involve any interaction with parties other than the website and website user. For example, websites often use a cookie to track when a user is logged into the website. No third-party interceptions are involved in such a use of a cookie, and the communication may remain entirely between the website user and the website. Accordingly, merely disclosing the use of "cookies" does not equal disclosure of any interception of communications by any third party (i.e., a party other than the website and the website user).

26. The Lawrence General Website also contains a page called "Legal," which includes various disclosures, such as information about the copyright of the website's contents and disclosures

about Lawrence General's lack of control over the content of external websites linked from the Lawrence General Website. That "Legal" page states: "This site maintains policies concerning the use of information gathered from site visitors. For more information, please visit the Privacy Policy, via the link provided at the base of our home page." But, the Privacy Policy referenced is the Notice of Privacy Rights and Practices, which does not discuss Lawrence General's practices or policies concerning any information they collect from visitors of the Lawrence General Website.

27. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by Lawrence General's deceptive statements on the Lawrence General Website. The interceptions of website users' communications with Lawrence General were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third-Parties Offering Tracking Technologies**

28. Plaintiff describes in this complaint various tracking technologies implemented on the Lawrence General Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with Lawrence General. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Lawrence General and the purposes for which interceptions are made.

29. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

---

[2] Facebook rebranded its parent company as "Meta" in October 2021.

30. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

31. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

32. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

33. Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

34. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

35. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[3]

[3] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

36. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

37. Google maintains detailed profiles of individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such as Gmail. Google maintains detailed profiles of individuals whether or not they have a Google account.

38. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

39. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

40. Another way Google collects information to build its detailed profiles on individuals is through its "Doubleclick" "activity tags." Doubleclick was previously an independent company,

founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired Doubleclick in 2007 and now operates it as an advertising division of Google. The particular Doubleclick technology that Lawrence General uses that is important to Plaintiff's claim is called "activity tags." Activity tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like Meta Pixel, Google then associates the data collected through Doubleclick activity tags with particular individuals to serve targeted advertising on the individual and evaluate the efficacy of Google's advertising campaigns.

41. In summary, with respect to Google, although Google Analytics and Doublclick "activity tags" are distinct products with distinct purposes (Google Analytics is used to analyze website user behavior, and Doubleclick "activity tags" are used to optimize advertising), they both function in a similar manner, and they both intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and Doubleclick activity tags, and Google can and does use those intercepted communications for its own commercial purposes.

**<u>Website Tracking Technologies on the Lawrence General Website</u>**

42. Lawrence General injects hidden code into the Lawrence General Website that permits third parties to contemporaneously intercept healthcare consumers' communications with Lawrence General. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with Lawrence General with the website user's Facebook profile.

43. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Lawrence

General, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

44. Lawrence General uses or has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

45. Before describing how such technologies work, it is important to first define some basic technological terms.

46. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

47. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Lawrence General Website, as of the time of this complaint, is 35.173.24.203. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

48. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the Lawrence General Website is https://www.lawrencegeneral.org/. URLs also often point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For

example, the Lawrence General Website has a page specifically about the Lawrence General Cancer Care Center; that page's URL is https://www.lawrencegeneral.org/services-and-centers/cancer-care.

49. A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one way to associate particular communications between website users and Lawrence General with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies," each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

50. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

51. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Lawrence General) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

52. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

53. When the JavaScript code causes the user's web browser to retrieve a file from the third-party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.lawrencegeneral.org/services-and-centers/cancer-care); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

54. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google or Facebook can then add the content of the user's communications with Lawrence General to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the

content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

55. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

56. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and Lawrence General contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

57. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[4] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[5] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code

[4] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[5] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

from their websites completely or severely limited its use. Lawrence General, however, continues as of the date of this complaint to use Meta Pixel on its website without disclosing that fact to website users.

**Lawrence General's Use of Tracking Technologies on the Lawrence General Website**

58. Lawrence General uses various tracking technologies across the Lawrence General Website. Lawrence General injects several of those tracking technologies into the code of all, or almost all, of the pages within the Lawrence General Website. For example, on nearly every page of the Lawrence General Website, Lawrence General injects hidden code that loads Google Analytics. It also injects hidden Meta Pixel code onto most pages on the Lawrence General Website.

59. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

60. Below is an image of the main landing page for the Lawrence General Website:




61. When a user loads the main landing page for the Lawrence General Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

62. The image below depicts the landing page for the Lawrence General Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




63. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

× Headers Payload Preview Response Initiator Timing
▾ Query String Parameters view source view decoded
v: 1
_v: j99
a: 1119799587
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2F
ul: en-us
de: UTF-8
dt: The%20Merrimack%20Valley%27s%20Premiere%20Health%20C
are%20Provider%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1351x979
je: 0
_u: YEBAAEABAAAAACAAI~
jid: 1011789919
gjid: 1108579961
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_r: 1
_slc: 1
gtm: 45He3360n81NWGNWGJ
z: 1073209687

64. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Lawrence General Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.lawrencegeneral.org"); and

(b) The title of the webpage (after the letters "dt," which includes "The Merrimack Vallely's Premier Healthcare Provider | Lawrence General Hospital").[6]

[6] When transmitting the intercepted communications to Google, certain characters are converted into HTML coding. For example, the "%20" code in between each word in the webpage title represents a

65. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Lawrence General).

66. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Lawrence General Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with Lawrence General with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

67. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for

space, while "%7C" represents the "|" character. The use of these HTML codes does not prevent Google from using the contents of the communication for its own commercial purposes.

example, a person with a Gmail account) and an individual visiting the Lawrence General Website are the same.

68. Hidden code that Lawrence General has injected into its website also permits Google to intercept the same communication through Google's "Doubleclick" advertising tracker. The contents of the communication that Google intercepts are reflected below:


× Headers Preview Response Initiator Timing

▾ General

Request URL: https://8922500.fls.doubleclick.net/activityi;dc_pre=CMbe67Hz3P0CFXwKaAgde0oB8g;src=8922500;type=lawre0;cat=homep0;ord=9870404953282;gtm=45He33d0;auiddc=255103174.1678847352;~oref=https%3A%2F%2Fwww.lawrencegeneral.org%2F?

Request Method: GET

Status Code: 200

Remote Address: 142.251.40.102:443

Referrer Policy: strict-origin-when-cross-origin

That is, the fact that the user is visiting the main page of the Lawrence General Website is intercepted and transmitted to doubleclick.net (i.e., Google Doubleclick).

69. The same landing page for the Lawrence General Website injects hidden Meta Pixel code. Lawrence General has configured its website to load Meta Pixel as a "piggyback" on the Google Doubleclick code.[7] The hidden code Lawrence General injects into its website ultimately causes the user's browser to load a JavaScript file called "fbevents.js." That JavaScript code, in turn, causes the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Lawrence General Website. Below is an example of the

[7] *See* "Can I use Meta Pixel with my third-party tracking provider to track conversions?," available at https://www.facebook.com/business/help/421433191260652 (explaining how a website "can use the Meta Pixel with your third-party tracking provider (ex: DoubleClick)," enabling "[t]he Meta Pixel [to] piggyback and fire off of the existing [Doubleclick] pixel implementation[]").

contents of the communication between the website user and Lawrence General, which the hidden Meta Pixel code intercepts and transmits to Facebook:[8]




70. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Lawrence General Website, including the URL of the webpage visited. The interception and transmission to Facebook also included information about the user's browser configuration and

[8] Because Lawrence General has configured the Meta Pixel code to "piggyback" on Google Doubleclick, the full URL intercepted and transmitted to Facebook contains a reference to "doubleclick.net" within it, but the same interecpted communication also contains the URL of the webpage visited—www.lawrencegeneral.org.

various codes to associate the communications with Lawrence General's advertising account with Facebook.

71. Also, the JavaScript code for Meta Pixel causes the user's web browser to reveal the user's IP address to Facebook. This identifier permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can then use the contents of communications between the website user and Lawrence General to serve personalized advertising to the website user in the future.

72. Moreover, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

73. The text fields communicated to Facebook by the Meta Pixel code also include a persistent identifier for each particular user. This allows Facebook to track that individual across the Lawrence General Website and further confirm that individual's real-world identity.

74. Lawrence General configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

75. The Lawrence General Website contains numerous subpages for specific "Services and Centers." For example, the Lawrence General Website contains a page entitled "Obstetrics and Gynecology (OB/GYN)," designed to inform the website user about OB/GYN services Lawrence

General offers. By visiting this webpage, a user communicates that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicates with Lawrence General by visiting this particular webpage, Lawrence General causes the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Obstetrics and Gynecology webpage:




76. The graphic below presents the contents of the communication between the website user and Lawrence General that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that Lawrence General secretly injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator »

▾ Query String Parameters view source view decoded

v: 1
_v: j99
a: 2056702176
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fservices-and-centers%2Fservices-for-growing-families%2Fobstetrics-and-gynecology
ul: en-us
de: UTF-8
dt: Obstetrics%20and%20Gynecology%20(OB%2FGYN)%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1351x979
je: 0
_u: QACAAEABAAAAACAAI~
jid:
gjid:
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_slc: 1
gtm: 45He3360n81NJGNWG3
z: 700604266

77. As reflected in the above screenshot, the code injected into the Lawrence General Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Obstetrics and Gynecology" webpage on the Lawrence General Website—information that Google retains and can use for its own commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise.[9]

---

[9] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.

78. The same webpage contains hidden code that intercepts the user's communication with Lawrence General and transmits the same information to Facebook. The contents of the communication intercepted by Facebook when a user visits the Obstetrics and Gynecology page are depicted below:

× Headers Payload Preview Response Initiator »

▾ Query String Parameters view source view URL-encoded

id: 716870845313145
ev: PageView
dl: https://8922500.fls.doubleclick.net/activityi;dc_pre=CJnQj_z_2f0CFRQOaAgdMZYMQA;src=8922500;type=lawre0;cat=mater0;ord=3628911959698;gtm=45He3360;auiddc=2108806055.1678746487;~oref=https%3A%2F%2Fwww.lawrencegeneral.org%2Fservices-and-centers%2Fservices-for-growing-families%2Fobstetrics-and-gynecology?
rl: https://www.lawrencegeneral.org/
if: true
ts: 1678748089134
sw: 1920
sh: 1080
v: 2.9.98
r: stable
ec: 0
o: 28
cs_est: true
it: 1678748089000
coo: false
rqm: GET

As depicted above, Lawrence General aids the secret interception and transmission to Facebook of the contents of the communication between the website user and Lawrence General, including that the user is visiting an "Obstetrics and Gynecology" webpage on the Lawrence General Website, information that Facebook retains and can use for commercial purposes.

79. The Lawrence General Website contains dozens of similar pages on particular medical specialties and practices that Lawrence General offers. For each such page, the Lawrence General Website aids Google and Facebook's secret interception of the contents of communications with Lawrence General, similar to the above Obstetrics and Gynecology example.

80. The Lawrence General Website also contains pages for specific services offered by Lawrence General. By visiting such pages, a user signifies that the service may be relevant to them. For example, the Lawrence General Website has a webpage for community COVID testing, depicted below:




By visiting the page, the user signifies an interest in COVID testing, which could indicate the user or a person the user knows has been exposed to or is experiencing symptoms of COVID.

81. When a website user visits the COVID testing page of the Lawrence General Website, the hidden Google Analytics code that Lawrence General has injected into its website intercepts that communication between the user and Lawrence General and transmits it to Google. The contents of the intercepted communication are depicted below(with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 1325307446
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fabout-us%2Fcovid-19-testing
ul: en-us
de: UTF-8
dt: Lawrence%20COVID-19%20Community%20Testing%20Center%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1332x979
je: 0
_u: QACAAEABAAAAACAAI~
jid: 910759338
gjid: 838257554
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_r: 1
_slc: 1
gtm: 45He3360n81NWGNWGJ
z: 2058612001

That is, hidden Google Analytics code intercepts the fact that the user is seeking "COVID-19 Community Testing" from Lawrence General Hospital, information Google retains and uses for its own commercial purposes.

82. Hidden Meta Pixel code that Lawrence General injected onto its website likewise intercepts communications between website users and Lawrence General concerning COVID testing. The contents of the same communication intercepted by Facebook are depicted below (with highlighting added):

× Headers Payload Preview Response »

▾ Query String Parameters view source view URL-encoc

id: 716870045313145
ev: PageView
dl: https://8922500.fls.doubleclick.net/activityi;dc
re=CIOK2ZSC2v0CFUAHaAgdyokHgA;src=8922500;type=lawr
0;cat=covid0;ord=359683049914;gtm=45He3360;auiddc=2
6806055.1678746487;~oref=https%3A%2F%2Fwww.lawrence
neral.org%2Fabout-us%2Fcovid-19-testing?
rl: https://www.lawrencegeneral.org/
if: true
ts: 1678748677656
sw: 1920
sh: 1080
v: 2.9.98
r: stable
ec: 0
o: 28
cs_est: true
it: 1678748677442
coo: false
rqm: GET

That is, hidden Meta Pixel code causes the interception and transmission to Facebook of the contents of the communication that the user is seeking COVID-19 testing from Lawrence General Hospital, information Facebook retains and uses for its own commercial purposes.

83. The Lawrence General Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual

uses the search function for particular symptoms, conditions, or medical specialties offered by Lawrence General. When an individual uses the search function, Lawrence General aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "I'm pregnant."




84. When a user performs this search on the Lawrence General Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's precise search terms and transmit them to Google. Below is the portion of the communication Google Analytics code intercepts and transmits to Google (with highlighting added):

× Headers Payload Preview Response »

▾ Query String Parameters view source view decoded

v: 1
_v: j99
a: 2102699953
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fsearch-results%3Fsearchtext%3DI%2527m%2520pregnant
ul: en-us
de: UTF-8
dt: Welcome%20to%20Lawrence%20General%20Hospital%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1332x979
je: 0
_u: QACAAEABAAAAACAAI~
jid:
gjid:
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_slc: 1
gtm: 45He3360n81NMGNMGJ
z: 238244722

As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google,[10] which Google can then use for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

---

[10] The "%2527" text between the "I" and "m" of the search terms is HTML code for an apostrophe; therefore, Google understands the precise search terms are "I'm pregnant," notwithstanding the garbled appearance of the search terms in the screenshot above.

85. The Lawrence General Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. By using the "Find a Doctor" function, the user communicates to Lawrence General that the user is a current or prospective patient. The screenshot below depicts the Find A Doctor page:




86. Depicted below are the contents of the user's communication with the Lawrence General website that are intercepted and transmitted to Google via hidden Google Analytics Code, intercepting that the user is searching for a Lawrence General doctor (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 1998184276
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Ffind-a-doctor
ul: en-us
de: UTF-8
dt: Find%20a%20Doctor%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1351x979
je: 0
_u: QACAAEABAAAAACAAI~
jid: 2082247815
gjid: 1463799224
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_r: 1
_slc: 1
gtm: 45He3360n81NWGHWGJ
z: 1996879824

87. Communications on the Find-A-Doctor function are likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook can then associate the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Below is a screenshot of the contents of the communication intercepted through Meta Pixel code on the same Find-a-Doctor page (with highlighting added);

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encod

id: 716870045313145
ev: PageView
dl: https://8922500.fls.doubleclick.net/activityi;dc
re=CLy83b792f0CFaMKaAgdXnMDpQ;src=8922500;type=lawr
0;cat=finda0;ord=2406474706227;gtm=45He3360;auiddc=
88806055.1678746487;~oref=https%3A%2F%2Fwww.lawrenc
egeneral.org%2Ffind-a-doctor?
rl: https://www.lawrencegeneral.org/
if: true
ts: 1678747423506
sw: 1920
sh: 1080
v: 2.9.98
r: stable
ec: 0
o: 28
cs_est: true
it: 1678747423326
coo: false
rqm: GET

88. When a user performs a search on the Find-a-Doctor page and then views information about a particular doctor, that communication between the user and Lawrence General is intercepted and transmitted to Google via hidden Google Analytics code. For example, the page below shows a nurse practitioner at Lawrence General who appears upon a search for OB/GYN doctors:




89. The screenshot below depicts the contents of the communication between the website user and Lawrence General that are secretly intercepted by and sent to Google via hidden Google Analytics code:




That is, the fact that the user performed a find-a-doctor search and then viewed information about OB/GYN practitioner Kathleen Absalom is intercepted and transmitted to Google.

90. The Lawrence General website also contains a section permitting patients to pay bills they received from Lawrence General. The "Pay Your Bill Online" page of the Lawrence General Website is depicted below:




91. When a user visits this page, the user communicates that the user is an individual who has received medical services from Lawrence General. That communication with Lawrence General is intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication that are intercepted by and transmitted to Google are depicted below (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 1665508897
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fyour-visit%2Fbilling-and-financial-assistance%2Fpay-your-bill
ul: en-us
de: UTF-8
dt: Lawrence%20General%20Hospital%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1332x979
je: 0
_u: QACAAEABAAAAACAAI~
jid:
gjid:
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_slc: 1
gtm: 45He3360n81NWGNWG3
z: 1408482447

As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is visiting the "Billing and Financial Assistance" page and is attempting to "pay" a "bill" owed to Lawrence General Hospital. Google retains this intercepted communication and may use it for its own commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

92. In addition to Google and Facebook, Lawrence General enables or has, during the class period, enabled communications between healthcare consumers and Lawrence General to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Simpli.fi.** Simpli.fi is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Lawrence General has inserted hidden code into their website that causes communications between the user and the website to be intercepted by and transmitted to Simpli.fi. According to Simpli.fi's manuals, websites such as Lawrence General that use Simpli.fi "tags" do so by injecting hidden "snippets of HTML code" into their website that "enable Simpli.fi to record user visits to a website" and "add users to specific [advertising] audiences based on the URL(s) the users view."

(b) **Yahoo Analytics.** Yahoo Analytics is a service similar to Google Analytics. It markets itself as providing "advertising insights" based on its tracking technologies, which it uses to "recognize, associate, and collect data about visitors" to websites that inject Yahoo Analytics code. Lawrence General injected hidden Yahoo Analytics code into the Lawrence General Website during the class period. Yahoo Analytics functions similarly to Google Analytics in using hidden code to secretly intercept and transmit to Yahoo Analytics the contents of website users' communications with Lawrence General through the Lawrence General Website.

(c) **Tapad.** Tapad offers a tracking technology designed to track users across devices for advertising purposes. It uses algorithms to analyze internet and device data and predict whether two or more devices are owned by the same person. Participating websites and apps then cater their advertisements based on a collective knowledge of the user's actions across all of their devices. During the class period, Lawrence General inserted hidden Tapad tracking code that intercepted communications between website users and Lawrence General and transmitted the content of those communications to Tapad.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

93. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Lawrence General Website's operation. The Lawrence General Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

94. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example,

a website can contain links to its Facebook profile or invite website users to interact with Lawrence General via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

95. Moreover, even if Lawrence General wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Lawrence General (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that Lawrence General does not share the communications with others when it does; or (iii) to claim that Lawrence General maintains the privacy of those communications when it does not.

**Class Action Allegations**

96. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.lawrencegeneral.org within three years prior to the date of the filing of this initial complaint in this action.

97. This action is properly maintainable as a class action.

98. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

99. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Lawrence General, through the Lawrence General Website, were wire communications under the Massachusetts Wiretap Act;

(b) Whether Lawrence General inserted tracking technologies into the hidden code of the Lawrence General Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the Lawrence General Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Lawrence General and users of the Lawrence General Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Lawrence General installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Lawrence General;

(g) If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

100. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Lawrence General Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

101. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

102. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

103. Lawrence General has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

104. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

105. The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

106. An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Lawrence General, through the Lawrence General Website, were wire communications under the Massachusetts Wiretap Act.

107. The tracking technologies inserted into the hidden code of the Lawrence General Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the Lawrence General Website; (ii) Class Members' web browsers used to access the Lawrence General Website; (iii) Lawrence General's own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the Lawrence General Website.

108. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Lawrence General and users of the Lawrence General Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

109. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Lawrence General installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Lawrence General.

110. Class Members' communications between the Class Members and Lawrence General were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

111. Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Lawrence General's violation of the Massachusetts Wiretap Act for Plaintiff and each Class Member or $1,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## **Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: March 27, 2023

Respectfully submitted,

*/s/ Michelle H. Blauner*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

2

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. 23-728 | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|
| PLAINTIFF(S)<br>Jane Doe, for herself and the class | | DEFENDANT(S)<br>Lawrence General Hospital |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number<br>Michelle Blauner (BBO #549049)<br>Shapiro Haber & Urmy LLP<br>One Boston Place, Suite 2600<br>Boston, MA 02108 | | ATTORNEY (if known) |
| Origin Code Original Complaint | | |

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * ________ (B) ☑ Yes ☐ No

# BK 1 - consumer matters involving complex issues

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and the defendant, Lawrence General Hospital ("Lawrence General"). Specifically, Lawrence General aided in the interception of communications between Plaintiff and other Class Members (defined below) and Lawrence General through a website maintained by Lawrence General (the "Lawrence General Website").

Lawrence General aided Google, Facebook, and other companies to secretly intercept healthcare consumers' communications with Lawrence General by injecting hidden code into the Lawrence General Website. That hidden code enabled Google, Facebook, and other third parties to secretly listen to the contents of healthcare consumers' communications with Lawrence General. Those third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals known to Google and Facebook. Google and Facebook could then use the contents of the intercepted communication for their own commercial purposes, such as serving personalized advertisements to healthcare consumers based on the contents of the secretly intercepted communications.

Healthcare consumers' wire communications with Lawrence General were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent. Lawrence General did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with Lawrence General, nor did Lawrence General seek or obtain their consent for such interception. On the contrary, Lawrence General falsely told (and continues to tell) healthcare consumers, through their published online privacy policy, that it does not share such information.

The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." The Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party and any party that aids such an interception. Lawrence General aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the Lawrence General Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Lawrence General Website.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record /s/ Michelle H. Blauner
DATE: 3/27/2023

I HEREBY ATTEST AND CERTIFY ON January 17, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

# CIVIL ACTION COVER SHEET INSTRUCTIONS

## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

BA.1 claims relating to the governance and conduct of internal of entities
BA2. claims relating to employment agreements
BA3. claims relating to liability of shareholders, directors, officers, partners etc.

BB.1 shareholder derivative claims
BB.2 claims relating to or arising out of securities transactions

BC.1 claims involving mergers, consolidation, sales of assets, issuance of debt, equity and like interests

BD.1 claims to determine the use or status of, or claims involving, intellectual property
BD.2 claims to determine the use or status of, or claims involving, confidential, property or trade secret information
BD.3 claims to determine the use or status, or claims involving restrictive covenants

BE.1 claims involving breaches of contract or fiduciary, fraud, mis-representation business torts or other violations involving business relationships

BF.1 claims under the U.C.C. involving complex issues
BG.1 claims arising from transactions with banks, investment bankers

BH.1 claims for violation of antitrust or other trade regulation laws
BH.2 claims of unfair trade practices involving complex issues

BL.1 malpractice claims by business enterprises against professionals

BJ.1 claims by or against a business enterprise to which a government entity is a party

BK.1 other commercial claims, including insurance, construction, real estate and consumer matters involving complex issues

TRANSFER YOUR SELECTION TO THE FACE SHEET

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| | | * | |
| BD3 | Restrictive covenants | (B) | Yes No |

DUTY OF THE PLAINTIFF. The plaintiff, or plaintiff's counsel, shall set forth, in the face sheet a statement specifying in full detail the facts upon which the plaintiff then relies for "presumptive" entry into the Business Litigation Session. A copy of the civil action cover sheet shall be served on all defendants, together with the complaint.

DUTY OF THE DEFENDANT. Should the defendant contest the entry into the Business Litigation Session, the defendant shall file with the answer (or dispositive motion) a statement specifying why the action does not belong in the Business Litigation Session. Such Statement shall be served with the answer (or dispositive motion).

A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCU-RATELY MAY RESULT IN THE TRANSFER OF THIS ACTION FROM THE BUSINESS LITIGATION SESSION TO ANOTHER APPROPRIATE SESSION OF THE SUPERIOR COURT.

* A special tracking order shall be created by the presiding justice of the Business Litigation Session at the Initial Rule 16 Conference.

Date Filed 3/27/2023 10:37 AM
Superior Court - Suffolk
Docket Number

329

NOTIFY

3

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>For herself and the Class,<br><br>v.<br><br>LAWRENCE GENERAL HOSPITAL,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-0728-BLS1<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S MOTION TO PROCEED IN PSEUDONYM**

Plaintiff respectfully moves, *ex parte*, to proceed in this action under the pseudonym Jane Doe, and to permit the impoundment of her name and/or other identifying information about herself for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2.[1]

The material sought to be precluded from public disclosure (both through proceeding in pseudonym and by impoundment for future court filings) are names of Plaintiff and/or other identifying information concerning Plaintiff.[2] The impoundment is necessary because the facts of the underlying action relate directly and specifically to sensitive medical information for Plaintiff. Specifically, the claim arises from the Defendant's systematic violation of the privacy rights of healthcare consumers who accessed its website, exposing sensitive personal information to third parties without those consumers' knowledge or consent. The information revealed during this litigation may include medical conditions experienced and procedures obtained by Plaintiff.

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."
[2] This could include social media handles, IP addresses, etc.

3/28/23 ALLOWED. Plaintiff shall file a notice with the court disclosing plaintiff's true name and address. The notice shall be impounded in the interest of justice until the completion of this case or further order of the court, and plaintiff shall serve the notice on defendant with the complaint (or provide it to defense counsel if the complaint has already been served).

Therefore, to protect the medical information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect Plaintiff, as Defendant has already mishandled her personal medical information. Plaintiff recognizes that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiff's full name would have the unwelcome effect of making impoundment a more laborious, tedious, and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW her Motion for Proceed in Pseudonym, including permitting Plaintiff to refer to herself by the pseudonym "Jane Doe" in her Complaint and future court filings and to redact any documents filed in the future that contain personal identifying information for Plaintiff. Because Plaintiff files this motion at the time of the complaint filing (as directed by the Court clerk) and before service, Plaintiff agrees that any order will be subject to modification for good cause upon motion by any party.

Dated: March 27, 2023

Respectfully submitted,

*/s/ Michelle H. Blauner*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

4

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>For herself and the Class,<br><br>v.<br><br>LAWRENCE GENERAL HOSPITAL,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-728<br><br>**JURY TRIAL DEMANDED** |

**AFFIDAVIT OF ATTORNEY MICHELLE H. BLAUNER IN SUPPORT OF PLAINTIFF'S MOTION TO PROCEED IN PSEUDONYM**

I, Michelle H. Blauner, hereby state and depose:

1. I am counsel for the Plaintiff in the above-captioned case.
2. Plaintiff is an individual, the identity of whom is known to me and my firm.
3. The allegations in Plaintiff's Complaint in this action, to the extent they relate to Plaintiff, reflect information Plaintiff has provided to my firm to prosecute this action.
4. The claims Plaintiff asserts relate to personal information that Defendants inappropriately assisted third parties to intercept. That personal information is highly sensitive, personal, and confidential.
5. To protect the privacy interests of the Plaintiff, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout this litigation.
6. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery while protecting the legitimate privacy interests of Plaintiff.

Signed under the pains and penalties of perjury this 27th day of March 2023.

*/s/ Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

\3|29

NOTIFY

5

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: **2384CV00728-BLS1**

Case: Doe v. Lawrence General Hospital

**NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION**

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS1**.

Hereafter, as shown above, all parties must include the initials **"BLS1"** at the end of the docket number on all filings.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the appropriate BLS Session Clerk at Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel. Before the Rule 16 Conference, counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Project on Discovery (counsel are directed to www.mass.gov/superior-court-business-litigation-session for description of the Project). Counsel may indicate their respective client's participation by completing, filing, and serving the attached form. If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated: March 27, 2023

/s/ Kenneth W. Salinger

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ____________________

Case: ________________________________________

As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) **Yes,** ______________ is willing to participate in the Discovery Project.
(Party's Name)

Case Name ________________________________________

Docket Number CIVIL DOCKET#: __________________________

Counsel For ____________________ Date ______________

Firm Name and Address:

______________________________

______________________________

______________________________

Please complete this form and return it to:

Assistant Clerk - BLS1
BLS1, Room 1309
3 Pemberton Square
Boston, MA 02108

**OR**

Assistant Clerk - BLS2
BLS2, Room 1017
3 Pemberton Square
Boston, MA 02108

6

| Summons | CIVIL DOCKET NO. 2384CV00728 - BLS1 | Trial Court of Massachusetts The Superior Court |
| --- | --- | --- |
| CASE NAME: JANE DOE, For herself and the Class, Plaintiff(s) vs. LAWRENCE GENERAL HOSPITAL Defendant(s) | | Michael Joseph Donovan, Clerk of Courts; Suffolk County; COURT NAME & ADDRESS: SUPERIOR CIVIL COURT, SUFFOLK COUNTY COURTHOUSE, THREE PEMBERTON SQ. 12th Floor, BOSTON, MASSACHUSETTS 02108 |

THIS SUMMONS IS DIRECTED TO LAWRENCE GENERAL HOSPITAL (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court and mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Court (address), by mail or in person **AND**

b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

4. **Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. **Required Information on All Filings:**

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the

**Essex County Sheriff's Department, PO BOX 2019, Salem, MA 01970**

April 10, 2023

I hereby certify and return that on 4/7/2023 at 1:10 PM I served a true and attested copy of the summons, complaint with jury trial demanded, Plaintiff's Motion to Proceed in Pseudonym, Notice of Acceptance into Business Litigation Session, Affidavit of Attorney Michelle H. Blauner in support of Plaintiff's Motion to Proceed in Pseudonym, Plaintiff's Motion to Proceed in Pseudonym, Impounded Notice of Plaintiff's True Identity, in this action in the following manner: To wit, by delivering in hand to Ken Consoli, Human Resource Rep. . , person in charge at the time of service for Lawrence General Hospital, 1 General Street Lawrence, MA 01841 . Attestation fee ($5.00) Basic Service Fee ($30.00) Conveyance ($1.50) Postage and Handling ($1.00) Travel ($12.80) Total: $50.30

Paul Armitage

Deputy Sheriff Paul Armitage

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret Buckley
Asst. Clerk

Date Filed 5/2/2023 1:08 PM
Superior Court - Suffolk
Docket Number 2384CV00728

ML
5/9

05.09

7

NOTIFY

Notice sent (2)
5/11/2023
(sc)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV00728-BLS1

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendants.

5/8/23 ALLOWED. Defendant shall answer or otherwise respond to the Complaint by 5/31/23.

## ASSENTED-TO MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S COMPLAINT

Defendant Lawrence General Hospital files this Assented-To Motion for an Extension of Time to Respond to Plaintiff's Complaint. In support of this Motion, Lawrence General Hospital states:

1. Plaintiff filed her Complaint on March 27, 2023.
2. Plaintiff served her Complaint on Lawrence General Hospital on April 7, 2023.
3. Granting Lawrence General Hospital the requested extension of time will allow the Parties to resolve this issue without Court intervention.
4. Good cause exists for the requested extension. The extension of time will not prejudice any party or the Court, nor will it unduly delay resolution of this matter.
5. Lawrence General Hospital's counsel has conferred with Plaintiff's counsel who does not oppose the requested five-week extension of time.

DOCKET NO. 2384CV00411

For the foregoing reasons, Lawrence General Hospital respectfully requests that the Court grant a five-week extension of time up to and including May 31, 2023 for Lawrence General Hospital to respond to Plaintiff's Complaint.

DATED: May 2, 2023

Respectfully submitted,

*/s/ Alan Y. Wong*
Alan Y. Wong (BBO# 687618)
awong@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal St., Ste. 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

***Attorney for Lawrence General Hospital***

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

DOCKET NO. 2384CV00411

**RULE 9C CERTIFICATION**

On May 1 and May 2, 2023 counsel for Lawrence General Hospital communicated with counsel for Plaintiff in a good faith effort to narrow the areas of disagreement regarding this motion. Plaintiff does not oppose the relief requested in this motion.

*/s/ Alan Y. Wong*
Alan Y. Wong

**CERTIFICATE OF SERVICE**

I, Alan Y. Wong, hereby certify that on May 2, 2023, a true and accurate copy of the foregoing document was served electronically, by agreement, upon all counsel of record in the above-captioned matter.

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Alan Y. Wong*
Alan Y. Wong (BBO# 687618)

Date Filed 5/18/2023 4:36 PM
Superior Court - Suffolk
Docket Number 2384CV00728

ML 5/25 05.23 NOTIFY NOTICE SENT (1) 05.25.23 (JO) 8

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV00728–BLS1

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**SECOND ASSENTED-TO MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S COMPLAINT**

Defendant Lawrence General Hospital files this Assented-To Motion for an Extension of Time to Respond to Plaintiff's Complaint. In support of this Motion, Lawrence General Hospital states:

1. Plaintiff filed her Complaint on March 27, 2023.
2. Plaintiff served her Complaint on Lawrence General Hospital on April 7, 2023.
3. On May 11, 2023, the Court granted Lawrence General Hospital's First Assented-To Motion for an Extension of Time, which extended Lawrence General Hospital's responsive pleading deadline to May 31, 2023.
4. Granting Lawrence General Hospital's second requested extension of time will allow Lawrence General Hospital to fully investigate and respond to Plaintiff's claims.
5. Good cause exists for the requested extension. The extension of time will not prejudice Plaintiff or the Court, and will not unduly delay resolution of this matter.

5/22/23 ALLOWED

6. Pursuant to Superior Court Rule 9C, Lawrence General Hospital's counsel conferred with Plaintiff's counsel on May 17, 2023. Plaintiff does not oppose the requested 10-day extension of time.

WHEREFORE, Lawrence General Hospital respectfully requests that its responsive pleading deadline be extended until June 12, 2023.

Dated: May 18, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

*/s/Emyr T. Remy*

Emyr T. Remy, BBO# 704156
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
remy@shb.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Asst. Clerk

DOCKET NO. 2384CV00728–BLS1

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/Emyr T. Remy*
Emyr T. Remy

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

\ 7/11

NOTIFY

9

ec

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

7/12/23
Notice sent
BA (2)

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>v.<br>LAWRENCE GENERAL HOSPITAL,<br>Defendant. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION<br>CIVIL ACTION NO. ~~2834-CV-00728~~-BLS1 2384CV00728<br>JURY TRIAL DEMANDED |

JOINT MOTION TO SET BRIEFING SCHEDULE ON MOTION TO DISMISS

Plaintiff Jane Doe ("Plaintiff") and defendant Lawrence General Hospital ("Lawrence General," and together with Plaintiff, the "Parties"), jointly move to set a briefing schedule on Lawrence General's motion to dismiss, requiring that Plaintiff serve an opposition to the motion to dismiss by July 12, 2023, and Lawrence General serve a reply and file all motion papers pursuant to Mass. Super. Ct. R. 9A by August 8, 2023. In support of this motion, the Parties state as follows:

1. Plaintiff filed her Complaint in this case on March 27, 2023. The Complaint was served on Lawrence General on April 7, 2023. After service, the parties agreed to extend the deadline for Lawrence General to respond to the Complaint to May 31, 2023, and then later to June 12, 2023. Lawrence General served upon Plaintiff its motion to dismiss on June 12, 2023.

2. The Parties have conferred and agreed to the proposed briefing schedule to provide the Parties' adequate time to prepare briefs on the issues raised in Lawrence General's motion to dismiss and to accommodate preexisting personal and professional commitments of the Parties and their counsel.

3. Good case exists for the requested briefing schedule, which extends the time for the Parties to serve and file further briefs on Lawrence General's motion.

7-10-23 ALLOWED. H. Kazanjian J.

For the foregoing reasons, the Parties respectfully request that the Court approve the Parties' proposed briefing schedule for Lawrence General's motion to dismiss, under which Plaintiff will serve an opposition to the motion to dismiss no later than July 12, 2023, and Lawrence will serve a reply and file all motion papers no later than August 8, 2023.

Respectfully submitted,

*/s/ Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

*/s/ Emyr T. Remy*
SHOOK, HARDY & BACON L.L.P.
Emyr T. Remy (BBO# 704156)
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
remy@shb.com

*Counsel for Defendant*

Dated: June 21, 2023

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Defendant's counsel, by email, on June 21, 2023

*/s/ Michelle H. Blauner*
Michelle H. Blauner

Date Filed 6/30/2023 10:02 AM
Superior Court - Suffolk
Docket Number 2384CV00728

NOTIFY

10

7-26-23 DENIED. H. Karanjian, J.

COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>v.<br>LAWRENCE GENERAL HOSPITAL,<br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br>CIVIL ACTION NO. ~~2384~~ 23 CV-00728-BLS1<br>**JURY TRIAL DEMANDED** |

**JOINT MOTION REGARDING PAGE LIMITS**
**FOR OPPOSITION AND REPLY ON MOTION TO DISMISS**

Plaintiff Jane Doe ("Plaintiff") and defendant Lawrence General Hospital ("Lawrence General," and together with Plaintiff, the "Parties"), jointly move pursuant to Mass. Super. Ct. R. 9A(a)(6) to extend the page limits for Plaintiff's opposition to and Lawrence General's reply in support of Lawrence General's motion to dismiss, permitting Plaintiff to file an opposition not to exceed twenty-five (25) pages and Lawrence General to file a reply not to exceed ten (10) pages. In support of this motion, the Parties state as follows:

1. Plaintiff filed her Complaint in this case on March 27, 2023. After service, Lawrence General served upon Plaintiff its motion to dismiss on June 12, 2023. The Parties have agreed that Plaintiff will oppose the motion to dismiss by July 12, 2023, and Lawrence General will serve a reply and file all motion papers by August 8, 2023.

2. Lawrence General's motion, supported by a twenty-page memorandum of law, raises legal issues that Plaintiff believes require legal analysis that may exceed the default 20-page limit for an opposition to a motion. Plaintiff believes the Court will benefit from Plaintiff's analysis presented in a modestly overlength brief not to exceed twenty-five (25) pages.

3. The Parties have agreed that Lawrence General may have up to ten (10) pages on its reply on its motion to dismiss to respond to Plaintiff's forthcoming opposition.

For the foregoing reasons, the Parties respectfully request that the Court approve the Parties' proposed brief lengths for the opposition to and reply in support of Lawrence General's motion to dismiss, under which Plaintiff may file an opposition not to exceed twenty-five (25) pages, and Lawrence General may file a reply not to exceed ten (10) pages.

Respectfully submitted,

*Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

*Emyr T. Remy*
SHOOK, HARDY & BACON L.L.P.
Emyr T. Remy (BBO# 704156)
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
remy@shb.com

*Counsel for Defendant*

Dated: June 30, 2023

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Defendant's counsel, by email, on June 30, 2023

*Michelle H. Blauner*
Michelle H. Blauner

SL

11

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**DEFENDANT THE LAWRENCE GENERAL HOSPITAL'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendant Lawrence General Hospital moves pursuant to Massachusetts Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. As explained in Lawrence General's supporting memorandum of law, Plaintiff's Complaint should be dismissed for at least six reasons:

1. Plaintiff does not allege that an interception took place ***in Massachusetts***;

2. Plaintiff fails to allege that a communication was ***heard*** or ***recorded***;

3. Plaintiff fails to allege that Lawrence General ***secretly*** obtained any information;

4. Plaintiff fails to allege that Lawrence General intercepted the substantive ***contents*** of any communication;

5. Plaintiff fails to allege the use of an ***intercepting device***; and

6. Plaintiff does not allege any ***oral or wire communication*** involving Lawrence General.

For these reasons, and as discussed in its supporting memorandum of law, Lawrence General requests that this Court grant its Motion to Dismiss.

Dated: June 12, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

*/s/Emyr T. Remy*
Emyr T. Remy, BBO# 704156
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411
remy@shb.com

Tammy B. Webb (*pro hac vice* forthcoming)
Patrick J. Gregory (*pro hac vice* forthcoming)
tbwebb@shb.com
pgregory@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900

Anna A. El-Zein (*pro hac vice* forthcoming)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
aelzein@shb.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/Emyr T. Remy*
Emyr T. Remy

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**MEMORANDUM IN SUPPORT OF DEFENDANT LAWRENCE GENERAL HOSPITAL'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ........ 1
BACKGROUND ........ 3
I. Plaintiff's Allegations. ........ 3
II. Meta Pixel. ........ 4
III. Google Analytics. ........ 6
IV. Plaintiff's Consent to Meta's and Google's Terms ........ 6
LEGAL STANDARD ........ 7
ARGUMENT ........ 8
I. Plaintiff Does Not Allege An "Interception" Took Place In Massachusetts. ........ 8
II. Plaintiff Does Not Allege An "Interception." ........ 9
A. Plaintiff does not allege an "interception" at all. ........ 10
B. No communication was "heard or recorded." ........ 11
C. Any alleged interception was not done "secretly." ........ 12
D. There was no interception of "contents." ........ 13
E. There was no interception by a "device." ........ 15
III. Plaintiff Does Not Allege An "Oral" or "Wire" Communication. ........ 17
CONCLUSION ........ 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 7

*Cardigan Mountain Sch. v. New Hampshire Ins. Co.*,
787 F.3d 82 (1st Cir. 2015) ..... 9

*Cardoso v. Whirlpool Corp.*,
2021 WL 2820822 (S.D. Fla. July 6, 2021) ..... 16

*Christensen v. Cox*,
2017 WL 7053911 (Mass. Super. Nov. 21, 2017) ..... 8

*Com. v. Moody*,
466 Mass. 196 (2013) ..... 12, 18

*Commonwealth v. Alleyne*,
23 Mass. ..... 20

*Commonwealth v. Connolly*,
454 Mass. 808 (2009) ..... 20

*Commonwealth v. Fitzpatrick*,
24 Mass. ..... 1, 10, 11

*Commonwealth v. Narvaez*,
490 Mass. 807 (2022) ..... 5

*Commonwealth v. Rainey*,
491 Mass. 632 (2023) ..... 13, 19

*Connor v. Whirlpool Corp.*,
2021 WL 3076477 (S.D. Fla. July 6, 2021) ..... 16

*Curtatone v. Barstool Sports, Inc.*,
487 Mass. 655 (2021) ..... 12

*Dillon v. Mass. Bay Transit Authority*,
49 Mass. App. Ct. 309 (2000) ..... 19

*Edwards v. Commonwealth*,
477 Mass. 254 (2017) .......... 7

*Glovsky v. Roche Bros. Supermarkets, Inc.*,
469 Mass. 752 (2014) .......... 7

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) .......... 14, 15

*Hill v. MCI WorldCom Commc'ns, Inc.*,
120 F. Supp. 2d 1194 (S.D. Iowa 2000) .......... 15

*Jacome v. Spirit Airlines*,
2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021) .......... 16

*Larrison v. Larrison*,
750 A.2d 895 (Pa. Super. Ct. 2000) .......... 8

*Lipsitt v. Plaud*,
466 Mass. 240 (2013) .......... 7

*MacNeill Eng'g Co. v. Trisport, Ltd.*,
59 F. Supp. 2d 199 (D. Mass. 1999) .......... 8

*Marquis v. Google, Inc.*,
2014 WL 4180400 (Mass. Jul. 27, 2014) .......... 12

*Pendell v. AMS/Oil, Inc.*,
1986 WL 5286 (D. Mass. Apr. 30, 1986) .......... 8

*Penobscot Nation v. Frey*,
3 F.4th 484 (1st Cir. 2021) .......... 18

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) .......... 8, 9

*Potter v. Havlicek*,
2008 WL 2556723 (S.D. Ohio June 23, 2008) .......... 16

*Project Veritas Action Fund v. Conley*,
244 F. Supp. 3d 256 (D. Mass. 2017), *aff'd sub nom. Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020) .......... 19

*Rich v. Rich*,
28 Mass. L. Rep. 553, 2011 WL 3672059 (Mass. Super. Ct., July 8, 2011) .......... 20

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......... 13

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
903 F. Supp. 2d 942 (S.D. Cal. 2012) ....................16

*State v. Fowler*,
157 Wash. 2d 387 (2006) (en banc) ....................9

*United States v. Ackies*,
918 F.3d 190 (1st Cir. 2019) ....................16

*Warrington v. Warrington*,
560 F. Supp. 3d 551 (D.N.H. 2021) ....................9

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ....................14

**Statutes**

18 U.S.C. § 2510 ....................14

Ballentine's Law Dictionary ....................15, 19

Mass. Gen. Laws ch. 272, § 99 ....................1

Mass. Gen. Laws ch. 272, § 99(A) ....................19

Mass. Gen. Laws ch. 272, § 99(B)(2) ....................18

Mass. Gen. Laws ch. 272, § 99(B)(3) ....................15

Mass. Gen. Laws ch. 272, § 99(B)(4) ....................9, 11, 12, 13

Mass. Gen. Laws ch. 272, § 99(B)(5) ....................13

Mass. Gen. Laws ch. 272, § 99(C)(3) ....................10

Mass. Gen. Laws ch. 272, § 99(Q) ....................17

## INTRODUCTION

Defendant Lawrence General Hospital moves pursuant to Rule 12(b)(6) to dismiss this case for failure to state a claim. Plaintiff filed this putative class action against Lawrence General for an alleged interception of internet communications. Plaintiff alleges that when she visited Lawrence General's website, a Meta[1] Pixel and Google Analytics technology embedded in Lawrence General's website assisted Meta and/or Google in recording her web-browsing activity without her consent. *See* Compl. ¶¶ 1, 2. Plaintiff asserts a single cause of action—breach of the Massachusetts Wiretap Statute, Mass. Gen. Laws ch. 272, § 99 (the "Wiretap Act"). Her novel attempt to invoke the Wiretap Act fails for multiple reasons.

First, as a threshold issue, Plaintiff does not allege that a Wiretap Act violation occurred **in Massachusetts**. Where, as here, the alleged "interception" occurred on a website, other courts have held that the place of interception is where the information was routed to the third-party's servers. Here, Plaintiff alleges that Facebook and Google intercepted her information, but she does not allege where Facebook's or Google's servers are. Without more, Plaintiff has not alleged where the actual violation allegedly occurred. Her claim fails for this reason alone.

Second, Plaintiff fails to allege an "interception" took place for a variety of reasons. As an initial matter, she does not allege an "**interception**" at all. The Superior Court of Massachusetts has recognized that the term "interception" means "the act or instance of receiving electronic transmissions *before they reach the intended recipient*" and does not extend "to a later dissemination of a previously intercepted and recorded statement." *Commonwealth v. Fitzpatrick*, 24 Mass. L. Rept. 132, 2008 WL 2357239, *6 (Mass. Super. June 2, 2008). But that's exactly what

[1] Meta, formerly known as The Facebook Company, is the developer and proprietor of the Facebook social media application. Complaint ¶ 31.

Plaintiff alleges here: that she voluntarily "communicated" with Lawrence General's website, and then that communication was passed along to someone else. That is not an "interception."

Next, she does not allege an "interception" because she fails to allege that any communications were "**heard**" or "**recorded**" as required by the Wiretap Act. Plaintiff does not allege that anything was "heard" because her interactions with the website were not audible. And Plaintiff's website interactions were not "recorded" because—under that term's ordinary meaning—the information allegedly disclosed to Facebook and Google does not "reproduce" her interaction with the website. As is evident throughout the Complaint, Plaintiff's attempt to shoehorn her allegations into a Wiretap Act claim falls flat.

Plaintiff also fails to allege an "interception" because Lawrence General's alleged conduct was not done "**secretly**." Courts have held that something done in "secret" necessarily implies concealment. But here, Plaintiff consented to Facebook and Google receiving her web-browsing activity when she assumedly signed up for accounts with those entities. The fact that Plaintiff did not read Facebook or Google's policies does not save her.

Plaintiff further fails to allege an "interception" because Lawrence General did not disclose any communication "**contents**." Not only does Plaintiff fail to allege that Lawrence General disclosed to Facebook and/or Google any of her own specific information, she also fails to allege that the information potentially disclosed qualifies as "content" in the first place. As numerous courts have held when considering the analogous Federal Wiretap Statute, "contents" only includes the "substance, purport, or meaning" of a communication; it does not include "extrinsic information used to route a communication," like Plaintiff alleges here.

Finally, Plaintiff fails to allege an "interception" because she does not allege that any interceptions took place through a "**device**." Plaintiff primarily claims that pixel technology is the

device that apparently intercepted her communications. But software—which is all that pixel technology is—does not qualify as a "device." Under that term's ordinary meaning, a device must be *tangible*. Numerous courts have dismissed similar wiretap claims for this reason. This Court should do the same.

Third, Plaintiff does not allege that an "**oral or wire communication**" was intercepted. The Complaint does not suggest that any "oral" communication is at issue, and Plaintiff's conclusory allegation of a "wire" communication does not withstand even the most generous scrutiny. Plaintiff broadly claims that any interactions she had with Lawrence General's website qualify as "wire" communications. But at the time of the Wiretap Act's enactment, a "wire" communication did not contemplate website interactions; that term instead related exclusively to conversations between humans. Indeed, not a single Massachusetts court has authorized a Wiretap Act claim outside of that context. Because Plaintiff's allegations do not relate to a traditional conversation between individuals, her claim fails.

Plaintiff's Complaint should be dismissed.

## BACKGROUND

### I. Plaintiff's Allegations.

Lawrence General is a healthcare system in Lawrence, Massachusetts. *See* Compl. ¶ 11. It maintains a website, www.lawrencegeneral.org. *See id.* ¶ 14. Anyone who visits Lawrence General's website has access to information about the services Lawrence General provides, including "information about doctors, services, and treatments provided by Lawrence General for

particular medical conditions." *Id.* The website also hosts Lawrence General's patient portal, which provides patients secure access to parts of their medical information. *See id.* ¶ 15.

Plaintiff alleges that Lawrence General implemented various advertising technology on its public facing website, including Google Analytics and the Meta Pixel. *See id.* ¶¶ 28–41. According to Plaintiff, when an individual visits the website, information about that individual's interaction with the website is sent to Google and/or Facebook. This information includes URLs of webpages visited, the title of any webpage visited, information about the individual's browser type (such as "screen resolution, device information, and browser settings"), an unidentified "identifier for the particular user visiting the website," and "codes to associate the [interaction] with Lawrence General's" Facebook or Google account. *Id.* ¶¶ 64, 65 70.

Plaintiff alleges that she "regularly uses the Lawrence General website to (i) obtain information about Lawrence General doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; (iii) obtain information about Lawrence General's locations; and (iv) obtain and review her medical records through the website's patient portal." *Id.* ¶ 10. Plaintiff does not allege when she last visited the website, or any information related to her specific interactions with the website. Instead, Plaintiff offers numerous hypothetical examples of website interactions a visitor *could* have with Lawrence General's website. *See id.* ¶¶ 58–95. In fact, Plaintiff acknowledges in her Complaint that all the alleged "interceptions" in the Complaint examples presented below "do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes." *Id.* ¶ 74.

**II. Meta Pixel.**

Advertising technologies have long been an ordinary, ubiquitous part of internet commerce. One kind of advertising technology is a pixel, which website owners use to gather

information about visitors' interactions with their websites. This technology allows website operators to improve their websites' effectiveness by using analytics, reach target audiences, and hone marketing efforts. Separately, entities like Meta often use pixel data in conjunction with cookies—small pieces of text—to gather information about their users' browsing histories.

Here's how the Meta Pixel works: many Internet users have a Facebook account. By signing up for Facebook, a user gives Meta permission to place cookies on their browser, and those cookies contain information—like the user's Facebook ID—that allows Facebook to identify the user. *See* Compl. ¶¶ 49. Facebook installs the cookie (also referred to as a "third-party cookie") on the user's browser to understand how the user interacts with other websites. This process is not controlled by, nor does it involve Lawrence General or its use of pixel technology. *See id.*

Meanwhile, the website owner incorporates code (a "tag" or "pixel") in its website that gathers information about a visitor's interaction with the website. *See id.* ¶¶ 51–54. That information, standing alone, is anonymous. It shows only that some device visited a particular webpage, or entered a particular search in the website's search bar. *See id.* The pixel sends this anonymous information from the website to the visitor's browser. *See id.* The user's browser then sends two distinct pieces of information to Facebook: (1) the anonymous website activity generated by the pixel, and (2) the information stored in the Facebook cookie installed on the user's browser. *See id.*

In other words, the only potentially identifying information sent to Facebook (the Facebook ID) is placed in the cookie by Facebook (not Lawrence General) based on the user's consent to have those cookies installed on their browser. Lawrence General never possesses—or is able to possess—the information contained in third-party cookies. And there is no direct communication between Lawrence General and Facebook; all information flows through the visitor's personal

browser. *See id.* Facebook then combines the two pieces of data to identify who visited a particular webpage and potentially offer targeted advertising to the user on Facebook. *See id.*

Notably, throughout this process, the user retains full control over both her Facebook privacy settings (such as turning off or limiting sharing information with Facebook) and her personal browser and cookie retention settings (such as blocking or deleting cookies).

## III. Google Analytics.

Google Analytics is another type of advertising technology website owners and operators frequently use to provide insights into their business. Google Analytics is not a pixel, but instead is a platform to monitor business activity. *See id.* ¶ 39. Here is how Google Analytics works: to use Google Analytics, the website owner adds a small piece of code to the pages of the website that the website owner wishes to collect data about. *See id.* ¶¶ 40, 51. Every time a user visits a webpage, the tracking code will collect anonymous information about how that user interacted with the page. *See id.* ¶ 39. The code can show how many users visited one page versus another, how many purchased a certain product, etc. Unlike the Meta Pixel, Google Analytics does not use cookies that contain information to identify a specific user.

## IV. Plaintiff's Consent to Meta's and Google's Terms.

The fact that Facebook and/or Google collects information regarding Plaintiff's browsing activities—including from third-party websites—should not come as a surprise. Facebook users consent to the transmission and use of data sent to Facebook and Meta via the Meta pixel. When they sign up for Facebook, they agree to Facebook's policies. As Facebook's policies explain, Facebook collects data about Plaintiff's browsing activities across the Internet—known as "off-Facebook activity"—through cookies and tools like the Meta Pixel, including information about the websites they visit and the content they interact with. Facebook tracks this information to help

personalize and improve content and services, provide a safer experience and to show you useful and relevant ads on and off Meta Products. Facebook also gives its account holders the ability to stop Facebook from tracking their off-Facebook activity. *See* Ex. A-1 (Meta's Cookies Policy). *See* Ex. A-2 ("Off-Facebook Activity: Control your information"); *see also* Ex. A-3 (Facebook Help Center: "How do I manage my future off-Facebook activity"). Plaintiff also has control over whether her browser retains cookies. *See id.*

Similarly, users should not be surprised that Google obtains similar data and information. When users sign up to use Google's services, they are subject to Google's privacy policies. As Google's policies explain, Google collects information to provide better services for users through cookies and Google Analytics. *See* Google Privacy & Terms, available at https://policies.google.com/privacy?hl=en-US.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) challenge, a complaint must "plausibly suggest an entitlement to relief, raising the right to relief above the speculative level." *Glovsky v. Roche Bros. Supermarkets, Inc.*, 469 Mass. 752, 754 (2014) (cleaned up). The pleading "must contain allegations plausibly suggesting (not merely consistent with) an entitlement to relief." *Lipsitt v. Plaud*, 466 Mass. 240, 252 (2013) (cleaned up). "[A] formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Nor will "legal conclusions cast in the form of factual allegations." *Edwards v. Commonwealth*, 477 Mass. 254, 260 (2017) (quotation marks omitted).

## ARGUMENT

### I. Plaintiff Does Not Allege An "Interception" Took Place In Massachusetts.

As a preliminary matter, Plaintiff fails to allege that a Wiretap Act violation occurred in Massachusetts. The Wiretap Act does not extend to conduct that takes place outside of Massachusetts' borders. *See Christensen v. Cox*, 2017 WL 7053911, at *7 (Mass. Super. Nov. 21, 2017) ("[N]othing in the wiretap statute suggests any intention to regulate conduct outside the bounds of the Commonwealth.") (citing *Commonwealth v. Maccini*, 22 Mass. L. Rptr. 393, 2007 WL 1203560, *2 (Mass. Super. Ct. Apr. 23, 2007)).

Here, because Plaintiff alleges an "interception" occurred on a website, the "place of interception is the point at which the signals were routed to [a third party's] servers." *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 132 (3d Cir. 2022). But Plaintiff does not allege where her information was allegedly routed to Facebook's or Google's servers. In fact, Plaintiff does not allege the location of any of the servers potentially involved in this case—Lawrence General's, Facebook's, or Google's. This fundamental deficiency is fatal.

As numerous courts have held, "secretly recording a conversation outside Massachusetts does not give rise to liability under [the Wiretap Act]," and this is true "even if the call originated within Massachusetts." *MacNeill Eng'g Co. v. Trisport, Ltd.*, 59 F. Supp. 2d 199, 202 (D. Mass. 1999); *see also Pendell v. AMS/Oil, Inc.*, 1986 WL 5286, at *3–5 (D. Mass. Apr. 30, 1986) (recognizing that the Wiretap Act is "inapplicable to . . . conduct which occur[s] outside Massachusetts."). Other jurisdictions have interpreted similar state wiretap statutes in the same way. *See Larrison v. Larrison*, 750 A.2d 895, 898 (Pa. Super. Ct. 2000) (not "extend[ing] [Pennsylvania's Wiretapping and Electronic Surveillance Control Act] to cover conduct occurring wholly outside the Commonwealth"); *Popa*, 52 F.4th at 132 (explaining that because the Commonwealth can only control the activities that occur within its borders, it must look to the

place of interception); *Warrington v. Warrington*, 560 F. Supp. 3d 551, 554 (D.N.H. 2021) (collecting cases and recognizing that "an interception occurs in the place where the party intercepting the communication is located" and that this holding "accords with the weight of authority interpreting other states' similar electronic surveillance statutes."); *State v. Fowler*, 157 Wash. 2d 387 (2006) (en banc) ("[T]he test for whether a recording of a conversation or communication is lawful is determined under the laws of the place of recording.").

Thus, even if Plaintiff accessed Lawrence General's website in Massachusetts—which she does not allege—she fails to state a claim because she does not allege where the actual "interception" took place. Although the Court must accept Plaintiff's factual allegations as true, the Court cannot accept facts where none are alleged. *See, e.g.*, *Cardigan Mountain Sch. v. New Hampshire Ins. Co.*, 787 F.3d 82, 86 (1st Cir. 2015) (recognizing "conclusory statements" are "not entitled to the assumption of truth.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Plaintiff's claim under the Wiretap Act should be dismissed for this reason alone.

## II. Plaintiff Does Not Allege An "Interception."

The Wiretap Act defines "interception" as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person[.]" Mass. Gen. Laws ch. 272, § 99(B)(4). Plaintiff fails to allege an "interception" for at least five reasons. First, she does not allege an actual "interception;" at best, she alleges a series of voluntary communications, which is not enough to sustain her claim. Second, she does not allege that a communication was "heard" or "recorded." Third, she fails to allege that any interception was done "secretly." Fourth, she does not allege that the "contents" of any communications were disclosed. And fifth, she fails to allege that any interception was done by a "device." Plaintiff's claim should be dismissed.

### A. Plaintiff does not allege an "interception" at all.

Plaintiff fails to allege an "interception" by Lawrence General (or anyone else, for that matter). In "its plain-English usage," the term "interception" means "the act or instance of receiving electronic transmissions *before they reach the intended recipient*." *Commonwealth v. Fitzpatrick*, 24 Mass. L. Rept. 132, 2008 WL 2357239, *6, *aff'd*, 463 Mass. 581, 977 N.E.2d 505 (2012) (emphasis by the court) (dismissing Wiretap Act claim for failing to allege an "interception") (citing Oxford American College Dictionary (2002)). "Nothing in the wording of the statute . . . suggests that the term 'interception' extends to a later dissemination of a previously intercepted and recorded statement." *Id.* But that is exactly what Plaintiff alleges happened here. Plaintiff claims that she voluntarily interacted with Lawrence General's website—and this so-called "communication" was later disclosed, by her own browser, to a third-party. *See, e.g.*, Compl. ¶¶ 51–53 (the "tracking technologies described in this complaint" cause the "user's web browser" to "communicate certain information to the third-party website").

This is not an interception. As the Court in *Fitzpatrick* recognized, "[j]ust as in football, an 'interception' is a single, momentary act. A subsequent handoff is not a second interception." *Fitzpatrick*, 2008 WL 2357239, at *6. Plaintiff alleges only that the tracking technologies used by Lawrence General caused "handoffs." Again, she voluntarily "communicated" with Lawrence General's website. She then alleges that information was "passed" to her own browser. *See* Compl. ¶¶ 51–54. And that information was then allegedly "passed" to Facebook or Google. *Id.* She does not allege an "interception," by anyone. And while the Wiretap Act prohibits certain types of disclosures, it only does so where that person "kn[ew] that the information was obtained through interception[.]" Mass. Gen. Laws ch. 272, § 99(C)(3). Here, there was no "interception" at all, let

alone one that Lawrence General *knew* about. Plaintiff's conclusory allegations of a "disclosure" are not enough to sustain her claim either. *See* Compl. ¶¶ 19, 108.

At bottom, Plaintiff simply does not allege that any communication was "intercepted." At best, she alleges a series of handoffs, which does not create liability under the Wiretap Act. *Fitzpatrick*, 2008 WL 2357239, at *6. Her claim must be dismissed.

### B. No communication was "heard or recorded."

To allege an "interception," a communication must be "hear[d]" or "record[ed]." Mass. Gen. Laws ch. 272, § 99(B)(4). Plaintiff alleges that "Lawrence General installed an intercepting device on [its] website with the intent to aid Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Lawrence General." Compl. ¶ 109. But Plaintiff's interaction with Lawrence General's public website cannot be "heard" because it is not an audible interaction. Plaintiff's interaction with the website is not "recorded" either. As an initial matter, Plaintiff's allegations with respect to how her alleged communication was "recorded" is unclear. The Complaint states that "[t]he computer code for tracking technologies . . . enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Lawrence General and users of the Lawrence General Website[.]" Compl. ¶ 8. In other words, Plaintiff alleges that the pixel technology on Lawrence General website enabled Facebook and/or Google to "record" her information so that Facebook and/or Google could send that information to themselves.

Even if this vague and confusing allegation is accepted as true, Plaintiff's claim still fails. As one court has held, the plain meaning of "record" means "to set down in writing" or "to cause (sound, visual images) to be transferred to and registered on something [by] electronic means in such a way that the thing so transferred and registered can . . . be subsequently reproduced." *Com.*

*v. Moody*, 466 Mass. 196, 209 (2013). Guided by this definition the *Moody* court ultimately found that transcribing text messages so that they could be used later qualified as a "recording" under the Wiretap Act. *See id.* Not so here. Plaintiff does not allege that her interaction with Lawrence General's website was "set down in writing" or that any "sound" or "visual images" were registered, or that anything was transferred that could "reproduce[]" her interaction with the website. And while Plaintiff alleges that the webpages she visited, "text of search queries," and information visitors enter into online forms are disclosed, (Compl. ¶ 108), none of this information represents a "recording." It does not allow Meta or Google to understand what Plaintiff read on Lawrence General's website, where her mouse hovered on a particular webpage, or otherwise allow a "reproduction" of her website activity. Her allegations simply do not fit within the bounds of a Wiretap Act claim.

### C. Any alleged interception was not done "secretly."

Plaintiff also fails to allege that any interception was "secret." Under the Wiretap Act, an "interception" includes only communications that are "secretly hear[d], secretly record[ed]," or where someone aids another to do the same. Mass. Gen. Laws ch. 272, § 99(B)(4); *see also Marquis v. Google, Inc.*, 2014 WL 4180400, at *12 (Mass. Jul. 27, 2014) ("[I]f a recording is not made secretly it does not constitute an 'interception'").

Plaintiff alleges that Lawrence General "secretly use[d]" Meta Pixel and Google Analytics on its website. Compl. ¶ 93. But, once again, this allegation is not supported by any facts in the Complaint. Lawrence General did not act "secretly" when it used Google Analytics or Meta Pixel. For something to be "secret," it has to be concealed. *See Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658–59 (2021) (recognizing the Wiretap Act's term "secret" to means that the act of hearing or recording must be "concealed."); *see id.* (noting that dictionary definitions of a "secret"

include "something kept hidden or unexplained" or "something that is studiously concealed") (citing Merriam–Webster's Collegiate Dictionary 1122 (11th ed. 2020) and Black's Law Dictionary 1622 (11th ed. 2019)). Here, however, Plaintiff consented to Facebook and Google receiving her web-browsing activity. If she registered as a Facebook user (notably, the Complaint does not make this allegation), she would have consented to Facebook's tracking of her off-Facebook web activities, including those captured on third-party websites, like Lawrence General's website. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (affirming dismissal and stating that "[t]he district court properly held that Plaintiffs consented to Facebook's data tracking and collection practices" by accepting Facebook's terms and policies); *Rainey*, 491 Mass. at 643–44 (officers' body-worn camera did not "secretly" record conversations where defendant otherwise knew police heard his voluntary statements). Similarly, when Plaintiff assumedly signed up for Google services, she consented to Google's tracking of her browsing activities. *See* Google Privacy & Terms, available at https://policies.google.com/privacy?hl=en-US. Thus, there is nothing "secret" about the alleged sharing of information with Meta and/or Google. Plaintiff's claim under the Wiretap Statute should be dismissed.

**D. There was no interception of "contents."**

Not all communications are subject to the Wiretap Act. An interception only relates to the secret hearing or recording of the "contents" of wire or oral communications through the use of an intercepting device. Mass. Gen. Laws ch. 272, § 99(B)(4). The Wiretap Act defines "contents" as "information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." *Id.* at § 99(B)(5). Plaintiff wholly fails to allege how anyone intercepted the "contents" of any communications.

Plaintiff alleges that the "contents" of her alleged communications include "(i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website." Compl. ¶ 108. But, as mentioned above, Plaintiff does not allege what webpages she visited, what queries or search criteria she used, or what information she input on any forms. Without more, Plaintiff has failed to plead that any "contents" of her alleged communications were disclosed to anyone.

But even assuming that the information above was disclosed, Plaintiff's claim still fails because it does not qualify as "content." While Massachusetts appellate courts have not analyzed the meaning of "contents" under the Wiretap Act, federal courts have.[2] The Federal Wiretap Statute similarly defines "contents" as "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8). In other words, the defendant must capture "the intended message conveyed by the communication" like the text of an email message or words spoken on a call. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

In contrast, "non-content" or "record information" about a communication, like "extrinsic information used to route a communication," is not actionable if collected. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015); *In re Zynga Priv. Litig.*, 750 F.3d at 1108. For example, invoice/billing information—names, addresses, and phone numbers of parties called by subscribers—are not "contents" of communications within the

[2] Because the Massachusetts Wiretap Statute defines "contents" so similarly to the federal wiretapping statute, 18 U.S.C. § 2510, federal decisions are highly persuasive here. Lawrence General notes that the Massachusetts Wiretap Statute does include, unlike the federal statute, "information concerning the identity of the parties to such communication." Mass. Gen. Laws ch. 272, § 99 (B)(5). However, at best, the only personally-identifying information allegedly disclosed is Plaintiff's IP address. But IP addresses are not a form of identifying personal information and therefore cannot disclose Plaintiff's identity. IP addresses identify a particular *device*, not an *individual*. *See* Compl. ¶ 47 ("An 'IP address' is a unique combination of four numbers, each between 0 and 255, that serves as ***a particular device's*** address on the internet.") (emphasis supplied).

meaning of the Federal Wiretap Statute. *See Hill v. MCI WorldCom Commc'ns, Inc.*, 120 F. Supp. 2d 1194, 1196 (S.D. Iowa 2000) (finding such information does not qualify as "contents").

Here, Plaintiff only alleges the interception of "non-content" or "record" information: buttons clicked, webpages visited, search queries, search criteria, and form submissions. *See* Compl. ¶¶ 15, 16. Plaintiff does not allege that any actual personal information was collected or disclosed (*i.e.*, no names, no addresses, no phone numbers, no financial information, no medical records, no medical data, etc.). *See id.* Let alone any *identifiable* personal information. All that is allegedly disclosed is the same type of "extrinsic information used to route a communication" that courts have found not to constitute "contents" pursuant to wiretap statutes. *In re Google*, 806 F.3d at 135. Thus, Plaintiff has not adequately alleged that the content of any communications has been intercepted. Her claim should be dismissed.

### E. There was no interception by a "device."

The Court should also dismiss Plaintiff's Complaint for failure to allege the use of an "intercepting device." The Wiretap Act defines an "intercepting device" as "[a]ny device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." Mass. Gen. Laws ch. 272, § 99(B)(3) (emphasis added).

Courts interpret the words of a statute according to "common and approved usage." *Commonwealth v. Narvaez*, 490 Mass. 807, 810 (2022). Under the common understanding of the term, a "device" or "apparatus" must be tangible; it does not encompass intangible code on a website. *See* Ballentine's Law Dictionary (3d ed. 1969) (defining "device" to mean "a thing devised or formed by design,--a contrivance, an invention."); *see also* Black's Law Dictionary (11th ed. 2019) (defining "device" as "[a] mechanical invention that may be "an apparatus or an article of manufacture," and defining "apparatus" with reference to "machine," which is defined

as "[a] device or apparatus consisting of fixed and moving parts"). Plaintiff's Complaint recognizes as much, using the term "device" to describe physical items like a "tablet or cell phone" or a computer. Compl. ¶¶ 46, 47. Yet, to sustain her Wiretap Act claim, Plaintiff summarily concludes that "Google Analytics and Meta Pixel" are "intercepting devices" as defined by the Wiretap Act. *Id.* ¶ 107.

Plaintiff's allegation is not supported in fact or law. Indeed, courts around the country have expressly addressed the definition of a "device," and have routinely held that code on a website is not a "device" or "apparatus" under similar wiretap laws. *See, e.g.*, *Potter v. Havlicek*, 2008 WL 2556723, at *8 (S.D. Ohio June 23, 2008) (dismissing federal wiretap claim because "the word 'device' does not encompass software"); *Jacome v. Spirit Airlines*, 2021 WL 3087860, at *5 (Fla. Cir. Ct. June 17, 2021) (dismissing Florida wiretap claim because session replay software, a similar advertising technology tool, is not a "device or apparatus"); *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *2 (S.D. Fla. July 6, 2021) (same); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *2 (S.D. Fla. July 6, 2021) (same); *United States v. Ackies*, 918 F.3d 190, 199 n.5 (1st Cir. 2019) (rejecting argument that software is a "device" under Federal Stored Communications Act because "software is not a 'device' under its plain meaning"); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 972 (S.D. Cal. 2012) ("[S]oftware is not a tangible good or service."). This Court should reach the same conclusion here.

Recognizing her deficient pleading, Plaintiff attempts to label everything as a "device," stating that "[i]ntercepting devices also include (i) any devices Class Members used to access the Lawrence General Website; (ii) Class Members' web browsers used to access the Lawrence General Website; (iii) Lawrence General's own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications

with the Lawrence General Website." Compl. ¶ 107. This allegation demonstrates Plaintiff's misunderstanding of both the technology at issue and the law she is attempting to enforce. Liability under the Wiretap Act can only be imposed against persons who use a device to intercept secret communications. Thus, if the relevant "device" at issue is putative class members' devices (which Lawrence General assumes is a *physical* device)—Plaintiff cannot state a claim against Lawrence General because Lawrence General has no control over putative class members' devices. The same is true with respect to putative class members' browsers, and the computer servers of third-party entities. The only supposed "devices" that Lawrence General controls on Plaintiff's laundry list are Lawrence General's own computer servers. But because Plaintiff does not allege that Lawrence General's servers "intercepted" her communications.

The core of Plaintiff's claim is about pixel technology. But pixel technology is not a "device" under the ordinary understanding of the term. Plaintiff's complaint should be dismissed.

**III. Plaintiff Does Not Allege An "Oral" or "Wire" Communication.**

To state a claim under the Wiretap Act, Plaintiff must allege that an "oral or wire communication" was intercepted without her consent. Mass. Gen. Laws ch. 272, § 99(Q). The Wiretap Act defines the term "oral communication" as "speech, except such speech as is transmitted over the public air waves by radio or other similar device," and the term "wire communication" as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." *Id.* § 99 (B)(1), (2).

Plaintiff does not allege that any "oral" communication is at issue here; her pleading rests entirely on there being an interception of a "wire" communication. Plaintiff summarily concludes, without any support, that "[h]ealthcare consumers' wire communications with Lawrence General

were contemporaneously intercepted, recorded, and transmitted to [] third parties without the consumers' knowledge or consent" and that "'[w]ire' communications include communications over the internet between websites and website users." Compl. ¶¶ 3, 4. She also claims that she "regularly uses the Lawrence General Website to (i) obtain information about Lawrence General doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; (iii) obtain information about Lawrence General's locations; and (iv) obtain and review her medical records through the website's patient portal." *Id.* ¶ 10. But Plaintiff does not allege specific facts supporting these allegations; in fact, Plaintiff does not allege that she ever entered any specific information on the website. Apparently, Plaintiff hopes this Court will reach the drastic conclusion that ***any*** interaction she has with the website is a "communication" that is entitled to protection under the Wiretap Act. *See* Compl. ¶¶ 15, 16.

Not only are these allegations not supported by any *facts* in the Complaint, but they also are entirely inconsistent with the Wiretap Act's plain language, purpose, and legislative intent. As noted above, the plain language of the definition of "wire communication" includes "any communication made . . . through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection[.]" Mass. Gen. Laws ch. 272, § 99(B)(2). At first blush, this definition seems broad enough to encompass "any" supposed "communication" imaginable. But as with all statutes, the Wiretap Act must be interpreted "in accordance with its ordinary meaning **at the time of its enactment**." *Penobscot Nation v. Frey*, 3 F.4th 484, 491 n.5 (1st Cir. 2021) (emphasis supplied); *Com. v. Moody*, 466 Mass. at 205 ("[I]n ascertaining the scope of the term 'wire communication' under the Massachusetts statute, it is instructive to review the scope of that term as it appears in the 1968 Federal wiretap statute."). When the Wiretap Act was enacted in 1968, the term "wire communication" did not encompass interactions with websites

(indeed, websites did not yet exist). Instead, the term related exclusively to back and forth speech or conversation between two individual persons. *See* Ballentine's Law Dictionary (3d ed. 1969) (defining "wiretapping" as "[i]ntercepting a telephone conversation of a telegraph message by tapping the line of communication, that is, connecting a receiving instrument to the line."); *see also Project Veritas Action Fund v. Conley*, 244 F. Supp. 3d 256, 263 (D. Mass. 2017), *aff'd sub nom. Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020) ("The express legislative purpose of Section 99's unequivocal ban of secret **audio recording** is to protect Massachusetts citizens' privacy.) (emphasis supplied). This explains why Lawrence General was not able to find **any** criminal or civil appellate decisions that have interpreted the Wiretap Act to extend its protections to so-called "communications" with public websites, as Plaintiff alleges here.

Interpreting the Wiretap Act's definition of "communications" to only include traditional conversations between humans is also consistent with the statute's legislative purpose and intent. *See Commonwealth v. Rainey*, 491 Mass. 632, 639–40 (2023) (discussing various Wiretap Statute cases, all of which recorded individual statements made in conversations). The Massachusetts Legislature enacted the Wiretap Statute primarily to address what people historically thought of as "wiretaps" (*i.e.*, audio/visual recording devices.). *See* Mass. Gen. Laws ch. 272, § 99(A). The Statute's primary purpose was "to help in the fight against organized crime." *Dillon v. Mass. Bay Transit Authority*, 49 Mass. App. Ct. 309, 310 (2000). And while the statute also applies to "modern electronic surveillance devices" which potentially "pose grave dangers to the privacy of all citizens of the commonwealth," nothing in the statute suggests any intention to extend its protections to the use of advertising technology on public websites.

In fact, when considering the scope of the Wiretap Act, the Supreme Judicial Court of Massachusetts has found that "[d]ata from GPS devices [] does not fall within the language of the

wiretap statute" because it was not an oral or wire communication. *Commonwealth v. Connolly*, 454 Mass. 808, 825 (2009). Other courts have found modern methods of communication to be "wire communications," but only where they retained the concept of person-to-person speech or conversation that a third party could intercept. *Compare Commonwealth v. Alleyne*, 23 Mass. L. Rep. 606 (Mass. Super. Ct., Nov. 17, 2008) (applies wire communications to communications over cellular phones) *and Rich v. Rich*, 28 Mass. L. Rep. 553, 2011 WL 3672059 (Mass. Super. Ct., July 8, 2011) (wire communications extend to conversation in email and instant messaging) *with Connolly*, 454 Mass. at 825 (GPS device data is not an oral or wire communication).

Here, Plaintiff has not alleged that she engaged in any conversation with another person, let alone that Lawrence General intercepted such a communication. Her suggestion that an interaction with Lawrence General's website is a "communication" at all is specious, and her conclusion that this supposed "communication" was "intercepted" by Lawrence General and/or Facebook or Google is even more so.

At bottom, Plaintiff's creative pleading does not state a claim under the Wiretap Act. There are simply no "oral or wire communications" at issue here. Not only is Plaintiff's attempt to cast website activity as such legally flawed, but it urges bad policy. If the Court were to adopt Plaintiff's novel argument, thousands of Massachusetts individuals, businesses and charities would be subject to criminal and civil liability for using common advertising technology on their websites. Such drastic and extensive liability was not envisioned when the Wiretap Act was adopted. Because Plaintiff has not alleged an "oral or wire communication," her Complaint should be dismissed.

**CONCLUSION**

Lawrence General respectfully requests that Plaintiff's Complaint be dismissed in its entirety.

Dated: June 12, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

*/s/Emyr T. Remy*

Emyr T. Remy, BBO# 704156
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411
remy@shb.com

Tammy B. Webb (*pro hac vice* forthcoming)
Patrick J. Gregory (*pro hac vice* forthcoming)
tbwebb@shb.com
pgregory@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900

Anna A. El-Zein (*pro hac vice* forthcoming)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
aelzein@shb.com

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**DECLARATION OF EMYR T. REMY**

I, Emyr T. Remy, hereby declare as follows:

1. I am over 18 years of age, and have personal knowledge of the facts set forth in this Declaration.

2. I am an attorney with Shook, Hardy & Bacon L.L.P. and counsel of record for defendant Lawrence General Hospital in this action.

3. I supply this declaration in support of Lawrence General Hospital's Motion to Dismiss the above-captioned case.

4. Attached as **Exhibit A-1** is a true and correct copy of Meta's "Cookies Policy" effective October 5, 2022, accessed on May 25, 2023 at:

https://mbasic.facebook.com/privacy/policies/cookies/printable.

5. Attached as **Exhibit A-2** is a true and correct copy of "Off-Facebook Activity: Control your information," accessed at https://www.facebook.com/off-facebook-activity on May 25, 2023.

6. Attached as **Exhibit A-3** is a true and correct copy of Facebook Help Center: "How do I manage my future off-Facebook activity", accessed on May 25, 2023 at https://www.facebook.com/help/1224342157705160.

I declare under the pains and penalty of perjury that the foregoing is true and correct.

Executed this 12th day of June 2023, in Boston, Massachusetts.

Emyr T. Remy

# Ex. A-1

# Meta's Cookies Policy

Meta

EXHIBIT A-1

# Cookies Policy

**Explore the policy**

What are cookies, and what does this policy cover?

Why do we use cookies?

Where do we use cookies?

Do other Companies use cookies in connection with the Meta Products?

How can you control your Information?

**Other policies**

Terms of Service

Cookies Policy

## What are cookies, and what does this policy cover?

Effective October 5, 2022

Cookies are small pieces of text used to store information on web browsers. Cookies are used to store and receive identifiers and other information on computers, phones and other devices. Other technologies, including data that we store on your web browser or device, identifiers associated with your device and other software, are used for similar purposes. In this policy, we refer to all of these technologies as "cookies".

We use cookies if you have a Facebook account, use the Meta Products, including our website and apps, or visit other websites and apps that use the Meta Products (including the Like button). Cookies enable Meta to offer the Meta Products to you and to understand the information that we receive about you, including information about your use of other websites and apps, whether or not you are registered or logged in.

This policy explains how we use cookies and the choices you have. Except as otherwise stated in this policy, the Privacy Policy will apply to our processing of the data that we collect via cookies.

## Why do we use cookies?

Cookies help us provide, protect and improve the Meta Products, such as by personalising content, tailoring and measuring ads, and providing a safer experience. The cookies that we use include session cookies, which are deleted when you close your browser, and persistent cookies, which stay in your browser until they expire or

you delete them. While the cookies that we use may change from time to time as we improve and update the Meta Products, we use them for the following purposes:

### Authentication

We use cookies to verify your account and determine when you're logged in so that we can make it easier for you to access the Meta Products and show you the appropriate experience and features.

- For example: We use cookies to keep you logged in as you navigate between Facebook Pages. Cookies also help us remember your browser so you don't have to keep logging in to Facebook and so you can more easily log in to Facebook via third-party apps and websites. For example, we use the "c_user" and "xs" cookies, including for this purpose, which have a lifespan of 365 days.

### Security, site and product integrity

We use cookies to help us keep your account, data and the Meta Products safe and secure.

- For example: Cookies can help us identify and impose additional security measures when someone may be attempting to access a Facebook account without authorisation, for instance, by rapidly guessing different passwords. We also use cookies to store information that allows us to recover your account in the event that you forget your password or to require additional authentication if you tell us that your account has been hacked. This includes, for example, our "sb" and "dbln" cookies, which enable us to identify your browser securely, as well as "datr." "Datr" is a unique identifier for your browser that, amongst other things, helps us protect you from fraud. For example, it helps us identify trusted browsers where you have logged in before. "Datr" has a lifespan of two years.

We also use cookies to combat activity that violates our policies or otherwise degrades our ability to provide the Meta Products.

- For example: Cookies help us fight spam and phishing attacks by enabling us to identify computers that are used to create large numbers of fake Facebook accounts. We also use cookies to detect computers infected with malware and to take steps to prevent them from causing further harm. Our "csrf" cookie, for example, helps us prevent cross-site request forgery attacks. The "datr" cookie also helps us to identify the browsers used by malicious actors and to prevent cyber-security attacks, such as a denial of service attack that could prevent you from accessing the Meta Products. Cookies also help us prevent underage people from registering for Facebook accounts.

### Advertising, recommendations, insights and measurement

We use cookies to help us show ads and to make recommendations for businesses and other organisations to people who may be interested in the prod-

ucts, services or causes they promote.

- For example: Cookies allow us to help deliver ads to people who have previously visited a business's website, purchased its products or used its apps and to recommend products and services based on that activity. Cookies also allow us to limit the number of times that you see an ad so you don't see the same ad over and over again. For example, the "fr" cookie is used to deliver, measure and improve the relevancy of ads, with a lifespan of 90 days.

We also use cookies to help measure the performance of ad campaigns for businesses that use the Meta Products.

- For example: We use cookies to count the number of times that an ad is shown and to calculate the cost of those ads. We also use cookies to measure how often people do things, such as make a purchase following an ad impression. For example, the "_fbp" cookie identifies browsers for the purposes of providing advertising and site analytics services and has a lifespan of 90 days.

Cookies help us serve and measure ads across different browsers and devices used by the same person.

- For example: We can use cookies to prevent you from seeing the same ad over and over again across the different devices that you use.

Cookies also allow us to provide insights about the people who use the Meta Products, as well as the people who interact with the ads, websites and apps of our advertisers and the businesses that use the Meta Products.

- For example: We use cookies to help businesses understand the kinds of people who like their Facebook Page or use their apps so that they can provide more relevant content and develop features that are likely to be interesting to their customers.

We also use cookies, such as our "oo" cookie, which has a lifespan of five years, to help you opt out of seeing ads from Meta based on your activity on third-party websites. Learn more about the information we receive, how we decide which ads to show you on and off the Meta Products and the controls that are available to you.

### Site features and services

We use cookies to enable the functionality that helps us provide the Meta Products.

- For example: Cookies help us store preferences, know when you've seen or interacted with Meta Products' content and provide you with customised content and experiences. For instance, cookies allow us to make suggestions to you and others, and to customise content on third-party sites that integrate our social plugins. If you are a Facebook Page administrator, cookies allow you to switch between posting from your personal Facebook account and the Facebook Page. We use cookies such as the session-based "presence" cookie to support your use of Messenger chat windows.

We also use cookies to help provide you with content relevant to your locale.

- For example: We store information in a cookie that is placed on your browser or device so that you will see the site in your preferred language.

### Performance

We use cookies to provide you with the best experience possible.

- For example: Cookies help us route traffic between servers and understand how quickly Meta Products load for different people. Cookies also help us record the ratio and dimensions of your screen and windows and know whether you've enabled high-contrast mode, so that we can render our sites and apps correctly. For example, we set the "dpr" and "wd" cookies, each with a lifespan of 7 days, for purposes including to deliver an optimal experience for your device's screen.

### Analytics and research

We use cookies to better understand how people use the Meta Products so that we can improve them.

- For example: Cookies can help us understand how people use the Facebook service, analyse which parts of our Products people find most useful and engaging, and identify features that could be improved.

### Third-party websites and apps

Our business partners may also choose to share information with Meta from cookies set in their own websites' domains, whether or not you have a Facebook account or are logged in. Specifically, cookies named _fbc or _fbp may be set on the domain of the business partner whose site you're visiting. Unlike cookies that are set on Meta's own domains, these cookies aren't accessible by Meta when you're on a site other than the one on which they were set, including when you are on one of our domains. They serve the same purposes as cookies set in Meta's own domain, which are to personalise content (including ads), measure ads, produce analytics and provide a safer experience, as set out in this Cookies Policy.

## Where do we use cookies?

We may place cookies on your computer or device and receive information stored in cookies when you use or visit:

- The Meta Products;
- Products provided by other members of the Meta Companies; and

- Websites and apps provided by other companies that use the Meta Products, including companies that incorporate Meta technologies into their websites and apps. Meta uses cookies and receives information when you visit those sites and apps, including device information and information about your activity, without any further action from you. This occurs whether or not you have a Facebook account or are logged in.

## Do other Companies use cookies in connection with the Meta Products?

Yes, other companies use cookies on the Meta Products to provide advertising, measurement, marketing and analytics services to us, and to provide certain features and improve our services for you.

For example, other companies' cookies help tailor ads off of Meta Products, measure their performance and effectiveness and support marketing and analytics. Certain features on the Meta Products use cookies from other companies to function, for example, certain maps, payment and security features. Learn more[1] about the companies that use cookies on the Meta Products.

Third party companies also use cookies on their own sites and apps in connection with the Meta Products. To understand how other companies use cookies, please review their policies.

1

### List of Companies

Listed below are the names and websites of some of the companies that use cookies on the Facebook Services to provide services to us and the businesses that advertise on Facebook.

Last update: September 13, 2021

| Company | Website |
|---|---|
| A9 | https://www.a9.com |
| Ada | https://www.ada.support |
| Adclear | https://www.adclear.de |
| Adform | https://site.adform.com |

| | |
|---|---|
| AdGear | https://www.adgear.com |
| Adition | https://www.adition.com |
| Adobe | https://www.mktoresp.com |
| Adobe Business Catalyst | https://www.businesscatalyst.com |
| Adometry | https://www.adometry.com/tv-attribution |
| AdParlor | https://www.adparlor.com |
| Adslot | https://www.adslot.com |
| Akamai | https://akamaihd.net |
| Amazon Web Services | https://www.cloudfront.net |
| Ancestry | https://www.ancestry.com |
| Autodesk | https://www.autodesk.com |
| Clarabridge | https://www.engagor.com |
| comScore | https://www.comscore.com |
| Conversant Media | https://www.conversantmedia.com |

| | |
|---|---|
| Convertro | https://www.convertro.com |
| DA Consortium | https://www.dac.co.jp |
| Datalicious | https://www.datalicious.com |
| DoubleClick | https://www.doubleclickbygoogle.com |
| Eyereturn Marketing | https://www.eyereturnmarketing.com |
| Flashtalking | https://www.flashtalking.com |
| GfK | https://www.gfk.com |
| Giphy | https://www.giphy.com |
| Google | https://www.google.com/ |
| Google | https://www.doubleclick.net/ |
| Google | https://www.google-analytics.com |
| Google | https://www.googleadservices.com |
| Google | https://www.googleapis.com |
| Google | https://www.googletagmanager.com |

| | |
|---|---|
| Google | https://www.gstatic.com |
| Google | https://www.youtube.com |
| Google | https://www.ytimg.com |
| Hive Streaming | https://www.hivestreaming.com |
| Integral Ad Science | https://www.integralads.com/ |
| Intuit | https://www.intuit.com |
| Ipsos | https://www.ipsos.com |
| Jio | https://www.jio.com |
| Kantar World Panel | https://www.kantarworldpanel.com |
| Kenshoo | https://kenshoo.com |
| Linkedin | https://www.linkedin.com |
| Linkedin | https://www.adsymptotic.com |
| Linkedin | https://www.licdn.com |
| Mapbox | https://www.mapbox.com |

| | |
|---|---|
| Markit | https://www.markit.com |
| Maxar | https://www.digitalglobe.com |
| Meetrics | https://www.meetrics.com |
| Megaphone | https://www.megaphone.fm/ |
| Metrix Lab | https://www.metrixlab.com |
| Microsoft | https://www.bing.com |
| Microsoft | https://www.virtualearth.net |
| Millward Brown | https://www.millwardbrowndigital.com |
| Mixpanel | https://www.mixpanel.com |
| Moat | https://moat.com/ |
| Nanigans | https://www.nanigans.com |
| Neustar | https://www.neustar.biz |
| Next Audience | https://next-audience.com |
| Nielsen | https://www.nielsen.com |

| | |
|---|---|
| Paypal | https://www.paypal.com |
| Podsights | https://www.pdst.fm |
| Podtrac | https://analytics.podtrac.com/ |
| Rakuten | https://marketing.rakuten.com |
| Reddit | https://www.redditstatic.com |
| Reddit | https://www.reddit.com |
| Research Now | https://www.researchnow.com |
| Salesforce | https://www.herokuapp.com |
| Sapient | https://publicis.sapient.com |
| Shift | https://www.shiftcomm.com |
| Shopify | https://www.shopify.com |
| Sizmek | https://www.sizmek.com |
| Smart Adserver | https://smartadserver.com |
| Spreaker | https://www.spreaker.com/ |

| | |
|---|---|
| Stackla | https://www.stackla.com |
| Symphony Advanced Media | https://www.symphonyam.com |
| Tealium | https://www.tiqcdn.com |
| Tenor | https://www.tenor.co |
| Tenor | https://www.tenor.com |
| The Trade Desk | https://www.thetradedesk.com/ |
| The Trade Desk | https://www.adsrvr.org |
| ThreatMetrix | https://www.threatmetrix.com/ |
| Trend Research | https://www.trendresearch.com |
| Twitter | https://twitter.com/ |
| Twitter | https://www.ads-twitter.com |
| Twitter | https://www.twimg.com |
| Twitter | https://t.co |
| UserReport | https://www.userreport.com |

| | |
|---|---|
| Visa | https://www.cardinalcommerce.com |
| Visual IQ | https://www.visualiq.com |
| Weborama | https://www.weborama.com |
| White Ops | https://www.whiteops.com/ |
| Xaxis | https://www.xaxis.com |

## How can you control your Information?

We use cookies to help personalise and improve content and services, provide a safer experience and to show you useful and relevant ads on and off Meta Products. You can control how we use data to show you ads and more by using the tools described below.

### If you have a Facebook account

- You can use your ad preferences to learn why you're seeing a particular ad and control how we use information that we collect to show you ads.
- To show you better ads, we use data that advertisers and other partners provide us about your activity off Meta Company Products, including websites and apps. You can control whether we use this data to show you ads in your ad settings.
- The Meta Audience Network is a way for advertisers to show you ads in apps and websites off the Meta Company Products. One of the ways that Audience Network shows relevant ads is by using your ad preferences to determine which ads you may be interested in seeing. You can control this in your ad settings.
- You can review your Off-Facebook activity, which is a summary of activity that businesses and organisations share with us about your interactions with them, such as visiting their apps or websites. They use our business tools, such as Meta Pixel, to share this information with us. This helps us do things like give you a more personalised experience on Meta Products. Learn more about off-Facebook activity, how we use it and how you can manage it.

### Everyone

You can opt out of seeing online interest-based ads from Meta and other participating companies through the Digital Advertising Alliance in the US, the Digital Advertising Alliance of Canada in Canada or the European Interactive Digital Advertising Alliance in Europe or through your mobile device settings, where available, using Android, iOS 13 or an earlier version of iOS. Please note that ad blockers and tools that restrict our cookie use may interfere with these controls.

## More information about online advertising

The advertising companies we work with generally use cookies and similar technologies as part of their services. To learn more about how advertisers generally use cookies and the choices they offer, you can review the following resources:

- Digital Advertising Alliance
- Digital Advertising Alliance of Canada
- European Interactive Digital Advertising Alliance

## Browser cookie controls

In addition, your browser or device may offer settings that allow you to choose whether browser cookies are set and to delete them. These controls vary by browser, and manufacturers may change both the settings they make available and how they work at any time. As of 23 June 2021, you may find additional information about the controls offered by popular browsers at the links below. Certain parts of the Meta Products may not work properly if you have disabled browser cookie use. Please be aware that these controls are distinct from the controls that we offer you.

- Google Chrome
- Internet Explorer
- Firefox
- Safari
- Safari Mobile
- Opera

# Ex. A-2

## "Off-Facebook Activity: Control your information"

facebook

EXHIBIT
A-2

## The best person to be in control of data is you.



## Introducing Off-Facebook Activity.

Control is important to you, especially when it comes to your data. Which is why you're seeing changes in how you view and manage your information on Facebook.

## Off-Facebook Activity. A tool that gives you more control of your data.

facebook

View a summary of information Facebook receives about your activity on other apps and websites.

## You control it.

If you'd like, you can disconnect that information from your account, and it will not be associated with you personally.

You will be able to access this tool from Settings in the coming months.

Help Center >



facebook




## Understanding Off-Facebook Activity.



### Data and the internet

Much of what you do online generates data—like when you're searching for vacation spots or buying a backpack. Occasionally, businesses share that data with Facebook.

facebook



## Data sent to Facebook

One way that data can be used is to help businesses find the right audience to show ads for things you might like—such as a deal on backpacks. These ads are what make most of the internet available free of charge, including Facebook.



## Data more in your control

Now you can see a summary of information Facebook receives about your activity on other apps and websites. You also have the option to disconnect it from your account.

facebook




Why do ads feel like they are directed to you, personally?




Where online advertising is headed

facebook

## Questions you may have about Off-Facebook Activity.

### If I disconnect my activity, will I stop seeing ads?

No, you'll still see the same number of ads. The ads that you will see may be less personalized to you.

### Does disconnecting my activity mean it's deleted?

The information you disconnect will no longer be connected to your account. This data can still be used without being linked to an individual user to allow us to let businesses know how their website, app or ads are performing.

### Why am I seeing businesses I don't recognize?

We sometimes receive information from businesses that use third-party data service providers or marketing agencies to help with content and ads.

## More about data and control on Facebook.

### Four Ideas to Regulate the Internet

Effective privacy and data protection needs a globally harmonized framework.

facebook

## Why Am I Seeing This? We Have an Answer for You

Helping you understand and control the posts and ads you see.

**See blog post >**

## Improving Location Settings on Android

An update to Facebook's location controls on Android to give people more choice over how we collect location information and how we store it.

**See blog post >**

facebook

We updated the Privacy Checkup tool to help you strengthen your account security and control who can see what you share and how your information is used.

See blog post >

English (US) English (UK) Français (France) Español (España) Deutsch Français (Canada)

More languages >

© 2023 Meta About Developers Careers Privacy Cookies Terms Help Center

# Ex. A-3

## Facebook Help Center:

## "How do I manage my future off-Facebook activity"

Help Center

Using Facebook

Managing Your Account

Privacy, Safety and Security

Policies and Reporting

EXHIBIT A-3

# How do I manage my future off-Facebook activity?

Copy link

Android App Help Computer Help More ▾

You can choose to turn off your future off-Facebook activity with the **Manage Future Activity** setting.

Off-Facebook activity is a summary of activity that businesses and organizations share with us about your interactions with them, such as visiting their apps or websites. They use our Business Tools, like Facebook Login or Facebook Pixel, to share this information with us. This helps us do things like give you a more personalized experience on Facebook. Learn more about off-Facebook activity and how we use it.

You can also choose to disconnect your off-Facebook activity, which will disconnect your past activity from your account. Keep in mind, when you turn off future activity for all apps and websites, it'll also disconnect your past activity.

## Turn off your future off-Facebook activity for all apps and websites

1. Click your profile picture in the top right of Facebook.
2. Select **Settings & privacy**, then click **Settings**.
3. Click **Your Facebook Information** in the left column, then click **Off-Facebook Activity**.
4. Click **Manage Your Off-Facebook Activity**, then click **Manage Future Activity**.
5. Click **Manage Future Activity**.
6. Click next to **Future Off-Facebook Activity**, then click **Turn Off** to turn off your future off-Facebook activity.

## Turn off your future off-Facebook activity for one app or website

1. Click your profile picture in the top right of Facebook.
2. Select **Settings & privacy**, then click **Settings**.

Help Center

4. Click **Manage Your Off-Facebook Activity**. You'll be prompted to re-enter your password.

5. Click the app or website you'd like to review.

6. Click **Turn off future activity from [name of business or organization]**, then click **Turn Off**.

## When you turn off your future off-Facebook activity:

- Your future off-Facebook activity will be disconnected within 48 hours from when it's received. During this time it may be used for measurement purposes and to make improvements to our ads systems.
- If you choose to turn off your future activity for all apps and websites, you'll also disconnect all your past off-Facebook activity.
- You may still see ads from these businesses. For example, advertisers can show ads based on your activity on Facebook, such as when you like a business page. Also, they can upload customer lists and show their ads to people on that list. Learn more about advertisers using these lists on your Ad Preferences page.
- You'll still see the same number of ads, but the ads you see may be less personalized to you.
- You may be logged out of apps and websites. To log in with Facebook in the future, you'll have to allow information from that app or website to stay connected to your Facebook account.

## Other ways you can manage your Facebook experience:

You can take more control over your information without turning off your off-Facebook activity. Here are a few ways to control your Facebook experience:

- Update your Feed preferences to see more content on your Feed that you're interested in.
- Customize your Ad Preferences to see ads that are more relevant to you. From here, you can update your ad settings to control things like if we show you ads based on your use of apps and websites off Facebook.

Help Center

- Walk through Privacy Checkup to make sure you're sharing your information with who you want.
- Visit Access Your Information to see and manage your Facebook information, or download your Facebook information for review.

Was this helpful?

Yes No

**Related Articles**

Find your Facebook activity log

Turn your Active Status on or off on Facebook

Disconnect your off-Facebook activity

Review your Off-Facebook activity

How to use activity log on Facebook to find specific content

About Privacy

Terms and Policies Ad Choices

Careers Cookies

Create Ad Create Page

from Meta

© 2023 Meta

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/Emyr T. Remy*
Emyr T. Remy

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>v.<br>LAWRENCE GENERAL HOSPITAL,<br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br>CIVIL ACTION NO. 2834-CV-00728-BLS1<br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

## Table of Contents

I. Introduction ..... 1

II. The Facts. ..... 2

A. The Tracking Technologies ..... 2

B. The Interceptions Were Secret ..... 3

C. Allegations Regarding the Plaintiff ..... 4

III. Argument ..... 4

A. The MWA Provides a Remedy for Interceptions of Communications Between Massachusetts Parties, Effected Through a Device Located in Massachusetts ..... 5

B. Plaintiff Alleges an "Interception." ..... 8

C. Plaintiff Alleges a "Wire Communication." ..... 10

D. Plaintiff Did Not Consent to LGH's Use of the Tracking Technologies on the LGH Website. ..... 12

E. Plaintiff Alleges the Interception of "Content" as the MWA Defines that Term. ..... 14

1. Plaintiff Pleads the Interception of Information Concerning the Identity of the Parties to the Communications. ..... 15

2. Plaintiff Alleges an Interception of "Substance, Purport, or Meaning" of Communications. ..... 17

F. Plaintiff Alleges LGH's Use of an Intercepting Device ..... 18

IV. Conclusion ..... 20

## Table of Authorities

Pages

**Cases**

*Apple Inc. v. Superior Court*,
292 P.3d 883 (Cal. App. Ct. 2013) ........ 11

*Cardoso v. Whirlpool Corp.*,
2021 WL 2820822 (S.D. Fla. July 6, 2021) ........ 20

*Christensen v. Cox*,
2017 Mass. Super. LEXIS 220 (Super. Ct. Nov. 21, 2017) ........ 6

*Commonwealth v. Alleyne*,
2007 Mass. Super. LEXIS 591 (Nov. 1, 2007) ........ 11

*Commonwealth v. Almonor*,
482 Mass. 35 (2019) ........ 11

*Commonwealth v. Browar-Jarus*,
97 Mass. App. Ct. 1108 (2020) ........ 19

*Commonwealth v. Connolly*,
454 Mass. 808 (2009) ........ 11

*Commonwealth v. Fitzpatrick*,
2008 Mass. Super. LEXIS 176 (Super. Ct. June 2, 2008) ........ 9

*Commonwealth v. Jackson*,
370 Mass. 502 (1976) ........ 12

*Commonwealth v. Maccini*,
2007 Mass. Super. LEXIS 235 (Super. Ct. Apr. 23, 2007) ........ 6

*Commonwealth v. Minori*,
101 Mass. App. Ct. 1106 (App. Ct. 2022) ........ 19

*Commonwealth v. Rainey*,
491 Mass. 632 (2023) ........ 11

*Commonwealth v. Wilcox*,
63 Mass. App. Ct. 131 (App. Ct. 2005) ........ 6, 7

*Connor v. Whirlpool Corp.*,
2021 WL 3076477 (S.D. Fla. July 6, 2021) ........ 20

*Cosme v. Whitin Mach. Works*,
417 Mass. 643 (1994) ... 7

*District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*,
379 Mass. 586 (1980) ... 15, 16

*Doe v. Bon Secours Mercy Health*,
Case No. A 2002633 (Ohio Cm. Pl. Nov. 23, 2021) ... 5

*Doe v. Medstar Health, Inc.*,
No. 24-C-20-000591 (Md. Cir. Ct. 2022) ... 5

*Doe v. Partners Healthcare System, Inc.*,
Case No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) ... 1, 4, 13, 18

*Doe v. Sutter Health*,
Case No. 34-2019-00258072 (Cal. Cty. Ct. June 9, 2022) ... 5, 11, 19

*Doe v. University Hospitals Health System, Inc.*,
Case No. CV-20-93333357 (Ohio Ct. Com. Pleas Nov. 16, 2020) ... 5

*Doe v. Va. Mason Med. Ctr.*,
2020 Wash. Super. LEXIS 7567 (Super. Ct. 2020) ... 14

*Facebook, Inc. v. State*,
2023 N.J. LEXIS 700 (June 29, 2023) ... 9

*Gen. Motors Acceptance Corp. v. Abington Cas. Ins. Co.*,
413 Mass. 583 (1992) ... 13

*Gilk v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) ... 19

*Heffernan v. Hashampour*,
2009 Mass. Super. LEXIS 409 (Super. Ct. Dec. 19, 2009) ... 5, 7

*Hill v. MCI WorldCom Communs., Inc.*,
120 F. Supp. 2d 1194 (S.D. Iowa 2000) ... 16

*In re Carrier IQ, Inc. Consumer Privacy Litig.*,
78 F. Supp. 3d 1051 (N.D.Cal. 2015) ... 19

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ... 18

*In re Facebook, Inc.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ... 14

*In re Google, Inc.*,
806 F.3d 125 (3d Cir. 2015) .......... 18

*In re Meta Pixel Healthcare Litig.*,
2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022) .......... passim

*In re Pharmatrak, Inc. Privacy Litig.*
329 F.3d 9 (1st Cir. 2003) .......... 4, 8, 9, 12

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
903 F. Supp. 2d 942 (S.D. Cal. 2012) .......... 20

*In re Zynga Privacy Litigation*,
750 F.3d 1098 (9th Cir. 2014) .......... 18

*Jacome v. Spirit Airlines*,
2021 Fla. Cir. LEXIS 1435 (Fla. Cir. Ct. June 17, 2021) .......... 20

*Johnson v. Frei*,
2016 Mass. App. Div. LEXIS 36 (App. Div. 2016) .......... 19

*Kearney v. Salomon Smith Barney, Inc.*,
137 P.3d 914 (Cal. 2006) .......... 6

*Klumb v. Goan*,
884 F. Supp. 2d 644 (E.D. Tenn. 2012) .......... 19

*Larrison v. Larrison*,
750 A.2d 895 (Pa. Super. Ct. 2000) .......... 8

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) .......... 12

*Luis v. Zang*,
833 F.3d 619 (6th Cir. 2016) .......... 8, 9, 19

*MacNeil Eng'g Co. v. Tisport, Ltd.*,
59 F. Supp. 2d 199 (D. Mass. 1999) .......... 6

*Marquis v. Google Inc.*,
No. 11-2808-BLS1 (Super. Ct. Jan. 17, 2012) .......... 11, 13

*OTR Transp., Inc. v. Data Interfuse LLC*,
2023 U.S. Dist. LEXIS 7562 (N.D. Ill. 2023) .......... 6

*Pendell v. AMS/Oil, Inc.*,
1986 U.S. Dist. LEXIS 26089 (D. Mass. Apr. 30, 1986) .......... 6, 7

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) .......... 8

*Potter v. Havlicek*,
2008 U.S. Dist. LEXIS 122211 (S.D. Ohio June 23, 2008) .......... 20

*Project Veritas Action Fund v. Conley*,
244 F. Supp. 3d 256 (D. Mass. 2017) .......... 11

*Project Veritas Action Fund v. Rollins*,
982 F.3d 813 (1st Cir. 2020) .......... 19

*Rackemann v. LISNR, Inc.*,
2017 U.S. Dist. LEXIS 162567 (S.D. Ind. 2017) .......... 15

*Rich v. Rich*,
2011 Mass. Super. LEXIS 148 (Super. Ct. July 8, 2011) .......... 9, 11, 19

*Smith v. Facebook Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) .......... 14

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......... 14

*State v. Fowler*,
139 P.3d 342 (Wash. 2006) .......... 8

*State v. Worthy*,
661 A.2d 1244 (N.J. 1995) .......... 6

*United States v. Ackies*,
918 F.3d 190 (1st Cir. 2019) .......... 20

*United States v. Hutchins*,
2018 U.S. Dist. LEXIS 183898 (E.D. Wis. 2018) .......... 19, 20

*United States v. Lyons*,
740 F.3d 702 (1st Cir. 2014) .......... 10

*United States v. Szymuszkiecz*,
622 F.3d 701 (7th Cir. 2010) .......... 9

*Warrington v. Warrington*,
560 F. Supp. 3d 551 (D.N.H. 2021) .......... 8

*Zaratzian v. Abadir*,
2014 U.S. Dist. LEXIS 129616 (S.D.N.Y. Sept. 2, 2014) .......... 9

**Statutes**

18 U.S.C. § 2510 .......... 16

Fla. Stat. § 934.02 .......... 20

**Treatises**

Rest. (2d) Conflict of Laws § 152 .......... 6

Rest. (2d) of Torts § 652B .......... 5

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......... 12

**Regulations**

78 Fed. Reg. 3972 (2013) .......... 17

## I. INTRODUCTION

Lawrence General Hospital ("LGH") aided third parties—including Google and Facebook—to secretly intercept Plaintiff Jane Doe's[1] and other healthcare consumers' wire communications with LGH. LGH injected into its website hidden code for "tracking technologies," including Google Analytics and Meta Pixel, that caused website users' browsers to surreptitiously intercept the contents of the user's communications with LGH, but LGH did not disclose such interceptions to website users. Plaintiff asserts a claim under the Massachusetts Wiretap Act, G.L. c. 272 § 99 ("MWA").

At least seven courts have affirmed wiretap and similar claims relating to tracking technologies such as Meta Pixel and Google Analytics, including this Court (Davis, J.) in *Doe v. Partners Healthcare System, Inc.*, where this Court rejected many of the same arguments LGH makes here.[2] LGH's scattershot arguments for dismissal ignore Plaintiff's express allegations and the MWA's plain text.

*First*, LGH argues that the MWA does not apply because Plaintiff fails to allege the interception occurred in Massachusetts. Not true. The intercepted communications were between two Massachusetts parties accomplished through devices located in Massachusetts. On these facts, Plaintiff states a claim.

*Second*, LGH argues that Plaintiff fails to allege an "interception" and only alleges "later dissemination of a previously intercepted and recorded statement." However, Plaintiff expressly alleges the interceptions were contemporaneous with Plaintiff's communications with LGH.

*Third*, LGH argues that Plaintiff alleges nothing was "heard" or "recorded," and similarly, that there is no "wire communication" because the MWA protects only human-to-human "conversation." Both arguments presume the MWA does not regulate modern technology, but the MWA's express terms do not limit it to human-to-human communications; the statute was designed to be applied to emerging technologies. The MWA applies to the forms of communication at issue here.

---

[1] The Court granted Plaintiff's motion to proceed in pseudonym, given the privacy interests concerning her status of a patient of LGH. Plaintiff has disclosed her true identity to LGH.

[2] *See* Ex. A (motion to dismiss in *Partners*, Case No. 1984CV01651-BLS1); Ex. B (Nov. 20, 2020 order denying motion to dismiss); Ex. C (transcript of motion to dismiss hearing explaining Court's reasoning, incorporated into order denying motion to dismiss). The *Partners* case later settled for $18.4 million.

*Fourth*, LGH argues the interceptions were not "secret." To prevail, LGH must prove Plaintiff had actual knowledge of the interceptions. Nothing in the Complaint establishes such actual knowledge. Plaintiff alleges in detail how the code for tracking technologies is hidden and how LGH utterly failed to disclose the technologies or the resulting interceptions. Google and Facebook's terms of service, even setting aside that those terms are outside the four corners of the complaint, do not come close to establishing Plaintiff's actual knowledge of any interception of Plaintiff's communications with LGH.

*Fifth*, LGH argues it did not intercept the "contents" of any communication. The MWA defines "contents" to include "any information concerning the identity of the parties." Plaintiff alleges the tracking technologies intercepted IP addresses in combination with other identifiers to associate intercepted communications with consumers' identities. Such information "concern[s] the identity of the parties." Moreover, the interceptions reflect the substance of communications, providing an alternative basis for the interceptions to involve the "contents" of communications.

*Finally*, LGH argues that the tracking technologies are not "intercepting devices" because they are implemented using computer code, and such "code" is not a "device." Ample authority under the MWA and similar laws confirms that Plaintiff's allegations describe an intercepting device.

In short, LGH's motion lacks merit. The Court should deny it.

## II. THE FACTS.

### A. *The Tracking Technologies*

Plaintiff alleges that LGH injected hidden code in its website that enabled third parties, including Google, Facebook, Yahoo!, Simpli.fi, and Tapad, to intercept the contents of Plaintiff's and other healthcare consumers' communications with LGH through the LGH Website. ¶¶ 28–57, 92.[3] Plaintiff alleges in detail how these technologies worked, but in general terms, LGH caused website users' browsers to load hidden code when the user visits the website. ¶ 51–56. When the user's device executes the code, the code causes the browser to intercept information about Plaintiff's communications with

[3] "¶ __" refers to paragraphs of Plaintiff's Complaint.

LGH and transmit that information to Google, Facebook, and other third parties. *Id.* The hidden code is invisible to ordinary users without special web developer tools. ¶ 55.

The categories of information intercepted included: (i) the URL of each webpage visited (the URL is a unique identifier that acts as an address for a webpage but also describes the content of the webpage, for example, https://www.lawrencegeneral.org/services-and-centers/services-for-growing-families/obstetrics-and-gynecology), *e.g.,* ¶¶ 48, 64, 76 (ii) the title of each page visited (such as "Obstetrics and Gynecology| Lawrence General Hospital"), *e.g.* ¶ 76; and (iii) actions users took on the website, including searches, the criteria for doctor searches, bill payments, and submissions of information through online forms, ¶ 83–86, 90–91. LGH installed these trackers throughout its website. ¶¶ 58–92.

The tracking technologies revealed sensitive health information about Plaintiff and other consumers, including (i) medical conditions, procedures, and specialties about which consumers sought information, ¶¶ 74–82; (ii) medical searches consumers performed on the website, ¶¶ 83–84; (iii) searches performed for doctors, ¶¶ 85–89, and (iv) consumers' retrieval and payment of bills, ¶¶ 90–91.

The interceptions also revealed identifying information about users, which permitted Google and Facebook to confirm the real-world identities of the individuals whose communications were intercepted. That information included the following:

(i) IP addresses, which are numerical codes that operate as a device's unique address on the Internet, similar to a physical address or telephone number, ¶¶ 30, 47, 54, 66, 71;

(ii) Browser fingerprints, which are combinations of browser and computer settings unique to each individual, which Google and Facebook also collect on their own websites, thus permitting both companies to confirm the identity of individuals communicating through the LGH Website by comparing browser fingerprints, ¶¶ 67, 72; and

(iii) User identification numbers assigned by Google or Facebook used to track a particular individual's movements across and actions on LGH Website, ¶¶ 65, 73.

B. *The Interceptions Were Secret*

The interceptions were secret and performed without the consent of Plaintiff and class members. The code for the tracking technologies was invisible to the website user, implemented through hidden code injected into the website that is not depicted visually in any part of the website that the website user

can see. ¶¶ 51–56, 61–63. LGH could have but did not disclose to healthcare consumers that it shares the contents of consumers' communications through the LGH with third parties. Instead, LGH told healthcare consumers, through their published online policies, that they did not share such information, including through several affirmatively deceptive statements. ¶¶ 21–26.

C. *Allegations Regarding the Plaintiff.*

Plaintiff is a resident of Burlington, Massachusetts and a patient of LGH. ¶ 10. She regularly uses the LGH Website to (i) obtain information about LGH doctors; (ii) search for information on particular medical procedures; (iii) obtain information about LGH's locations; and (iv) obtain and review her medical records through the website's patient portal. *Id.* The pages Plaintiff regularly uses are the same pages on which LGH injected hidden code for the tracking technologies. ¶¶ 85–89 (find-a-doctor communications and searches intercepted); ¶¶ 74–82 (pages on particular specialties and medical procedures intercepted); ¶ 83–84 (contents of user searches intercepted).

Plaintiff alleges that she and other Class Members are "Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed" the LGH Website. ¶ 96. That is, Plaintiff's claims are limited to communications between Massachusetts residents and a Massachusetts hospital made while Plaintiff and other Class Members were physically present within Massachusetts. *Id.*

## III. ARGUMENT

At least seven decisions have upheld claims relating to the tracking technologies that are either the same as or similar to those at issue here. These include this Court's denial of the defendant's motion to dismiss in the *Partners* case (see n.2 & accompanying text, *supra*); *In re Pharmatrak, Inc. Privacy Litig.* 329 F.3d 9 (1st Cir. 2003) (reversing dismissal of wiretap claims relating to tracking technologies on pharmaceutical websites); *In re Meta Pixel Healthcare Litig.*, 2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022) (concluding in considering preliminary injunction[4] that plaintiffs made a "strong showing as to

[4] The court ultimately denied the motion for a preliminary injunction based on a defense specific to the federal wiretap act that LGH does not contend applies here. *See id.* at *37–41.

each of the elements of their [federal] Wiretap Act claim" against Facebook relating to the use of Meta Pixel on hospital websites); *Doe v. Medstar Health, Inc.*, No. 24-C-20-000591 (Md. Cir. Ct. 2022) (Ex. D) (denying motion to dismiss Maryland wiretap act case relating to hospital use of Meta Pixel and Google Analytics); *Doe v. Sutter Health*, Case No. 34-2019-00258072 (Cal. Cnty. Ct. June 9, 2022) (Ex. E) (same, except California wiretap law); *Doe v. Bon Secours Mercy Health*, Case No. A 2002633 (Ohio Cm. Pl. Nov. 23, 2021) (Ex. F) (denying motion to dismiss Ohio claim similar to wiretap claim based on hospital use of Meta Pixel and Google Analytics); *Doe v. University Hospitals Health System, Inc.*, Case No. CV-20-933357 (Ohio Ct. Com. Pleas Nov. 16, 2020) (Ex. G) (same).

These decisions and the serious flaws in LGH's arguments on particular MWA elements, to which Plaintiff responds below, compel the conclusion that Plaintiff amply states a claim.

A. *The MWA Provides a Remedy for Interceptions of Communications Between Massachusetts Parties, Effected Through a Device Located in Massachusetts*

LGH argues that the MWA does not apply to the "conduct" Plaintiff alleges, which LGH claims took "place outside of Massachusetts' borders." MTD 8.[5] Under any potentially applicable conflicts-of-law analysis, the MWA applies to the interceptions here, which involved communications between two Massachusetts parties accomplished through a device located in Massachusetts.

The only Massachusetts decision that applies the current Massachusetts conflicts-of-law principles adopted by the Supreme Judicial Court ("SJC") to the MWA is *Heffernan v. Hashampour*, 2009 Mass. Super. LEXIS 409 (Super. Ct. Dec. 19, 2009). There, an out-of-state defendant secretly recorded telephone conversations with an in-state plaintiff. *Id.* at *1–2. The court applied a conflicts-of-law analysis, drawing upon Restatement (2d) of Conflict of Laws and SJC precedent construing it. *Id.* at *4. The Court applied the Restatement principles governing invasions of a right of privacy because a wiretapping claim is 'an action for an invasion of privacy' within the meaning of § 152 of the Restatement." *Id.* at *6.[6] The

[5] "MTD" refers to LGH's memorandum in support of its motion to dismiss.

[6] The Restatement (2d) of Torts § 652B confirms that the tort of "intrusion upon seclusion" includes wiretapping. *Id.* cmt. b. & illus. 3 ("intrusion upon seclusion" includes an attempt to "overhear the plaintiff's private affairs," including by "tapping his telephone wires" or "install[ing] a recording device.").

court held, quoting the Restatement, that "'[w]hen the [privacy] intrusion involves an intrusion upon the plaintiff's solitude,' as plaintiffs allege here, 'the place of invasion is the place where the plaintiff was at the time.'" *Id.* at *6 (quoting Rest. (2d) Conflict of Laws § 152 cmt. c).

*Heffernan* aligns with the MWA's purpose. The Legislature enacted the MWA to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which "pose grave dangers to the privacy of all **citizens of the Commonwealth.**" M.G.L. c. § 99(A) (emphasis added). It would be perverse to construe the MWA to deny the "citizens of the Commonwealth"—the persons for whose benefit the MWA was enacted—a remedy expressly afforded to them.[7]

Applying *Heffernan*, the MWA applies to Plaintiff's and class members' claims. Although LGH pretends Plaintiff fails to allege her location, she does so. She alleges she is a Massachusetts resident who regularly visited the LGH Website and that she and other Class Members, "while in the Commonwealth of Massachusetts, accessed" that website. ¶¶ 10, 96. Under *Heffernan*, the MWA applies here.

LGH cites several cases that diverge from *Heffernan*, focusing on where a defendant made a recording instead of the location of the injured plaintiff.[8] Those decisions trace their origins to one of two decisions—the Courts of Appeals decision in *Commonwealth v. Wilcox*, 63 Mass. App. Ct. 131 (App. Ct. 2005), or a federal magistrate judge's 1986 decision in *Pendell v. AMS/Oil, Inc.*, 1986 U.S. Dist. LEXIS 26089 (D. Mass. Apr. 30, 1986). Those decisions are either inapplicable or no longer good law.

[7] *State v. Worthy*, 661 A.2d 1244, 249–50 (N.J. 1995) (applying New Jersey wiretap law to call to New Jersey resident recorded outside of the state, reasoning, "there can be no doubt that the legislative concern for privacy embraces the privacy interest that a resident in New Jersey has in telephone conversations that originate from an out-of-state telephone"); *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 931 (Cal. 2006) ("[T]here can be no question that the principle purpose of [the California wiretap law] is to protect the privacy of confidential communications of California residents *while they are in California*") (emphasis in original); *OTR Transp., Inc. v. Data Interfuse LLC*, 2023 U.S. Dist. LEXIS 7562, at *15–17 (N.D. Ill. 2023) (because "injured party" in wiretap case "was located in Virginia," Virginia law applies).
[8] *See MacNeil Eng'g Co. v. Tisport, Ltd.*, 59 F. Supp. 2d 199, 202–03 (D. Mass. 1999) (applying *Pendell* to decline to apply MWA to telephone call with Massachusetts party recorded in England); *Christensen v. Cox*, 2017 Mass. Super. LEXIS 220 (Super. Ct. Nov. 21, 2017) (citing *Wilcox* to hold that MWA would apply only if party recording telephone conversation was located in Massachusetts); *Commonwealth v. Maccini*, 2007 Mass. Super. LEXIS 235, at *5–6 (Super. Ct. Apr. 23, 2007) (citing *Wilcox* to decline to apply MWA to recording of instant message conversation by out-of-state party).

*Wilcox* involved a different scenario: **all parties** to an **in-person** verbal conversation were **in Rhode Island** and recorded using a **tape recorder present with them in Rhode Island**. 63 Mass. App. Ct. at 139. *Wilcox*'s holding that there is "no authority for the proposition that [the MWA] applies to recordings made outside of Massachusetts," *id.*, does not apply here, where **both parties** (LGH and Plaintiff) were in Massachusetts, intercepted through Plaintiff's device in Massachusetts.

As to *Pendell,* that case followed "[t]he *lex loci delecti*" principle, which applies "the local law of the place of the wrong" for a tort claim. *Pendell*, 1986 U.S. Dist. LEXIS 26089, at *8. The court focused on the "physical act of recording," which there was a tape recording. *Id.* Massachusetts conflicts-of-law principles, however, have changed since *Pendell.* The SJC in 1994 (eight years after *Pendell*) announced a new rule adopting Restatement (2d) of Conflict of Laws (published in 1988, also after *Pendell*), which provides that for tort claims, the "state where the injury occurred applies, unless [another state] has a more significant relationship to the parties." *Cosme v. Whitin Mach. Works*, 417 Mass. 643, 647 (1994) (quotations omitted). *Heffernan* recognized this change in Massachusetts conflicts law, explaining:

> The defendants misplace their reliance on [*Pendell*], which a United States District Court magistrate decided in 1986 before the Supreme Judicial Court announced the two-step Restatement analysis [in *Cosme*] in 1984….. *Pendell*, a non-binding opinion, applied the now-outdated *lex loci delecti* approach.

2009 Mass. Super. LEXIS 409 at *8 n.6.

Notably, even under *Pendell's* "lex loci" standard, the MWA applies here. The Complaint makes abundantly clear the interceptions are accomplished through code executed in users' web browsers.[9] And, Plaintiff asserts claims for her and other Class Members accessing the LGH Website "while in the

[9] ¶ 51 (the "JavaScript code [for the tracking technologies] is…executed automatically within the individual's web browser"); ¶ 53 ("When the JavaScript code causes the user's web browser to retrieve a file from the third party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website…."); ¶ 54 ("When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address…."); ¶ 61 (the "user's web browser…execute[s] the JavaScript code" for Google Analytics); ¶ 69 (same for Meta Pixel); ¶ 107 (intercepting devices include "any devices Class Members used to access the [LGH] Website" and "Class Members' web browsers used to access the [LGH] Website").

Commonwealth of Massachusetts." ¶ 96. Because the interceptions were accomplished with devices located in Massachusetts, the MWA applies, even under the outdated *Pendell* and cases following *Pendell.*

LGH's own authority, *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121 (3d Cir. 2022), explains why the interception occurs in Massachusetts. Like this case, *Popa* involved tracking technologies that permitted third parties to eavesdrop on website communications. Construing Pennsylvania's wiretap act, the Third Circuit held, "[e]lectronic communications are… 'intercepted' when software reroutes communications to an interceptor." *Id.* at 130. Moreover, "the point where [tracking technologies] routed [the] communications to [third parties] was **[the plaintiff's] browser, not where the signals were received at [the third party's] servers**." *Id.* at 131 (emphasis added). That is, even if the court focuses on the point of interception, the MWA applies here. The fact that the communications were ultimately transmitted to third parties that may have been out-of-state does not matter. *Luis v. Zang*, 833 F.3d 619, 633 (6th Cir. 2016) (an "intercept of a communication…occurs at the point where [tracking software] captures the communication and reroutes it").[10]

B. *Plaintiff Alleges an "Interception."*

LGH argues Plaintiff fails to allege an "interception" because she merely alleges that a "previously intercepted and recorded" communication was "later disclosed." MTD 10. LGH's argument ignores Plaintiff's express allegations and fails to acknowledge, let alone grapple with, directly on-point case law.

The First Circuit in *Pharmatrak* explained that "some courts had narrowed the Wiretap Act's definition of interception to include only acquisitions of a communication contemporaneous with the transmission." 329 F.3d at 21. Although skeptical of the "contemporaneous" requirement, as the statute itself contains no such limitation, the First Circuit held that for tracking technologies, "[t]he acquisition

[10] LGH's out-of-state authorities focusing on the location of a recording align with *Popa* and therefore do not provide a different result. *Warrington v. Warrington*, 560 F. Supp. 3d 551, 554 (D.N.H. 2021) (focusing on place where conversation "recorded"); *State v. Fowler*, 139 P.3d 342, 346 (Wash. 2006) (Washington law applying "the laws of the…place where the conversation was intercepted") (quotations omitted). LGH's citation to *Larrison v. Larrison*, 750 A.2d 895 (Pa. Super. Ct. 2000), to argue wiretap laws should not be applied to "conduct occurring wholly outside of" the state does nothing for its argument, as under no conception of the facts did conduct occur "wholly outside of" Massachusetts.

[is] contemporaneous with the transmission by the internet users to the pharmaceutical companies." *Id.* at 22. The court reasoned: "the clear GIF [i.e., the pixel] that enabled the interception…sometimes arrived before the content delivered" by the website. Therefore, the tracking technologies were an "interception." *Id.* Critically, the fact that there were two technically separate internet connections—one between the plaintiff and the website and another between the plaintiff and the third party server—did not matter, as an "interception" does "not require that the acquisition somehow constitute the same communication as the transmission." *Id.*; *Meta Pixel Healthcare Litig.*, 2022 U.S. Dist. LEXIS 230754, at *34–35 (finding plaintiff is "likely to succeed on" the merits of its claim that Meta Pixel causes "interception," given allegations that Meta Pixel is "designed for the very purpose of intercepting communications on third-party websites by surreptitiously and contemporaneously redirecting these communications to Meta").[11]

In *Partners*, the same issue was litigated in depth under similar facts. Partners Healthcare argued, as LGH does here, that website tracking technologies involve "several communications," including separate communications between the website user and the website and then between the website user and Google or Facebook. Ex. A at 12. Judge Davis discussed this argument at length, including the import of *Pharmatrak*. He shared the First Circuit's skepticism on whether a contemporaneity requirement even exists,[12] observing, "I don't see any simultaneous or contemporaneous requirement in the [MWA]." Ex. C at 16-33. Ultimately, the Court denied the motion to dismiss. *Id.* at 32.[13]

[11] *See also Rich v. Rich*, 2011 Mass. Super. LEXIS 148, at *14–15 (Super. Ct. July 8, 2011) (computer monitoring software that tracked computer user's actions satisfy *Pharmatrak*'s contemporaneous requirement); *Luis*, 833 F.3d at 627–32 (similar facts to *Rich* involving monitoring software; same holding); *United States v. Szymuszkiecz*, 622 F.3d 701, 705–06 (7th Cir. 2010) (rejecting argument that email auto-forwarding software involved separate communications and therefore no interception; where communications happen an "eyeblink" apart, "[t]hat's contemporaneous by any standard"); *Zaratzian v. Abadir*, 2014 U.S. Dist. LEXIS 129616, at *14–15 (S.D.N.Y. Sept. 2, 2014) (same).

[12] *See also Facebook, Inc. v. State*, 2023 N.J. LEXIS 700, at *6–7 (June 29, 2023) ("[T]he word 'contemporaneous' does not appear in the ECPA or its state counterpart. A strict contemporaneity rule adopted before the advent of the Internet would not be a good fit to address the situations technology presents today… Nor would it be consistent with the underlying purpose of the wiretap statutes -- to protect individual privacy.").

[13] In the decision LGH cites, *Commonwealth v. Fitzpatrick*, an inmate conceded that the recording of his telephone calls was not secret but challenged the later sharing of the recordings—facts that do not meet any contemporaneity requirement. 2008 Mass. Super. LEXIS 176, at *19–21 (Super. Ct. June 2, 2008).

Just like in *Pharmatrak* and *Partners*, Plaintiff **does** allege "[t]he tracking technologies intercept and transmit to third parties the contents of communications between healthcare consumers and [LGH] contemporaneously with those communications," explaining that "[t]he tracking technologies intercept and transmit the contents of [the] communication to third parties before the webpage has even completed loading." ¶ 56.[14] Plaintiff's allegations align with *Partners*, *Pharmatrak*, and other decisions (see n. 14, *infra*) rejecting similar arguments in other cases involving the interception of computer communications.[15]

C. *Plaintiff Alleges a "Wire Communication."*

LGH presents two related arguments that proceed from a common flawed premise. First, LGH argues that Plaintiff fails to allege any communication was "heard or recorded" (MTD 11–12), and second, that Plaintiff fails to allege a "wire communication" (MTD 17–20). Both arguments have as their premise that the MWA "only [concerns] traditional conversations between humans" and should be limited to technologies that existed at the time of the MWA's passage. MTD 19.

The MWA's terms are not limited to human-to-human conversation. The statute includes communications between "persons," defined as "any individual, **partnership, association, joint stock company, trust, or corporation**." *Id.* § 99(B)(4, 13). That is, the MWA is not limited to "human conversation" but also covers communications with business entities like LGH.

Furthermore, the MWA defines a "**wire** communication" as "**any** communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." M.G.L. c. 272 § 99(B)(1) (emphasis added). The communications here occurred "by the aid of wire [or] cable, or other like connection," as the "Internet is an instrumentality" that transmits information "by aid of wire, cable, or other like connection." *United States v. Lyons*, 740 F.3d 702, 716 (1st Cir. 2014).

[14] *See also* ¶¶ 3, 42, 43, 56, 64, 66, 69, 77 (additional allegations of contemporaneous interception).

[15] LGH's discussion concerning the requirements for a separate theory of liability arising from subsequent disclosures of intercepted communications, including whether LGH "knew" the disclosed information was obtained by interception (MTD 10, citing M.G.L. c. 272 § 99(C)(3)), is beside the point, as Plaintiff alleges LGH aided an interception, not that LGH disclosed a previously intercepted communication.

This Court (Davis, J.) affirmed that the MWA applies to tracking technologies, rejecting the defendants' technical arguments that Google Analytics and Meta Pixel do not involve the "interception of any communication." *See* Ex. A at 12; Exs. B, C; *see also Sutter* (Ex. E) at 3–4 (rejecting argument under California wiretap act that participants to communication must each be "natural persons," collecting authorities construing federal wiretap act that reject the same argument).

The cases LGH cites applying the MWA to "speech" and "conversation" contain no holding **restricting** the statute to only such forms of communication; instead, those cases merely happened to involve speech or conversation[16] or contained no analysis limiting the MWA in the fashion LGH argues.[17]

LGH's contention (MTD 19) that "nothing in the statute suggests any intention to extend its protections to…websites" ignores that the Legislature was driven by the "**grave dangers**" posed by "the **uncontrolled development** and unrestricted use of **modern electronic surveillance devices**." M.G.L. c. 272 § 99(A) (emphasis added). *See also Commonwealth v. Almonor*, 482 Mass. 35, 41 (2019) ("[T]his court [has] been careful to guard against the power of technology to shrink the realm of guaranteed privacy by emphasizing that privacy rights cannot be left at the mercy of advancing technology but rather must be preserved and protected as new technologies are adopted and applied by law enforcement.").[18]

[16] *Commonwealth v. Rainey*, 491 Mass. 632, 645 (2023) (referencing "conversations," but **no** holding limiting "wire communication" to human-to-human communications); *Commonwealth v. Alleyne*, 2007 Mass. Super. LEXIS 591, at *4–6 (Nov. 1, 2007) (applying MWA to cell phone conversations, but **no** suggestion of exclusion of website communications); *Rich*, 2011 Mass. Super. LEXIS 148, at *12 (holding MWA language is "sufficiently broad to include… new technologies" including "email and instant messaging"; **no** suggestion of exclusion of other forms of internet communication); *Project Veritas Action Fund v. Conley*, 244 F. Supp. 3d 256, 263 (D. Mass. 2017) (referencing prohibition on secret "audio recording" but suggesting no limitation of MWA to such types of recordings).

[17] The Court in *Commonwealth v. Connolly* noted, without analysis or discussion, that "[d]ata from GPS devices…does not fall within the language of the wiretap statute," 454 Mass. 808, 825 (2009), but the Court did not explain which terms of the statute it applied (i.e., whether there was no "interception" of that data or whether the technology involved no "communications"). Nothing in *Connolly* suggests the decision was driven by any limitation of the MWA's scope to technologies that existed in 1968 or that the MWA applies only to traditional conversations between humans.

[18] *See also Marquis v. Google Inc.*, No. 11-2808-BLS1, Order on Motion to Dismiss at 4–5 (Super. Ct. Jan. 17, 2012) (Ex. H) (rejecting argument that "had the Legislature desired to include…electronic communications in the [MWA], then it would have done so expressly"); *Apple Inc. v. Superior Court*, 292 P.3d 883, 887 (Cal. App. Ct. 2013) ("Fidelity to legislative intent does not 'make it impossible to apply a

LGH's arguments that it did not enable Google and Facebook to "hear" or "record" any communications (MTD 11–12) reflect an implausible reading of the MWA that would exclude modern technologies from its scope. LGH's argument that website communications cannot be "heard" is a remarkable argument that able counsel for another hospital disavowed as a "Luddite" construction of the MWA.[19] Similarly, LGH's contention (MTD 11) that the technologies do not "set [anything] down in writing," such as a transcription, again reflects an implausible construction of the statute. Finally, LGH's argument that only an exact "reproduction" of an entire communication counts as a "recording" (MTD 12) is contradicted by the broad scope of "contents" that can be "recorded" and thus intercepted, which, as argued in § IV-E, *infra*, support a finding of an interception even when content well short of a complete duplication of the entire communication is made.

D. *Plaintiff Did Not Consent to LGH's Use of the Tracking Technologies on the LGH Website.*

LGH contends its facilitation of eavesdropping by Google and Facebook was not "secret." To avoid liability on the "secret" element, a defendant must establish the plaintiff's "actual knowledge" of the interception. *Commonwealth v. Jackson*, 370 Mass. 502, 505 (1976); *Pharmatrak*, 329 F.3d at 19 (defendant bears the burden in establishing consent). Proof of consent must be "specific and unambiguous." *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 685 (N.D. Cal. 2021).

Plaintiff alleges she had no knowledge of the interceptions. ¶ 3. She alleges how LGH implemented Google Analytics and Meta Pixel through hidden code designed to be invisible to the website user. ¶¶ 42–56. LGH nowhere disclosed eavesdropping by Google, Facebook, and other third parties. To the contrary, LGH falsely tells the users that it strictly limits any sharing of information with third parties to circumstances not applicable here, including "for law enforcement" and "to coroners,

legal text to technologies that did not exist when the text was created.... Drafters of every era know that technological advances will proceed apace and that the rules they create will one day apply to all sorts of circumstances they could not possibly envision.'") (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) pp. 85–86)).

[19] Ex. C at 20:13–20:19 ("**The Court:** So you read 'hear' – and the definition of interception you mean it really has to be audibly heard as opposed to communicated --.... **[Counsel:]** No. I accept -- I'm not taking some luddite approach to the wiretap act.").

medical examiners, and funeral directors." ¶ 22. LGH's deception vitiates any claimed consent defense. *Pharmatrak*, 329 F.3d at 19–20 (promises **not** to collect certain information negate consent defense).

This Court in *Partners* rejected the same argument that LGH makes here—that "[t]here was nothing secret about any of the Hospitals' using [Google Analytics and Meta Pixel] to track activity," explaining, "this is another situation where [the Court is] bound by the allegations of the complaint." Ex. A at 10; Ex. C at 22; *Marquis* (Ex. H) at 8 (holding at the "motion to dismiss stage," "the court accepts as true [plaintiff's] allegation that Google secretly intercepted her electronic communications").

LGH points to materials outside the Complaint, including Google's and Facebook's terms of service. MTD at 6–7, 13. The Court should not consider these documents in deciding LGH's 12(b)(6) motion, as "all materials outside the pleadings are excluded from [a 12(b)(6)] review." *Gen. Motors Acceptance Corp. v. Abington Cas. Ins. Co.*, 413 Mass. 583, 584 (1992). LGH also does not explain how Google or Facebook's terms of service apply; no facts establish Plaintiff's knowledge of those terms.

In any event, the terms LGH cites do not support its position. **Neither** set of terms suggest Google Analytics or Meta Pixel is used on the LGH Website or all websites.[20] Instead, the separate Meta Pixel terms applicable to LGH require it to "represent and warrant that [they] have provided **robust and sufficiently prominent notice** to users regarding [Meta Pixel] that includes, at a minimum:…a **clear and prominent notice on each web page where our pixels are used** that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your websites…and use that information to provide measurement services, target and deliver ads."[21] The terms of service for Google Analytics to which LGH agreed likewise requires LGH to prominently disclose Google Analytics to users.[22] That is, both Google and Facebook permit companies such as LGH to install

[20] https://www.facebook.com/privacy/policy/version/20220104/; https://policies.google.com/privacy.
[21] https://www.facebook.com/legal/terms/businesstools.
[22] https://marketingplatform.google.com/about/analytics/terms/us/ ("You must disclose [to users] the use of Google Analytics, and how it collects and processes data. This can be done by displaying a prominent link to the site 'How Google uses information from sites or apps that use our services.'").

Google Analytics and Meta Pixel only when the company prominently discloses to its website users that those technologies are being used. LGH utterly failed to meet these disclosure obligations.

Moreover, consumers reasonably expect medical providers will not share their communications with third parties. ¶¶ 18–20. In a case asserting federal wiretap **against Facebook** relating to **Meta Pixel**, a court recently held that the plaintiffs "raise potentially strong claims on the merits" and that even as to claims **against Facebook**, website users did not consent to Facebook's collection of browsing activity on hospital websites. *Meta Pixel Healthcare*, 2022 U.S. Dist. LEXIS 230754, at *4–5, 24–33.

The cases LGH cites do not support its position. The decision the Ninth Circuit affirmed in *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018), held that the Facebook terms of service provided a consent defense **only** for claims "**against Facebook**." *Smith v. Facebook Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017) (emphasis added). There was no suggestion that such terms could be invoked by hospitals, who were also defendants in the case. *Smith* has been distinguished on this basis in subsequent cases. *Doe v. Va. Mason Med. Ctr.*, 2020 Wash. Super. LEXIS 7567, *4 (Super. Ct. 2020) (distinguishing *Smith* in case involving Meta Pixel against a hospital which "does not hinge on the relationship between the Plaintiff and Facebook"); *see also Meta Pixel Healthcare*, 2022 U.S. Dist. LEXIS 230754, at *4–5, 24–33.

These issues—how a reasonable consumer would understand LGH's disclosures and any other information (including information outside of the Complaint)—are not the stuff of motions to dismiss. *In re Facebook, Inc.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019) ("[I]n the context of this motion to dismiss the plaintiffs may be deemed to have consented to this arrangement only if that is the only plausible interpretation."). Plaintiff more than adequately alleges the interceptions were secret.

E. *Plaintiff Alleges the Interception of "Content" as the MWA Defines that Term.*

LGH contends Plaintiff fails to allege that the "content" of any wire communication was intercepted. The MWA's text is critical on this issue, as it differs from federal and some other state wiretap statutes. The MWA provides a remedy wherever the "contents" of a communication are intercepted, and the MWA defines "contents" as: "**any** information concerning the **identity of the parties to such**

**communication** **or** the **existence**, contents, substance, purport, **or** meaning of that communication." M.G.L. c. 272 § 99(B)(5) (emphasis added). Plaintiff pleads interception of both "information concerning the identity of the parties" **and** "information concerning…the contents, substance, purport, or meaning" of communications, although allegations of **either** type of "contents" are sufficient to state a claim.

As a threshold matter, LGH's argument that Plaintiff fails to plead the contents of her own communications with LGH, MTD at 14, is nonsense. As explained above, § I-C, *supra*, Plaintiff alleges she regularly visited pages on the LGH Website that included the tracking technologies.[23] LGH's arguments that the intercepted information was not "content" are also wrong.

1. Plaintiff Pleads the Interception of Information Concerning the Identity of the Parties to the Communications.

The plain text of the MWA provides that "contents" include "**any** information concerning the **identity of the parties**." M.G.L. c. 272 § 99(B)(5) (emphasis added). Plaintiff alleges multiple types of information were intercepted that permit Google and Facebook to identify the user whose communications are intercepted. The information includes IP addresses, ¶¶ 30, 47, 54, 66, 71; browser fingerprints (combinations of computer settings that are unique to individuals), ¶¶ 67, 72; and identification numbers Google and Facebook assign to individuals to track them, ¶¶ ¶¶ 65, 73. The fact that Google and Facebook use this information to identify individuals for individualized advertising, ¶¶ 34–37, 40–41, demonstrates the information "concerns the identity of the parties."

LGH asserts that "Massachusetts appellate courts have not analyzed the meaning of 'contents' under the [MWA]." MTD 14. To the contrary, in *District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*, 379 Mass. 586 (1980), the SJC construed "contents," and its holding directly applies here. *New England Telephone* addressed the use of "cross frame unit traps," which record phone numbers of incoming

[23] *Rackemann v. LISNR, Inc.*, 2017 U.S. Dist. LEXIS 162567, at *16–18 (S.D. Ind. 2017) ("Defendants argue that [plaintiff] has failed to identify in his Complaint any specific, private communications that were intercepted… In suggesting that [the plaintiff] was required to provide such information…, Defendants ask this Court to apply the wrong standard…. [T]his is not a fraud case, subject to the heightened pleading requirements of [Rule 9(b)]… . [The plaintiff] is subject to the normal notice-pleading requirements, which require him to provide enough facts to state a claim to relief that is plausible on its face….")

calls to a particular phone line (but **not** the audio of the call itself). *Id.* at 587. The SJC held that telephone numbers count as "contents" of communications under the MWA's plain text. It reasoned:

> An interception is defined…to include the secret recording of "the *contents* of any *wire* or oral communication through the use of any intercepting device…." "Contents" in turn is defined broadly to include, among other things, "any information concerning the identity of the parties to such communication or the existence…of that communication…." [T]he recording of the telephone number of the line from which a call was attempted is "information concerning the identity of'" a party to a communication and concerning 'the existence…of that communication."

*Id.* at 591–92 (emphasis in original).

Of course, phone numbers, similar to IP addresses, do not necessarily belong to particular individuals. Given the broad definition of "contents," however, the SJC held that telephone numbers are "information concerning the identity of the parties" and hence constitute "content" under the MWA. For the same reasons, IP addresses also constitute content under the MWA.[24]

LGH attempts to avoid this clear law by pointing to cases under the federal wiretap act. But LGH ignores that Congress amended the federal act in 1986 to **exclude** from the definition of "content" "information concerning the identity" of the parties to a communication. *See* 18 U.S.C. § 2510(8). The case LGH cites to argue "phone numbers" are not "contents," *Hill v. MCI WorldCom Communs., Inc.*, 120 F. Supp. 2d 1194 (S.D. Iowa 2000), explains that before Congress removed the phrase "information concerning the identity of the parties" from the definition of "contents" (i.e., when the federal act mirrored the current MWA), the act "**did cover such information**." *Id.* at 1196 (emphasis added).

Here, Plaintiff's allegations are not limited to IP addresses; she also alleges Google and Facebook intercepted other identifying information that can be used in with IP addresses to identify the individuals, including persistent identifiers and "browser fingerprints." ¶¶ 66, 68, 73, 74. Even focusing on IP

[24] Although an individual's IP address sometimes changes, it is sufficiently stable to permit Google and Facebook use it to associate intercepted communications with individuals' real-world identities. An individual, for example, may connect to Google around the same time as the communication with LGH, using the same IP address, the same browser fingerprint, and the same persistent identifier. This permits Google to be sufficiently certain of the user's identity to use the contents of the intercepted communication to direct advertising personalized to that individual. ¶¶ 30, 34–37, 40–41, 47, 54, 66–67, 71–73.

addresses in isolation, IP addresses are the Internet's equivalent of telephone numbers. The MWA does not require an individual to be actually identified; instead, it covers the interception of "**any** information concerning the identity of the parties." Under *New England Telephone*, IP addresses fall well within the "broad" language of the MWA as "any" information concerning a party's identity.[25]

The Federal Trade Commission ("FTC"), construing another privacy law, rejected the same argument LGH makes here—that IP addresses provide no identifying information because they relate to "devices," not "individuals." The FTC explained:

> The Commission continues to believe that persistent identifiers [including IP addresses] permit the online contacting of a specific individual. [I]t is not persuaded by arguments that persistent identifiers only permit the contacting of a device. This interpretation ignores the reality that, at any given moment, a specific individual is using that device. Indeed, the whole premise underlying behavioral advertising is to serve an advertisement based on the perceived preferences of the individual user.
>
> Nor is the Commission swayed by arguments noting that multiple individuals could be using the same device. Multiple people often share the same phone number, the same home address, and the same email address, yet Congress still classified these, standing alone, as "individually identifiable information about an individual."

78 Fed. Reg. 3972, 3980 (2013). The FTC correctly recognizes that IP addresses are information concerning a party's identity. Consistent with these authorities, *Partners* affirmed an MWA claim over the precise same argument LGH makes here. Ex. C (rejecting argument that IP address "really just identifies a machine" and "any one of those devices can…be held by any number of people"); Ex. B.

2. Plaintiff Alleges an Interception of "Substance, Purport, or Meaning" of Communications.

Plaintiff also alleges interception of communication's "substance, purport, or meaning," providing an additional basis for LGH's liability. Plaintiff details the intercepted information, including descriptive URLs, webpage titles, the precise search terms consumers used on the website, the precise

[25] LGH contends, without support, that Google Analytics is "anonymous." LGH cites to Complaint ¶ 39, but the Complaint does not say that, and instead, that exact paragraph states Google **does** use Google Analytics to identify particular users; *see also Bon Secours* (Ex. F) at 4 (rejecting hospital contention that visits to website are anonymous because "this is contradicted by the amended Complaint," including allegations that Google used "IP address, user agent and browser fingerprint" to identify individuals).

criteria consumers used to search for doctors, and requests for appointments and medical records. See § II-A, supra (cataloging categories of information intercepted).

Even focusing on URLs alone, ample authority confirms that URLs contain "content" when they are "descriptive" by revealing the substance of a webpage that a user visits. The district court in *Meta Pixel Healthcare* found allegations relating to Meta Pixel on hospital websites to be "strong," rejecting the argument that the interceptions accomplished through Meta Pixel did not involve contents. It explained:

> [T]he log-in buttons and the kinds of descriptive URLs identified [by the plaintiff] are "contents" within the meaning of the statute. Unlike in *Zynga*,[26] the URLs at issue here would not merely reveal the name of a Facebook user or group.... [Instead, the URLs] are content because they concern the substance of a communication.... [P]laintiffs' internet communications on their healthcare providers' websites appear to fall squarely within the statutory definition [of "contents"].

2022 U.S. Dist. LEXIS 230754, at *4, 35–37; *Partners* (Ex. C) at 12 (crediting allegations that hospital URLs reveal the substance of communications); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (affirming wiretap claim; explaining that "the URL provides significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it").

F. *Plaintiff Alleges LGH's Use of an Intercepting Device.*

LGH argues that Plaintiff does not allege that the interceptions at issue involve an "intercepting device" because they were accomplished through "intangible code," and a "device" must be "tangible." LGH ignores compelling authorities on this precise issue, including those LGH itself cites.

The Superior Court in *Rich v. Rich* confirmed, in discussing keylogger software (hidden software that records activities on a computer, similar to the tracking technologies here), that "[t]he key logger program is an 'intercepting device' (at least when surreptitiously installed on a computer) because it 'is

---

[26] "*Zynga*" refers to *In re Zynga Privacy Litigation,* 750 F.3d 1098 (9th Cir. 2014), a case LGH cites. As *Meta Pixel Healthcare* explains, *Zynga* did not hold that URLs never contain "content"; instead, the particular URLs in *Zynga* did not. 2022 U.S. Dist. LEXIS 230754, at *35–36. *In re Google, Inc.* likewise rejected a "categorical assessment that [URL]s *never* 'concern[] the substance, purporting, or meaning' of a communication." 806 F.3d 125, 136–37 (3d Cir. 2015).

capable of…recording a wire…communication.'" *Rich*, 2011 Mass. Super. LEXIS 148, at *15–16. And, this Court in *Partners* denied a motion to dismiss claims focused on the same tracking technologies at issue here. *Rich* and *Partners* align with the weight of authority construing the same word, "device," under federal and other states' wiretap laws. *Meta Pixel Healthcare*, 2022 U.S. Dist. LEXIS 230754, at *37 (Meta Pixel transmits communications "through the use of 'devices'"); *Sutter* (Ex. E) at 5–6 (rejecting argument California wiretap act does not cover Meta Pixel and Google Analytics "code").[27]

These decisions align with common sense. Practically all modern devices are a combination of hardware and software. Construing the phrase "intercepting device" to exclude interceptions accomplished through a combination of hardware and software on the reasoning that "software" is not a "device" would effect a judicial repeal of the MWA as applied to most modern technology.[28]

LGH also argues (MTD 17) that even if one considers the relevant device to be Plaintiff's device, Plaintiff cannot state a claim because LGH "has no control over [her] devices." This argument—made without citation—is contradicted by Plaintiff's express allegations that LGH can and did control her device by surreptitiously causing it to load computer code that accomplished the interceptions. ¶¶ 51–56.

LGH's cases (MTD 16) either do not hold as LGH contends or construe materially different statutes. In *Potter v. Havlicek*, a case in which the only defendant was a computer spyware software

[27] *See also Luis*, 833 F.3d at 634 (manufacturer of computer spyware software sold a "device" designed for interceptions in violation of federal wiretap act); *United States v. Hutchins*, 2018 U.S. Dist. LEXIS 183898, at *34–37 (E.D. Wis. 2018) (software is "device" under the federal Wiretap Act given the "ordinary meaning of" [a] "device"); *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1084 (N.D. Cal. 2015) ("[S]oftware [which records websites visited on a cell phone] is a 'device' for purposes of the Wiretap Act."); *Klumb v. Goan*, 884 F. Supp. 2d 644, 661 (E.D. Tenn. 2012) (affirming wiretap liability where "program has been installed on a computer which [caused] emails sent…through the internet to be rerouted…to a third party address").

[28] Under LGH's construction of the MWA, cell phone recordings would be beyond the MWA's reach because cell phones use a recording app (i.e., software) to record, and software is not a "device." This is simply not the law. *Gilk v. Cunniffe*, 655 F.3d 78, 86 (1st Cir. 2011) (cell phone recording falls within MWA's scope); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020) (MWA "makes it…a crime…to use a smartphone to [secretly] record"); *Martin v. Evans*, 241 F. Supp. 3d 276, 286 (D. Mass. 2017) (MWA "not obviously susceptible to a limiting construction that excludes the audio recording function of cell phones"); *Commonwealth v. Browar-Jarus*, 97 Mass. App. Ct. 1108 (2020) (affirming **criminal conviction** under MWA for cell phone recording); *Commonwealth v. Minori*, 101 Mass. App. Ct. 1106 (App. Ct. 2022) (same); *Johnson v. Frei*, 2016 Mass. App. Div. LEXIS 36, *11-12 (App. Div. 2016).

company, the court held only that the software "**alone** is not a…device" because software "**alone** cannot be used to intercept communications." 2008 U.S. Dist. LEXIS 122211, at *23 (S.D. Ohio June 23, 2008) (emphasis added). The court's use of the word "alone" implies that even if software "alone" is not a device, software in combination with hardware **may** be an "intercepting device." The court did not decide that issue, as the plaintiff asserted no claim against the party who installed the software on a computer.[29]

LGH also cites a series of Florida cases construing Florida's wiretap act to exclude software. The Florida act, however, is different from the MWA in a critical respect. In *Jacome v. Spirit Airlines*, 2021 Fla. Cir. LEXIS 1435 (Fla. Cir. Ct. June 17, 2021), the court emphasized that the Florida act was "amended in 1988 to exclude '[a]ny communication from an electronic or mechanical device which permits the tracking of the movement of a person or an object,'" *id.* at *7–8 (quoting Fla. Stat. § 934.02(12)(c)), and therefore, the court reasoned, "software which *tracks* a website browser's movements…is thus definitionally excluded." *Id.* The MWA contains no such exclusion for devices that track the movement of a person; accordingly, *Jacome*'s reasoning does not apply to the MWA. The other Florida cases LGH cites simply follow *Jacome*. *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *6 (S.D. Fla. July 6, 2021) (citing *Jacome*); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *6 (S.D. Fla. July 6, 2021) (same).[30]

Plaintiff's allegations fall comfortably within the MWA's definition of an "intercepting device."

## IV. CONCLUSION

For the foregoing reasons, the Court should deny LGH's motion to dismiss.

[29] "[T]here are reasons to doubt [*Potter*'s] strict interpretation of the Wiretap Act would be warranted even if this court were to undertake such an interpretation. Determining that the Wiretap Act could never apply to software would require the court to overlook the notably broad language of the Wiretap Act, which was to generally prohibit unauthorized artificial interception of communication in an era of changing technologies, in favor of a hyper-technical reading of the statute." *Hutchins*, 2018 U.S. Dist. LEXIS 183898, at *37.

[30] LGH's other cases involve materially different laws. *United States v. Ackies* construed a different statute on warrants for the installation of "mobile tracking devices." 918 F.3d 190, 199 (1st Cir. 2019); M.G.L. c. 272 § 99. The court relied on the "context" of that statute, which it understood to focus on physical GPS trackers; here, in contrast, the express statutory text contemplates the MWA will apply broadly to all "modern electronic surveillance devices." M.G.L. c. 272 § 99(A). LGH's citation to *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 972 (S.D. Cal. 2012), is even further off-point, as that case construes the phrase "tangible good or service," which is much different than "device."

Dated: August 2, 2023

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by e-mail on August 2, 2023.

*/s/ Patrick J. Vallely*
Patrick J. Vallely

# Exhibit A

29.1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 1984CV01651-BLS1

JOHN DOE AND JANE DOE,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

PARTNERS HEALTHCARE SYSTEM, INC.,
THE GENERAL HOSPITAL
CORPORATION D/B/A MASSACHUSETTS
GENERAL HOSPITAL, BRIGHAM,
HEALTH INC., DANA-FARBER CANCER
INSTITUTE, INC., DANA-FARBER/
PARTNERS CANCER CARE, INC., AND
DANA-FARBER, INC.,

Defendants.

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2:44
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants Partners Healthcare System, Inc. ("Partners"), The General Hospital Corporation ("Massachusetts General Hospital" or "MGH"), Brigham Health, Inc. ("Brigham and Women's Hospital" or "BWH"), Dana-Farber Cancer Institute, Inc. ("Dana-Farber" or "DFCI"), Dana-Farber, Inc., and Dana-Farber/Partners Cancer Care, Inc. (collectively, "the Hospitals")[1] move under Massachusetts Rule of Civil Procedure 12(b)(6) ("Rule 12") to dismiss this case in its entirety for failure to state a claim upon which relief can be granted. Plaintiffs have filed a 111-

[1] Defendants contend that the Complaint misnames Dana-Farber/Partners Cancer Care, Inc. and Dana-Farber, Inc. as parties in this case.

page, 419-paragraph First Amended Complaint ("FAC"), replete with graphics, flowcharts, links to YouTube videos, snippets of code, and digressions from academic articles.[2] In fact, Plaintiffs spend 73 pages before even trying to allege a single cause of action against the Hospitals, inveighing against Google, Facebook, a hodgepodge of lesser-known companies, and the way the Internet generally functions. (Indeed, Plaintiffs' counsel, Simmons Hanly Conroy, sues these non-profit hospitals after suffering dismissal of a similar suit against Facebook itself, and a group of other hospitals, in California.) With this bulk of extraneous material, Plaintiffs seek to obscure their fundamental failings and proceed into costly class discovery, threatening non-profit hospitals with millions in damages. They cannot do so. Even assuming all their factual allegations to be true, the FAC does not "raise a right to relief above the speculative level." Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008) (adopting the Fed. R. Civ. P. 12 standard set forth in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007)). To the contrary, a close examination of the allegations and the law compels dismissal.

## I. SUMMARY OF ARGUMENT

Plaintiffs fail to allege any "secret interception" of communications that would allow them to recover under G.L. c. 272, § 99 ("Wiretap Act"). To the contrary, the FAC and referenced documents show that the Hospitals extensively disclosed what everyone already knows – that websites in 2019 use third-party cookies. Further, the actions that Plaintiffs describe in their FAC do not amount to "interception" at all.

---

[2] To say Plaintiffs' initial filings are voluminous is an understatement. Plaintiffs have filed: (i) two complaints, the first was fifty pages and 218 paragraphs, and the second is over one hundred pages and four hundred paragraphs (without any change in the underlying facts); (ii) two motions for preliminary injunction and memoranda in support; and (iii) two affidavits by their expert, totaling over one-hundred pages.

Plaintiffs' allegations do not support an "unreasonable, substantial, or serious interference with [their] privacy" as required to recover under G.L c. 214, § 1B ("Invasion of Privacy"). The Hospitals' disclosures, incorporated by reference in the FAC, amply rebut any idiosyncratic, unrealistic privacy expectation Plaintiffs may now claim to have had.

Plaintiffs do not – and cannot – establish a breach of fiduciary duty. Massachusetts law has never recognized a fiduciary duty owed by hospitals to patients. To sustain such a claim, the Court would have to create a new fiduciary duty under Massachusetts law. Members of the public engaging with general informational websites is certainly not compelling grounds upon which to build such a duty.

Lastly, Plaintiffs fail to state a claim under G.L. c. 93A, § 9 because, among other reasons, the Hospitals are non-profit, charitable institutions and by offering publicly-available informational websites they are not engaged in "trade or commerce," as required under the statute, and Plaintiffs' claims fall short of showing that they have suffered any legally-cognizable injury.

## II. FACTUAL ALLEGATIONS AND FACTS SUBJECT TO JUDICIAL NOTICE

### A. The Hospitals' Non-Profit Status Is Subject to Judicial Notice

Plaintiffs accuse the Hospitals of violating patient privacy for economic gain. Plaintiffs are wrong. The Hospitals are all non-profit institutions, chartered and dedicated to serve the public interest. The Hospitals' non-profit status is a fact subject to judicial notice. That status is a "fact that is not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction," and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Mass. G. Evid., § 201(b). For example, the Secretary

of the Commonwealth maintains records of the status of non-profit (and for profit) corporations,[3] and the Office of the Attorney General maintains a registry of non-profit entities in the state.[4] The Hospitals' non-profit status is listed on each of these sources. Therefore, the Court can take judicial notice of that non-profit status, even at this stage. Mass. G. Evid., § 201(c) ("A court may take judicial notice at any stage of the proceeding, whether requested or not[.]").

### B. Hospital Website Disclosures Incorporated By Reference

The FAC cites continuously to websites maintained by the Hospitals. These include massgeneral.org, brighamandwomens.org, and dana-farber.org (the "Informational Websites"). The FAC not only references these websites, but provides multiple screenshots. Therefore, the disclosures made on each of these sites is incorporated by reference and subject to the Court's notice on this Motion. See, e.g., Martin v. Lefkowitz, 93-7454, 1994 Mass. Super. LEXIS 37, at *6 (Aug. 3, 1994) (granting motion to dismiss after giving defendants the benefit of documents incorporated by reference into the complaint).

#### 1. The Hospitals' Websites' Disclosures Make Clear Their Informational Nature

The Informational Websites each provide disclaimers about the nature of the websites themselves. For example, MGH states on its Informational Website: "Disclaimer: The Massachusetts General Hospital website is intended to provide general educational information and to help users more easily access information about health care services at Mass General."

---

[3] SEC. OF THE COMMONWEALTH OF MASS., CORPORATIONS DIV., SEARCH FOR A BUSINESS ENTITY, http://corp.sec.state.ma.us/corpweb/corpsearch/CorpSearch.aspx (last visited Sept. 10, 2019).
[4] OFFICE OF THE MASS. ATT'Y GEN., NON-PROFITS & CHARITIES DOCUMENT SEARCH, http://www.charities.ago.state.ma.us/charities/ (last visited Sept. 10, 2019).

TERMS OF USE, https://www.massgeneral.org/notices/terms-of-use.aspx (last visited Sept. 10, 2019).

Brigham and Women's Hospital's Informational Website states:

> The Brigham and Women's Hospital (BWH) web site is intended to provide general educational information and to help users arrange more easily for health care services…This site is not an attempt to practice medicine or provide specific medical advice . . . . Use of programs on the BWH site does not establish a doctor-patient relationship.

DISCLAIMER, https://www.brighamandwomens.org/about-bwh/disclaimer (last visited Sept. 10, 2019).

DFCI's Informational Website states:

> The Dana-Farber Cancer Institute website is intended to provide general information about the Institute, its care and research programs, and about cancer and related diseases. This site also provides links to health information that may be written by Dana-Farber staff or by outside providers, and access (links) to some external websites for your convenience . . . . This site is not an attempt to practice medicine or provide specific medical advice, nor does the use of the site establish a doctor-patient relationship.

LEGAL STATMENTS, https://www.dana-farber.org/legal-statements/ (last visited Sept. 10, 2019).

### 2. The Informational Websites Make Any Necessary Privacy Disclosures

On any fair reading, the Informational Websites disclose an active web environment, with data being gathered automatically and subject to analysis, potentially with the help of third parties. For example, MGH affirmatively states:

> The Mass General websites use "cookies", tracking pixels and related technologies. Cookies are small data files that a website can transfer to your computer. Examples of information we collect include how often someone visits our site and what they do while on our site. We use this information in the aggregate to understand how our visitors as a group use different resources and to help us improve our site. We also collect information about the activity of individual website users. This information may be used to target related Mass General advertisements to you on other third-party sites.

WEBSITE PRIVACY POLICY, https://www.massgeneral.org/notices/privacy/websiteprivacy.aspx (last visited Sept. 10, 2019). Similarly, the BWH privacy policy discloses:

> The Brigham and Women's website[s] use web analytics, tag management services, and remarketing tools provided by Google, Inc. ("Google") and other third parties to collect certain information relating to your use of the website. Google Analytics uses "cookies", which are text files placed on your computer, and tags (such as tracking codes and event codes) to help us analyze how users use different resources and to help us improve our site. This information may also be used to target related Brigham and Women's Hospital advertisements to you on other third-party sites.

WEBSITE CONTENT AND PRIVACY POLICY, https://www.brighamandwomens.org/about-bwh/privacy (last visited Sept. 10, 2019). Both provide a link to opt out of interest-based advertising.

Likewise, DFCI discloses the use of cookies "to track traffic coming to our site." DANA-FARBER WEBSITE PRIVACY STATEMENT, https://www.dana-farber.org/privacy-policy/ (last visited Sept. 10, 2019). Thus, the Hospitals' Informational Website policies clearly disclose the use of cookies and other tracking tools.

### C. The First Amended Complaint Is Overstuffed with Irrelevant Red Herrings

The First Amended Complaint starts with a quote from a speech by an executive of one of the Hospitals. In this quote, she is discussing the values of the organization, and promoting privacy. In that context, she states that "[t]he trust and the confidence that you place in your potential or existing health care provider is sacred." *FAC*, Ex. 1.[5] The Hospitals, of course, stand by that quote and act accordingly. But the First Amended Complaint does not say what legal relevance this quote has and, without offering any support to the contrary, misappropriates and weaponizes it against well-meaning Hospitals.

---

[5] All "¶" references are to the FAC unless otherwise noted.

As an initial matter, Plaintiffs patently misstate the purpose and functionality of the Informational Websites. The Informational Websites are sources of information about the Hospitals, recent medical news and research, events, and other health-related issues.[6] Plaintiffs attempt to augment this reality with phrases like "the precise content of the patient's communication" (¶¶ 12, 14, 16), implying the false narrative that visitors are able to communicate directly with medical professionals through the Informational Websites as opposed to the reality that visitors are merely navigating through publicly-available materials. Plaintiffs contend, for example, that the Informational Websites "are designed for patient communications, including . . . signing up [for] and signing in to a personal patient portal" (¶ 30), and that clicking a link from each of the Informational Websites is all that is required to sign up and sign in (¶¶ 103-11). This clever wordplay obscures the fact that the Informational Websites merely provide a link to a separate website, where one may sign up or sign in – a fact that Plaintiffs concede later in the FAC. See ¶ 146 (belatedly referencing a "specific webpage within [a Partners] website that contained the Patient Portal log-in").[7]

The FAC also generally maintains the fiction that every person who visits the Informational Websites is, in fact, a patient. ¶¶ 29-30. The websites on their face make clear that their purpose

---

[6] While the Hospitals respect that, for the purposes of a Motion to Dismiss, they must accept all well-pled allegations as true, it is notable that Plaintiffs misrepresent the functionality of the Informational Websites (see, e.g., ¶ 30), which only provide visitors with *information about* actions such as payment and accessing the patient portal, not the ability to complete those tasks. In fact, the Informational Websites direct visitors to Hospital personnel and/or a separate online resource for direct communications with doctors and other functions related to their actual medical care or records.

[7] Although Partners need not respond to the contention in ¶ 146 that any action taken by that separate website – which is used for a distinct purpose from the Informational Websites and against which Plaintiffs raise **no** allegations – was related to the instant suit (in fact, it was not), it is absurd to suggest that the Informational Websites be treated the same as a patient login portal.

is to provide information to the public at large – for example, providing a history of the institutions, the offerings at each facility, and information about various health issues, among other content. Further, those websites expressly disclaim the creation of a patient relationship, and there is nothing unique about a patient's interaction with any of the Informational Websites as compared to that of a member of the public at large. Critically, Plaintiffs do not allege (nor could they) that the Hospitals know whether the visitors to their Informational Websites are patients, medical professionals, medical students, employees, or other members of the public.

The FAC spends dozens of pages describing the general business practices of third parties not named as defendants in this action, only vaguely relating these practices to the instant claims. Plaintiffs never explain how the Hospitals would be liable for the business model of these third parties. For example, Plaintiffs speculate that Facebook may have tools that allow it to scrape appointment request forms from the Hospitals' websites, but admit "Plaintiff is without knowledge whether Mass General and Partners have actually implemented form-scraping functionality." ¶ 123.

Further, Plaintiffs surmise that Facebook and Google cookies may be synched up in a nefarious tracking scheme on the Hospitals' respective websites, but admit that without further discovery, "it is impossible to know whether and how much data is disclosed to Facebook through this method." ¶ 176. Without any supporting facts, Plaintiffs allege that tag manager tools are deployed as "invisible tracking" (¶¶ 63-64); then, they concede, in the following paragraph, that tag managers improve website functionality (¶ 65). The continuing implication is that Plaintiffs need to engage in full-scale discovery to determine whether there is any merit to their claims against the Hospitals; but, the reality is that Plaintiffs want to start a fishing expedition targeting

these non-defendant third parties, without sufficiently alleging that it would result in any liability against the Hospitals.

**D. Almost Nothing in The FAC is Actually About Plaintiffs**

By contrast, John Doe and Jane Doe, the supposed parties in interest, barely appear in their own FAC. Fewer than a dozen of the 419 paragraphs concern John Doe or Jane Doe, as opposed to the countless allegations that if "a patient" were to do this or that, the Informational Websites would respond in such and such a way. ¶ 25. Plaintiffs make no allegations about the privacy settings they deployed on their own Internet browsers, and no allegations about when, where, why, or the manner in which they used the Informational Websites.

The FAC alleges in a conclusory fashion that "Defendants disclosed Plaintiffs John Doe's and Jane Doe's communications, including patient status and personally identifiable information associated with these communications to third parties," and were, thereby, compensated "in the form of enhanced marketing services." ¶¶ 294-95. Plaintiffs do not identify what "personally identifiable information" was disclosed to third-parties, and deliberately use the term "compensate" to create the misleading impression that the Hospitals received money in connection with the allegations in the FAC. But, Plaintiffs stop short of actually making any such allegation. There is no allegation, nor could there be one in good faith, that any of the Hospitals received financial remuneration in connection with the operation of their Informational Websites.

The FAC does not allege with whom John Doe's or Jane Doe's information was shared, by which Hospital, or for what purpose. FAC Paragraphs 95-101 criticize browser fingerprinting, in general, but the FAC does not allege that John Doe's or Jane Doe's browser was fingerprinted. Long sections of the FAC concern appointment schedulers and how the Informational Websites can be searched ("queries"), but neither John Doe nor Jane Doe alleges that they used the appointment scheduler or made any queries on the website. The FAC discourses at length on

alleged inadequacies, gaps, or lacunae in the online disclosures but does not allege that John Doe or Jane Doe read or relied on any of them.

Nor does the FAC allege any facts specific to John Doe or Jane Doe to demonstrate any damage from or consequence of the alleged sharing of "personally identifiable information". The FAC relies on academic musings about the economic value of personal information, ¶ 227, but does not allege that John Doe or Jane Doe were ever looking to sell their personal information or were somehow thwarted by the Hospitals in those (hypothetical) efforts. See, e.g., Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 451 (D. Mass. 2012) (dismissing claim for "value" of personal information involved in a data security breach). Like their pseudonyms, John Doe and Jane Doe are ciphers in this suit, which is first, last, and only about the desire by Plaintiffs' counsel to make money suing non-profit hospitals.

## III. LEGAL ANALYSIS

### A. Plaintiffs State No Claim Under The Wiretap Act

Under the Massachusetts Wiretap Act, it is unlawful to intercept, disclose, or use intercepted oral or wire communications. Mass. Gen. Laws ch. 272, § 99. The critical limiting term in the statute is "interception," expressly defined to mean "to *secretly* hear, *secretly* record, or aid another to *secretly* hear or *secretly* record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Id., § 99(B)(4) (emphasis added). There was nothing secret about any of the Hospitals using third-party cookies to track activity. Each of them disclosed that fact in their respective privacy policies posted on their websites. Under § 99(C)(1), a recording made pursuant to public notice is not secret, and hence not a violation. See, e.g., Glik v. Cunniffe,

655 F.3d 78, 87-88 (1st Cir. 2011) (finding "actual knowledge" does not require that there be any explicit acknowledgment of or reference to the fact of the recording).[8]

Even apart from the specific privacy policies, it is common knowledge that cookies "are part of routine Internet functioning and can easily be blocked." See In re Facebook Internet Tracking Litig., 263 F. Supp. 3d 836, 846-847 (N.D. Cal. 2017) (dismissing privacy claims, and noting that "websites routinely embed content from third-party servers in the form of videos, images, and other media, as well as through their use of analytics tools, advertising networks, code libraries and other utilities"). There, the Court noted that the Plaintiffs did not "have a reasonable expectation of privacy in the URLs of the pages they visit," in part because they "could have taken steps to keep their browsing histories private." Id. at 846.

For almost two decades, the plaintiffs' bar has been trying to cash in on hyper-technical claims surrounding cookies, and for almost two decades the courts consistently have rebuffed these efforts. See, e.g., In re DoubleClick Privacy Litig., 154 F. Supp. 2d 497 (S.D.N.Y. 2001) (dismissing claims against ad network for using cookies to target advertisements). Indeed, the DoubleClick court's legal decision and reasoning has withstood the test of time. It noted that the Internet is predicated on sharing information between computers: "The Internet is accurately described as a 'network of networks.' Computer networks are interconnected individual computers that share information. Anytime two or more computer networks connect, they form an 'internet.'" Id. at 501. DoubleClick provided website advertisements for its clients, promising

[8] Plaintiffs make much of the standard of consent under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). However, that is not the applicable law. Plaintiffs did not and cannot sue under it. See, e.g., Miller v. Nichols, 586 F.3d 53, 59-60 (1st Cir. 2009), cert. denied, 559 U.S. 1008 (2010) (refusing to create a private cause of action since one did not already exist for a HIPAA violation); Padilla-Ruiz v. United States, 593 F. App'x 1, 4 (1st Cir. 2015) (affirming District Court decision that HIPAA does not create a private right of action).

that it "will place their banner advertisements in front of viewers who match their demographic targets," and "creat[ing] value for its customers in large part by building detailed profiles of Internet users and using them to target clients' advertisements." Id. at 502. Critical to the DoubleClick court's analysis in dismissing plaintiffs' complaint with prejudice was the fact that "users can easily and at no cost prevent DoubleClick from collecting information from them." Id. at 504. Thus, at least as a general matter, website visitors understand that third-party cookies are part of virtually any website.

Further, the actions that the Plaintiffs allege do not amount to "interception" of any communication at all. The FAC first describes the GET request, by which a web user asks to see a page (¶ 56); then, describes the POST request, by which a web user can send form information (¶ 57); and finally, alleges that the Hospital servers, in response to these requests, send commands to the web user's browser (¶ 58). Allegedly, these commands tell the browser to redirect the GET or POST information to a third party. Even if this were true, it would not constitute the "interception" of any communication. See, e.g., In re Facebook Internet Tracking Litig., 263 F. Supp. 3d at 844 (dismissing Wiretap Act claim).

Here, as in In re Facebook, Plaintiffs allege several communications, but none is intercepted. In the first, the user sends a GET or POST request to the web server. The web server sends instructions back. The third party is not a part of these communications. Then, following directions, the web user's browser sends information to the third party. Dismissing the Wiretap Act claim, the court held that "[t]he fact that a user's web browser automatically sends the same information to both parties does not establish that one party intercepted the user's communication with the other." Id. at 844.

A contrary conclusion would subject almost all websites to catastrophic potential liability pursuant to the liquidated damages available under the Wiretap Act. Further, the Wiretap Act is a criminal statute; and Plaintiffs' interpretation of that statute would criminalize basic Internet functionality (which has been recognized by courts in the United States for nearly twenty years). See, e.g., Flemings v. Contributory Ret. Appeal Bd., 431 Mass. 374, 375-76 (2000) ("If a sensible construction is available, we shall not construe a statute to make a nullity of pertinent provisions or to produce absurd results").

**B. Plaintiffs State No Claim For Invasion of Privacy**

To sustain a claim for invasion of privacy, "the invasion must be both unreasonable and substantial or serious." Nelson v. Salem State Coll., 446 Mass. 525, 536 (2006). Relevant to the analysis is the "location, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." Polay v. McMahon, 468 Mass. 379, 383 (2014). In this case, to the extent that anything can be gleaned from the FAC concerning John Doe and Jane Doe specifically, the "intrusion" is nothing more than placing standard cookies files on their browsers; the frequency and duration is minimal; and, the underlying purpose is to help with retargeting, ¶ 220, which is a standard advertising practice. As a matter of law, even if what Plaintiffs say is true, it is not an actionable invasion of privacy. Cf., Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514 (1991) (finding that scattered telephone calls over a period of years from stock brokerage firm advertising sale of securities, which did not disrupt daily routine, did not constitute an actionable invasion of privacy). Moreover, courts in other jurisdictions assessing allegations similar to those made by Plaintiffs have concluded that disclosure of unique device identifier data, personal data, and geolocation information (including physical addresses) does not constitute "an egregious breach of social norms" but rather "routine commercial behavior." See

In re iPhone App. Litig., 844 F. Supp. 2d 1040, 103 (N.D. Cal. 2012) (citing Folgelstrom v. Lamps Plus, Inc., 195 Cal. Rptr. 4th 986, 992 (Cal. Ct. App. 2001)).

The FAC's perpetual reference to the health care context does not help them avoid dismissal. See, e.g., Kelley v. CVS Pharmacy, Inc., No. CIV.A. 98-0897-BLS2, 2007 WL 2781163 (Mass. Super. Aug. 24, 2007) (Gants, J.). In Kelley, the plaintiff obtained prescription drugs from defendant CVS to help with his diabetes. CVS, in conjunction with defendant Merck & Co, Inc., sent Kelley a letter promoting the use of high cholesterol medication. The plaintiff sued CVS, Merck, and a third-party mailing company used to coordinate the promotion for invasion of privacy. The Suffolk County Superior Court found that plaintiff had no actionable claim under Massachusetts law for invasion of privacy:

> Even if this Court were to assume that it would constitute a substantial or serious interference with Kelley's privacy for CVS to reveal the medication he was prescribed or his diagnosis of diabetes, there is no evidence that CVS did so here. CVS did not even provide Kelley's name to Merck. It provided his name, address, and date of birth to Elensys, and directed Elensys to send him the letter described above, but it did not reveal to Elensys his prescription or medical diagnosis. Nor could anyone from Elensys determine what his prescription or medical diagnosis was from the fact that this particular letter was sent to him because Elensys never was informed of the criteria that CVS used to determine which of its customers would receive this letter.

Id. at *2. The Kelley court found that "[t]he limited dissemination of this information falls well below the threshold of a substantial or serious interference with privacy." Id. at *3. The court went on to note that there was "plainly nothing improper" about a pharmacy using its own records to do targeted, knowledge-based outreach, and it "[could] not imagine any good reason" to prohibit pharmacies from doing so in conjunction with third parties. Id.

In contrast, here, neither John Doe nor Jane Doe even allege any specific targeted communication that they received (Kelley at least provided the court a letter). Neither John Doe nor Jane Doe allege what information was supposedly breached (diabetic condition for Kelley).

Nor do Plaintiffs say to whom that information was allegedly provided (Kelley specifically named multiple recipients). Kelley fell short in his drive to prove an actionable violation of Massachusetts law, and lost his case on summary judgment – John Doe and Jane Doe do not even get so far as pleading the requisite facts, and their invasion of privacy claim should be dismissed at the pleading stage.

Nothing about the online, cookie context changes these common sense standards. See, e.g., Smith v. Facebook, 262 F. Supp.3d 943 (N.D. Cal 2017), aff'd, 745 F. App'x 8 (9th Cir. 2018) (dismissing claim for invasion of privacy). In Smith, the plaintiffs[9] sought to sue the social media company and a series of hospitals. Those hospitals, Smith alleged, had websites that incorporated Facebook plug-ins. Therefore, Smith claimed, the hospitals were impermissibly disclosing confidential health care information to Facebook, *i.e.*, the fact that a certain website user may be browsing pages associated with a certain medical condition. The court dismissed the action on a variety of grounds, including for failure to state a privacy claim. As the Smith court told this same Plaintiffs' counsel, utilizing cookie-generated information that includes "general health information that is accessible to the public at large" is not an invasion of privacy. Id. at 955.

More generally, Plaintiffs constantly use the term "personally identifiable information" in their allegations, yet in an effort to obfuscate those allegations, they leave this term undefined. See discussion supra, at Part I.D. By contrast, G.L. c. 93H, § 1, defines "personal information" as a resident's first name and last name or first initial and last name in combination with any 1 or more of the following data elements that relate to such resident:

---

[9] Plaintiffs in Smith were represented by Simmons Hanley Conroy, lead Plaintiffs' counsel in this case. Apparently, after unsuccessfully pursuing the likes of Facebook and Google, Plaintiffs' counsel has trained their sights on non-profit hospitals that simply utilize Facebook and Google technology.

(a) Social Security number;
(b) [D]river's license number or state-issued identification card number; or
(c) [F]inancial account number, or credit or debit card number, with or without any required security code, access code, personal identification number or password, that would permit access to a resident's financial account[.]

Plaintiff does not allege that any "personal information," so defined, is at issue in connection with these Informational Websites.

### C. Plaintiffs State No Claim for Breach of Fiduciary Duty

"To establish a breach of fiduciary duty, there must be a duty owed to the plaintiff by the defendant and injury to the plaintiff proximately caused by the breach." Estate of Moulton v. Puopolo, 467 Mass. 478, 492 (2014). Here, Plaintiffs allege that the Hospitals breached some unprecedented, unsupported duty by claiming obliquely that the Hospitals "owe Plaintiffs … a fiduciary duty of confidentiality in the data and content of communications between [the Hospitals] and the Plaintiffs []." ¶ 349. No Massachusetts court has ever imposed such a duty on a hospital owing to a patient, nor any other type of fiduciary duty. See, e.g., Doe v. Boston Med. Ctr., 88 Mass. App. Ct. 289, 289 (2015) (evaluating hospital on negligence standard, and not from a fiduciary perspective, in connection with claims made by a patient relating to an assault that occurred during patient's stay at hospital).

Under Massachusetts law, a fiduciary duty only "arises out of a unique or intimate one-to-one relationship[.]" Petrell v. Rakoczy, No. CA012849F, 2005 WL 1683600, at *4 (Mass. Super. July 11, 2005) (finding no fiduciary relationship between a diocese and the parishioner of a diocesan church); cf. Knelman v. Middlebury Coll., 570 F. App'x 66, 68 (2d Cir. 2014) ("While schools, colleges, and educators assume the responsibility of educating their students, the law does not recognize the existence of a special relationship for the purposes of a breach of fiduciary duty claim"). Thus, for certain purposes, Massachusetts law recognizes a fiduciary duty as between physicians and their patients. See, Korper v. Weinstein, 57 Mass. App. Ct. 433, 437 (2003). No

Massachusetts court has extended this fiduciary duty to hospitals, and certainly not in this factual context.

Plaintiffs allege that they used websites available to the general public. The use of public websites does not create a "unique or intimate one-on-one relationship" between users and the website operator. Further, each of the websites disclaims the offering of advice and/or creation of a physician-patient relationship. Dismissal at the Rule 12 stage is appropriate. See Smith v. Massimiano, 414 Mass. 81, 85 (1993) (noting that the viability of a legal theory should be tested on Rule 12 rather than waiting until summary judgment).

**D. Plaintiffs State No Claim Under Chapter 93A**

Chapter 93A makes it unlawful to engage in "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). This proscription "must be read to apply to those acts or practices which are perpetrated in a business context." Hubert v. Melrose-Wakefield Hosp., 40 Mass. App. Ct. 172, 175-76 (1996). Plaintiffs cannot assert a c. 93A claim against the Hospitals because none of these charitable institutions were acting in a business context when Plaintiffs voluntarily engaged with their websites, and, accordingly, the Hospitals were not engaged in "trade or commerce" within the meaning of c. 93A.

The Hospitals are all non-profit institutions, chartered and dedicated to serve the public interest. See discussion, supra, Part II.A. Through the operation of their websites, the Hospitals were engaged in incidental activities necessary to meet their charitable purpose—*i.e.*, providing information regarding health care services and increasing educational opportunities and awareness of health care related issues. Furthermore, the Hospitals did not seek to profit from maintaining their websites or from providing information about their institutions to the Plaintiffs. Therefore, c. 93A does not apply as a matter of law. See All Seasons Servs., Inc. v. Comm'r of Health and Hosps. of Boston, 416 Mass. 269, 271-72 (1993) (declining to extend c. 93A to a non-profit

hospital that did not seek to profit from a contract with a food service company because providing food services was incidental to primary hospital activity); Hubert, 40 Mass. App. Ct. at 176 (affirming denial of motion for leave to add c. 93A claim against non-profit hospital because "[n]othing in the record indicated that the hospital, a non-profit organization, was acting in a business context so as to generate a profit" in land purchase from home owners).

Furthermore, the Plaintiffs cannot assert a Chapter 93A claim against the Hospitals merely as interested citizens who believe that an unfair or deceptive act or practice has occurred. Chapter 93A is not intended "to authorize purely 'vicarious suits by self-constituted private attorneys-general.'" Bellerman v. Fitchburg Gas & Elec. Light Co., No. WOCV200900023B, 2013 WL 518526, at *15 (Mass. Super. Jan. 7, 2013) (quoting Leardi v. Brown, 394 Mass. 151, 161 (1985)); see also Roberts v. Enterprise Rent-A-Car Co., 445 Mass. 811, 813-14 (2006) (concluding that plaintiff had no standing to allege that car rental company's collision damage waivers were deceptive for purposes of c. 93A because plaintiff never purchased such a waiver). Rather, the Plaintiffs must allege that they have "suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself." Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013). "[T]he violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself." Id.

Here, Plaintiffs recite the same general five-category description of their purported damages in each Count. ¶¶ 334, 346, 351, 419. The three additional allegations relating to "harm" made in connection with Plaintiffs' c. 93A claim demonstrate that Plaintiffs have not suffered any distinct injury: (i) "Defendants shared Plaintiffs' . . . personally identified information with third parties;" (ii) "Defendants bartered and sold Plaintiffs' personally identifiable information . . . ;" and (iii) "Defendants used Plaintiffs' . . . personally identifiable information and communications



#70392032_v1

for marketing purposes." ¶ 419 (b), (c), (e).[10] Even if these alleged actions could be considered unfair or deceptive (they were not), Plaintiffs have not alleged that they suffered any separate, identifiable harm resulting from these actions. Therefore, Plaintiffs have failed to allege distinct injuries, and their Chapter 93A claim should be dismissed for this reason as well.

## IV. CONCLUSION

For the foregoing reasons, the Hospitals respectfully request that the Court grant the Hospitals' motion to dismiss.

[10] Plaintiffs make no allegations about the security settings they deployed on their own Internet browsers, no allegations about what free and publicly-available tools they used to protect their Internet behavior, and no allegations about when, where, why, or the manner in which they used the Informational Websites.

PARTNERS HEALTHCARE SYSTEM, INC.,
THE GENERAL HOSPITAL
CORPORATION D/B/A MASSACHUSETTS
GENERAL HOSPITAL, BRIGHAM
HEALTH, INC., DANA-FARBER CANCER
INSTITUTE, INC., DANA-FARBER/
PARTNERS CANCER CARE, INC., AND
DANA-FARBER, INC.,

By their attorneys,

Adam J. Bookbinder (BBO No. 566590)
Michael T. Maroney (BBO No. 653476)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
michael.maroney@hkla w.com
adam.bookbinder@hklaw.com

Mark S. Melodia (*pro hac vice* pending)
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
mark.melodia@hklaw.com

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2:49
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

Dated: September 20, 2019

**CERTIFICATE OF SERVICE**

I, Michael T. Maroney, hereby certify that on September 20, 2019, I served, via first class mail, a copy of the foregoing document upon counsel for Plaintiffs, J. Michael Conley, 100 Grandview Road, Suite 218, Post Office Box 9139, Braintree, Massachusetts 02185, michael@kenneyconley.com.

Michael T. Maroney

Suffolk
2019.
1651



#70392032_v1

# Exhibit B

11/25 ✓

10.23 NOTIFY

29

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 1984CV01651-BLS1

NOTICE SENT
12.07.20
H.+K.
C.A.M.
C.M.I.
M.T.M.
K.B.
K.+C.
J.M.C.
S.H.C.
E.S.J.
T.A.V.T.
(mA)

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2:44
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

JOHN DOE AND JANE DOE,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

PARTNERS HEALTHCARE SYSTEM, INC.,
THE GENERAL HOSPITAL
CORPORATION D/B/A MASSACHUSETTS
GENERAL HOSPITAL, BRIGHAM
HEALTH INC., DANA-FARBER CANCER
INSTITUTE, INC., DANA-FARBER/
PARTNERS CANCER CARE, INC., AND
DANA-FARBER, INC.,

Defendants.

**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants Partners Healthcare System, Inc. ("Partners"), The General Hospital Corporation ("Massachusetts General Hospital" or "MGH"), Brigham Health, Inc. ("Brigham and Women's Hospital" or "BWH"), Dana-Farber Cancer Institute, Inc. ("Dana-Farber" or "DFCI"), Dana-Farber, Inc., and Dana-Farber/Partners Cancer Care, Inc. (collectively, "the Hospitals"),[1] through their undersigned counsel, move under Massachusetts Rule of Civil Procedure 12(b)(6) to dismiss this case in its entirety for failure to state a claim upon which relief can be granted. As grounds for this motion, the Hospitals state as follows:

[1] Defendants contend that the Complaint misnames Dana-Farber/Partners Cancer Care, Inc. and Dana-Farber, Inc. as parties in this case.

① After a virtual hearing, this motion is Allowed in Part. The motion is denied as to Counts I and II of the Plaintiffs' First Amended Complaint for the reasons stated on the record at the hearing. The motion also is denied as to Count III of the Complaint alleging breach of fiduciary duty. The Massachusetts Supreme Judicial Court has held that a physician has a "fiduciary obligation to hold in [] trust confidential information of his or her patient." Alberts v. Devine, 395 Mass. 59, 69 (1985). See also Korper v. Weinstein, 57 Mass. App. Ct. 433, (cont. below)

② 437 (2003) ("[A] physician has a duty to maintain the confidentiality of a plaintiff's medical records."). An individual's fiduciary obligations also can extend to the organization of which he or she is a member. See, e.g., Baker v. Wilmer Cutler Pickering Hale and Dorr LLP, 91 Mass. App. Ct. 835, 847 (2017) (law firm potentially liable for breach of fiduciary duty to client based on actions of law firm's attorneys). The motion is allowed as to Count III alleging violation of G.L. c. 93A, [illegible] because the defendant not-for-profit hospitals serve the [illegible]

③ core mission, and, "[i]n most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission." Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 26 (1997). [signature] 11/20/20

1. In their First Amended Complaint, Plaintiffs attempt to allege claims individually and on behalf of the unsubstantiated Class and Subclasses against the Hospitals for: interception of wire communications in violation of G.L. c. 272, § 99 (Count I); invasion of privacy in violation of G.L c. 214, § 1B (Count II); breach of fiduciary duty (Count III); and, unfair and deceptive business practices in violation of G.L. c. 93A, § 9 (Count IV).

2. Plaintiffs fail to allege any "secret interception" of communications that would allow them to recover under G.L. c. 272, § 99. Indeed, the actions that Plaintiffs describe in their First Amended Complaint do not amount to "interception" at all.

3. Plaintiffs' allegations do not support an "unreasonable, substantial, or serious interference with [their] privacy," as required to recover under G.L c. 214, § lB. The Hospitals' disclosures amply rebut any idiosyncratic, unrealistic privacy expectation Plaintiffs may now claim to have had.

4. Plaintiffs do not – and cannot – establish a breach of fiduciary duty. Massachusetts law has never recognized a fiduciary duty owed by hospitals to patients.

5. Plaintiffs also fail to state a claim under G.L. c. 93A, § 9 because, among other reasons, the Hospitals are nonprofit, charitable institutions that are not engaged in "trade or commerce," as required under the statute, and Plaintiffs' claims fall short of showing that they have suffered any legally cognizable injury.

For the foregoing reasons, explained in detail in the accompanying Memorandum of Law, the Court should (A) grant this Motion, (B) dismiss all counts of the First Amended Complaint with prejudice and without leave to amend, (C) award the Hospitals costs and reasonable attorney's fees, and (D) grant such further relief as justice requires.

## REQUEST FOR ORAL ARGUMENT

The Hospitals respectfully request a hearing on this Motion at the Court's earliest convenience.

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM HEALTH, INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

By their attorneys,

Adam J. Bookbinder (BBO No. 566590)
Michael T. Maroney (BBO No. 653476)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
michael.maroney@hklaw.com
adam.bookbinder@hklaw.com

Mark S. Melodia (*pro hac vice* pending)
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
mark.melodia@hklaw.com

Dated: September 20, 2019

subsumed within plaintiff's *Biddle* claim because these theories do not present distinct theories of recovery for plaintiff.

In *Scott v. Ohio Dept. of Rehab. & Corr.*, 2013-Ohio-4383, 999 N.E.2d 231, ¶ 29 (10th Dist.), the Tenth District Court of Appeals indicated in dicta that a *Biddle* claim could include a claim for negligent disclosure. In *Sheldon v. Kettering Health Network*, 2015-Ohio-3268, 40 N.E.3d 661, the Second District Court of Appeals considered whether a *Biddle* claim could be maintained against a health care provider where an employee allegedly abused his position to disclose his ex-spouse's medical information. Plaintiff did not specifically state a *Biddle* claim and alleged that the medical provider was negligent in failing to detect and prevent the disclosure. The court analyzed plaintiff's claims under *Biddle* and concluded that "an inadvertent disclosure might, under different facts, fulfill the elements of *Biddle*, [but] the present case does not." *Id.* at ¶¶ 32-33.

In *Herman v. Kratche*, 8th Dist. Cuyahoga No. 86697, 2006-Ohio-5938, the Court of Appeals analyzed a *Biddle* claim based on a "mistaken" disclosure as a breach of fiduciary duty relying on *Hammonds v. Aetna Cas. & Sur. Co.*, 243 F. Supp. 793 (N.D. Ohio 1965). The Eighth District held that a medical provider owes a patient a fiduciary duty and reasoned that "a claim for breach of fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care." *Herman* at ¶ 18 (citations omitted). On this basis the Court of Appeals reversed summary judgment in favor of the medical provider. *Id.* at ¶ 39.

The result is a continuing lack of clarity with respect to whether and under what circumstances an unintentional disclosure can support a *Biddle* claim. It is the opinion of this Court that *Biddle* does not require intentional disclosure to support a claim. *Biddle* does not expressly require intentional conduct. The *Scott* court held that an unintentional disclosure claim

can be theoretically maintained under *Biddle*, but not on the facts presented in *Scott*. And no court seems to have clearly held that a disclosure must be intentional to support a *Biddle* claim. Accordingly, defendant's motion to dismiss is granted with respect to Counts V and VI of the Amended Complaint, with the caveat that plaintiff's *Biddle* claim can proceed based on intentional and/or negligent conduct if supported by the evidentiary record to be developed as this matter proceeds.

**V. Conclusion**

For all the foregoing reasons, defendant's motion to dismiss is granted with respect to Count II, V and VI of the Amended Complaint and denied with respect to Counts I, III and IV of the Amended Complaint.

So ordered.

Date: 11/22/21

Judge Christian A. Jenkins

Exhibit G

COURT OF COMMON PLEAS
CUYAHOGA COUNTY

| | | |
|---|---|---|
| JANE DOE, | ) | Case No. CV-20-933357 |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| v. | ) | |
| UNIVERSITY HOSPITALS HEALTH SYSTEM, INC., | ) | |
| Defendant. | ) | |

FILED
NOV 18 2020
Clerk of Courts
Cuyahoga County, Ohio

**OPINION AND ORDER**

Plaintiff Jane Doe, proceeding anonymously at this point in the proceedings by agreement of the parties due to the confidential health information underlying the allegations in the complaint, claims that Defendant University Hospitals Health System, Inc. disclosed her confidential health information to Facebook, Google, Microsoft, and other technology and data companies when she used the hospital's website. Defendant moves to dismiss, arguing that Jane Doe lacks standing and that Plaintiff's complaint fails to state claims under *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 1999-Ohio-115, 715 N.E.2d 518, or for intrusion upon seclusion. For the reasons that follow, the Court concludes that Plaintiff has standing and so DENIES Defendant's motion to dismiss on that ground. Pending the Ohio Supreme Court's forthcoming decision in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, the Court defers ruling on the balance of Defendant's motion to dismiss.

**PLAINTIFF'S ALLEGATIONS**

Plaintiff's complaint contains lengthy and detailed allegations about claimed information-sharing between Defendant's website and various technology and data companies through the use of certain source code, cookies, and browser fingerprints. According to the complaint, various

information shared with or available to the technology and data companies through these means contains or transmits personally identifiable health and similar information. This information allegedly allows technology and data companies to market to those who use Defendant's website or engage in other data mining.

In her complaint, Jane Doe alleges that she is a patient receiving treatment for an unspecified illness at University Hospitals and uses the patient portal on Defendant's website. (Complaint at ¶ 12.) Plaintiff avers that the specific communications she exchanged with University Hospitals through its website include "communications about specific appointments, providers, conditions and treatments." (Complaint at ¶ 173.) She also alleges that she "registered for, used, and exchanged communications with UH inside the MyUHCare patient portal." (Complaint at ¶ 172.) Further, the complaint alleges that the source code of a different domain that hosts the patient portal for University Hospitals causes "data transmissions from patient computers to Google connected to personally identifiable information about patients." (Complaint at ¶ 165.) This information, according to the complaint, constitutes confidential information entitled to privacy protections under State and federal law. Beyond these facts, the complaint scarcely contains any additional information regarding the information Jane Doe claims Defendant improperly disclosed.

Plaintiff's complaint asserts three causes of action. Count I alleges disclosure of non-public medical information under *Biddle*. Count II asserts a claim for breach of confidence, and Count III alleges intrusion on seclusion. Additionally, Plaintiff seeks to maintain this action on behalf of a class of "Ohio residents who are, or were, patients of UH or any of its affiliates, and who used UH's web properties, including but not limited to, [*sic*] www.uhhospitals.org and the Patient Portal at MyUHCare." (Complaint at ¶ 224.)

**ANALYSIS**

The Eighth District set forth the governing standard under which this Court considers a motion to dismiss pursuant to Rule 12(B)(6) as follows:

> Under the notice pleading requirements of Civ.R. 8(A)(1), the plaintiff need only plead sufficient, operative facts to support recovery under his claims. *Doe v. Robinson*, 6th Dist. Lucas No. 1-07-1051, 2007-Ohio-5746, ¶ 17. Nevertheless, to constitute fair notice, the complaint must still allege sufficient underlying facts that relate to and support the alleged claim, and may not simply state legal conclusions. *See DeVore v. Mut. of Omaha Ins. Co.*, 32 Ohio App.2d 36, 38, 288 N.E.2d 202 (7th Dist.1972).

*Henderson v. State*, 8th Dist. Cuyahoga No. 101862, 2015-Ohio-1742, ¶ 10. "[W]hen a party files a motion to dismiss for failure to state a claim, all the factual allegations of the complaint must be taken as true and all reasonable inferences must be drawn in favor of the nonmoving party." *Kennedy v. Dottore*, 8th Dist. Cuyahoga No. 108562, 2020-Ohio-3451, ¶ 30.

**I. Standing**

"The Ohio Constitution expressly requires standing for cases filed in common pleas courts." *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 11. A court of common pleas may only exercise jurisdiction over "justiciable matters." Ohio Constitution, Article IV, Section 4(B). To present a justiciable controversy, a plaintiff must have standing to sue. *Federal Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 41.

To have standing, a plaintiff must show that she has suffered an injury fairly traceable to the defendant's allegedly unlawful conduct that is likely to be redressed through the relief requested. *Estate of Mikulski v. Centerior Energy Corp.*, 2019-Ohio-983, 133 N.E.3d 899, ¶ 59 (8th Dist.), citations omitted. "Perhaps the most basic requirement to bringing a lawsuit is that the plaintiff suffer some injury. Apart from a showing of wrongful conduct and causation, proof of

actual harm to the plaintiff has been an indispensable part of civil actions." *Felix v. Ganley Chevrolet, Inc.*, 145 Ohio St.3d 329, 2015-Ohio-3430, 49 N.E.3d 1224, ¶ 36. Injury results from "an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent, not hypothetical or conjectural." *City of Athens v. Testa*, 2019-Ohio-277, 119 N.E.3d 469, ¶ 60 (10th Dist.), quotations omitted. Plaintiff's attempt to proceed on behalf of a class does not change this threshold standing requirement. *Estate of Mikulski* at ¶ 60, quotation omitted. Indeed, "[i]ndividual standing is a threshold to all actions, including class actions." *Id.*

Defendant makes two separate arguments that Plaintiff lacks standing. The Court addresses each in turn.

**I.A. The Allegations of the Complaint**

Defendant maintains that Plaintiff fails to allege concrete and particularized injury in fact. Instead, according to this argument, the complaint details the operation of the website of University Hospitals and its alleged disclosure of protected health information to third parties. In this way, Defendant contends that the complaint presents circumstances involving hypothetical patients or visitors to the website or patient portal. In light of the complaint's voluminous allegations about the technology at issue and the comparatively few facts alleged about Jane Doe herself, Defendant makes an understandable, though misplaced, argument.

Plaintiff pleads that she is a patient of University Hospitals who communicated with the hospital through its website about specific conditions, appointments, and providers. (Complaint at ¶ 12, 173.) Similarly, she alleges that she exchanged communications with the hospital through the patient portal. (Complaint at ¶ 172.) Although she fails to identify specific protected information or data allegedly disclosed to third parties, one may fairly infer from the allegations of the complaint that transmission of Jane Doe's private data is at least plausible. Construing these

allegations in Plaintiff's favor, as the Court must at this stage of the proceedings, the complaint pleads sufficient operative facts under Ohio's notice pleading requirements that Jane Doe has allegedly suffered an injury in fact.

**I.B. Economic Harm**

Defendant also argues that Plaintiff cannot establish standing based on generic allegations that the personal data and information at issue may have value in the marketplace. University Hospitals pins this argument on the absence of any allegation that Jane Doe has lost value in her data. Defendant's position misunderstands Plaintiff's claims. The complaint does not allege unjust enrichment, loss of value of her data, or another sort of claim rooted in pecuniary value. Instead, Plaintiff asserts privacy claims. Valuing such an injury, if proved, may present challenges, but any such difficulties do not warrant dismissal at the pleading stage.

**II. Motion to Dismiss the Three Counts of the Complaint**

In *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, the Ohio Supreme Court *sua sponte* ordered post-argument briefing on whether to overturn or modify *Biddle* in light of the enactment of certain provisions of the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat. 1936. Because the Ohio Supreme Court's ruling may well bear on each of Plaintiff's claims, the Court defers ruling on Defendant's motion to dismiss the three counts of the complaint at this time. Doing so will not prejudice the parties because the Ohio Supreme Court's ruling will likely come before the end of the year. Once it does, the Court requests the parties to submit supplemental briefs, not to exceed fifteen pages, by January 18, 2021 on how, if at all, the Ohio Supreme Court's ruling affects Plaintiff's claims. Alternatively, the parties may advise that they are standing on their previous briefing on Defendant's motion to dismiss the three counts of the complaint.

**CONCLUSION**

For the foregoing reasons, the Court concludes that the allegations of the complaint establish that Jane Doe has standing. Following the Ohio Supreme Court's forthcoming ruling on whether to overturn or modify *Biddle*, the Court requests supplemental briefing from the parties on how, if at all, the ruling affects the claims in this case.

If Plaintiff's claims survive the Ohio Supreme Court's ruling, it may turn out in discovery that the evidence does not support Jane Doe's factual allegations. Because of the costs and burdens associated with discovery of the technological matters underlying Plaintiff's claims and the likely scope of such discovery Plaintiff will seek, the Court directs the parties to direct their discovery efforts to those matters relating specifically to Jane Doe's use of Defendant's website and the patient portal first. If discovery shows that Defendant has not in fact transmitted Jane Doe's personal health information to any technology or data company as alleged, then an early summary judgment may be appropriate in this case or Plaintiff may lack standing to maintain her claims in in whole or in part. On the other hand, if discovery tends to corroborate Jane Doe's factual allegations, then the case may proceed with that assurance. Such an approach is consistent with the proportionality requirement of Rule 26(B)(1) and the mandate of Rule 1(B).

ORDER:

For the foregoing reasons, the Court DENIES Defendant's motion to dismiss for lack of standing and defers ruling on the balance of Defendant's motion to dismiss pending the Ohio Supreme Court's forthcoming ruling in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, and supplemental briefing regarding the same.

Dated: November 16, 2020

Judge J. Philip Calabrese

117625842

FILED
JUN 28 2021
Clerk of Courts
Cuyahoga County, Ohio

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

JANE DOE, ON BEHALF OF HERSELF AND ALL OTHERS, ETC
Plaintiff

UNIVERSITY HOSPITALS HEALTH SYSTEM, INC.
Defendant

Case No: CV-20-933357

Judge: WILLIAM F. B. VODREY

**JOURNAL ENTRY**

THIS CASE IS BEFORE THE COURT ON DEFENDANT'S MOTION TO DISMISS. FOR THE REASONS STATED IN THE ATTACHED DECISION, DEFENDANT'S MOTION TO DISMISS IS HEREBY DENIED.

[signature] 6-25-21
Judge Signature Date

06/25/2021

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| JANE DOE, ON BEHALF OF HERSELF AND ALL OTHERS, ETC | CASE NO. CV-20-933357 |
| Plaintiff, | Judge: WILLIAM F.B. VODREY |
| v. | |
| UNIVERSITY HOSPITAL HEALTH SYSTEM, INC. | **JOURNAL ENTRY** |
| Defendant. | |

This case is before the court on defendant's motion to dismiss. On Nov. 16, 2020, the court issued an order that denied defendant's motion to dismiss on the grounds that plaintiff lacked standing. At that time, the court deferred ruling on defendant's motion to dismiss the three counts of plaintiff's complaint pending the Supreme Court of Ohio's decision in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582. The parties have completed supplemental briefing on the issue, and the remainder defendant's motion to dismiss is now ripe for review.

In *Menorah Park*, the Supreme Court of Ohio, *sua sponte*, ordered post-argument briefing on whether the court should overturn or modify its previous decision in *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 1999-Ohio-115, 715 N.E.2d 518, in light of the enactment of certain provisions of the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat. 1936. The court held that "*Biddle* remains good law and it continues to permit a cause of action for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information." *Menorah* at ¶40.

A Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the legal sufficiency of the complaint. *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 605 N.E.2d 378 (1992). A complaint is subject to dismissal for failure to state a claim upon which relief can be granted when it appears beyond doubt that plaintiff can prove no set of facts in support of his or her claim that would entitle plaintiff to relief. *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268, ¶11. When considering a Civ.R. 12(B)(6) motion, the court must construe all factual allegations of the complaint as true, and all reasonable inferences shall be drawn in favor of the nonmoving party. *York v. Ohio State Highway Patrol*, 60 Ohio St.3d 143, 144, 573 N.E.2.d 1063 (1991).

Here, in accepting plaintiff's allegations as true and acknowledging the Supreme Court of Ohio's ruling in *Menorah Park*, the court finds that plaintiff has adequately stated claims upon which relief can be granted. Defendant's motion to dismiss is hereby denied.

In accordance with this court's prior order on Nov. 16, 2020, the court hereby orders the parties to direct their initial discovery efforts to those matters relating specifically to Jane Doe's use of defendant's website and patient portal. If discovery reveals that defendant did not, in fact, transmit her personal health information to any technology or data company as alleged, an early motion for summary judgment may then be appropriate.

W. Vodrey. 6-25-21
William F.B. Vodrey, Judge

# Exhibit H

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 11-2808-BLS1

DEBRA L. MARQUIS

v.

GOOGLE INC.

MEMORANDUM OF DECISION AND ORDER ON DEFENDANT GOOGLE INC.'S MOTION TO DISMISS

This action arises from the alleged monitoring of emails by defendant Google Inc. ("Google") in order to sell advertisements based on keywords that appear in those emails. Google operates Gmail, which is an electronic communications or email service. The plaintiff, Debra L. Marquis, represents a putative class of Massachusetts residents who have non-Gmail email accounts, but who exchange emails with Gmail users. Marquis alleges that Google's monitoring of emails sent from non-Gmail email accounts violates the Massachusetts wiretap statute, G.L. c. 272, § 99.

Google has now moved to dismiss this action on the grounds that the wiretap statute does not apply to email communications or to its conduct. For the reasons discussed below, Google's motion to dismiss is denied.

BACKGROUND

The court takes as true all well-pled factual allegation set forth in Marquis's Complaint, see *Marshall* v. *Stratus Pharms., Inc.*, 51 Mass. App. Ct. 667, 670-71 (2001). Marquis is a Massachusetts resident who has a non-Gmail email account.

Compl. ¶ 3. Google is a Delaware corporation with its principal place of business in California. Compl. ¶ 4. It operates Gmail, which is an electronic communication service that is free to its users. Compl. ¶¶ 6-8. While Google does not charge Gmail account holders for using its service, Google generates revenue through advertisements that it presents to Gmail users. Compl. ¶ 8. Google intercepts and scans emails sent from non-Gmail users, such as Marquis, in order to find keywords or content in the emails that will enable it to target advertisements specifically at Gmail users. Compl. ¶ 9. Once targeting individual emails, Google now focuses on numerous emails to find keywords. Compl. ¶ 11. This system is known as "interest-based advertising." Compl. ¶ 11.

Marquis has an America-On-Line ("AOL") email account that she has used since the late 1990s. Compl. ¶ 13. While she routinely exchanged emails with Gmail users, Marquis did not consent to Google's secret interception, disclosure, or scanning of her emails. Compl. ¶¶ 12, 14. Marquis seeks to represent a class of Massachusetts residents who have non-Gmail email accounts and who exchange emails with Gmail users, and who have their emails intercepted and/or scanned without their consent. Compl. ¶ 15.

Marquis alleges that Google's conduct violates the Massachusetts Wiretap statute, G.L. c. 272, § 99. The statute "was enacted to give due protection to the privacy of individuals by barring the secret use of electronic surveillance devices for

eavesdropping purpose . . . ." *Dillon* v. *Massachusetts Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 310 (2000). It prohibits any person from intercepting or attempting to intercept "any wire or oral communication." G. L. c. 272, § 99(C)(1). A wire communication is defined as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." *Id.* at § 99(B)(1). An intercepting device does not include "any telephone or telegraph instrument, equipment facility, or a component thereof . . . being used by a communications common carrier in the ordinary course of business." *Id.* at § 99(B)(3).

Google has now moved to dismiss the Complaint. First, it contends that the Massachusetts wiretap statute does not apply to electronic communications, and if it does, then it is preempted by the federal wiretap statute. Second, it argues that Marquis was aware that Google intercepted and scanned her emails, and the statute requires that the interception be done secretly. Third, Google's alleged interception occurred in the ordinary course of business and is therefore exempted from the statute.

## DISCUSSION

In order to withstand a motion to dismiss, a plaintiff's complaint must contain "allegations plausibly suggesting (not merely consistent with) an entitlement to relief,

in order to reflect [a] threshold requirement . . . that the plain statement possess enough heft to sho[w] that the pleader is entitled to relief." *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 636 (2008), quoting *Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955, 1966 (2007) (internal quotations omitted). While a complaint need not set forth detailed factual allegations, the plaintiff is required to present more than labels and conclusions, and must raise a right to relief "above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* See also *Harvard Crimson, Inc.* v. *President & Fellows of Harvard Coll.*, 445 Mass. 745, 749 (2006). The court will examine the Complaint under this standard.

Google's first argument is that the Massachusetts wiretap statute does not include a prohibition against monitoring emails. In essence, it contents that had the Legislature desired to include such electronic communications in the statute, then it would have done so expressly.[1] The Massachusetts wiretap statute was originally intended to mirror its federal counterpart. See *O'Sullivan* v. *NYNEX Corp.*, 426 Mass. 261, 264 (n.5) (1997). In 1986, the federal statute was "recognized to be hopelessly out of date," and it was amended by the Electronic Communications Privacy Act ("ECPA") in order to cover "electronic communication," which encompasses email. *Dillon*, 49 Mass. App. Ct. at 314-15 (citations omitted); 18

[1] Google presents G.L. c. 276, § 1B, which expressly defines "electronic communication services" and "remote computing services,"as one such example. In contrast, the Massachusetts wiretap statute does not define these terms.

U.S.C. § 2510(12). The Massachusetts Legislature did not provide for a similar amendment. However, "the fact that there has been no amendment of the Massachusetts statute comparable to the Congressional action of 1986 does not bar us from reading [an exception] so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases." *Dillon*, 49 Mass. App. Ct. at 315.

This court declines to accept Google's contention that the Massachusetts wiretap statute does not prohibit the secret interception of emails. First, the statute's definition of "wire communications" is sufficiently broad to include electronic communications, as it includes "the aid of wire, cable, or *other like connection* between the point of origin and the point of reception." G.L. c. 272, § 99(B)(1) (emphasis supplied). Permitting the interception of private emails, while prohibiting the same conduct for oral telephone conversations, is an inconsistency that contravenes the purpose of the statute. Second, a Massachusetts court has recently held that the Massachusetts wiretap statute cover email, and the court finds its reasoning persuasive. See *Rich* v. *Rich*, 2011 WL 3672059, *5 (Mass. Super. July 8, 2011) (McGuire, J.).

At this stage of the litigation, the court must accept the factual allegations of the Complaint. Marquis alleges that Google intercepts and scans private emails that she sends from her AOL account to Gmail account users, and that she did not consent to Google's interception. Compl. ¶¶ 9, 13-14. This alleged conduct violates

the Massachusetts wiretap statute.

Google's second argument is that federal law preempts the Massachusetts wiretap statute. Federal law may preempt state law "when it explicitly or by implication defines such an intent, or when a State statute actually conflicts with Federal law or stands as an obstacle to the accomplishment of Federal objectives. Whether a Federal statute preempts State law is ultimately a question of Congress's intent." *City of Boston* v. *Commonwealth Employment Relations Bd.*, 453 Mass. 389, 396 (2009) (internal citations omitted). A court should be hesitant to find preemption, as "[u]nless Congress's intent to do so is clearly manifested, a court does not presume that Congress intended to displace State law on a particular subject. . . ." *Id.*

Prior to the 1986 amendments to the federal wiretap statute, the Supreme Judicial Court determined that the federal statute did not preempt the Massachusetts wiretap statute. See *Commonwealth* v. *Vitello*, 367 Mass. 224, 249-53 (1975). Google maintains that the ECPA's comprehensive regulatory scheme indicates Congress's intent to occupy the field. However, this is insufficient to warrant a finding that the federal wiretap statute preempts the Massachusetts wiretap statute. The ECPA does not contain language expressly, or by implication, preempting state law. See 18 U.S.C. §§ 2510-2522. In addition, the ECPA does not occupy the entire field of interception of electronic surveillance, as Google contends. As long as the Massachusetts wiretap statute does not conflict with the federal wiretap statute, then

it is a valid law under principles of federalism. *Vitello*, 367 Mass at 247 ("[A] State statute may adopt standards more stringent than the requirements of Federal law."). As Google itself notes, the federal wiretap statute prohibits the secret interception of electronic communications, just like the Massachusetts wiretap statute, see *supra*. In the absence of manifest Congressional intent to preempt state law, the ECPA does not preempt the Massachusetts wiretap statute.

Google's next contention is that while the Massachusetts wiretap statute prohibits "secret" interceptions, its advertisement policy is publicly disclosed and transparent. As a result, Google argues that its conduct does not violate the Massachusetts wiretap statute. Under the statute, an interception "means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication. . . ." G.L. c. 272, § 99(B)(4). Marquis alleges that Google "secretly" intercepts her electronic communications with Gmail users. Compl. ¶¶ 14, 27. To rebut that allegation, Google has submitted an affidavit that includes Google's Terms of Service and Privacy Center screen. See Burhans Affidavit at Tabs 1 and 2. These documents illustrate that Google's "interest-based advertising" is fully disclosed.

The Burhans Affidavit does not rebut the Complaint's allegations. First, Google's attempt to introduce documents outside the pleadings is improper at the

motion to dismiss stage.[2] Second, the court accepts as true Marquis's allegation that Google secretly intercepted her electronic communications with Gmail users. Additionally, Marquis is entitled to the reasonable inference that she, as an AOL account holder, would not be privy to or have notice of Google's Terms of Use and Privacy Center policy for Gmail users. The Complaint alleges sufficient facts that Google secretly intercepted electronic communications between non-Gmail users and Gmail users.

Google's final argument is that it is exempt from liability because it is a communications common carrier, and that it conducted the alleged interceptions "in the ordinary course of its business." G.L. c. 272, § 99(B)(3). In support of this contention, Google presents two cases that involve employers who secretly intercepted communications between their employees and third-parties. Google's reliance on these cases is misplaced, as it does not have an employer-employee relationship with Gmail users. While Gmail is a free service, Google generates revenue through selling advertising. Compl. ¶ 8. It intercepts and scans emails sent to Gmail users by non-Gmail users such as Marquis in order to find keywords so that

[2] "In evaluating a rule 12(b)(6) motion, we take into consideration the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000) (quotation omitted). Google's Terms of Use and Privacy Center policy, external to the Complaint, are not appropriate for consideration at this stage.

it can target Gmail users with relevant advertisements. Compl. ¶¶ 9, 11. At this preliminary stage, the court cannot conclude as a matter of law that intercepting and scanning emails for purposes of "interest-based advertising" is "in the ordinary course of [Google's] business" under the Massachusetts wiretap statute.

ORDER

For the foregoing reasons, Defendant Google Inc.'s Motion to Dismiss is DENIED.

Peter M. Lauriat
Justice of the Superior Court

Dated: January 17, 2012

Defendant Sutter Health's ("Sutter") Motion for Judgment on the Pleadings against Plaintiffs' Third Amended Complaint ("3AC") is DENIED as follows.

**Background**

Facts

In this putative class action, Plaintiffs are patients of Sutter, a health care provider in Sacramento. (3AC, ¶¶ 14-16.) The action arises out of Plaintiffs' use of Sutter's "My Health Online" patient portal ("Portal"). Plaintiffs allege that Sutter represents that the Portal is secure, but when a person uses it, Sutter discloses certain information about such use to Facebook, Google, and other third parties. (*Id.*, ¶¶ 3-5.) For example, Plaintiffs allege that upon signing into the Portal, Sutter discloses the fact of the sign in and each patient's personally identifiable information to Facebook, Google, and Crazy Egg. (*Id*, ¶¶ 5b, 8.) Once signed-in, if a patient clicks to view allergies, a disclosure of that action is made to Google of the specifics; if a patient clicks "Find-A-Doctor" or set up an appointment, a disclosure of that action is made to Facebook, Google, and others. (*Id.*, ¶5c.) On logoff, Sutter discloses this action to Facebook and Google. (*Id.*, ¶ 5i.) Plaintiffs allege Sutter makes these disclosures by intentionally including source code on its website that commanded Plaintiffs' browser to redirect the contents of HTTPS communications to third parties through invisible tracking pixels that are also code web bugs. (*Id.*, ¶¶ 128-130.)

Plaintiffs' 3AC was filed on December 7, 2021 and contains three causes of action: (1) violation of the California Invasion of Privacy Act ("CIPA"), specifically Penal Code § 631 ("section 631"), (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing. This Court has twice sustained Sutter's demurrer to Plaintiffs' cause of action for violation of section 631. (See ROA 134, 206.) However, on November 16, 2021, the Court overruled Plaintiffs' demurrer to that cause of action as stated in the 2AC. (ROA 301.) Sutter now moves for judgment on the pleadings with respect to the 3AC's cause of action for violation of section 631.

**Request for Judicial Notice**

Sutter's request for judicial notice in support of this motion is GRANTED as to request Nos. 1 (the Court's 11/16/2021 Minute Order sustaining portions of Sutter's demurrer to Plaintiffs' 2AC; 2 (the Court's 11/16/2021 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 2AC; 3 (the Court's 11/3/2020 Minute Order sustaining Sutter's demurrer to the 1AC); 4 (the Court's 11/3/20 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 1AC; 5 (the Court's 1/29/2020 Minute Order sustaining Sutter's demurrer to the original complaint); 6 (Plaintiffs' 2AC); 7 (Plaintiffs' 1AC); 8 (Plaintiffs' original complaint); and 10 (the text of AB 860 passed by the Assembly on July 26, 1967 and passed by the California Senate on July 27, 1967). (Evid. Code, § 452(a), (d).)

Sutter's request for judicial notice is DENIED as to request No. 9 (Model Notice of Privacy Practices for health care providers published by the US Department of Health and Human Services' Office for Civil Rights) as this material is irrelevant to the disposition of this motion. (See *State Comp. Ins. Fund* v. ReadyLink Healthcare, Inc. (2020) 50 Cal.App.5th 422, 442.)

**Legal Standard**

A motion for judgment on the pleadings has the same function as a general demurrer, but may be made after the time for demurrer has expired. (See Code Civ. Proc., § 438.) Like a demurrer, the grounds for a motion for judgment on the pleadings must appear on the face of the complaint, or in documents attached to the pleadings and properly incorporated by reference. (Code Civ. Proc., § 438(d); *Lumbermens Mutual Casualty Company* v. Vaughn (1988) 99 Cal.App.3d 171, 178.) The motion may be based on matters of which the court may take judicial notice. (Code Civ. Proc. § 438(d); see also *Howard Jarvis Taxpayers Assoc. v. Riverside* (1999) 73 Cal.App.4th 679, 685.) However, the motion does not lie on grounds previously raised by demurrer unless there has been a "material change in applicable case law or statute" since the demurrer was overruled. (Code Civ. Proc. § 438(g)(1); see *Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 562, fn. 1.) The motion should be granted if, taking

all of the allegations of the complaint to be true, the defendant is entitled to judgment as a matter of law. (*Consolidated Fire Protection Dis. v. Howard Jarvis Taxpayers' Ass'n* (1998) 63 Cal. App. 4th 211, 219.) A motion for judgment on the pleadings is properly granted without leave to amend when there is no reasonable possibility that the defect can be cured by amendment. (See *Schonfeldt v. State of California* (1998) 61 Cal. App.4th 1462, 1465 ("If there is no liability as a matter of law, leave to amend should not be granted.").)

**Analysis**
Section 631 penalizes various forms of secret monitoring of conversations. (*Ribas v. Clark* (1985) 38 Cal.3d 355, 359 (*Ribas*).) It provides, in pertinent part:

"(a) Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170. . . ." (Emphasis added.)

Sutter advances two arguments with respect to the construction of the following phrases in section 631 emphasized above: "without the consent of all the parties" and "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable." The Court discusses each argument separately below.

First Argument: "Without the Consent of All the Parties"
The parties do not dispute that section 631 requires the consent of "all parties" to the communication. (See *People v. Conklin* (1974) 12 Cal.3d 259, 270; RJN Exh. J.) Nor do they dispute that section 631 applies only to third parties and not to a participant to the communication. (See *Warden v. Kahn* (1979) 99 Cal.App.3d 805, 811.) However, Sutter contends that (1) section 631 applies only where there are least two participants to the communication, (2) that both of those participants must be natural persons capable of giving consent, and (3) that Plaintiffs do not allege the presence of "another individual as a second participant who could have given consent." (Mov. Mot. P&A, p. 6: 15-16.) While Sutter's argument is creative, the Court finds it ultimately lacks merit.

As Sutter's argument is based on statutory construction, the Court begins by setting forth the fundamental rules governing such construction. When a court interprets a statute, its fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.) The court first examines the statutory language, giving it a plain and commonsense meaning. (*Ibid.*) The court does not examine the language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. (*Ibid.*) If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. (*Ibid.*)

Sutter's statutory argument relies on *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377 (*Kight*) . In

*Kight*, the plaintiffs brought claims against a consumer finance company under Penal Code § 632 ("section 632"), which is part of CIPA and prohibits eavesdropping on confidential communications. The plaintiffs alleged that the company monitored their telephone conversations with the company's employees without the plaintiffs' knowledge or consent. (*Id.* at p. 1383.) The trial court determined that eavesdropping under section 632 requires *three* parties and there were only two parties to the conversations – the corporation and the customer. (*Id.* at p. 1391.) The appellate court reversed, finding this interpretation contrary to the statutory language and intent of section 632. (*Ibid.*) With respect to the statutory language, the court focused on the use of the terms "party" and "person" in the statute. The court noted that section 632 prohibits a "person" from overhearing a confidential communication without the consent of "all parties" and that the term "person" is defined, for purposes of section 632, to include both an individual and a corporation. (*Id.* at p. 1391.) By contrast, as the court explained, the statutory term "parties" is used to identify the "*individuals* who are the conversation participants from whom consent is required" before a conversation may be overheard. (*Ibid.* (Emphasis added).) The court determined that this difference in terms supported the interpretation that a corporation is not a single unit for purposes of determining who must give consent and that all participants to the conversation must give consent. The court held that each individual listener should be counted as a person as opposed to all corporate employees counting as one corporate person. (*Ibid.*) Sutter argues that, pursuant to *Kight*, the term "party" in section 631 can only mean an individual and, thus, section 631 cannot apply here where the intended recipient of the communication is not a natural person.

The Court is not convinced. First, the Court does not interpret *Kight* to mean that sections 631 and 632 are inapplicable when a communication is between a natural person and an entity or technology created by other natural persons,. Second, the particular context of *Kight* alone is distinguishable. *Kight* considered a *telephone* conversation between a corporate employee and the plaintiff, a conversation to which another corporate employee listened unbeknownst to the plaintiff. Here, the Court does not consider a telephone conversation but rather click communications by Plaintiffs to Sutter's website. "Tautalogically, a communication will always consist of at least two parties: the speaker and/or sender, and at least one intended recipient." (*In re Google Inc.* (3d. Cir. 2015) 806 F.3d 125, 143.) Courts interpreting section 631 have indicated that a party to a communication, for purposes of section 631, may include an entity or website. In *Revitch v. New Moosejaw* (2019) 2019 U.S. Dist. LEXIS 186955 (*Revitch*), for example, the plaintiff alleged that the defendant, Moosejaw, embedded into its webpages a mechanism that allowed another company, NaviStone, to eavesdrop on the plaintiff's communications. (*Id.* at *2.) The court held that the plaintiff's "interaction with the Moosejaw website was a communication within the meaning of section 631." (*Id.* at *3.) In particular, the court noted that "[a]dmittedly, a customer in [a] brick-and-mortar store does not communicate by searching through the inventory. But the same is not true for off-site shoppers: a customer who calls to inquire about a store's products undoubtedly communicates with the retailer. As does an online patron, [the plaintiff] requested information from Moosejaw by clicking on terms of interest; Moosejaw responded by supplying that information. This series of requests and responses – whether online or over the phone – is communication." (*Ibid.*; see also *Graham v. Noom* (N.D. Cal. 2021) 533 F.Supp.3d 823, 832-833 [concluding that a company was a party to a communication and another company was an extension of that company]; *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 775 (*Flanagan*) [addressing possibility that an auditor to a conversation can be a person or a mechanical device].) The Court disagrees with Sutter that *Revitch* is inapposite here or deviates from California precedents interpreting CIPA. The only precedent Sutter cites is *Kight*, and the Court is unconvinced that precedent dictates a different result than *Revitch*.

Courts have also reached the same result with respect to the federal Wiretap Act, which prohibits similar conduct as section 631 and involves a similar analysis. (See *In re Google Inc.* (3d Cir. 2015) 806 F.3d 125, 143 [concluding defendant advertising companies were parties to a communication for purposes of the federal wiretapping law because they were the intended recipients of requests that plaintiff's browsers sent to the defendant's servers); *Calhoun v. Google LLC* (N.D.Cal. 2021) 526 F.Supp. 3d 605, 623.) [discussing website consent under the federal Wiretap Act]; *Chance v. Ave. A, Inc.* (W.D.Wash.

2001) 165 F.Supp.2d 1153, 1162 [finding it implicit that web pages consented to interception under federal wiretapping law]; *In re Doubleclick Privacy Litig.* (S.D.N.Y. 2001) 154 F.Supp.2d 497, 514 [concluding certain websites were parties to the communications from the plaintiffs and gave sufficient consent]; see also *Cline v. Reetz-Laiolo* (N.D. Cal. 2018) 329 F.Supp.3d 1000, 1051 ["The analysis for a violation of CIPA is the same as that under the federal Wiretap Act.") As stated in the Court's ruling on Sutter's demurrer to the 2AC, "California courts are likely to rely on federal decisions interpreting the federal wiretap statute" when interpreting section 631. (ROA 301, p. 21.)

Second, in addition to considering the text of section 631, the court in *Kight* considered the legislative intent and determined that the Legislature enacted section 632 to "ensure an individual's right to control the firsthand dissemination of a confidential communication, and expressed its intent to strongly protect an individual's privacy rights in electronic communications." (*Id.* at p. 1392.) Based on that legislative purpose, the court construed section 632 broadly in favor of the plaintiff, concluding the required third party to the conversation was present. Accordingly, contrary to Sutter's point, *Kight* does not suggest that section 631 or 632 applies only if the parties to the conversation or communication are natural persons. Instead, it suggests that CIPA, including section 631, should be construed broadly to protect an individual's privacy rights. As *Kight* held with respect to section 632, the privacy rights affected under section 631 are the same regardless whether a communication is with a machine or a human being. (*Id.* at p. 1393.) Interpreting section 631 in the way Sutter suggests would undermine both the requirement of two-party consent and the overall purpose of this section. CIPA was enacted in 1967, "replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation." (*Flanagan, supra,* 27 Cal.4th at p. 768.) "The purpose of the act was to protect the right of privacy by, among other things, requiring that all parties consent to a recording of their conversation." (*Ibid.*) The legislative history is "replete with references to the Legislature's intent to strengthen then existing law by 'prohibiting wiretapping or 'electronic eavesdropping' without the consent of all parties to the communication which is being tapped or overheard." (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1487.) "The philosophy [of protecting an individual's privacy right] lie[s] at the heart of virtually all the decisions construing the [Act]." (*Flanagan, supra,* 27 Cal.4th at p. 775.) The addition of all-party consent in section 631 was clearly intended to broaden the coverage of section 631; however, Sutter's suggested interpretation here would limit that coverage by effectively removing entities or technological devices as possible parties to a communication. The Court refuses to adopt such an interpretation.

<u>Second Argument: "Reads, or Attempts to Read, or to Learn the Contents or Meaning of any Message, Report, or Communication While the Same Is in Transit or Passing Over any Wire, Line, or Cable"</u>
The California Supreme Court has explained that section 631 contains three operative clauses covering "three distinct and mutually independent patterns of conduct." (*Tavernetti v. Superior Court* (1978) 22 Cal. 3d 187, 192.) Section 631 also includes a fourth clause that establishes liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the" other three bases for liability. (*Mastel v. Miniclip SA* (E.D.Cal. 2021) 549 F.Supp.3d 1129, 1134 (*Mastel*); see 3AC ¶¶ 367-368 [alleging Sutter aided, agreed with, and conspired with third-party tracking companies in violating section 631].)

The first clause of section 631 has been described as creating "liability for any individual who 'intentionally taps, or makes any unauthorized connection . . . with any *telegraph or telephone* wire, line, cable, or instrument." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12. 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57 (emphasis added).) Sutter argues that, according to its plain language, this first clause is limited to only *telegraphic or telephonic* communications and that Plaintiffs' allegations do not involve such a communication. On the one hand, Sutter's argument is supported by precedent. (See *Mastel, supra,* 549 F.Supp.3d at pp. 1133-1135, citing *In re Google Assistant Priv. Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [claim under first clause must be dismissed if allegations do not show technology at issue operates using a telegraph or telephone wires]; *In re Google Inc. Gmail Litig.* (N.D. Cal. 2013 No. 13-MD-02430-LHK) 2013 U.S.Dist.LEXIS 172784, at *77 (*Google Gmail*)

["difference in coverage between first and second clauses suggests that the Legislature intended the two clauses to apply to different types of communication"]; see also *Ward General Insurance Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 554 [adjective in series of nouns generally modifies each noun following the phrase.) On the other hand, other federal courts have suggested, without breaking down the different clauses in section 631, that section 631 covers the type of claims at issue here. In *Revitch, supra*, the plaintiff argued that Moosejaw embedded into its webpages a mechanism that allowed a third party to eavesdrop on the plaintiff's communications with the Moosejaw website. (2019 U.S. Dist. LEXIS 186955 at *2.) The code embedded on the website functioned as a wiretap that redirected the plaintiff's communications to the third party. (*Id.* at *3.) The court held that the plaintiff's allegations were sufficient to state a claim under section 631. (*Id.* at *2.)

However, the Court need not resolve the extent of the first clause's coverage as it finds Sutter's argument as to the second clause of section 631 unpersuasive. "The second clause of [section 631] creates liability for any individual who 'reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57.) Sutter's argument relies on the absence of the term "instrument" from this clause (whereas "instrument" is included in the first clause). Sutter argues that Plaintiffs' 3AC allegations are premised on connection to an "instrument" and, as a result, Plaintiffs' allegations are outside the scope of the second clause. More specifically, Sutter contends the 3AC alleges that Sutter's "source code connected to and 'commandeer[ed]' an instrument – the visitor's computer – which caused the computer's web browser to react to inputted or received web data in the visitor's web browser and/or computer by sharing information about the data in separate transmissions to third parties." (Mov. Mot. P&A, p. 16: 13-16.) Again, the Court finds Sutter's argument lacks merit.

In support of its argument, Sutter's moving papers do not cite any cases interpreting section 631 and instead rely on general cases for rules of statutory construction. Conducting its own research, the Court has located a single case in which a federal court stated that "the second clause applies only to 'wire[s], line[s], or cable[s]' – not 'instrument[s,]' which are included in the first clause." (*Google Gmail, supra*, at *77.) However, in so doing, the federal court intended to highlight the breadth of the statute, not its limitations. Specifically, the court concluded that, by excluding the term "instrument" in the second clause, the Legislature reflected its intent to have the first and second clauses apply to different types of communications, thereby *expanding* its coverage. The court did not interpret "wire," "line" or "cable" narrowly. Rather, the Court found that the second clause is broad enough to encompass email. (*Id.*)

The Court's research further confirms that other courts have not read the second clause, or section 631 in its entirety, as narrowly as Sutter. In its order with respect to Sutter's demurrer to Plaintiffs' 2AC, this Court noted that "[f]ederal courts . . . have concluded that section 631 applies to communications over the internet." (See ROA 301, p. 4, citing *Matera, supra*, at *52); see also (*Yoon* v. Lululemon United States (C.D.Cal. 2021) 549 F. Supp. 3d 1073, 1080 (*Yoon*) ["[c]ourts agree . . . that [section 631] applies to communications conducted over the internet])").) Such communications by definition involve a computer; thus, Sutter's interpretation would upend the general consensus among federal courts as to Section 631's application to internet-based communications. These cases help illustrate that Sutter's argument with respect to the phrase "wire, line, or cable" is misplaced. That phrase refers to the *device* through which the communication is transmitted. Federal courts have already determined that communications transmitted over the Internet are transmitted over a wire, line, or cable for purposes of section 631. (See *Matera, supra*, at *57.) The parties do not question whether Plaintiffs' communications at issue here were conducted over the Internet – the fact that they involved a computer is part and parcel of the communication occurring over the Internet.

It appears that Sutter's argument also takes issue with the *means* by which the improper interception of

the communication over wire, line, or cable is achieved. In this regard, Sutter directs the Court's attention to the structure of section 631. According to Sutter, when broken down into grammatical clauses, the first two clauses of section 631 read as follows:
"Any person:

(i) who *by means of any machine, instrument, or contrivance, or in any other manner*, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or
(ii) who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or" (431 (Emphasis added).)

Sutter argues that the italicized phrase specifies the means by which the unlawful activity is achieved but this phrase only appears in the first clause. In Sutter's view, this phrase does not apply to the second clause and, as a result, using an "instrument" to act as described in clause (ii) is not a violation of that clause. However, Sutter's interpretation would make it impossible to violate the second clause of section 631 because any means by which the violation is achieved is not mentioned in that clause. The Court rejects such an interpretation. With respect to the means by which the interception is achieved, the Ninth Circuit has described section 631 as prohibiting "any person from *using electronic means* to 'learn the contents or meaning' of any 'communication' 'without consent' or in an 'unauthorized manner.'" (*Davis v. Facebook, Inc.* (9th Cir. 2020) 956 F.3d 589, 606-607.) Additionally, the Central District of California read the second clause as prohibiting the unlawful reading or learning "*by means* of any machine, *instrument*, or contrivance." (See *Alder v. Cmty.* (C.D.Cal. Aug. 2, 2021, No. 2:21-cv-02416-SB-JPR) 2021 U.S.Dist.LEXIS 201644, at *5 [describing section 631 as imposing "liability on any person who 'by means of any machine, instrument, or contrivance, . . . and without the consent of all parties . . . reads, or attempts to read, or to learn the contents or meaning of any . . . communication while the same is in transit . . . or is being sent from, or received at any place within this state"]; see also *Yoon, supra*, 549 F.Supp.3d 1073, 1080.) Another court described the second clause as applying to "*both* communications 'in transit over any wire, line, or cable' *and* those 'sent from, or received at any place within this state.'" (*Lopez v. Apple, Inc.* (N.D. Cal. 2021) 519 F.Supp. 3d 672, 687; see also *In re Google Assistant Privacy Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [agreeing that second cause could be read in disjunctive].) Under these constructions, the allegation that Sutter used Plaintiffs' computers to enable a third-party's interception of their communications on the Portal does not remove Plaintiffs' claim from section 631.

Lastly, the Court reiterates the California Supreme Court's instruction to interpret CIPA in a manner that "fulfills the legislative purpose of [the Act] by giving greater protection to privacy interests." (*Flanagan, supra*, 27 Cal. 4th at p. 775.) Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed the Act in accordance with the interpretation that provides the greatest privacy protection. (See *Ribas, supra*, 38 Cal. 3d at 360-61.) Sutter's interpretation of section 631 would provide less privacy protection and the Court finds it not well supported by case law. Accordingly, the Court rejects Sutter's second argument with respect the cause of action for violation of section 631.

Disposition
Based on the foregoing, Sutter's Motion for Judgment on the Pleadings is DENIED.

This minute order is effective immediately. No formal order or other notice is required. (Code Civ. Proc., § 1019.5; Cal. Rules of Court, rule 3.1312.)

*To request oral argument on this matter, you must call Department 28 at (916) 874-6695 by 4:00 p.m., the court day before this hearing and notification of oral argument must be made to the opposing party/counsel. If no call is made, the tentative ruling becomes the order of the court. (Local Rule 1.06.) Parties requesting services of a court reporter may arrange for private court reporter services at their own expense, pursuant to Government code §68086 and California Rules of Court, Rule 2.956. Requirements for requesting a court reporter are listed in the Policy for Official Reporter Pro Tempore available on the Sacramento Superior Court website at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-6a.pdf. The list of Court Approved Official Reporters Pro Tempore is available at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-13.Pdf.*
**Please check your tentative ruling prior to the next Court date at www.saccourt.ca.gov prior to the above referenced hearing date.**

***If oral argument is requested, the matter shall be held via Zoom with the links below:***

*To join by Zoom link - https://saccourt-ca-gov.zoomgov.com/my/sscdept28*
*To join by phone dial (833) 568-8864 ID 16039062174*

**Counsel for Plaintiff is directed to notice all parties of this order.**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO**

Gordon D Schaber Courthouse
720 Ninth STREET
Sacramento, CA 95814-1311

**SHORT TITLE:** Doe I vs. Sutter Health

| | |
|---|---|
| **CLERK'S CERTIFICATE OF SERVICE BY MAIL (Minute Order)** | CASE NUMBER: **34-2019-00258072-CU-BT-GDS** |

I certify that I am not a party to this cause. I certify that a true copy of the Minute Order was mailed following standard court practices in a sealed envelope with postage fully prepaid, addressed as indicated below. The mailing and this certification occurred at Sacramento, California, on 06/14/2022.

Clerk of the Court, by: /s/ V. Aleman, Deputy

PAUL R KIESEL
KIESEL LAW LLP
8648 WILSHIRE BOULEVARD
BEVERLY HILLS, CA 90211-2910

# Exhibit F

D133503521

**IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO**

ENTERED
NOV 23 2021

| | | |
|---|---|---|
| John Doe, on behalf of himself and all others similarly situated, | : | Case No.: A2002633 |
| Plaintiff, | : | Judge Christian A. Jenkins |
| v. | : | |
| Bon Secours Mercy Health, | : | Decision And Entry Granting In Part And Denying In Part Defendant's Motion To Dismiss |
| Defendant. | : | |

**I. Procedural Background**

Plaintiff filed a complaint on July 24, 2020. On August 28, 2020, defendant moved to dismiss for failure to state a claim pursuant to Civ.R. 12(B)(6). Defendant's motion was fully briefed on December 2, 2020 when plaintiff filed a motion for leave to file an amended complaint. Defendant opposed plaintiff's motion for leave to amend.

By entry docketed on February 12, 2021, the Court granted plaintiff's motion for leave to file an amended complaint. The Court deemed plaintiff's amended complaint filed as of said date.

Defendant filed a motion to dismiss plaintiff's amended complaint pursuant to Civ.R. 12(B)(6) on March 9, 2021. That motion is now fully briefed and ripe for decision.

**II. Standard of Review**

A motion to dismiss for failure to state a claim tests the sufficiency of the complaint. *Assn. for the Defense of the Washington Local School Dist. v. Kiger*, 42 Ohio St.3d 116, 117, 537 N.E.2d 1292 (1989). The material allegations in the complaint are taken as admitted, and all reasonable inferences must be drawn in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). Before the Court may dismiss the complaint, it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitlir

VERIFY RECORD

to recovery. *O'Brien v. University Community Tenants Union*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975).

**III. Plaintiff's Allegations**

The Court accepts the well-pleaded allegations set forth in the amended complaint to consider defendant's motion to dismiss. Plaintiff is a patient of defendant, a health care provider. (Amended Complaint ¶¶ 1-2). Defendant operates a website (i.e., www.mercy.com) that it encourages its patients to utilize. (*Id.* ¶¶ 4, 42). Defendant's website includes a "patient portal" through which patients can access medical records and test results and make appointments. *Id.* Plaintiff has visited and used www.mercy.com. (*Id.* ¶¶ 11, 154-159).

Plaintiff's Amended Complaint explains at length how a website can be designed to cause information about visitors to the website and their activity on the website to be provided to third parties such as Facebook and Google, and that defendant's site employs such tactics. (*Id.* ¶¶ 44-63). Plaintiff alleges that the information provided to third parties includes among other things: (1) information from which individual users can be identified by matching them to their Facebook accounts (*Id.* ¶¶ 64-73); (2) individual users' IP address and thereby their physical location (*Id.* ¶¶ 89-97); (3) the substance of individual users' searches on mercy.com (*Id.* ¶ 140); (4) whether a user logged into the mychart portal (*Id.* ¶ 149); (5) whether a user attempted to schedule a virtual visit (*Id.* ¶¶ 143-145); and (6) the pages visited on mercy.com by a user (*Id.* ¶ 142). The net effect according to plaintiff is that defendant discloses to Google, Facebook and others the identity of patients who visit mercy and the substance of their search and other activity on mercy.com (*Id.* ¶ 159).

Plaintiff alleges that the disclosure of such information is not necessary for the operation of mercy.com, but rather that it enables defendant and others to engage in targeted marketing to

visitors to mercy.com that generates revenue for defendant. (*Id.* ¶¶ 180-181). Plaintiff alleges claims for disclosure of non-public medical information pursuant to *Biddle v. Warren Gen. Hosp.*, 86 Ohio St.3d 395, 715 N.E.2d 518 (1999), breach of confidence, invasion of privacy – intrusion upon seclusion, breach of contract, negligence and breach of fiduciary duty.

## IV. Discussion

### A. The Complaint Adequately Alleges A Claim Under *Biddle v. Warren General Hospital.*

In *Biddle*, the Ohio Supreme Court established a common law tort under Ohio law "for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship." *Id.* at 401. According to the Ohio Supreme Court, the *Biddle* decision represents an effort to provide a "legal identity" for "an evident wrongdoing" that Ohio courts had "shoehorned" into traditional legal theories. *See Menorah Park Center for Senior Living v. Rolston*, 164 Ohio St.3d 400, 2020-Ohio-6658, 173 N.E.3d 400, ¶ 14. Thus, a *Biddle* claim is properly evaluated in this broad light.

Defendant argues that plaintiff's *Biddle* claim fails because: (1) no information learned through the physician-patient relationship was disclosed; (2) there was no disclosure of non-public medical information; and (3) public policy interests favoring the digitization of medical records and defendant's First Amendment right to promote its services on its website outweigh any privacy interest of plaintiff implicated by the conduct alleged in this case. Defendant's first two arguments fail based on the factual allegations in the Amended Complaint. Defendant's third argument cannot be properly assessed on a motion to dismiss on the facts alleged in this case.

Defendant first notes that its website is available to anyone, not just its patients. (Defendant's Memorandum in Support of Motion to Dismiss p. 2). No doubt this is true, but plaintiff is a patient. Plaintiff alleges he and other patients are encouraged by defendant to use its

website to obtain information about medical conditions, access medical records through the mychart portal and schedule appointments. While a non-patient may visit defendant's website to view some of the information thereon, in the absence of a physician-patient relationship with defendant, plaintiff and others would be unlikely to visit defendant's website to access their medical records or schedule appointments, actions that are allegedly disclosed to third parties. Plaintiff alleges that the information disclosed to third parties includes the fact that a visitor to defendant's website is a patient of defendant. (Amended Complaint ¶ 148).

Defendant also argues that visitors to its website are anonymous. (Defendant's Memorandum in Support of Motion to Dismiss p. 4). But this is contradicted by the Amended Complaint. Plaintiff alleges defendant's website deploys Facebook cookies to identify individual patients by matching them to their Facebook accounts. (Amended Complaint ¶¶ 70-71). Coupled with the other information allegedly disclosed such as IP address, user agent and browser fingerprint (*Id.* 89), the clear implication is that third parties are able to identify plaintiff and other patients of defendant and associate their identities with the data about their activity on defendant's website. (*Id.* 99-116). Plaintiff also alleges that defendant's website does not utilize available "anonymization" tools to protect the identities of visitors to its website. (*Id.* 126). One of the authorities relied on by defendant aptly summed up the net effect of these allegations by noting that by "[u]sing these techniques, Facebook can identify individual users and watch as they browse third-party websites . . ." *Smith v. Facebook*, 262 F.Supp.3d 943, 948 (N.D.Ca.2017).

The real question before the Court at this juncture is whether the aggregated information allegedly disclosed to third parties could conceivably constitute information learned within the physician-patient relationship so as to state a claim at this stage of the proceedings. In *Biddle*, the hospital's law firm requested four pieces of information to assess patients for social security

disability eligibility – name, telephone number, age and medical condition. *Biddle*, 86 Ohio St.3d at 396. The information allegedly disclosed in this case appears to be potentially more extensive when considered collectively. (Amended Complaint ¶¶ 134-153). Plaintiff has used defendant's website to research his and his wife's medical conditions, make appointments and access his medical records. (*Id.* 155-156). These actions were purportedly disclosed to third parties. (*Id.* 78-80). According to the allegations of the Amended Complaint, this means that searches for plaintiff's conditions and/or visits to pages containing information about such conditions have been disclosed to third parties and associated with identifying information about plaintiff. The sum and substance of such disclosures appears at least equivalent to the information at issue in *Biddle*. None of this information would be publicly available if not for defendant's disclosure thereof. (*Id.* 164-167). Thus, the Court cannot say from the face of the Amended Complaint at this juncture that plaintiff can prove no set of facts that would support a *Biddle* claim. [1]

With respect to defendant's disclaimer declaring that use of the website does not establish a physician-patient relationship, defendant seemingly misses the point of plaintiff's allegations. Plaintiff does not allege that he became a patient by accessing the website; he is an actual patient of defendant who, at defendant's suggestion, has used defendant's website. If in fact defendant caused the disclosure of nonpublic medical information about one of its patients through the

[1] Defendant's reliance on *Jenkins v. Metro Life Ins. Co.*, 171 Ohio St. 557, 173 N.E.2d 122 (1961) and *Evans v. Toledo Neurological Assocs.*, 2014-Ohio-4336, 20 N.E.3d 333 (6th Dist.) is misplaced. *Jenkins* involved application of the statutory testimonial privilege in a case involving a life insurance claim. The Ohio Supreme Court held that, under the privilege statute and in the context of a dispute about whether the decedent lied on a life insurance application, there was no privilege to prevent a physician from testifying about the fact that the decedent had seen the physician. *Jenkins* predates *Biddle* by 38 years and arises in a completely different context. It does not inform application of *Biddle* in this case. Likewise, *Evans* was a medical malpractice claim in which defense counsel provided a physician with medical records obtained in discovery for his review. The physician being consulted by defense counsel happened to be employed by the same hospital system where plaintiff received care and that he was suing for medical malpractice. There is no allegation in this case that the information allegedly disclosed was provided to third parties other than as a result of the actions of defendant that caused such disclosures. Accordingly, *Evans* is unhelpful.

operation of its website, its self-serving proclamation that use of the website is not part of the physician-patient relationship does not in this Court's view make it otherwise. Thus, the existence of a physician-patient relationship is established for purposes of the current analysis.

Finally, defendant argues that its alleged disclosures are permitted because public policy interests advanced by such disclosures outweigh plaintiff's interest in confidentiality. Defendant relies primarily on the Ohio Supreme Court's decision in *Menorah Park* holding that disclosure of the minimum information necessary to pursue a collection action against a patient is permissible. The *Menorah Park* court based its holding on language in the *Biddle* decision recognizing that "special situations may exist where the interest of the public, the patient, the physician, or a third person are of sufficient importance to justify the creation of a conditional or qualified privilege to disclose in the absence of any statutory mandate or common-law duty." *Biddle*, 86 Ohio St.3d at 402.

In the absence of a statutory mandate or common law duty requiring disclosure, the *Menorah Park* court looked "to HIPAA for guidance in determining how those competing interests should be weighed." *Menorah Park*, 2020-Ohio-6658 at ¶ 32. Federal regulations promulgated pursuant to HIPAA expressly permit disclosure of protected health information "for treatment, payment, or health care operations." 45 C.F.R. 164.502(a)(1)(ii). The *Menorah Park* court went on to find public policy support for a payment-related exception in R.C. 3798.04, which prohibits unauthorized disclosure "except when the use or disclosure is required or permitted without such authorization [under HIPAA regulations]." *Menorah Park* at ¶ 33. Based on these clear recognitions of public policy under which disclosure may be proper, the *Menorah Park* court recognized a qualified privilege under which physicians and hospitals may disclose the minimum amount of patient information necessary to pursue a collection action. *Id.* at ¶ 35.

Looking to HIPAA regulations for guidance as in *Menorah Park* does not yield the same result in this case. HIPAA permits limited disclosures for treatment, payment or health care operations. The alleged disclosures in this case clearly do not facilitate treatment or payment, and review of the regulation defining "health care operations" is equally unavailing. *See* 45 C.F.R. § 164.501.

Without a statute or regulation expressly recognizing that plaintiff's privacy interests are outweighed by a policy interest advanced by the disclosures at issue, defendant argues that federal policy favoring the digitization of medical records and defendant's First Amendment commercial speech rights supply countervailing policy interests. Perhaps they do, but unlike *Menorah Park*, the connection between defendant's asserted policy interests and the disclosures in this case are far from clear. *See e.g. Turk v. Oiler*, 732 F.Supp.2d 758, 776 (N.D. Ohio 2010) (declining to grant judgment on the pleadings where defendant asked court to "extend the countervailing interests doctrine").

To be sure there is a public policy interest in making the delivery of healthcare more effective, efficient and less costly through widespread adoption of electronic medical records. But defendant has failed to sufficiently articulate how that interest is advanced by the disclosure of information about plaintiff's and others' activity on defendant's website to third parties to warrant dismissal as a matter of law. Likewise for defendant's First Amendment argument, unlike the *Menorah Park* court that could look to an unambiguous federal regulation recognizing that the policy interest in allowing providers to pursue payment outweighs patient confidentiality, defendant's claimed commercial speech interests are simply too nebulous and undeveloped at this stage of the proceedings for this Court to hold as a matter of law that plaintiff cannot establish any facts that might entitle him to relief. This is in accord with the decision of the Cuyahoga County

Court of Common Pleas in an analogous case. *See Jane Doe v. University Hospital Health System, Inc.*, Cuyahoga C.P. No. CV-20-933357 (June 25, 2021).

Plaintiff has adequately alleged a claim under *Biddle v. Warren General Hospital*. Defendant's motion to dismiss is denied with respect to Count I of the Amended Complaint.

**B. Breach of Confidence**

Count II of the Amended Complaint alleges a claim for "breach of confidence." This count appears to be a verbatim restatement of the *Biddle* claim stated in Count I. Subsequent to *Biddle* it is unnecessary to "shoehorn a breach-of-confidence theory of recovery into many traditional legal theories . . ." *Menorah Park*, 2020-Ohio-6658, ¶ 14. This claim is duplicative of Count I and is therefore subsumed within it and unnecessary. Defendant's motion to dismiss is granted with respect to Count II of the Amended Complaint.

**C. Invasion of Privacy – Intrusion Upon Seclusion**

Ohio law recognizes the common law tort of invasion of privacy by intrusion upon seclusion where the defendant intentionally intrudes upon the solitude or seclusion or the private affairs or concerns of another, and if such an intrusion would be highly offensive to a reasonable person. *See Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (1956), syllabus. Defendant cites *Moran v. Lewis*, 2018-Ohio-4423, 114 N.E.3d 1254, ¶ 5 (8th Dist.) ("In order to properly plead an invasion of privacy claim, there must be allegations that the tracking invaded the seclusion or private affairs of another."). Defendant argues that there was no intrusion in this case, especially not into any secluded or private place.

*Moran v. Lewis* involved a GPS tracker placed on the plaintiff's car that tracked his movement on public roads. The Eighth District Court of Appeals cited authorities noting that the tracking at issue had not "led to the disclosure of private facts" and there was "no evidence that the vehicle was driven into a private or secluded location where one would have a reasonable

expectation of privacy." *Id.* at ¶ 10, citing *Troeckler v. Zeiser*, S.D.Ill. No. 14-cv-40-SMY-PMF, 2015 WL 1042187, *3 (March 5, 2015) and *Villanova v. Innovative Investigations, Inc.*, 21 A.3d 650, 652, 420 N.J.Super. 353 (2011). The *Moran* court held that "[t]he mere act of monitoring another's public movements through the attachment of a GPS tracking device is not, in and of itself, sufficient to state an invasion of privacy claim." *Id.* at ¶ 11.

*Moran* is not analogous to this case. Plaintiff's public movements were not tracked, rather his online engagement with his healthcare provider was allegedly disclosed to third parties. As discussed above, this included the substance of searches for medical conditions that plaintiff submitted on defendant's website, plaintiff's access of his medical records and scheduling of medical appointments.[2]

Indeed, intrusion upon seclusion is a heavily fact-dependent claim. An evidentiary record will likely reveal the substantive details of these disclosures for closer scrutiny, but for purposes of a motion to dismiss the allegations are sufficient. *See e.g. Demo v. Kirksey*, D.Md. No. 8:18-cv-00716-PX, 2018 WL 5994995, *6 ("the trier of fact [must] consider all the circumstances including the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion, as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.") (citations omitted). Defendant's motion is denied with respect to Count III of the Amended Complaint.

---

[2] Distinguishing decisions like *Moran* involving only tracking in public spaces, courts have noted that other forms of electronic surveillance may be much more intrusive. For example, with respect to cell phone location data, Justice Sotomayor noted in a concurrence that "the time stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Carpenter v. U.S.*, 138 S.Ct. 2206, 2217, 201 L.Ed.2d 507 (2018), citing *U.S. v. Jones*, 556 U.S. 400, 415, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). Based on the allegations of the Amended Complaint, which must be accepted as true, the net effect of the aggregated data allegedly disclosed in this case seems more akin to the latter than the former.

**D. Breach of Contract**

Plaintiff's breach of contract claim is not subsumed because the source of the obligation allegedly breached is a contract rather than the common law duty recognized in *Biddle*. However, the parties disagree about the substance of any alleged contract between patients who utilize defendant's website and defendant. Plaintiff contends that the HIPAA Notice of Privacy Practices contains contractually enforceable promises that defendant made to plaintiff and others, which defendant allegedly breached. (Amended Complaint ¶¶ 270-275). Plaintiff also contends that defendant breached the covenant of good faith and fair dealing implicit in contracts under Ohio law. (*Id.* ¶ 276). Defendant argues that the HIPAA Privacy Notice applies to patients' medical records and information communicated in connection with patients' healthcare but is inapplicable to the information allegedly disclosed in this case. The Court cannot resolve this disagreement in the context of a motion to dismiss on the record presented. Defendant's motion is therefore denied with respect to Count IV.

**E. Negligence and Breach of Fiduciary Duty**

Plaintiff alleges that defendant negligently breached its duty of confidentiality to plaintiff by disclosing the content of plaintiff's communications to third parties, and that plaintiff suffered damages. (Amended Complaint ¶¶ 289-294). Plaintiff also alleges that defendant has a fiduciary duty to its patients, including plaintiff, and that defendant breached that duty by engaging in the conduct alleged in the amended complaint. (Id. ¶¶ 295-303). Defendant argues that these claims are duplicative and are subsumed by plaintiff's *Biddle* claim.

To determine whether these claims are subsumed within plaintiff's *Biddle* claim, this Court questions whether a *Biddle* claim includes a claim for unintentional disclosure. If so, they are

original -------- 68
other - 14, 15, 21, 22, 30, 35, 40, 42, 48, 50, 53, 54, 56, 57, 59, 60, 62, 68
others - 14, 16, 22
otherwise -- 28, 67
ought ----------- 26
our 10, 26, 34, 45, 50, 56, 57, 59
out 28, 31, 33, 37, 38, 54, 57, 58, 64
outcome --------- 67
outlined -------- 49
outright -------- 43
outset ---------- 37
over 5, 13, 21, 27, 37
overcome -------- 13
overlooked ------ 28
owe ------------- 46
own 8, 11, 14, 40, 49, 59

P

p ------- 3, 64, 66
pa -------------- 68
page 9, 11, 13, 14, 37, 58, 68
Page ------------- 1
PAGE ------------- 2
Pages ------------ 1
paid ------------ 38
paper ------ 15, 37
papers 5, 6, 7, 14, 16, 54, 60
Paragraph -- 14, 49
paragraphs - 13, 29
parcel ---------- 55
parent ---------- 38
parental -------- 38
Parenthood ------ 58
parishioner ----- 45
part -- 14, 18, 21, 41, 44, 47, 52, 53, 55, 57, 59
Part ------------ 53
participated----59
particular-11, 23, 25, 31, 33, 36, 37
particularly----17
parties 32, 34, 40, 44, 60, 63, 67
parts------------7
party--16, 17, 18, 19, 21, 27, 28, 50
pass---------8, 21
passing---------17
password--------39
past------------54
path------------31
patient-8, 10, 12, 29, 30, 31, 32, 35, 36, 38, 40, 41, 44, 45, 46, 47, 51, 54
patients---11, 16, 23, 40, 41, 47, 50, 53, 54, 56
pattern---------49
Pause-----------10
PDF-------------68
pending---------65
people--8, 13, 14, 15, 23, 26, 31, 33, 35, 37, 46, 50, 53, 55
perhaps-11, 12, 33
Perhaps----------6
permit----------19
person---7, 8, 11, 14, 16, 24, 32, 36, 41, 51, 55
personal---10, 35, 37, 40, 41, 45, 46, 48
personally-12, 33, 41
persuaded---22, 39
pharmaceutical--50
pharmacy--------39
phone 3, 24, 31, 50
phonetic--------45
PHR-------------39
physical---------8
physician - 45, 46, 47
physicians - 44, 48
pick ----------- 62
picked ----- 14, 44
piece -- 16, 22, 30
PII ------------ 27
pile ----------- 12
pixel ---------- 30
pixels --------- 23
place ------ 40, 49
places ----- 22, 38
plaintiff 3, 5, 6, 8, 10, 14, 18, 21, 22, 26, 30, 32, 34, 35, 41, 43, 46, 59, 60
Plaintiff ------- 1
plaintiffs - 3, 11, 13, 14, 15, 22, 23, 27, 33, 34, 42, 43, 57, 60
play --- 39, 40, 58
plead ---------- 13
pleading 12, 13, 23
pleadings ------ 15
please - 3, 62, 64, 65
Please --------- 64
pled ---- 7, 28, 51
point 6, 8, 12, 16, 27, 28, 29, 33, 34, 40, 45, 51, 52, 55, 56, 57, 58, 63
pointed -------- 38
points --------- 10
policies -------- 9
policy ----- 13, 38
pop ------------ 41
portal - 10, 38, 51
portals ----- 9, 40
positives ------ 51
possibility ---- 12
possible --- 10, 19
possibly ------- 35
post ------- 18, 19
potential - 35, 47, 49, 61
potentially 25, 45,

50
practice --- 38, 54
practices -- 13, 56
pragmatic -- 40, 64
preamble ------- 25
precise ---- 30, 58
preliminary - 5, 9, 10, 17, 54, 59, 61
prepared ---- 1, 67
presence -------- 3
present ----- 3, 48
presented ------ 61
presents ------- 32
press ---------- 51
pretty --------- 44
prevent -------- 42
previous ------- 41
priest --------- 45
primarily ------ 59
primary -------- 51
principle ------ 39
privacy 5, 7, 8, 9, 13, 32, 33, 34, 36, 38, 40, 42, 43, 44, 48, 61
private --------- 9
privilege ------ 24
probability ---- 12
probable ------- 12
probably 44, 55, 60
problem 24, 47, 59, 65
problematic ---- 62
problems ------- 26
produced ------- 68
products ------- 36
profession ----- 39
profit - 53, 54, 57
profits -------- 58
prohibits ------ 16
prologue ------- 25
prominently ---- 38
promise ---- 39, 43
proper ----- 18, 58
properly ----- 7, 9
properties ----- 41
property ------- 30
propose -------- 65
proposed ------- 63
proprietorship--46
prospective-----59
protect 31, 43, 54, 58
protectable-----39
protected--10, 13, 34, 37, 38
protection------38
protective------13
protects--------41
provide-29, 53, 55
provided----41, 67
provider 35, 41, 49
providers---11, 35
providing--------9
public--9, 23, 26, 34, 36, 39, 42, 50, 57
publicly--------35
pull----11, 25, 52
pulled------15, 63
purportedly-----56
purpose---------56
purposes---12, 16, 24, 40, 41, 58
pursuing--------54
put-11, 30, 38, 50
puts------------30

**Q**

qualify-----16, 19
QUALITY---------68
question---32, 40, 47, 55
questions--------7
quickly-----44, 61
quote-------49, 58

**R**

R---------------67
ra--------------52
raised----------52
ran-------------24
random-------8, 50
Rather----------46
Raymond--1, 67, 68
re---5, 6, 11, 12, 13, 16, 17, 19, 20, 21, 22, 23, 24, 27, 30, 31, 32, 33, 34, 35, 36, 38, 40, 41, 43, 44, 45, 46, 47, 49, 51, 52, 53, 54, 55, 56, 58, 60, 63, 64
reach ---------- 40
read - 5, 6, 7, 14, 16, 20, 25, 44, 52, 59
real --- 12, 27, 36
realistically -- 26
reality -------- 46
really 6, 7, 8, 10, 15, 20, 25, 28, 34, 37, 39, 48, 49, 53, 59
reason 30, 35, 39, 45, 53
reasonable - 62, 65
reasons - 6, 7, 49, 61
rec 16, 17, 20, 22, 28, 31, 67
recall --------- 10
received -------- 5
receives ------- 30
recited -------- 60
recognize -- 6, 10, 11, 26, 44, 45, 49
recognized - 44, 48
recognizes ----- 52
recognizing ----- 6
record - 3, 14, 15, 20
recorded 20, 21, 28
Recording ------- 1
RECORDING ------ 68
records ----- 9, 38
red ----------- 39
redirections --- 31
redirects ------ 30
reduce ---------- 4
ref --------- 9, 60
refer ---------- 11
reference --- 9, 60

referenced -- 9, 60
references ----- 23
referencing ---- 10
reflected --- 6, 21
regarding ------- 7
regardless ----- 61
regards -------- 17
regs ----------- 41
regulated ------ 48
related -------- 67
relates ---- 30, 50
relating --- 51, 55
relationship 8, 45, 46, 53
relationships -- 45
rely ----------- 27
remaining ------ 65
remedy --------- 49
remind ---------- 7
reminder -------- 7
repeal --------- 31
repeatedly - 10, 28
report --------- 18
Reporter -------- 1
reposes -------- 49
represent -- 14, 37
representations 57
representative - 15
represented ---- 42
representing --- 11
represents ----- 37
reps ----------- 50
request -------- 51
require - 6, 27, 63
required -- 13, 38, 41, 60, 63
requirement 27, 28
research --- 37, 61
reserve -------- 51
reserved ------- 27
resolve ---- 27, 36
respect - 5, 7, 13, 14, 15, 25, 32, 34, 44, 51, 55, 61
respond ---- 43, 61
responding ----- 15
response ---- 5, 29
rests ---------- 46
result --------- 30
results ---------31
revenue-53, 56, 58
revenues --------56
reviewed ------5, 6
revolve ---------59
right-4, 5, 6, 17, 29, 31, 32, 38, 41, 44, 48, 58, 59, 61, 63, 64
Right ---23, 29, 40
rights ----------38
Road -------------2
Rogan ------------4
role --------39, 40
room ------------11
routine ---------58
rule ------------61
Rule 3, 62, 63, 64, 65
rules -----------58
ruling ----------62
rummaging -------25
run -------------59

**S**

s 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64
S ---------------68
sacred--41, 49, 60
safety ----------26
said 27, 42, 49, 50
Saint ------------2
same---17, 20, 21, 23, 29, 30, 36, 38, 45, 46, 60
saw---------33, 53
say--7, 9, 11, 13, 16, 17, 25, 26, 28, 29, 30, 33, 35, 40, 43, 48, 52, 53, 56, 60, 62
saying 20, 22, 43, 47, 56
says 9, 14, 17, 25, 29, 30, 41, 47, 48
scenario ------- 20
school --------- 37
screen - 17, 28, 29
screenshot ----- 29
search - 34, 36, 41
searches --- 24, 34
searching ------ 24
second 16, 40, 42, 51
Second ------ 8, 31
secrecy 9, 16, 23, 26
secret 16, 22, 23, 26, 28
secretly -- 14, 15, 16, 17, 19, 20, 25
Section 15, 54, 56
see 7, 14, 15, 20, 21, 22, 28, 30, 33, 44, 47, 52, 53, 62
See ------------ 24
seem 10, 44, 50, 55
seemed ----- 50, 55
seems -- 7, 12, 22, 25, 26, 35, 38, 44, 45, 56, 58, 59, 61
seen ----------- 18
send ----------- 30
sends ---------- 32
sense - 15, 21, 27, 47
senses --------- 13
sent -------- 5, 50
separate -- 10, 20, 27, 29, 31, 39
separateness --- 21
series ---------- 5

serious 32, 33, 34, 39
served --------- 62
Services --- 57, 68
session ----- 3, 64
set 8, 26, 30, 31, 62
setting ---- 24, 31
settings --- 13, 31
share -- 6, 10, 17, 41, 60
shared - 35, 40, 44
shoes ---------- 42
should - 5, 17, 35, 49, 56, 61
show 20, 29, 41, 57
showed --------- 28
shown ------ 17, 30
shows ------ 20, 37
side ------- 44, 45
sidebar -------- 68
sides -------- 5, 7
sign --- 29, 30, 51
significant ---- 59
significantly -- 60
signify ---- 37, 38
similar ---- 14, 27
similarly ------- 8
Simmons --------- 2
simply 17, 21, 23, 34
simultaneous -- 27, 28, 68
sir ---- 32, 48, 58
situation ------ 22
SJC 32, 44, 47, 52, 59
slide ---------- 20
slides --------- 21
Smith - 20, 21, 28, 29
so -- 7, 9, 10, 15, 18, 19, 21, 22, 25, 37, 41, 43, 53, 59, 61, 63
So - 3, 4, 5, 6, 7, 8, 10, 11, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 25, 26, 28, 31, 32, 33, 34, 36, 40, 43, 44, 45, 46, 47, 51, 52, 53, 54, 56, 57, 58, 59, 61, 62, 64, 65
So the-10, 13, 19, 21, 31, 52
sociologically--26
sole--------29, 46
solving---------59
some---5, 6, 7, 9, 10, 12, 13, 15, 16, 20, 22, 24, 40, 50, 52, 60, 61, 63, 64
somebody 6, 17, 20, 21, 23, 24, 36
somehow--8, 13, 14
someone-10, 11, 16
something--11, 13, 20, 21, 23, 28, 35, 46, 56, 57
somewhat----27, 49
soon-----------63
sorry-------37, 63
Sorry-----------49
sort 10, 39, 48, 52
sorts-------21, 58
sounds----------62
source--30, 32, 50
space------------9
speak----6, 42, 55
speaking 32, 46, 58
specialist-11, 33, 36
specialists 11, 33, 35
specific-6, 11, 56
specifically 9, 14, 51
speech----------68
spilled---------44
squarely--------43
Squares----------4
SS---------------1
stack------------5
stage------------7
stamp-----------68
stand-----------14
standard ------- 12
stands --------- 46
start --- 5, 35, 40
starts --------- 30
State ----------- 7
stated ----- 51, 61
statement ------ 23
status ----- 37, 51
statute 15, 16, 24, 26, 41
statutes ------- 27
statutory --- 6, 32
stay ----------- 55
Stay ----------- 65
still ------- 5, 27
Street ------ 2, 67
stretch -------- 49
subject ---- 38, 58
submissions - 5, 59
subscribe ------ 30
subset --------- 50
substantial 32, 33, 34, 39
succeed -------- 26
succeeds ------- 32
success -------- 60
successful ------ 8
such 11, 16, 25, 45
sudden ----- 24, 38
sued ------- 24, 45
sufficient - 23, 60
suggest ---- 48, 50
suggesting - 46, 48
summary --------- 9
supplied ------- 59
support -------- 36
supposition ---- 12
Sure ----------- 15
surprise ------- 49
survive -------- 61
suspect ---- 61, 65
syncing -------- 31
system --------- 46
systems -------- 46

T

T ---------- 2, 67
ta ------------ 25
take 7, 8, 12, 26,

40, 45, 52, 56, 61, 62, 65
taken ---------- 67
takes ---------- 25
taking 12, 18, 20, 39, 56, 57
talk 13, 15, 22, 55
talked --------- 32
talking 8, 11, 19, 30, 34, 40, 42, 46, 53, 55
talks ------- 9, 47
TAPE ----------- 68
targeted ------- 26
technically 8, 26, 46, 48
technological -- 21
technology 31, 34, 49
telephone ------ 31
tell -- 13, 24, 37, 39, 63
telling -------- 36
tells ---------- 64
Teresa ---------- 4
term ----------- 37
terms -- 8, 12, 15, 34, 46, 48
test ----------- 49
testing --------- 7
text ----------- 30
than -- 22, 45, 48, 55, 59, 62
Thank -- 5, 11, 18, 32, 43, 65
that 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67, 68
That - 7, 9, 10, 15, 17, 22, 24, 29, 30, 32, 34, 35, 37, 42, 44, 45, 48, 49, 52, 53, 54, 55, 56, 58, 60, 62, 63
that I --- 5, 6, 17, 39, 40, 42, 54, 59, 60, 61, 67
the - 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67, 68
The --- 2, 7, 9, 16, 17, 21, 22, 23, 25, 29, 32, 33, 42, 43, 45, 49, 63, 68
THE 1, 3, 4, 6, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 28, 29, 30, 32, 33, 34, 35, 39, 40, 41, 43, 44, 45, 46, 47, 48, 50, 51, 53, 54, 55, 56, 58, 62, 63, 64, 65
THE CLERK -------- 3
their 7, 8, 13, 14, 15, 16, 18, 19, 25, 27, 31, 32, 35, 36, 40, 41, 43, 44, 47, 48, 53, 54, 55, 56, 60, 61
them -- 17, 28, 29, 35, 36, 41, 51, 55, 61
themselves - 7, 13, 61
Then -------- 5, 62
theory -- 8, 21, 27
there 6, 7, 9, 10, 12, 13, 14, 15, 16, 18, 20, 21, 22, 25, 26, 28, 29, 31, 34, 35, 38, 40, 41, 42, 46, 47, 49, 50, 52, 54, 57, 58, 59, 65
There -- 7, 16, 23, 27, 28, 43, 46, 47, 50, 54, 55, 57, 62
therefore --- 9, 12
these -- 9, 12, 14, 15, 16, 20, 23, 27, 28, 34, 38, 39, 41, 43, 48, 49, 50, 52, 53, 54, 55, 56, 57, 59
These -- 20, 23, 38
They -- 11, 13, 18, 21, 23, 24, 27, 31, 34, 35, 36, 42, 44, 47
thing - 10, 13, 42, 43, 47, 50, 51
things -- 6, 7, 15, 27, 51, 64
think - 5, 6, 7, 9, 10, 11, 22, 26, 27, 28, 31, 32, 36, 39, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 54, 55, 56, 57, 58, 59, 60, 61, 64, 65
third -- 8, 16, 17, 18, 21, 28, 32, 40, 43, 44, 50,

60
Third ------------ 9
this -- 4, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 20, 21, 22, 23, 25, 26, 27, 30, 31, 32, 34, 36, 37, 39, 40, 41, 44, 45, 49, 50, 51, 53, 54, 55, 56, 57, 59, 61, 62, 63, 64, 65, 67, 68
This 3, 11, 20, 26, 38, 41, 43
those - 4, 5, 6, 8, 12, 13, 25, 33, 34, 36, 41, 42, 43, 44, 45, 51, 54, 56, 60, 61, 62, 64
Those -- 24, 51, 57
though ----- 20, 56
three ------- 9, 37
Three ---------- 65
through 5, 11, 19, 28, 39, 40
time 6, 8, 10, 12, 15, 24, 26, 29, 37, 40, 41, 45, 63, 68
times ------ 41, 46
timing --------- 27
to - 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67
To --------- 18, 20
today 5, 18, 36, 65
together----11, 63
too-------------65
took----13, 14, 50
tool------------57
tools---53, 54, 56
top---------29, 30
topics----------50
towards---------26
trace-----------35
tracking---23, 30, 31, 36, 64
trade---52, 53, 57
traditional-----31
TRANSCRIBER-----68
transcribers----68
transcript--67, 68
TRANSCRIPT------68
Transcription---68
transit---------16
transmission 21, 30
transmitted-----34
travel----------63
treatment---35, 50
Trial-----------67
tried-------18, 31
true-7, 8, 12, 13, 21, 22, 23, 26, 28, 30, 34, 36, 43, 58, 67
truly-----------39
trust--24, 41, 42, 49
truth------------7
trying--13, 34, 47
turn-------------4
two 13, 14, 15, 16, 18, 19, 21, 29, 40, 57
tying-----------43
type------------25
TYPE------------68
types---27, 38, 48

**U**

Ultimately------52
under---7, 13, 26, 36, 44, 47, 56, 57
undermine ------ 60
understand 12, 25, 33, 34, 41, 48, 68
understanding - 44, 61
understood ----- 59
Understood ----- 26
undertake ------ 39
undertakes - 52, 59
unfair ----- 54, 56
unfortunately -- 10
unless ----- 10, 64
unreasonable 32, 33
until ---------- 62
unusual -------- 11
unwieldy ------- 49
up - 8, 14, 18, 24, 25, 29, 30, 31, 41, 43, 44, 49, 50, 52, 60, 62, 63
upon 9, 12, 18, 27, 30
urgency -------- 62
URL ------------ 39
URLs ----------- 34
us 13, 27, 37, 43, 49
use 9, 23, 34, 40, 41, 53
used 8, 36, 51, 56, 61
useful --------- 12
user -- 25, 31, 33, 36, 38, 60
users ------ 36, 59
using -- 8, 21, 23, 24, 26

**V**

v ----------- 1, 68
V --------------- 1
vaccines ------- 64
various ---- 15, 59
ve 5, 6, 9, 12, 17, 18, 22, 24, 31, 32, 34, 36, 40, 41, 43, 44, 45,

51, 54, 55, 61, 63, 65
vending -------- 64
version -------- 34
versus - 3, 42, 44, 49, 52
very -- 35, 44, 57, 58, 59, 61, 65
Very ----------- 58
VI -------------- 1
via -------- 55, 64
viability ------- 7
viable -- 7, 26, 44
victim --------- 31
violation ------ 25
Virginia ------- 42
virtually ------ 39
virtue --------- 23
visited -------- 23
visitor - 8, 18, 21
visits --------- 36
Volume ---------- 1
VOLUME --------- 68
voracity -------- 7
vs ------------- 67

W

w -- 9, 10, 11, 13, 17, 18, 19, 21, 23, 24, 27, 30, 31, 34, 35, 36, 38, 40, 51, 53, 55
wait ----------- 55
waiting -------- 11
Wakefield ------ 57
walk ----------- 38
walking -------- 48
walks ---------- 38
want 3, 6, 13, 22, 29, 35, 37, 40, 42, 50, 51, 54, 56, 63, 65
wanted ----- 14, 55
wants ------ 30, 37
warning -------- 53
wary ----------- 42
was 14, 15, 22, 24, 26, 27, 28, 33, 37, 42, 43, 44, 49, 51, 54, 57, 58, 59, 67
way--8, 9, 10, 11, 12, 16, 17, 18, 20, 21, 23, 30, 31, 32, 33, 34, 36, 38, 45, 46, 48, 53, 56, 58, 59
we-5, 7, 8, 9, 11, 13, 14, 15, 17, 18, 19, 20, 22, 25, 27, 30, 31, 33, 35, 40, 41, 43, 44, 45, 47, 49, 50, 53, 54, 55, 64, 65
We---5, 7, 12, 17, 32, 40, 44, 45, 47, 53, 61, 62, 64
web-8, 30, 32, 41, 50
WebMD -----------36
website-9, 10, 11, 13, 17, 18, 19, 21, 23, 24, 27, 30, 31, 34, 35, 36, 38, 40, 51, 53, 55
websites-7, 9, 11, 16, 23, 35, 36, 38, 42, 52, 53, 55, 56, 59, 61
week 61, 62, 63, 65
weekend---------65
weeks-----------64
Welcome----------3
welfare---------26
well-6, 7, 13, 23, 28, 29, 32, 42, 44, 47, 52, 55, 60, 62, 65
Well---13, 17, 29, 33, 34, 40, 42, 46, 49, 53
went--------22, 36
were-5, 9, 13, 15, 22, 34, 39, 50, 57
what 5, 7, 10, 11, 14, 15, 16, 18, 22, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 37, 38, 40, 43, 44, 45, 46, 47, 50, 51, 53, 54, 55, 56, 57, 58, 61, 64
What -- 11, 31, 33, 48, 56
whatsoever ----- 27
when -- 26, 32, 36, 41, 43, 46, 47, 51, 52, 53, 56, 58, 59
When ------- 29, 49
where - 22, 23, 28, 30, 31, 39, 40, 46, 51, 57, 58
Where ---------- 38
whether 12, 13, 22, 32, 36, 39, 52, 59
Whether -------- 26
which - 5, 7, 8, 9, 10, 11, 13, 14, 15, 20, 22, 23, 24, 27, 34, 36, 38, 40, 42, 43, 49, 51, 55, 56, 61, 63, 64, 65, 67
Which ------ 22, 39
while ---------- 16
white ---------- 15
who - 3, 4, 11, 13, 23, 24, 26, 35, 37, 38, 40, 50, 53, 59
whole ------ 21, 43
will 3, 4, 26, 35, 52, 61, 62, 63, 64, 65
win ------------ 22
wire --- 14, 15, 22
wiretap 5, 14, 15, 20, 22, 23, 25,

26, 27, 31, 32
wish ---- 6, 35, 41
wit ------------ 25
with 3, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 17, 22, 24, 26, 32, 34, 35, 36, 38, 39, 40, 41, 43, 44, 45, 46, 51, 52, 53, 55, 59, 60, 61, 63, 64, 67, 68
within --------- 25
without ---- 41, 44
won -------- 37, 57
Worcester ------ 67
word 23, 28, 34, 68
words - 21, 41, 42, 43
work --- 62, 63, 64
work¬ -- 62, 63, 64
works - 21, 23, 26, 34, 62, 63, 64
world --- 9, 36, 39
worry ----------- 5
worse ---------- 43
would 4, 6, 8, 12, 18, 19, 25, 31, 33, 34, 39, 40, 41, 45, 48, 49, 50, 52, 54, 58, 62, 63, 64
Would ---------- 11
wrestling -- 52, 53
written ---- 41, 59
wrong ---------- 36

Y

years ------ 20, 23
yes 19, 20, 26, 29, 44, 58, 63
Yes - 3, 7, 15, 17, 18, 29, 41, 44, 47, 50, 55, 56, 58, 62, 63, 64
yet ---- 25, 39, 48
you 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 20, 21, 22, 24, 26, 27, 28, 29, 31, 32, 33, 35, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 60, 61, 62, 63, 64, 65
You-3, 12, 17, 19, 21, 25, 30, 38, 46, 47, 52, 53, 54, 57, 61, 63, 65
your 3, 4, 6, 7, 9, 10, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 26, 27, 28, 29, 30, 32, 33, 35, 36, 38, 40, 41, 42, 43, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 57, 59, 62, 63, 64, 65
Your 3, 17, 29, 43, 58, 65

Exhibit D

| | | |
|---|---|---|
| **JANE DOE**, ***on behalf of herself and all others similarly situated*** | * | **IN THE** |
| **Plaintiff** | * | **CIRCUIT COURT** |
| v. | * | **FOR BALTIMORE CITY** |
| **MEDSTAR HEALTH, INC.**, ***et al.*** | * | 20 591<br>**CASE NO.: 24-C-19-000488** |
| **Defendants** | * | |

* * * * * * * * * * * * *

**MEMORANDUM OPINION**

This matter has come before the Court on Defendants Medstar Health, Inc. and Medstar Good Samaritan's Motion to Dismiss (Docket Entry #5). The Court has considered the briefs of the parties, oppositions, replies, and the oral argument of counsel, held on July 27, 2020.

**I. Background.**

Plaintiff, Jane Doe, is a patient of Defendant, medical provider MedStar Health, Inc. ("MedStar"). MedStar is the owner and operator of hospitals and health care facilities, including MedStar Good Samaritan Hospital. MedStar has public websites that any individual can access to obtain information about general medical topics and information about MedStar and its facilities and services. Patients can also use MedStar's website to log in, access their private medical records, communicate with doctors, and schedule appointments. Plaintiff alleges that MedStar uses computer coding to disclose personally identifiable, private data related to patients' medical care to at least 23 different third parties, including, but not limited to Facebook, Google, LinkedIn, Twitter, and Pinterest. Plaintiff claims that MedStar disclosed: the URLs that Plaintiff visited; "search queries about specific doctors, medical conditions, treatments"; patients' clicks to "Search," "FindADoctor," "Login," or "Enroll' in MyMedStar (Medstar's online patient portal); "summaries of MedStar's responsive communications, the parties to all

communications at MedStar's web properties, and the existence of communications at MedStar's web properties."

Plaintiff raises five claims: 1) violation of the Maryland Wiretap Act, 2) intrusion upon seclusion, 3) publication of private facts, 4) breach of confidence, and 5) violation of the Consumer Protection Act. Plaintiff alleges that her data was disclosed without prior authorization, and that the disclosure of her data harms Plaintiff by invading her privacy and harming her property rights to her data. Plaintiff seeks general damages and economic damages for these harms. Additionally, Plaintiff pursues a theory of unjust enrichment for Defendant's profit from Plaintiff's data, as well as statutory damages.

**II. Applicable Law.**

In deciding a Motion to Dismiss, the Court takes as true all well-pleaded allegations and reviews them in the light most favorable to the plaintiff. *Lloyd v. General Motors Corp.*, 397 Md. 108, 121 (2007). Although a court must assume the truth of all well-pleaded facts, dismissal is proper when the facts alleged, if proven, would fail to afford relief to the plaintiff. Md. Rule 2-322(b)(2); see also *Hogan v. Maryland State Dental Ass'n*, 155 Md. App. 556, 561 (2004). The facts as set forth in the complaint must be pleaded with "sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *Sutton v. FedFirst Financial Corp.*, 226 Md. App. 46, 74 (2015) (quoting *RRC Northeast, LLC v. BAA MD, Inc.*, 413 Md. 638, 643 (2010)). Any ambiguity or uncertainty in the allegations is construed against the pleader. *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 335 (2009).

**III. Analysis.**

In Count 1 of the Complaint, Plaintiff alleges that Defendants have violated the Maryland Wiretap Act, Md. Code Ann., Cts. & Jud. Proc. § 10-402. Maryland's appellate courts have not,

to this Court's knowledge, addressed wiretapping in the context of online data being intercepted and disclosed to third parties. This is apparent from the briefs of the parties, which look extensively to other jurisdictions for persuasive authority to assist in interpreting the Maryland statute.[1]

Despite the paucity of Maryland precedent, the Court feels that the plain language of the statute itself is straightforward and provides a legal foundation for Count 1 of the Complaint. The Maryland Wiretap Act provides as follows with respect to prohibited conduct:

> (a) Except as otherwise specifically provided in this subtitle it is unlawful for any person to:
> (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
> (2) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or
> (3) Willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle.

Md. Code Ann., Cts. & Jud. Proc. § 10-402. The statute goes on to authorize a civil cause of action for any victim of the unlawful conduct:

[1] The Court finds the analysis in *Doe v. Virginia Mason Medical Center*, 2020 WL 1983046, No. 19-2-26674-1 (Kings County, WS Feb. 12, 2020) to be persuasive. In that matter, MedStar presented nearly identical arguments as Defendant in the instant case. The court rejected MedStar's arguments and distinguished that case from *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017), noting that the *Smith* Plaintiffs "consented to Facebook tracking . . . and the allegations in this case are broader than sharing URL information only." *Virginia Mason* at 2. Similarly, in the instant matter, Plaintiff alleges to be a patient, that Defendant Medstar's information disclosures were executed without Plaintiff's knowledge, and that the disclosures were made to "at least 23 different third-party marketing firms." The *Virginia Mason* court noted that the case before it, as with the instant case, "involves the allegations of sharing data with more than Facebook and does not hinge on the relationship between the Plaintiff and Facebook." *Id.*

> (a) Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this subtitle shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and be entitled to recover from any person:
> (1) Actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;
> (2) Punitive damages; and
> (3) A reasonable attorney's fee and other litigation costs reasonably incurred.

Md. Code Ann., Cts. & Jud. Proc. § 10-410. In the instant case, the Court finds that Plaintiff has sufficiently plead the elements of a Wiretap Act claim and that such a claim can be maintained by Plaintiff under the Act. The Court further finds that there are questions of fact as to whether Defendant's conduct constitutes an "interception," whether the types of data alleged to have been disclosed constitute "communications" and/or "disclosures," and whether Plaintiff consented to disclosure, thus rendering Defendant's conduct lawful under Md. Code Ann., Cts & Jud. Proc. § 10-402(c)(3).

Counts 2 and 3 of Plaintiff's Complaint assert privacy claims: invasion of privacy – intrusion upon seclusion (Count 2), and invasion of privacy – publication of private facts (Count 3). Intrusion upon seclusion is "the intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person." *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 163 (1986) (citing Restatement of Torts, 2d, § 652B). The parties disagree about the kinds of data that Defendant disclosed and whether that data is personally identifiable information. At this stage in the proceedings, and pursuant to a motion to dismiss, the Court assumes the truth of Plaintiff's allegations that Defendant provided express promises of privacy to patients, and that Defendant violated those promises by disclosing Plaintiff's data. Under these circumstances, dismissal of this claim is inappropriate as a

reasonable finder of fact could conclude that, if Plaintiff's disclosed data constitutes personally identifiable information, Defendant's disclosures are highly offensive.

Similarly, Defendant has failed to persuade the Court regarding Count 3 alleging disclosure of private facts. To sustain such a claim, Plaintiff must demonstrate that a party has publicized Plaintiff's "private life" and that the matter publicized "is of a kind which (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Furman v. Sheppard*, 130 Md. App. 67, 77 (2000). Private medical data is not of legitimate concern to the public, and again, assuming the allegations in the Complaint to be true, the data disclosed constitutes personally identifiable information; a reasonable fact-finder could conclude that Defendant's disclosures are highly offensive.

Count 4 of the Complaint alleges a claim for breach of a confidential relationship. Generally, there is no cause of action in Maryland offering relief for a breach of confidence claim involving a patient-provider relationship. Plaintiff likens her case to precedent that addresses confidentiality in the context of business relationships involving free competition and trade secrets, but the comparison is not persuasive. *See Space Aero Prods. Co. v. R. E. Darling Co.*, 238 Md. 93, 208 A.2d 74 (1965). In *Space Aero Prods. Co.*, the breaching party profited by replicating the non-breaching party's product, and the non-breaching party lost profits as a result. The Court in *Space Aero Prods. Co.* provided that compensatory damages are awarded unless they would be inadequate, in which case the Court will issue an injunction. Even assuming *arguendo* that there is a cause of action for a patient-provider relationship, Plaintiff has not demonstrated a monetary loss tied to the data itself, and the purpose of an injunction for this type of claim is meant to curb further economic loss, again not present here. *Id.* at 124. While

Plaintiff's other privacy tort claims may recognize general damages for the loss of privacy itself, the Court has no method to award her relief under a breach of confidence claim.

Finally, in Count 5, Plaintiff alleges a breach of the Consumer Protection Act. To establish a claim under the Consumer Protection Act, a consumer must state "an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation." *Lloyd v. GMC*, 397 Md. 108, 143 (2007). Although Plaintiff cites to cases from other jurisdictions, there is no basis in Maryland law to suggest that Plaintiff is entitled to claim a "privacy injury" under this cause of action. Any recovery for such an injury should be limited to Plaintiff's privacy tort claims. Additionally, Plaintiff argues that she is entitled to this cause of action because she can claim benefit of the bargain damages and unjust enrichment, but Plaintiff is not raising a breach of contract claim, and these are theories for damages under contract law.

**IV. Conclusion.**

For the reasons set forth above, the Court will grant the Motion in part, dismissing Counts 4 and 5.

August 5, 2020
Date

**Judge's Signature appears on the original document**
Jeffrey M. Geller, Judge
Circuit Court for Baltimore City

Exhibit E

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SACRAMENTO
GORDON D SCHABER COURTHOUSE**

**MINUTE ORDER**

DATE: 06/09/2022 TIME: 01:30:00 PM DEPT: 28

JUDICIAL OFFICER PRESIDING: Lauri A. Damrell
CLERK: V. Aleman
REPORTER/ERM: Shelia Pham #13293
BAILIFF/COURT ATTENDANT: T. Gonzalez

CASE NO: **34-2019-00258072-CU-BT-GDS** CASE INIT.DATE: 06/10/2019
CASE TITLE: **Doe I vs. Sutter Health**
CASE CATEGORY: Civil - Unlimited

**EVENT TYPE**: Motion for Judgment on the Pleadings - Civil Law and Motion - Demurrer/JOP

**APPEARANCES**
Jeffrey A Koncius, counsel, present for Plaintiff(s) remotely via video.
Nicole Ramirez, specially appearing for counsel Mitchell M. Breit, present for Plaintiff(s).
Jay Barnes, counsel, present for Plaintiff(s) remotely via video.
Stephen C Steinberg, counsel, present for Defendant(s) remotely via video.
Michael D. Abraham, counsel, present for Defendant(s) remotely via video.

**Nature of Proceedings: Motion for Judgment on the Pleadings**

The matter became before the Court his date for a hearing with the above-indicated counsel present.

After hearing from the parties, the Court affirmed the tentative ruling.

**Tentative Ruling:**

Defendant Sutter Health's ("Sutter") Motion for Judgment on the Pleadings against Plaintiffs' Third Amended Complaint ("3AC") is DENIED as follows.

**Background**
Facts
In this putative class action, Plaintiffs are patients of Sutter, a health care provider in Sacramento. (3AC, ¶¶ 14-16.) The action arises out of Plaintiffs' use of Sutter's "My Health Online" patient portal ("Portal"). Plaintiffs allege that Sutter represents that the Portal is secure, but when a person uses it, Sutter discloses certain information about such use to Facebook, Google, and other third parties. (*Id.*, ¶¶ 3-5.) For example, Plaintiffs allege that upon signing into the Portal, Sutter discloses the fact of the sign in and each patient's personally identifiable information to Facebook, Google, and Crazy Egg. (*Id*, ¶¶ 5b, 8.) Once signed-in, if a patient clicks to view allergies, a disclosure of that action is made to Google of the specifics; if a patient clicks "Find-A-Doctor" or set up an appointment, a disclosure of that action is made to Facebook, Google, and others. (*Id.*, ¶5c.) On logoff, Sutter discloses this action to Facebook and Google. (*Id.*, ¶ 5i.) Plaintiffs allege Sutter makes these disclosures by intentionally including source code on its website that commanded Plaintiffs' browser to redirect the contents of HTTPS communications to third parties through invisible tracking pixels that are also code web bugs. (*Id.*, ¶¶ 128-130.)

Plaintiffs' 3AC was filed on December 7, 2021 and contains three causes of action: (1) violation of the

California Invasion of Privacy Act ("CIPA"), specifically Penal Code § 631 ("section 631"), (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing. This Court has twice sustained Sutter's demurrer to Plaintiffs' cause of action for violation of section 631. (See ROA 134, 206.) However, on November 16, 2021, the Court overruled Plaintiffs' demurrer to that cause of action as stated in the 2AC. (ROA 301.) Sutter now moves for judgment on the pleadings with respect to the 3AC's cause of action for violation of section 631.

**Request for Judicial Notice**
Sutter's request for judicial notice in support of this motion is GRANTED as to request Nos. 1 (the Court's 11/16/2021 Minute Order sustaining portions of Sutter's demurrer to Plaintiffs' 2AC; 2 (the Court's 11/16/2021 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 2AC; 3 (the Court's 11/3/2020 Minute Order sustaining Sutter's demurrer to the 1AC); 4 (the Court's 11/3/20 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 1AC; 5 (the Court's 1/29/2020 Minute Order sustaining Sutter's demurrer to the original complaint); 6 (Plaintiffs' 2AC); 7 (Plaintiffs' 1AC); 8 (Plaintiffs' original complaint); and 10 (the text of AB 860 passed by the Assembly on July 26, 1967 and passed by the California Senate on July 27, 1967). (Evid. Code, § 452(a), (d).)

Sutter's request for judicial notice is DENIED as to request No. 9 (Model Notice of Privacy Practices for health care providers published by the US Department of Health and Human Services' Office for Civil Rights) as this material is irrelevant to the disposition of this motion. (See *State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 442.)

**Legal Standard**
A motion for judgment on the pleadings has the same function as a general demurrer, but may be made after the time for demurrer has expired. (See Code Civ. Proc., § 438.) Like a demurrer, the grounds for a motion for judgment on the pleadings must appear on the face of the complaint, or in documents attached to the pleadings and properly incorporated by reference. (Code Civ. Proc., § 438(d); *Lumbermens Mutual Casualty Company v. Vaughn* (1988) 99 Cal.App.3d 171, 178.) The motion may be based on matters of which the court may take judicial notice. (Code Civ. Proc. § 438(d); see also *Howard Jarvis Taxpayers Assoc. v. Riverside* (1999) 73 Cal.App.4th 679, 685.) However, the motion does not lie on grounds previously raised by demurrer unless there has been a "material change in applicable case law or statute" since the demurrer was overruled. (Code Civ. Proc. § 438(g)(1); see *Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 562, fn. 1.) The motion should be granted if, taking all of the allegations of the complaint to be true, the defendant is entitled to judgment as a matter of law. (*Consolidated Fire Protection Dis. v. Howard Jarvis Taxpayers' Ass'n* (1998) 63 Cal. App. 4th 211, 219.) A motion for judgment on the pleadings is properly granted without leave to amend when there is no reasonable possibility that the defect can be cured by amendment. (See *Schonfeldt v. State of California* (1998) 61 Cal. App.4th 1462, 1465 ("If there is no liability as a matter of law, leave to amend should not be granted.").)

**Analysis**
Section 631 penalizes various forms of secret monitoring of conversations. (*Ribas v. Clark* (1985) 38 Cal.3d 355, 359 (*Ribas*).) It provides, in pertinent part:

"(a) Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to

communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170. . . ." (Emphasis added.)

Sutter advances two arguments with respect to the construction of the following phrases in section 631 emphasized above: "without the consent of all the parties" and "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable." The Court discusses each argument separately below.

First Argument: "Without the Consent of All the Parties"
The parties do not dispute that section 631 requires the consent of "all parties" to the communication. (See *People v. Conklin* (1974) 12 Cal.3d 259, 270; RJN Exh. J.) Nor do they dispute that section 631 applies only to third parties and not to a participant to the communication. (See *Warden v. Kahn* (1979) 99 Cal.App.3d 805, 811.) However, Sutter contends that (1) section 631 applies only where there are least two participants to the communication, (2) that both of those participants must be natural persons capable of giving consent, and (3) that Plaintiffs do not allege the presence of "another individual as a second participant who could have given consent." (Mov. Mot. P&A, p. 6: 15-16.) While Sutter's argument is creative, the Court finds it ultimately lacks merit.

As Sutter's argument is based on statutory construction, the Court begins by setting forth the fundamental rules governing such construction. When a court interprets a statute, its fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.) The court first examines the statutory language, giving it a plain and commonsense meaning. (*Ibid.*) The court does not examine the language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. (*Ibid.*) If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. (*Ibid.*)

Sutter's statutory argument relies on *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377 (*Kight*) . In *Kight*, the plaintiffs brought claims against a consumer finance company under Penal Code § 632 ("section 632"), which is part of CIPA and prohibits eavesdropping on confidential communications. The plaintiffs alleged that the company monitored their telephone conversations with the company's employees without the plaintiffs' knowledge or consent. (*Id.* at p. 1383.) The trial court determined that eavesdropping under section 632 requires *three* parties and there were only two parties to the conversations – the corporation and the customer. (*Id.* at p. 1391.) The appellate court reversed, finding this interpretation contrary to the statutory language and intent of section 632. (*Ibid.*) With respect to the statutory language, the court focused on the use of the terms "party" and "person" in the statute. The court noted that section 632 prohibits a "person" from overhearing a confidential communication without the consent of "all parties" and that the term "person" is defined, for purposes of section 632, to include both an individual and a corporation. (*Id.* at p. 1391.) By contrast, as the court explained, the statutory term "parties" is used to identify the "*individuals* who are the conversation participants from whom consent is required" before a conversation may be overheard. (*Ibid.* (Emphasis added).) The court determined that this difference in terms supported the interpretation that a corporation is not a single unit for purposes of determining who must give consent and that all participants to the conversation must give consent. The court held that each individual listener should be counted as a person as opposed to all corporate employees counting as one corporate person. (*Ibid.*) Sutter argues that, pursuant to *Kight*, the term "party" in section 631 can only mean an individual and, thus, section 631 cannot apply here where the intended recipient of the communication is not a natural person.

The Court is not convinced. First, the Court does not interpret *Kight* to mean that sections 631 and 632 are inapplicable when a communication is between a natural person and an entity or technology created by other natural persons,. Second, the particular context of *Kight* alone is distinguishable. *Kight* considered a *telephone* conversation between a corporate employee and the plaintiff, a conversation to which another corporate employee listened unbeknownst to the plaintiff. Here, the Court does not consider a telephone conversation but rather click communications by Plaintiffs to Sutter's website. "Tautalogically, a communication will always consist of at least two parties: the speaker and/or sender, and at least one intended recipient." (*In re Google Inc.* (3d. Cir. 2015) 806 F.3d 125, 143.) Courts interpreting section 631 have indicated that a party to a communication, for purposes of section 631, may include an entity or website. In *Revitch v. New Moosejaw* (2019) 2019 U.S. Dist. LEXIS 186955 (*Revitch*), for example, the plaintiff alleged that the defendant, Moosejaw, embedded into its webpages a mechanism that allowed another company, NaviStone, to eavesdrop on the plaintiff's communications. (*Id.* at *2.) The court held that the plaintiff's "interaction with the Moosejaw website was a communication within the meaning of section 631." (*Id.* at *3.) In particular, the court noted that "[a]dmittedly, a customer in [a] brick-and-mortar store does not communicate by searching through the inventory. But the same is not true for off-site shoppers: a customer who calls to inquire about a store's products undoubtedly communicates with the retailer. As does an online patron, [the plaintiff] requested information from Moosejaw by clicking on terms of interest; Moosejaw responded by supplying that information. This series of requests and responses – whether online or over the phone – is communication." (*Ibid.*; see also *Graham v. Noom* (N.D. Cal. 2021) 533 F.Supp.3d 823, 832-833 [concluding that a company was a party to a communication and another company was an extension of that company]; *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 775 (*Flanagan*) [addressing possibility that an auditor to a conversation can be a person or a mechanical device].) The Court disagrees with Sutter that *Revitch* is inapposite here or deviates from California precedents interpreting CIPA. The only precedent Sutter cites is *Kight*, and the Court is unconvinced that precedent dictates a different result than *Revitch*.

Courts have also reached the same result with respect to the federal Wiretap Act, which prohibits similar conduct as section 631 and involves a similar analysis. (See *In re Google Inc.* (3d Cir. 2015) 806 F.3d 125, 143 [concluding defendant advertising companies were parties to a communication for purposes of the federal wiretapping law because they were the intended recipients of requests that plaintiff's browsers sent to the defendant's servers); *Calhoun v. Google LLC* (N.D.Cal. 2021) 526 F.Supp. 3d 605, 623.) [discussing website consent under the federal Wiretap Act]; *Chance v. Ave. A, Inc.* (W.D.Wash. 2001) 165 F.Supp.2d 1153, 1162 [finding it implicit that web pages consented to interception under federal wiretapping law]; *In re Doubleclick Privacy Litig.* (S.D.N.Y. 2001) 154 F.Supp.2d 497, 514 [concluding certain websites were parties to the communications from the plaintiffs and gave sufficient consent]; see also *Cline v. Reetz-Laiolo* (N.D. Cal. 2018) 329 F.Supp.3d 1000, 1051 ["The analysis for a violation of CIPA is the same as that under the federal Wiretap Act.") As stated in the Court's ruling on Sutter's demurrer to the 2AC, "California courts are likely to rely on federal decisions interpreting the federal wiretap statute" when interpreting section 631. (ROA 301, p. 21.)

Second, in addition to considering the text of section 631, the court in *Kight* considered the legislative intent and determined that the Legislature enacted section 632 to "ensure an individual's right to control the firsthand dissemination of a confidential communication, and expressed its intent to strongly protect an individual's privacy rights in electronic communications." (*Id.* at p. 1392.) Based on that legislative purpose, the court construed section 632 broadly in favor of the plaintiff, concluding the required third party to the conversation was present. Accordingly, contrary to Sutter's point, *Kight* does not suggest that section 631 or 632 applies only if the parties to the conversation or communication are natural persons. Instead, it suggests that CIPA, including section 631, should be construed broadly to protect an individual's privacy rights. As *Kight* held with respect to section 632, the privacy rights affected under section 631 are the same regardless whether a communication is with a machine or a human being. (*Id.* at p. 1393.) Interpreting section 631 in the way Sutter suggests would undermine both the requirement

of two-party consent and the overall purpose of this section. CIPA was enacted in 1967, "replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation." (*Flanagan, supra*, 27 Cal.4th at p. 768.) "The purpose of the act was to protect the right of privacy by, among other things, requiring that all parties consent to a recording of their conversation." (*Ibid.*) The legislative history is "replete with references to the Legislature's intent to strengthen then existing law by 'prohibiting wiretapping or 'electronic eavesdropping' without the consent of all parties to the communication which is being tapped or overheard." (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1487.) "The philosophy [of protecting an individual's privacy right] lie[s] at the heart of virtually all the decisions construing the [Act]." (*Flanagan, supra*, 27 Cal.4th at p. 775.) The addition of all-party consent in section 631 was clearly intended to broaden the coverage of section 631; however, Sutter's suggested interpretation here would limit that coverage by effectively removing entities or technological devices as possible parties to a communication. The Court refuses to adopt such an interpretation.

Second Argument: "Reads, or Attempts to Read, or to Learn the Contents or Meaning of any Message, Report, or Communication While the Same Is in Transit or Passing Over any Wire, Line, or Cable"
The California Supreme Court has explained that section 631 contains three operative clauses covering "three distinct and mutually independent patterns of conduct." (*Tavernetti v. Superior Court* (1978) 22 Cal. 3d 187, 192.) Section 631 also includes a fourth clause that establishes liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the" other three bases for liability. (*Mastel v. Miniclip SA* (E.D.Cal. 2021) 549 F.Supp.3d 1129, 1134 (*Mastel*); see 3AC ¶¶ 367-368 [alleging Sutter aided, agreed with, and conspired with third-party tracking companies in violating section 631].)

The first clause of section 631 has been described as creating "liability for any individual who 'intentionally taps, or makes any unauthorized connection . . . with any *telegraph or telephone* wire, line, cable, or instrument." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57 (emphasis added).) Sutter argues that, according to its plain language, this first clause is limited to only *telegraphic or telephonic* communications and that Plaintiffs' allegations do not involve such a communication. On the one hand, Sutter's argument is supported by precedent. (See *Mastel, supra*, 549 F.Supp.3d at pp. 1133-1135, citing *In re Google Assistant Priv. Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [claim under first clause must be dismissed if allegations do not show technology at issue operates using a telegraph or telephone wires]; *In re Google Inc. Gmail Litig.* (N.D. Cal. 2013 No. 13-MD-02430-LHK) 2013 U.S.Dist.LEXIS 172784, at *77 (*Google Gmail*) ["difference in coverage between first and second clauses suggests that the Legislature intended the two clauses to apply to different types of communication"]; see also *Ward General Insurance Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 554 [adjective in series of nouns generally modifies each noun following the phrase.) On the other hand, other federal courts have suggested, without breaking down the different clauses in section 631, that section 631 covers the type of claims at issue here. In *Revitch, supra*, the plaintiff argued that Moosejaw embedded into its webpages a mechanism that allowed a third party to eavesdrop on the plaintiff's communications with the Moosejaw website. (2019 U.S. Dist. LEXIS 186955 at *2.) The code embedded on the website functioned as a wiretap that redirected the plaintiff's communications to the third party. (*Id.* at *3.) The court held that the plaintiff's allegations were sufficient to state a claim under section 631. (*Id.* at *2.)

However, the Court need not resolve the extent of the first clause's coverage as it finds Sutter's argument as to the second clause of section 631 unpersuasive. "The second clause of [section 631] creates liability for any individual who 'reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57.) Sutter's argument relies on the absence of the term "instrument" from this clause (whereas "instrument" is included in the first clause). Sutter argues that Plaintiffs' 3AC allegations are premised on connection to an "instrument"

and, as a result, Plaintiffs' allegations are outside the scope of the second clause. More specifically, Sutter contends the 3AC alleges that Sutter's "source code connected to and 'commandeer[ed]' an instrument – the visitor's computer – which caused the computer's web browser to react to inputted or received web data in the visitor's web browser and/or computer by sharing information about the data in separate transmissions to third parties." (Mov. Mot. P&A, p. 16: 13-16.) Again, the Court finds Sutter's argument lacks merit.

In support of its argument, Sutter's moving papers do not cite any cases interpreting section 631 and instead rely on general cases for rules of statutory construction. Conducting its own research, the Court has located a single case in which a federal court stated that "the second clause applies only to 'wire[s], line[s], or cable[s]' – not 'instrument[s,]' which are included in the first clause." (*Google Gmail, supra*, at *77.) However, in so doing, the federal court intended to highlight the breadth of the statute, not its limitations. Specifically, the court concluded that, by excluding the term "instrument" in the second clause, the Legislature reflected its intent to have the first and second clauses apply to different types of communications, thereby *expanding* its coverage. The court did not interpret "wire," "line" or "cable" narrowly. Rather, the Court found that the second clause is broad enough to encompass email. (*Id.*)

The Court's research further confirms that other courts have not read the second clause, or section 631 in its entirety, as narrowly as Sutter. In its order with respect to Sutter's demurrer to Plaintiffs' 2AC, this Court noted that "[f]ederal courts . . . have concluded that section 631 applies to communications over the internet." (See ROA 301, p. 4, citing *Matera, supra*, at *52); see also (*Yoon v. Lululemon United States* (C.D.Cal. 2021) 549 F. Supp. 3d 1073, 1080 (*Yoon*) ["[c]ourts agree . . . that [section 631] applies to communications conducted over the internet])").) Such communications by definition involve a computer; thus, Sutter's interpretation would upend the general consensus among federal courts as to Section 631's application to internet-based communications. These cases help illustrate that Sutter's argument with respect to the phrase "wire, line, or cable" is misplaced. That phrase refers to the *device* through which the communication is transmitted. Federal courts have already determined that communications transmitted over the Internet are transmitted over a wire, line, or cable for purposes of section 631. (See *Matera, supra*, at *57.) The parties do not question whether Plaintiffs' communications at issue here were conducted over the Internet – the fact that they involved a computer is part and parcel of the communication occurring over the Internet.

It appears that Sutter's argument also takes issue with the *means* by which the improper interception of the communication over wire, line, or cable is achieved. In this regard, Sutter directs the Court's attention to the structure of section 631. According to Sutter, when broken down into grammatical clauses, the first two clauses of section 631 read as follows:
"Any person:

(i) who *by means of any machine, instrument, or contrivance, or in any other manner*, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or
(ii) who willfully and <u>without the consent of all parties</u> to the communication, or in any unauthorized manner, <u>reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable</u>, or is being sent from, or received at any place within this state; or" (431 (Emphasis added).)

Sutter argues that the italicized phrase specifies the means by which the unlawful activity is achieved but this phrase only appears in the first clause. In Sutter's view, this phrase does not apply to the second clause and, as a result, using an "instrument" to act as described in clause (ii) is not a violation of that clause. However, Sutter's interpretation would make it impossible to violate the second clause of section 631 because any means by which the violation is achieved is not mentioned in that clause. The Court

rejects such an interpretation. With respect to the means by which the interception is achieved, the Ninth Circuit has described section 631 as prohibiting "any person from *using electronic means* to 'learn the contents or meaning' of any 'communication' 'without consent' or in an 'unauthorized manner.'" (*Davis v. Facebook, Inc.* (9th Cir. 2020) 956 F.3d 589, 606-607.) Additionally, the Central District of California read the second clause as prohibiting the unlawful reading or learning "*by means* of any machine, *instrument*, or contrivance." (See *Alder v. Cmty.* (C.D.Cal. Aug. 2, 2021, No. 2:21-cv-02416-SB-JPR) 2021 U.S.Dist.LEXIS 201644, at *5 [describing section 631 as imposing "liability on any person who 'by means of any machine, instrument, or contrivance, . . . and without the consent of all parties . . . reads, or attempts to read, or to learn the contents or meaning of any . . . communication while the same is in transit . . . or is being sent from, or received at any place within this state"]; see also *Yoon, supra*, 549 F.Supp.3d 1073, 1080.) Another court described the second clause as applying to "*both* communications 'in transit over any wire, line, or cable' *and* those 'sent from, or received at any place within this state.'" (*Lopez v. Apple, Inc.* (N.D. Cal. 2021) 519 F.Supp. 3d 672, 687; see also *In re Google Assistant Privacy Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [agreeing that second cause could be read in disjunctive].) Under these constructions, the allegation that Sutter used Plaintiffs' computers to enable a third-party's interception of their communications on the Portal does not remove Plaintiffs' claim from section 631.

Lastly, the Court reiterates the California Supreme Court's instruction to interpret CIPA in a manner that "fulfills the legislative purpose of [the Act] by giving greater protection to privacy interests." (*Flanagan, supra*, 27 Cal. 4th at p. 775.) Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed the Act in accordance with the interpretation that provides the greatest privacy protection. (See *Ribas, supra*, 38 Cal. 3d at 360-61.) Sutter's interpretation of section 631 would provide less privacy protection and the Court finds it not well supported by case law. Accordingly, the Court rejects Sutter's second argument with respect the cause of action for violation of section 631.

Disposition
Based on the foregoing, Sutter's Motion for Judgment on the Pleadings is DENIED.

This minute order is effective immediately. No formal order or other notice is required. (Code Civ. Proc., § 1019.5; Cal. Rules of Court, rule 3.1312.)

*To request oral argument on this matter, you must call Department 28 at (916) 874-6695 by 4:00 p.m., the court day before this hearing and notification of oral argument must be made to the opposing party/counsel. If no call is made, the tentative ruling becomes the order of the court. (Local Rule 1.06.) Parties requesting services of a court reporter may arrange for private court reporter services at their own expense, pursuant to Government code §68086 and California Rules of Court, Rule 2.956. Requirements for requesting a court reporter are listed in the Policy for Official Reporter Pro Tempore available on the Sacramento Superior Court website at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-6a.pdf. The list of Court Approved Official Reporters Pro Tempore is available at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-13.Pdf.*
**Please check your tentative ruling prior to the next Court date at www.saccourt.ca.gov prior to the above referenced hearing date.**

***If oral argument is requested, the matter shall be held via Zoom with the links below:***

*To join by Zoom link - https://saccourt-ca-gov.zoomgov.com/my/sscdept28*
*To join by phone dial (833) 568-8864 ID 16039062174*

**Counsel for Plaintiff is directed to notice all parties of this order.**

in Mass a physician could have a fiduciary obligation not to disclose -- or the opposite side, flip side of the coin is to maintain the confidentiality of a patient's medical information.

So basically what we've got alleged here, it seems to me that it's potentially -- potentially it's a breach of fiduciary duty. And it seems a little bit of an odd fit. But those cases recognize a fiduciary obligation.

MR. MELODIA: But we're being -- no, that would be I think clear error to find that in this case. Because --

THE COURT: It wouldn't be the first time, but go ahead.

MR. MELODIA: -- no. But this one -- clearer than most, your Honor, because of this reason. Look, the -- if you take as a given that a physician can have such a personal fiduciary relationship with a patient in the same way that for example a priest might have with a parishioner like the "Petrelvy Reposi"(phonetic) case we've cited, case nine of our brief. That's fair enough, those are personal relationships. I'm not contesting that. I don't think we ever contested that. The point here is nobody has sued a physician. We've sued hospital

systems and hospitals. Fundamentally what the "Petrelvy Reposi" case stands for is that the church as an organization and the diocese is not the priest. Nor is the physician, the hospital or the hospital system. There's fundamentally a difference in a fiduciary --

THE COURT: So you're argument essentially that an organization can't owe a fiduciary obligation? It has to be an individual obligation? Am I characterizing --

MR. MELODIA: -- it has to --

THE COURT: -- correctly?

MR. MELODIA: -- but I think there are times when you could have a sole proprietorship or something, your Honor, where there's an organization technically speaking, but there is a personal relationship. I'm not suggesting that it only has to do with how many people or the corporate form. I'm having -- I'm talking about where the reality of the relationship rests, where the duty rests. And the duty rests not with the hospital in terms of an individualized personal relationship with the plaintiff here, with the patient. Rather it rests with the physician. In the same way that --

THE COURT: Well pause, Mr. Melodia. You're

confusing me. So are you saying for example that MGH doesn't have any duty or obligation to its patients?

MR. MELODIA: -- well --

THE COURT: You have MGH -- let me finish the question. Does MGH, or Dana-Farber, or Brigham, have any duty as organizations not to disclose their patient's confidential information? Do they have a duty?

MR. MELODIA: Yes, under HIPAA, absolutely, your Honor. They have a --

THE COURT: You don't think they have any common law duty? So when the SJC talks about a physician's obligation not to disclose confidential medical information of a patient again you don't think that there's a comparable duty on the part of the organizations as well?

MR. MELODIA: -- I don't think there's a fiduciary duty, your Honor. I think you could have a negligence claim, your Honor. There could be a duty in the negligence sense. So you could have a breach of a duty in the negligence claim potential. But I can't see -- I mean and of course if an institution says one thing and does another, you know, there's a problem there. But that's not what we have here. We're trying to impose a fiduciary duty. And that is

different in the law than other types of duties, including duty in the negligence sense. So I'm not suggesting in any way that any of these hospitals don't fully understand and meet their obligations for privacy. But these are highly regulated institutions. And HIPAA does (inaudible -- indecipherable at 2:57:51) how they approach these issues. So to sort of suggest that HIPPA defines the expectation as Mr. Barnes would have it, of everybody walking in the door, and yet HIPAA doesn't really technically have to apply and we don't really have to find that PHI is present (inaudible -- indecipherable at 2:58:10). That's disingenuous. So I think here there is no case law that extends anything in terms of a fiduciary duty to institutions in the (inaudible -- indecipherable at 2:58:23) of hospitals here.

THE COURT: Got it. All right.

MR. MELODIA: And I think it would be a mistake.

THE COURT: Mr. Barnes, he says institutions, that the duty that's been recognized by the Supreme Judicial Court and the Mass Appeals Court doesn't extend to the institutions, it's personal to the physicians. What do you say?

MR. BARNES: Can you hear me, your Honor?

THE COURT: I can hear you, sir.

MR. BARNES: Okay. Sorry. I got -- the technology got mixed up here. Well we disagree, your Honor. I don't think that should surprise you, for a number of reasons. First, the case "Doe versus Harbor Schools", the Massachusetts -- the Supreme Judicial Court outlined that a fiduciary duty exists quote, "When one reposes faith, confidence and trust in another."

Paragraph one -- to go back to it, the quote from Mass General's own chief marketing officer was "The trust and confidence you place in your existing or potential healthcare provider is sacred."

That fits the Massachusetts test and we're there.

The "CVS" case found a breach of fiduciary duty of the first go-around. That's a corporate entity. And I think the "Alberts versus Devine", which you mentioned your Honor, that court -- the court clearly said just because a certain fact pattern hasn't come before us before doesn't mean the common law doesn't recognize a cause of action in that fact pattern. And it's not a far stretch. And it's interesting because the remedy for a dismissal for failure to name the corporate entity is to bring in every doctor at all of these hospitals as defendants in this case, which would be somewhat unwieldy and we don't really

think that's the thing to do because the corporate entities were the ones making the decision to put this source code on these web pages.

And your Honor, there's one thing I'd like to -- Mr. Melodia said -- seemed to suggest we were making the argument that HIPPA defines the expectations. I think that's the opposite of the argument I made. It's that HIPAA colors the expectations. And I'd like to give you an example as it relates to this breach of fiduciary claim.

THE COURT: Yes.

MR. BARNES: Okay? If an oncologist clinic took down the phone numbers of everyone who called the public phone line for that clinic and some basic notes on the topics of what the caller discussed, and at the end of the day they bundled all of that up and they sent it off to a third-party marketing firm and said hey, we want to advertise to these people to potentially come in for treatment at our clinic, would that be a breach of fiduciary duty for that subset of callers who were patients? I think there is no doubt that it would be. But we also know that there would likely be some pharmaceutical drug reps who had called. There may be some random advertising people who had called. There may be other doctors

who had called, who would have been in that batch of phone numbers that was sent to the third-party marketing company. But the fact that those positives might exist in the data does not negate the hospital's duty to its patients. It can't just give patient information away. And the other thing, your Honor that's relating to this is it's not just the enroll or sign in to the patient portal click that attaches patient status to a person at the primary website, it's also all kinds of other things, like when they look up to request an appointment, when they look up at Dana-Farber to get a second opinion. Those examples are in our complaint. And we specifically pled that our clients -- and you stated this earlier, we specifically pled that our clients used that sign in button to get where they were going, which attaches patient status to them. It's as if they called the phone line and the phone number said hey, press one if you're a patient --

THE COURT: I'm not sure I --

MR. BARNES: -- and you press one.

THE COURT: -- I agree with you on that point Mr. Barnes. But okay, I think I've got it.

So here's what I'm going to do with respect to this claim. Folks, I want to reserve -- I want to

take a look. I want to take closer look at the point that Mr. Melodia raised. Certainly again I agree with the Mass law definitely recognizes some sort of fiduciary obligation. And it's kind of interesting. You read -- I read the "Alberts" case earlier. You can see sort of the SJC wrestling with the notion of there is this obligation and how they're going to characterize it. Ultimately they say it's a fiduciary obligation. I can't say they look like they're entirely comfortable with that. But I -- but that's what they hold. I need to go back and take a look, and see whether that would extend to the organization as well. So I'm going to defer on that one.

That leaves the 93A claim. Let me jump on that one.

So Mr. Barnes, front and center, you have on that one, 93A. So the SJC has held -- let me pull it up, they held in the "Linkage Corp versus Trustees of Boston" case, "That in most circumstances a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission."

So you have to agree with me Mr. Barnes that these websites definitely are part of the core

mission of these institutions.

MR. BARNES: Well I -- accept that the reason for the -- for the use of these marketing tools is to increase revenue, gain more patients --

THE COURT: I saw that.

MR. BARNES: -- your Honor.

THE COURT: But that's not what we're talking about here. We're talking about the relationship, the interaction between these organizations and the patients, your clients. So your patients, they're going to this website, they're going to these websites because they're looking for healthcare information. Part of what these defendants provide. That's their core mission is to provide healthcare to people who need it. And so it's a little difficult to say that really anything that goes on at these websites is trade or commerce when it's part of the core. It's the core mission of these not-for-profit healthcare institutions. And I'll hear you, but I'm wrestling with it. I don't see how you can see it any other way.

MR. BARNES: Well, thank you for that warning, your Honor. And I --

THE COURT: Laughing. Go for it. Go for it. You know, it's never caused people to hold back in

the past. Go for it.

MR. BARNES: -- okay. So your Honor, I think that the Massachusetts Consumer Protection Act is out there to -- it's not just to protect consumers, it's to protect businesses engaged in commerce from unfair methods or practice in their business.

There is no doubt that these hospitals compete against other institutions that are not nonprofit institutions; that are for-profit institutions. And that --

THE COURT: But you're not pursuing a claim on behalf of other institutions against these hospitals. You've got individuals. So if anything, this is a Section 9 claim, 93A, Section 9. It's not business to business.

MR. BARNES: -- correct. And I want to connect the dots to why it involves commerce. It's because it involves competition for the dollars that are attached to those consumer patients that it involves commerce. And in -- first of all we have alleged it, but in addition to that I think the opposition papers on the motion for preliminary injunction it's conceded that this was to increase patient volume to -- it's a marketing effort. That's what these tools are, they're marketing efforts. Maybe it would be

more appropriate to -- do you want me to talk about -- we've got a couple documents in discovery that we're going to provide for the Court relating to the motion for preliminary injunction that I guess can wait, or if you want me to speak about them now, your Honor, I can.

THE COURT: No, well actually, let's stay on -- if you don't mind just stay on this point for the moment, which again is what we're talking about are the websites. That's the core.

MR. BARNES: Yes. That --

THE COURT: That's the core of the complaint, is what happens on the websites. And again it seemed -- I don't think you actually -- with all due respect, I don't think you answered the question which is the website --

MR. BARNES: -- well, I wanted --

THE COURT: -- the websites --

MR. BARNES: -- what --

THE COURT: -- seem to be again to be front and center even these days. There are probably more people interact with these institutions via their websites than in person I'm guessing. But in any event, that the websites are part and parcel of what these folks deliver which is healthcare, healthcare

advice and it's part of -- when you look at it that way you can't characterize it I don't think fairly as anything other than part of the core mission.

So Mr. Barnes, you want to take another crack at it?

MR. BARNES: Yes. I think the Court should narrow in a little bit further. It is about the websites. It's also about the deployment of these specific invisible marketing tools on those websites, and how those marketing tools are used by the defendant to increase revenues by bringing more patients to their facilities to increase revenues. That's the purpose of this, is to increase revenue. And our argument is look, when you have an entity engaged in commerce -- and they are engaged in commerce and they're taking -- making an effort to increase their revenue that falls under the Chapter 93A, Section 9.

THE COURT: It seems to me -- I hear you Mr. Barnes. What I think you're saying though is you're focusing on what you allege are the unfair or deceptive acts or practices. But again, the context in which those purportedly arise is in the websites.

Mr. Melodia, do you want to say something on this point?

MR. MELODIA: Just a little bit, your Honor. You know the case your Honor cited, the "Linkage" case from the Supreme Judicial Court was actually the case the plaintiffs cited. There are two other cases; the "All Seasons Services" case against the "Boston" -- then called "Boston City Hospital" and the "Melrose Wakefield Hospital" case, both cited in our briefs. Those are cases that show where hospitals; nonprofits, were engaged in conduct that if a for-profit were doing it could be something that makes money. But that doesn't mean, according to the Supreme Judicial Court, that automatically because one markets, or advertises or amplifies the message of these public charitable institutions that automatically that converts it to trade or commerce. So if there is no message that get out there, if there is ultimately no margin to the services offered, there is no mission, there is no public charity to be had because the organizations won't exist very long.

So I think in addition to the point your Honor made even taking Mr. Barnes' representations as, you know, part of what he's after in this case, focusing on the advertising tool, that isn't enough to convert this to trade or commerce under the case law from the

Supreme Judicial Court.

THE COURT: Okay. All right, Counsel.

Mr. Barnes --

MR. BARNES: Your Honor?

THE COURT: -- yes, very briefly, sir. Yes?

MR. BARNES: Very briefly. So I'd like to point out the defendant's memorandum on page 13 characterized what it's doing here as quote, "routine commercial behavior." And the precise quote from Linkage Corp -- and it cites to a Planned Parenthood case is "That where an institution has inserted itself into the marketplace in a way that makes it only proper that it be subject to the rules of ethical behavior and fair play."

And I think that language from the case lends itself to what I was speaking about earlier that the CPA is designed not just to protect consumers, but one of its purposes is to make sure there is ethical behavior and fair play in the marketplace. And that means making sure that even nonprofit corporations when they're engaged in revenue enhancing activities in the marketplace they're subject to the CPA.

THE COURT: That would be true for all sorts of activities it seems to me that not-for-profits would be engaged in.

I'm going to dismiss Count Four. Again, SJC has indicated that as a general matter 93A doesn't apply when a charitable institution undertakes activities in furtherance of its core mission. Again, I can't describe these websites as anything other than part of these defendants' core mission. So maybe this is another instance of my clear error. I don't think so, but I'm going to run with it.

All right, let me address the motion for preliminary injunction. Folks, I'm denying that motion. And here's why. I read everything that was supplied to me in the aftermath of our last hearing of the various submissions; the written submissions, the affidavits, the further letters. A preliminary injunction is prospective in nature. And anyone who was alive and listened to or participated in our last hearing on this matter understood that I had very significant concerns that really revolve primarily around issues of notice and consent on the part of users of these websites. And consent seems to me, if it exists, effectively moots all of the plaintiff's claims. So a lot of your fight here is going to be about consent, whether there is in fact consent. By plaintiff's own admission defendants already have gone a long way to solving the problem. I know

that's the same -- that's the equivalent of the sacred language that you're probably going to hear a lot about Mr. Barnes, but by including those cookie banners and other changes in their websites. I mean I got on folks. I looked at the cookie banners. And I -- they're also recited in the papers. And I don't -- I'm not required to say I think in the preliminary injunction context whether those changes are sufficient to eliminate all liability. In fact it seems to me the cookie banners might make some reference to the fact that actually the institutions share some of the data that's collected with third parties. That could be referenced it seems to me in the cookie banners as well. But I'm not -- it's not up to me to dictate the language of the cookie banners. But it does cause me to conclude that in light of those changes and in light of the prospective nature of a preliminary injunction that the defendants -- that the plaintiffs have not demonstrated a likelihood of success going forward.

And I'll also mention that I think the changes that have been made significantly undermine plaintiff's irreparable harm arguments because if the nondisclosure -- if nondisclosure of confidential information is of great importance to a user of those

websites then I suspect that they'll click on those privacy notices that are presented to them in the cookie banner and that they will get a fairly good understanding of what is actually happening with their data and how it can be used.

And so it seems to me in those circumstances they have a means themselves, it's available to them, to address any potential irreparable harm.

So I'm going to -- it seems that this is not a case right now that calls for a preliminary injunction. I'm denying the motion for preliminary injunction for the reasons that I've stated.

Counsel, some of this case is going to survive. I have to get back to you with respect to the count for breach of fiduciary duty. I'm going to do that quickly. It's not going to take me very long. I'm going to do that research. You should get my decision on that by next week.

We need to give you a next date in this case. All right. It's going to take -- regardless of how I rule with respect to the breach of fiduciary duty claim, some of the claims survive, which means that defendant's going to need to respond and then I need to answer the amended complaint in this case.

Mr. Melodia, how long do you think it's going to

take for your client's to do that?

MR. MELODIA: I'd ask if 30 days from your Honor's ruling on the fiduciary duty?

THE COURT: Yes, I'm going to give that to you next week. So let's just pick a date that works.

Mr. Barnes, 30 days, that sounds reasonable in the circumstances, do you agree?

MR. BARNES: More than reasonable, your Honor.

THE COURT: So let's just say -- well, I'll give you until the end of December. That works. So December 31st, Mr. Melodia, you need to get your -- please if you would, get the answers on file, get those served.

Then let me give you -- see if I can set you up for a Rule 16 conference in this case say maybe later in January? Does that work?

MR. MELODIA: It does.

MR. BARNES: Yes, your Honor.

THE COURT: How's the 26th look, or the 27th look Ms. Brooks?

MR. MELODIA: We will make either work, your Honor.

THE COURT: Are they problematic Mr. Barnes? If those are problematic I can give you other dates. There's no urgency to those dates?

MR. BARNES: I don't believe so at this point in time.

THE COURT: Maybe move it to the first week of February, is that better? I want to give --

MR. BARNES: I've pulled up --

THE COURT: -- the parties are going to need to get together. You're going to get a Rule 16 order in this case which is going to require you to confer, come up with some -- a proposed agenda for Rule 16. I just want to leave you enough time in this case to do that.

MR. MELODIA: The first week in February would work for me, your Honor if it works for Mr. Barnes.

THE COURT: Mr. Barnes, you get to choose --

MR. BARNES: I'm sorry. As soon as you give me -- it will -- tell me, I can look at my calendar, your Honor. I'm -- it's -- my computer is locking up a little bit here.

THE COURT: All right.

MR. BARNES: Hold on.

THE COURT: That's okay.

MR. BARNES: Okay. The --

THE COURT: Yes, this is going to be on Zoom, so no travel required.

MR. BARNES: -- yes. Okay. Earlier in the week

is better for me, your Honor.

THE COURT: All right. How about the 2nd of February?

MR. MELODIA: Groundhog Day, works, your Honor.

THE COURT: Mr. Barnes, February 2nd, is that early enough?

MR. BARNES: Yes, your Honor.

THE COURT: All right. Let's do it 2:00 p.m. please on February 2nd is going to be your Rule 16 conference. Again, it will almost certainly be a Zoom folks, unless those vaccines are available in vending machines in the next eight weeks.

So with that, we'll do it via Zoom on the 2nd. Again, you're going to get a notice and an order from the court that tells you what needs to be done in advance of the Rule 16. Please come with an agenda. And actually if you get that to the Court in advance that would be appreciated.

Also, we'll invite you -- you're going to need to work out some tracking order dates in this case, meaning discovery deadlines; things of that nature. I ask you in this first instance to confer. We try to be pragmatic about that in this session which means we're interested in your input and what you think works in this case. So again I will give you

the dates that you propose but we're very interested in what you think is reasonable in the circumstances. So please --

MR. MELODIA: Your Honor, we've been cooperating already on discovery, notwithstanding the pending motions. So I suspect we'll have no problem doing that.

THE COURT: Good. Okay. So I'll give you a new date for a next date for a Rule 16 conference on the 2nd of February. I will get you a decision on that one remaining count, which I think is Count Three; the breach of fiduciary duty count. I want to take a look at the case law on that. So you'll get that by next week. I'm not expecting to do anything elaborate folks, but I will give you an answer by next week.

Is there anything else that we can accomplish on this case today, Counsel? No?

MR. MELODIA: No, your Honor. Thank you your Honor.

THE COURT: Thank you.

MR. BARNES: Thank you, your Honor.

THE COURT: Stay well everyone.

MR. MELODIA: Thank you. You too. Have a good weekend.

(Hearing ends at 3:18 p.m.)

C E R T I F I C A T E

I, Raymond F. Catuogno, Jr., do hereby certify that the foregoing is a true and accurate transcript, prepared to the best of my ability, of an audio recording provided to me in the matter of John Doe vs. Partners Healthcare System, Inc.

I, Raymond F. Catuogno, Jr., further certify that the foregoing is in compliance with the Administrative Office of the Trial Court Directive on Transcript Format.

I, Raymond F. Catuogno, Jr., further certify that I neither am counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

____________________________

Raymond F. Catuogno, Jr.
November 25, 2020
9 Hammond Street
Worcester, MA 01610
raycatuogno@realtimereorting.net

**The Commonwealth of Massachusetts**
**OFFICE OF COURT MANAGEMENT, Transcription Services**

**AUDIO ASSESSMENT FORM**

***For court transcribers:*** *Complete this assessment form for each volume of transcript produced, and include it at the back of every original and copy transcript with the certificate page, word index, and CD PDF transcript.*

**TODAY'S DATE:** 11/25/2020 **TRANSCRIBER NAME:** Raymond F. Catuogno, Jr.

**CASE NAME:** Doe v Partners Healthcare System **DOCKET NUMBER:** 1984CV01651

**RECORDING DATE:** 11/20/2020 **TRANSCRIPT VOLUME:** I OF I

*(circle one)* TYPE: **CD** TAPE QUALITY: EXCELLENT GOOD **FAIR** POOR

*(circle all that apply)* **ISSUES** *(include time stamp):*

**background noise** **time stamp:**

**low audio**

**low audio at sidebar**

**simultaneous speech**

**cannot understand** 2:05:10, 2:06:54, 2:08:38, 2:13:15, 2:13:20, 2:22:43, 2:25:30, 2:57:51, 2:58:10, 2:58:23.

**other:** **time stamp:**

**COMMENTS:**

**0**

0 --- 1
01 --- 3
01610 --- 67
04/15/2019 --- 68
05 --- 6, 68
06 --- 8, 68
08 --- 9, 68

**1**

1 --- 1, 68
10 --- 2, 6, 48, 68
100 --- 2
1001CR006761 --- 68
103 --- 29
104 --- 29, 30
11 --- 68
11/13/2018 --- 68
11/2 --- 68
11/20 --- 68
111 --- 13, 14
12 --- 1, 3
13 -- 1, 12, 58, 68
1323CR0284 -- 1, 68
146 --- 38
15 --- 12, 68
1523CR001679 --- 68
1523CR1679 --- 1
16 - 62, 63, 64, 65
18 --- 66
1984CV1651 --- 3

**2**

2 -- 1, 3, 6, 8, 9, 12, 20, 23, 48, 64, 68
20 -- 1, 12, 23, 68
2001 --- 23
2013 --- 68
2014 --- 32
2015 --- 68
2016 --- 68
2018 --- 68
2019 --- 68
2020 --- 1, 67, 68
22 --- 20, 68
23 --- 48, 68
24 --- 29
25 -- 1, 23, 29, 67, 68
26th --- 62
272 --- 15
27th --- 62
2nd --- 64, 65

**3**

3 --- 66, 68
30 --- 23, 62, 68
327 --- 14, 22
38 --- 9, 68
31st --- 62

**4**

40 --- 20
400 --- 13
43 --- 20, 68

**5**

5 --- 68
5/2 --- 68
5/20 --- 68
51 --- 48, 68
54 --- 8, 68
57 --- 48, 68
58 --- 48, 68

**6**

6 --- 68
67 --- 1, 13

**7**

74 --- 14

**9**

9 --- 54, 56, 67
99 --- 15

**A**

a 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 52, 53, 54, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67
A --- 1, 59, 67
abet --- 20, 21
abetting --- 19
ability --- 19, 67
about 7, 8, 9, 10, 11, 12, 13, 14, 15, 19, 22, 25, 30, 32, 34, 35, 37, 38, 40, 42, 46, 47, 53, 55, 56, 58, 59, 64
absolutely 13, 27, 47
absurd --- 43
ac - 6, 21, 26, 34, 39
accept - 7, 12, 20, 22, 23, 34, 53
access --- 9, 19
accessed --- 13
accomplish --- 65
according 8, 43, 57
accurate --- 67
acknowledged --- 23
across - 6, 21, 26, 34, 39
Act 5, 16, 27, 28, 31, 54
action --- 49, 67
actionable - 34, 42
active --- 43
activities 26, 52, 58, 59

activity --- 25, 38
acts ----------- 56
actual 14, 20, 25, 38
actually -- 14, 24, 27, 30, 34, 44, 55, 57, 60, 61, 64
Actually ------- 13
added ---------- 22
addition 3, 23, 42, 54, 57
address -- 5, 6, 7, 14, 16, 27, 37, 59, 61
addresses ------ 24
Administrative - 67
admission ------ 59
advance ---- 10, 64
advertise ------ 50
advertises ----- 57
advertising 50, 57
advice --------- 56
affidavit - 20, 21, 28
affidavits ----- 59
after ---------- 57
aftermath ------ 59
afternoon ---- 3, 4
again 5, 6, 12, 19, 21, 22, 25, 28, 32, 33, 36, 40, 47, 52, 55, 56, 64
Again -- 3, 15, 28, 32, 35, 59, 64
against 43, 54, 57
agenda ----- 63, 64
ago ------------ 17
agree - 26, 39, 40, 51, 52, 62
agreed --------- 36
ahead --- 8, 13, 45
aid 16, 17, 20, 21
aiding 14, 15, 16, 17, 19, 22
alive ---------- 59
all -- 4, 5, 6, 21, 24, 26, 31, 37, 38, 49, 50, 54, 55, 58, 59, 68
All---4, 5, 6, 17, 32, 35, 48, 57, 58, 59, 61, 63, 64
allegation-10, 16, 17, 22, 25, 26
allegations-7, 12, 15, 22, 26, 32, 36, 44
allege-11, 23, 32, 34, 36, 56
alleged 10, 11, 14, 16, 22, 28, 31, 34, 40, 45, 54
alleges-----16, 40
allow-8, 9, 17, 18
allowing--------10
allows------18, 33
almost------15, 64
along-------22, 31
already-9, 17, 23, 59, 65
also 6, 25, 30, 34, 39, 50, 56, 60
Also------------64
alternative-----35
alternatives----35
Alton------------2
always-------7, 43
am-------6, 33, 67
Am----------28, 46
ambiguous-------44
amended 6, 7, 8, 9, 14, 15, 22, 29, 38, 61
among-------15, 22
amplifies-------57
an 6, 7, 9, 12, 14, 15, 16, 19, 25, 27, 32, 33, 34, 36, 39, 42, 45, 46, 47, 50, 56, 58, 64, 65, 67
An--------------19
analogy-----21, 24
analysis----39, 40
and-3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41, 42, 43, 46, 47, 48, 49, 50, 51, 52, 53, 55, 56, 57, 58, 59, 61, 64, 67, 68
And 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 18, 20, 21, 22, 24, 25, 26, 28, 29, 30, 31, 32, 34, 35, 36, 37, 39, 40, 41, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 58, 59, 60, 61, 64
animal --------- 33
anonymous ------ 27
another 15, 19, 22, 43, 47, 49, 56, 59
answer - 40, 61, 65
answered ------- 55
answers -------- 62
any 8, 17, 21, 28, 36, 39, 40, 41, 47, 48, 53, 55, 61, 67
anybody - 6, 9, 26, 36
anyone --------- 59
anything 6, 13, 17, 18, 40, 43, 48, 53, 54, 56, 59, 65
anyway --------- 31
anywhere ---- 9, 36
apologize ------ 10
app ------------ 20
appeals -------- 44
appearance ------ 3
APPEARANCE ------ 1

APPEARANCES -- 1, 2
applied -------- 20
applies ---- 27, 43
apply - 26, 27, 48, 59, 68
appointment 39, 41, 51
appreciate ------ 5
appreciated ---- 64
approach --- 20, 48
appropriate 38, 55
April ----------- 9
are 4, 6, 7, 8, 9, 12, 13, 15, 17, 18, 20, 22, 23, 24, 25, 26, 27, 29, 30, 32, 36, 38, 41, 43, 44, 45, 46, 47, 48, 51, 52, 54, 55, 56, 57, 60, 61, 62, 63, 64
Are ------------ 62
area ----------- 37
argue ---------- 42
arguing ------ 3, 4
argument 4, 14, 22, 25, 42, 46, 50, 56
arguments 4, 6, 15, 16, 39, 43, 44, 60
arise ---------- 56
around 10, 20, 23, 24, 31, 59
as - 2, 6, 7, 8, 9, 11, 13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 28, 32, 35, 37, 38, 41, 44, 45, 47, 48, 49, 50, 51, 52, 56, 57, 58, 59, 60, 63
As ----- 28, 30, 63
aside ------ 16, 40
ask 5, 28, 40, 62, 64
aske ------------ 5
asked ----------- 5
asking ----------31
aspects ----------7
assessment ------68
ASSESSMENT ------68
assume---7, 17, 24
assuming --------17
attached --------54
attaches --------51
attachments ------5
attendance -------4
attending --------4
attention -------10
attorney/client-24
audibly ---------20
audio -------67, 68
Audio ------------1
authorization---41
automatically---57
available--25, 61, 64
Avenue -----------2
away ------------51

**B**

back-5, 7, 10, 14, 16, 22, 23, 32, 35, 37, 40, 49, 52, 53, 61, 68
background ------68
baggage ---------42
banner ----------61
banners ---------60
barging ---------10
BARNES---3, 4, 17, 29, 30, 40, 41, 44, 48, 49, 50, 51, 53, 54, 55, 56, 58, 62, 63, 64, 65
based -------18, 26
bases -----------15
basic -------39, 50
basically---42, 45
batch -----------51
be--3, 4, 6, 7, 8, 9, 10, 12, 16, 17, 19, 20, 23, 24, 25, 32, 34, 35, 36, 38, 42, 45, 46, 47, 48, 49, 50, 52, 54, 55, 57, 58, 59, 61, 63, 64
became --------- 36
because -- 7, 8, 9, 12, 13, 14, 16, 22, 24, 30, 31, 33, 37, 45, 49, 53, 54, 57, 60
Because 22, 27, 31, 45
become ----- 23, 39
becomes -------- 38
been -- 20, 23, 24, 48, 51, 60, 65
before - 3, 13, 14, 30, 49
BEFORE ---------- 1
begin ---------- 36
beginning ------- 3
behalf 3, 4, 24, 54
behavior --- 31, 58
behind --------- 38
being - 23, 27, 31, 34, 36, 38, 40, 44, 45
believe 19, 31, 63
Believe -------- 43
best ----------- 67
better ----- 63, 64
between 10, 16, 18, 21, 30, 31, 34, 53
beyond --------- 18
bios ----------- 24
bit 39, 45, 56, 57, 63
block ------ 13, 31
bone ----------- 14
Boston 1, 2, 52, 57
both - 5, 7, 18, 57
bouncing ------- 24
bound ------ 22, 26
Box ------------- 2
Braintree ------- 2
breach - 6, 24, 44, 45, 47, 49, 50, 61, 65
breast - 11, 33, 35

brief ---------- 45
briefly 22, 29, 32, 58
briefs --------- 57
Brigham ----- 2, 47
bring ---------- 49
bringing --- 41, 56
broad ---------- 22
Brooks --------- 62
browser 8, 13, 18, 30, 31
browsers ------- 30
bug ------------ 31
bugs ----------- 32
bulletin ------- 38
bundled -------- 50
business --- 36, 54
businesses ----- 54
but 4, 7, 8, 9, 10, 11, 12, 15, 19, 20, 23, 24, 25, 26, 27, 32, 33, 34, 36, 38, 41, 44, 45, 46, 52, 53, 54, 58, 59, 60, 65
But -- 3, 4, 6, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 25, 26, 27, 29, 30, 33, 34, 35, 39, 40, 43, 44, 45, 47, 50, 51, 52, 53, 54, 55, 56, 57, 60
button - 29, 30, 51
buy ------------ 22
buying --------- 42
By ---------- 2, 59

C

C ------- 2, 67, 68
calendar ------- 63
call -------- 3, 10
called 18, 21, 31, 32, 42, 50, 57
caller --------- 50
callers -------- 50
Calling --------- 3
calls -------27, 61
cameras ----------4
can 3, 7, 8, 9, 10, 11, 12, 14, 15, 17, 20, 21, 23, 24, 25, 27, 32, 35, 37, 39, 42, 43, 44, 45, 46, 47, 48, 51, 52, 53, 55, 56, 59, 61, 62, 63, 65
Can -------------48
cancer --11, 33, 35
cannot ------21, 68
capability ------17
case 3, 4, 6, 7, 8, 9, 13, 14, 16, 18, 23, 27, 30, 32, 42, 43, 44, 45, 48, 49, 52, 57, 58, 61, 62, 63, 64, 65
CASE ------------68
cases 7, 8, 15, 43, 44, 45, 57
Catuogno-1, 67, 68
cause -------49, 60
caused ------31, 53
CD --------------68
Center -----------2
certain-37, 43, 49
certainly --13, 35, 39, 64
Certainly ---41, 52
certificate -----68
certify ---------67
change ----------37
changes ------8, 60
Chapter -----15, 56
characterize 52, 56
characterized ---58
characterizing --46
charged ---------26
charges ---------26
charitable-52, 57, 59
charity ---------57
Chelsea ----------4
chief -------41, 49
choice ----------10
choose - 24, 31, 63
Chris ----------- 4
church --------- 46
circle -- 5, 40, 68
circuit 8, 28, 42, 43
circumstances - 25, 30, 34, 52, 61, 62, 65
cite ------------ 8
cited - 15, 22, 45, 57
cites ---------- 58
claim -- 5, 11, 14, 15, 24, 26, 32, 36, 42, 44, 47, 50, 51, 52, 54, 61
claims -- 6, 7, 14, 15, 25, 28, 59, 61
class ---------- 14
clear - 38, 39, 45, 59
clearer -------- 45
clearly -------- 49
click -- 30, 51, 61
clicking 23, 24, 30
clicks ----- 24, 29
client 23, 24, 36, 62
clients ---- 51, 53
clinic --------- 50
closer --------- 52
Clovitz --------- 4
co ------------- 21
code 20, 30, 32, 50
coin ----------- 45
colleague ------- 4
colleagues ------ 4
collected -- 27, 60
colors ----- 42, 50
com -------- 36, 42
come -- 16, 43, 49, 50, 63, 64
comfort -------- 52
comfortable ---- 52
COMMENTS ------- 68
commerce -- 52, 53, 54, 56, 57

commercial ----- 58
common ----- 47, 49
Commonwealth 25, 68
COMMONWEALTH ---- 1
communicate ---- 39
communicated --- 20
communication - 16, 17, 18, 19, 20, 21, 25, 27, 28, 29, 30, 31
communications 14, 16, 18, 20, 22, 27, 29, 31
companies ------ 21
company -------- 51
comparable ----- 47
compete -------- 54
competing ------ 37
competition ---- 54
complaint 6, 7, 8, 9, 10, 13, 14, 15, 18, 22, 26, 28, 29, 31, 32, 37, 40, 41, 44, 51, 55, 61
complaints ----- 15
complete --- 19, 21
Complete ------- 68
completely - 26, 33
completion ------ 21
compliance ----- 67
computer ------- 63
conceded ------- 54
concern ---- 12, 39
concerned ------ 38
concerns ------- 59
conclude --- 11, 60
conclusion ----- 23
condition -- 8, 32, 34, 37
conditions - 27, 34
conduct ---- 43, 57
confer ----- 63, 64
conference 62, 64, 65
confidence 41, 42, 49
confidential -- 12, 25, 32, 35, 44, 47, 60
confidentiality-45
configured-16, 18, 30
confuses--------10
confusing-------47
Conley-----1, 2, 3
connect---------54
connection-------9
Conroy-----------2
consent-----40, 59
consider--------18
considered-------9
constitute------26
consumer--------54
consumers---54, 58
contacting------24
contemporaneous 17, 28
content-21, 30, 31
contents--------14
contested-------45
contesting------45
context 26, 27, 31, 56, 60
continue--------14
continues-------21
contract--------24
convert---------57
converts--------57
conveyed----11, 12
cookie--31, 60, 61
cookies-9, 13, 18, 19, 23, 31, 36
coop------------65
cooperating-----65
Coppola---------68
copy------------68
core 8, 52, 53, 55, 56, 59
Corp--------52, 58
corporate---46, 49
corporations----58
correct------5, 54
Correct------6, 11
correctly-------46
correlate-------33
could--11, 36, 38, 41, 45, 46, 47, 57, 60
Counsel--3, 5, 58, 61, 65
count --- 5, 61, 65
Count - 14, 32, 59, 65
counts ------- 5, 6
couple ----- 17, 55
course 3, 4, 19, 47
Court - 2, 3, 8, 9, 13, 18, 23, 26, 31, 38, 40, 48, 49, 55, 56, 57, 58, 64, 67
COURT - 1, 3, 4, 6, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 28, 29, 30, 32, 33, 34, 35, 39, 40, 41, 43, 44, 45, 46, 47, 48, 50, 51, 53, 54, 55, 56, 58, 62, 63, 64, 65, 68
Courtney -------- 4
covered ---- 15, 34
CPA ------------ 58
crack ---------- 56
create ----- 38, 43
credentials ---- 38
crime ---------- 25
cruising --- 11, 35
cut ------------- 6
CVS -------- 42, 49

**D**

Dana 2, 35, 37, 47, 51
danger --------- 26
data 30, 51, 60, 61
date --- 61, 62, 65
DATE ----------- 68
dates ------ 62, 64
day -------- 37, 50
Day ------------ 64
days --- 17, 55, 62
deadlines ------ 64
deal ------- 26, 44
dealing 15, 22, 39

deals ---------- 13
debate --------- 27
December ------- 62
deception --- 8, 43
deceptive ------ 56
decide --------- 27
decision -- 43, 50, 61, 65
declaration ---- 29
deemed --------- 25
deeply --------- 35
def ------------ 52
default -------- 31
Defendant ------- 1
DEFENDANT ------- 1
defendants -- 4, 6, 11, 16, 19, 32, 43, 49, 53, 59
Defendants 1, 2, 14
defense --------- 3
defer ---------- 52
defined ---- 19, 34
defines 15, 48, 50
definitely ----- 52
definition ----- 20
deflection ----- 27
deliver -------- 55
delivered ------ 31
demonstrated --- 60
demonstratives - 17
deny ------- 32, 44
denying 44, 59, 61
deployment - 31, 56
describe ------- 59
described ------ 18
describing ----- 22
descriptive ---- 10
deserve -------- 38
designed --- 25, 58
detail --------- 41
determination --- 7
device ----- 23, 37
devices - 8, 31, 37
Devine ----- 44, 49
diagnoses ------ 33
diagnosis -- 12, 35
diagram -------- 18
dictate -------- 60
difference - 21, 46
different - 21, 22, 25, 26, 27, 32, 33, 48
difficult---10, 53
diocese---------46
Directive-------67
disagree----26, 49
disclose---35, 44, 45, 47
disclosed---23, 38
discloses--------9
disclosing------32
disclosures-36, 42
discovery--55, 64, 65
discussed--15, 33, 50
discussion------10
disingenuous----48
dismiss---5, 7, 9, 12, 18, 22, 25, 26, 32, 34, 44, 59
dismissal----6, 49
displayed-------38
dispute-----10, 34
disputes--------12
disputing-------33
distinct----18, 39
distinction-----29
disturbing------35
do-5, 6, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 23, 26, 27, 28, 29, 31, 34, 35, 37, 38, 40, 44, 46, 47, 48, 49, 51, 55, 56, 57, 59, 61, 62, 63, 64, 65, 67
Do--------------47
Docket-----------3
DOCKET----------68
doctor--11, 39, 49
doctors---------50
documents-------55
does 4, 17, 24, 26, 28, 29, 32, 37, 38, 40, 47, 51, 60, 62
Does --- 24, 47, 62
doing -- 7, 33, 36, 43, 57, 58, 65
Doing ----------- 2
dollars -------- 54
Don ------------ 12
done ------- 25, 64
door ----------- 48
dots ----------- 54
doubt ------ 50, 54
down ------- 11, 50
drug ----------- 50
due ------------ 55
during ---------- 4
duties --------- 48
duty 6, 24, 44, 45, 46, 47, 48, 49, 50, 61, 62, 65

**E**

E -------------- 67
each 6, 8, 10, 23, 68
earlier 51, 52, 58
Earlier -------- 63
early ---------- 64
eavesdrop ------ 17
eff ------------ 59
effect ---------- 4
effectively ---- 59
effort ----- 54, 56
efforts ---- 43, 54
eight ---------- 64
eighth --------- 37
either - 20, 44, 62
elaborate ------ 65
eliminate ------ 60
else 3, 6, 16, 17, 30, 36, 65
email ---------- 24
employed ------- 67
employer ------- 38
employment ----- 38
end -------- 50, 62
ends ----------- 66
engage --------- 14
engaged 14, 52, 54, 56, 57, 58
engagement ----- 24

enhancing ------ 58
enough - 4, 13, 36, 39, 45, 57, 63, 64
enroll - 29, 30, 51
enter ---------- 27
entered --------- 3
entire ----- 26, 39
entirely 18, 30, 52
entirety -------- 6
entities ------- 50
entity ----- 49, 56
equivalent ----- 60
Eric ------------ 3
error ------ 45, 59
Esquire ------ 1, 2
ethical -------- 58
even 8, 10, 13, 17, 20, 27, 30, 31, 34, 55, 57, 58
event ---------- 55
ever ------- 13, 45
every -- 8, 22, 30, 39, 42, 49, 68
everybody -- 38, 48
everyone 10, 50, 65
everything - 42, 59
exact ---------- 20
exactly -------- 32
example 11, 14, 19, 24, 29, 30, 33, 35, 38, 45, 47, 50
examples ------- 51
exchange ------- 30
Exhibits -------- 1
exist -- 35, 51, 57
existence ------ 27
existing --- 11, 49
exists - 25, 49, 59
expectation ---- 48
expectations --- 50
expecting ------ 65
expert ------ 9, 18
explain -------- 40
explicitly ----- 27
extend - 44, 48, 52
extends -------- 48
extent --------- 18

**F**

F--------1, 67, 68
face-------------9
Facebook 8, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 25, 28, 30, 31, 32, 33, 34, 35, 36, 42
facilities------56
facility--------37
fact 8, 12, 25, 27, 32, 37, 40, 49, 51, 59
facts-----------27
factual---7, 9, 22
factually--------9
failure---------49
fair-----7, 45, 58
fairly------56, 61
faith-----------49
falls-----------56
family----------37
far-------------49
Farber--2, 35, 37, 47, 51
February 63, 64, 65
federal-----29, 38
feel------------10
feet------------14
few--------------8
fiduciary---6, 44, 45, 46, 47, 49, 50, 52, 61, 62, 65
fight-----------59
fighting-----5, 22
figured---------31
file------------62
financially-----67
find 12, 37, 45, 48
finding---------42
finds-----------25
fine------------18
finish----------47
finished--------17
firewall--------38
firm 23, 24, 36, 50
firms-----------21

first - 5, 6, 7, 8, 9, 40, 41, 42, 45, 49, 54, 63, 64
First ------ 31, 49
fit ------------ 45
fits ----------- 49
flip ----------- 45
flow ----------- 39
flows ---------- 12
focus ----------- 6
focusing 16, 56, 57
folks -- 5, 55, 60, 64, 65
Folks -- 44, 51, 59
followed -------- 3
football --- 17, 21
For - 1, 2, 11, 33, 68
foregoing ------ 67
form ------- 46, 68
Format --------- 67
forth ------- 7, 10
forward ----- 6, 60
found -- 27, 28, 49
four ------------ 5
Four ----------- 59
fraud ---------- 24
free ----------- 23
friend --------- 37
frivolous ------ 42
from 1, 4, 5, 7, 8, 9, 10, 21, 23, 29, 31, 32, 34, 36, 37, 41, 42, 49, 54, 57, 58, 62, 64
front -- 29, 52, 55
full ----------- 38
fully ---------- 48
fumble --------- 21
fundamental -- 6, 7
fundamentally -- 46
further 42, 56, 59, 67
furtherance 52, 59
furthered ------ 41

**G**

gain ---- 7, 19, 53
game ------------ 7
gender ---------- 27
general 24, 25, 36, 39, 59
General 2, 30, 41, 49
generalized ---- 15
get 10, 14, 17, 18, 28, 34, 35, 38, 40, 42, 51, 57, 61, 62, 63, 64, 65
gets 11, 12, 21, 30
getting ----- 6, 25
give 6, 43, 50, 51, 61, 62, 63, 64, 65
given ---- 8, 9, 45
go 10, 11, 13, 14, 18, 28, 29, 37, 41, 42, 45, 49, 52
Go ------------- 53
goes --- 24, 41, 53
going 5, 6, 9, 16, 17, 22, 23, 28, 32, 36, 38, 40, 43, 44, 51, 53, 55, 59, 61, 62, 63, 64
gone -------- 5, 59
good 35, 41, 61, 65
Good ----- 3, 4, 65
Google - 8, 13, 14, 16, 21, 22, 23, 28, 33, 34, 36, 42, 43
got 5, 10, 12, 22, 25, 32, 34, 36, 40, 41, 43, 44, 45, 49, 51, 54, 55, 60
Got - 4, 19, 32, 48
grade ---------- 37
graph ---------- 30
grave ---------- 26
great ---------- 60
Groundhog -------64
guess -----------55
guessing --------55
guilty ----------13

**H**

h -------32, 42, 50
hack ------------31
hacked ----------31
had-8, 13, 31, 43, 50, 57, 59
Hammond ---------67
HAMPDEN ----------1
handle ----------38
happen ------28, 31
happened 15, 31, 42
happening--27, 33, 34, 36, 61
happens-29, 31, 55
happy ------------6
harm --------60, 61
has--3, 8, 11, 17, 18, 20, 21, 23, 25, 29, 35, 37, 38, 39, 44, 45, 46, 52, 58, 59
Has -------------32
hat ---------23, 39
have 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, 34, 39, 40, 42, 43, 45, 46, 47, 51, 52, 54, 56, 59, 60, 61, 65
Have --------28, 65
having ----------46
he-21, 37, 38, 48, 57, 67, 68
head ------------24
health--9, 13, 33, 34, 37
healthcare-21, 41, 49, 53, 55
hear 3, 15, 19, 20, 48, 53, 56, 60
heard - 20, 21, 28, 30, 43
hearing 3, 16, 17, 19, 20, 28, 41, 59, 67
Hearing -------- 66
HEARING BEFORE -- 1
held -------- 8, 52
help ------- 22, 35
here 3, 4, 5, 7, 9, 10, 15, 18, 20, 21, 22, 23, 24, 26, 28, 29, 33, 34, 40, 42, 43, 45, 46, 47, 49, 51, 53, 58, 59, 63
Here ------- 32, 44
hereby --------- 67
herring -------- 39
hey ---- 32, 42, 50
highlight ------- 6
highlighting --- 37
highly --------- 48
him ------------- 4
himself --------- 4
HIPAA - 13, 34, 38, 39, 40, 41, 47, 48, 50
HIPPA ------ 48, 50
his ----- 3, 38, 43
hoarding ------- 43
hold ------- 52, 53
Hold ----------- 63
Holland ------ 2, 4
Hollywood ------- 4
Honor - 3, 4, 6, 7, 9, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23, 26, 27, 28, 29, 30, 32, 33, 36, 38, 40, 42, 43, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 57, 58, 62, 63, 64, 65
HONORABLE ------- 1
hospital 9, 17, 18, 21, 23, 36, 45,

46, 51
Hospital 2, 30, 57
hospitals - 33, 34, 37, 38, 46, 48, 49, 54, 57
how 12, 26, 34, 38, 46, 48, 52, 53, 56, 61
How -------- 62, 64
However - 5, 13, 28
huge ----------- 34
hyperbole ------ 43

I

I 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67, 68
I know --------- 59
Iaquinto --------- 4
ID ---------- 8, 37
idea 14, 37, 41, 43
identical ------ 28
identifiable 7, 8, 12, 15, 33, 37, 39, 41
identified ----- 34
identifier ----- 11
identifies -- 8, 14
identify ---- 8, 33
identity ------- 25
if -- 6, 8, 10, 12, 13, 17, 18, 19, 21, 22, 23, 24, 29, 31, 33, 34, 36, 38, 41, 42, 43, 45, 47, 51, 54, 55, 57, 59, 60, 62, 63, 64
If-13, 23, 29, 35, 39, 43, 50, 62
ignore----------40
Illinois---------2
immediately-----30
importance------60
important----9, 37
importantly-----37
impose----------47
impression------43
improper--------27
in--3, 4, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 67
In--3, 21, 23, 27, 37, 42, 46, 60
inapplicable----13
inaudible-6, 7, 9, 12, 20, 23, 48
Inc----------2, 67
include-----19, 68
includes--------33
including--14, 21, 23, 32, 48, 60
incorrect--------9
increase 53, 54, 56
increasing------26
indecipherable--6, 8, 9, 12, 20, 23, 48
index-----------68
indicated-------59
individual-11, 12, 14, 15, 21, 33, 34, 36, 39, 46
individualized--46
individuals-----54
inference-------12
inform --------- 35
information - 6, 8, 10, 11, 12, 13, 25, 26, 32, 33, 34, 35, 36, 38, 40, 41, 44, 45, 47, 51, 53, 60
informational - 10, 11
injunction -- 5, 9, 10, 18, 54, 59, 61
ink ------------ 44
input ---------- 64
inserted ------- 58
inserting ------ 15
instance --- 59, 64
Instead ----- 9, 38
institution 47, 52, 58, 59
institutions -- 48, 53, 54, 55, 57, 60
insurance ------ 27
intend ---------- 5
inter ---------- 33
interact ------- 55
interaction ---- 53
intercept ------ 17
intercepting 21, 31
interception -- 14, 15, 16, 17, 19, 20
interest ------- 33
interested - 4, 44, 64, 67
interesting 24, 49, 52
interference --- 32
internet 9, 15, 21, 23, 26, 42
into 6, 24, 38, 42, 58
introduce ------- 4
intruded -------- 9
intrusion ------ 32
invasion 5, 32, 33, 34, 36, 40, 44
invisible ------ 56
invite --------- 64

involve -------- 27
involves ------- 54
IP --------- 14, 37
irreparable 60, 61
is - 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 63, 64, 65, 67
Is ------ 6, 28, 65
isn 6, 11, 14, 19, 34, 57
issue - 10, 16, 25, 27
issues - 7, 27, 48, 59
it 4, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 36, 38, 39, 41, 43, 44, 45, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 63, 64, 68
It - 4, 13, 14, 17, 21, 23, 25, 30, 34, 37, 38, 43, 45, 46, 50, 51, 53, 54, 56, 61, 62
italics -------- 41
its 6, 11, 16, 19, 30, 47, 51, 52, 58, 59
itself ----- 18, 58

**J**

J------------1, 2
James ------------2
Jane -------------2
January ---------62
Jason ---------1, 2
Jay -----------3, 4
John ------2, 3, 67
Johnson ----------3
Judge -----------42
judicial ---------7
jump -----6, 22, 52
jurisdictions ---22
jus ---4, 7, 8, 15, 16, 18, 20, 22, 26, 28, 29, 33, 37, 39, 49, 51, 54, 55, 58, 62, 63
just --4, 7, 8, 15, 16, 18, 20, 22, 26, 28, 29, 33, 37, 39, 49, 51, 54, 55, 58, 62, 63
Just ------------57

**K**

keeps -----------42
kind -----4, 35, 52
kinds -----------51
Knight --------2, 4
know 4, 11, 12, 14, 20, 21, 26, 35, 36, 38, 41, 47, 50, 53, 57
knowing ---------26
knowledge -------44
knows --------8, 14

**L**

label -----------22
Lahoy ------------4
language ---22, 25, 41, 58, 60
last ------------59
later ------ 42, 62
law 7, 21, 23, 24, 26, 29, 34, 36, 38, 41, 44, 47, 48, 49, 52, 57, 65
lead ----------- 12
least - 15, 16, 19, 22, 25, 44
leave ------ 38, 63
leaves --------- 52
legal --- 7, 22, 25
legally ------ 7, 8
lends ---------- 58
let -- 4, 6, 7, 14, 17, 20, 22, 25, 31, 37, 40, 47, 52, 55, 59, 62
Let 15, 25, 28, 52, 64
letters - 5, 15, 59
level -- 39, 40, 43
liability ------ 60
light ---------- 60
like 5, 8, 10, 11, 13, 15, 17, 25, 31, 33, 34, 38, 42, 45, 50, 51, 52, 58
likelihood ----- 60
likely --------- 50
lim ------------ 24
limitations ---- 24
line --- 41, 43, 50
Linkage 52, 57, 58
linked --------- 39
list ------------ 1
listen --------- 33
listened ------- 59
listening ------ 16
literally --- 9, 13
little 45, 53, 56, 57, 63
ll -- 4, 6, 15, 17, 22, 25, 32, 39, 40, 43, 53, 60, 62, 64, 65
LLP ------------- 2
locking -------- 63
log ------------ 38

long --- 57, 59, 61
look -- 11, 12, 14, 15, 29, 32, 51, 52, 56, 62, 63, 65
Look ----------- 45
looked 13, 22, 24, 60
looking 11, 23, 25, 35, 53
looks ------ 15, 24
lot -------- 44, 59
low ------------ 68
luddite -------- 20

**M**

MA ------------- 67
machine --------- 8
machines ------- 64
macro ---------- 39
made -- 15, 25, 41, 50, 57, 60
main ----------- 27
maintain ------- 45
make 7, 13, 24, 27, 30, 39, 58, 60, 62
makes - 25, 29, 38, 57, 58
making 15, 42, 50, 56, 58
malpractice ---- 24
MANAGEMENT ----- 68
many ----------- 46
margin --------- 57
Mark ------ 1, 2, 4
marketing - 41, 49, 50, 53, 54, 56
marketplace ---- 58
markets -------- 57
MARONEY --------- 4
Mason ---------- 42
Mass 6, 22, 30, 36, 40, 45, 48, 49, 52
Massachusetts 1, 2, 5, 7, 15, 16, 28, 29, 31, 35, 44, 49, 54, 68
MASSACHUSETTS ----1
match---11, 12, 25
materials----5, 25
matter--3, 23, 26, 32, 36, 59, 67
may 17, 27, 36, 42, 43, 50
maybe---40, 59, 62
Maybe---35, 54, 63
me--3, 4, 5, 6, 7, 10, 12, 14, 15, 17, 20, 22, 25, 26, 28, 33, 35, 40, 43, 44, 45, 47, 48, 52, 55, 56, 58, 59, 61, 62, 63, 64, 67
mean---12, 20, 21, 27, 38, 47, 49, 57, 60
meaning---------64
means--31, 58, 61, 64
measures--------13
meat------------14
medical 11, 27, 32, 34, 37, 40, 44, 45, 47
medications-----27
meet------------48
Melodia 1, 2, 4, 6, 10, 14, 17, 18, 19, 22, 24, 28, 29, 30, 31, 32, 33, 40, 42, 43, 44, 46, 50, 52, 56, 61, 62
Melrose---------57
member------14, 37
memorandum------58
mention-25, 36, 60
mentioned 9, 37, 49
merely----------23
merits-----------7
message---------57
methods---------54
MGH 11, 16, 31, 35, 47
microphone------68
microphones------4
middle --------- 17
might - 41, 45, 51, 60
Mike ------------ 3
mind --- 11, 22, 55
minute --------- 43
minutes -------- 40
misreading ----- 33
missed --------- 24
missing -------- 28
mistake -------- 48
Mitchell -------- 3
mixed ---------- 49
Mm ---------- 4, 40
modulate ------- 10
moment - 8, 10, 16, 17, 19, 24, 28, 33, 43, 55
money ---------- 57
months ---------- 8
moots ---------- 59
more -- 10, 25, 37, 40, 53, 55, 56
More ----------- 62
most 7, 30, 45, 52
mostly --------- 15
motions ---- 18, 65
move ------- 15, 63
moving ------ 6, 43
Mr 1, 3, 4, 6, 10, 14, 17, 18, 19, 22, 24, 27, 28, 29, 30, 31, 32, 33, 37, 40, 42, 43, 44, 46, 48, 50, 51, 52, 56, 57, 58, 60, 61, 62, 63, 64
MR 3, 4, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 26, 28, 29, 30, 33, 34, 35, 36, 39, 40, 41, 43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 56, 57, 58, 62, 63, 64, 65

Ms -------------- 62
much --- 14, 39, 40
mundane --------- 40
mute -------- 6, 10

**N**

NA ------------- 68
name 3, 27, 38, 49
NAME ----------- 68
named ------ 13, 14
narrow --------- 56
nature ----- 59, 64
necessarily -- 4, 5
need - 5, 7, 9, 12, 17, 26, 40, 42, 52, 53, 61, 62, 63, 64
needed ---------- 4
needs 8, 16, 28, 64
negate --------- 51
negligence ----- 47
neither 20, 21, 67
never -- 33, 41, 53
new -------- 38, 65
next -- 20, 21, 61, 62, 64, 65
nine ----------- 45
ninth ------ 28, 42
No 1, 3, 6, 16, 20, 24, 39, 55, 65
Nobel ---------- 37
nobody --------- 45
Nobody --------- 33
noise ---------- 68
nondisclosure -- 60
None ----------- 39
Nonetheless ---- 20
nonprofit -- 54, 58
nonprofits ----- 57
nor ---- 20, 38, 67
not 3, 4, 6, 7, 8, 9, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 24, 26, 29, 30, 31, 33, 34, 35, 36, 38, 39, 41, 42, 44, 45, 46, 47, 49, 51, 52, 53, 54, 58, 60, 61, 65, 67
Not 10, 33, 36, 38, 42, 44
note---3, 4, 5, 18
noted-----------41
notes-----------50
nothing-----14, 30
notice--7, 13, 38, 41, 59, 64
notices---------61
notion----------52
notwithstanding 14, 65
November-----1, 67
now-----17, 55, 61
NPP-----13, 38, 43
number---4, 8, 16, 17, 18, 19, 20, 21, 25, 28, 37, 41, 49, 51
Number----------12
NUMBER----------68
numbers--8, 24, 50

**O**

o---12, 33, 55, 67
objection-------17
obligation-44, 45, 46, 47, 52
obligations-----48
obvious----------9
occur-----------18
occurs----------21
OCR---------13, 43
odd-------------45
OF-----------1, 68
off----------4, 50
Off----------2, 67
offensive-------10
offered-----38, 57
Office-------2, 67
OFFICE----------68
officer-----41, 49
officially----5, 6
Okay-3, 6, 14, 22, 28, 29, 34, 39, 42, 43, 49, 50, 58, 63, 65
on - 1, 3, 4, 5, 6, 7, 9, 10, 11, 14, 15, 16, 18, 21, 23, 24, 25, 26, 27, 29, 30, 31, 32, 34, 35, 36, 38, 40, 42, 44, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 65, 67
oncologist ----- 50
one - 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 20, 21, 22, 24, 27, 28, 29, 32, 33, 37, 40, 43, 44, 45, 47, 49, 50, 51, 52, 57, 58, 65, 68
One 2, 10, 14, 15, 17, 18, 32
ones ----------- 50
ongoing -------- 17
only -- 10, 13, 28, 30, 43, 46, 58
onto ----------- 36
operator ------- 36
opinion -------- 51
opportunity ----- 6
opposed ---- 15, 20
opposite --- 45, 50
opposition ----- 54
or 6, 8, 9, 11, 12, 13, 15, 16, 17, 19, 20, 21, 24, 26, 27, 28, 29, 30, 32, 33, 36, 38, 42, 44, 45, 46, 47, 49, 51, 52, 53, 54, 55, 56, 57, 59, 62, 64, 67, 68
order 5, 9, 63, 64
organization 46, 52
organizations - 47, 53, 57
organized ------ 25

**SUPERIOR COURT RULE 9C CERTIFICATION**

Pursuant to Mass. Sup. Ct. R. 9C(a) and (b), Adam J. Bookbinder (counsel for Defendants) and J. Michael Conley (counsel for Plaintiffs) met and conferred on August 14, 2019 by telephone. Despite good faith efforts, the parties were unable to eliminate or narrow the issues of dispute.

Michael T. Maroney

**CERTIFICATE OF SERVICE**

I, Michael T. Maroney, hereby certify that on September 20, 2019, I served, via email and first class mail, a copy of the foregoing document upon counsel for Plaintiffs, J. Michael Conley, 100 Grandview Road, Suite 218, Post Office Box 9139, Braintree, Massachusetts 02185, michael@kenneyconley.com.

Michael T. Maroney

# Exhibit C

Volume: I
Pages: 1-88
Exhibits: 0

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS SUPERIOR COURT

* * * * * * * * * * * * * * * * *
* JOHN DOE, *
* Plaintiff, *
* v. *
* PARTNERS HEALTHCARE SYSTEM INC *
* Defendant *
* * * * * * * * * * * * * * * * *

No. 1984CV01651

RULE 12 HEARING
BEFORE THE HONORABLE BRIAN A. DAVIS

APPEARANCES:

For the Plaintiffs, Mr. J. Michael Conley, Esquire
For the Plaintiffs, Mr. Jason Barnes, Esquire
For the Defendants, Mr. Michael Maroney, Esquire
For the Defendants, Mr. Mark Melodia, Esquire
(Full Appearance list on Page 2)

Boston, Massachusetts
November 20, 2020

(Transcript prepared from Audio Recording)
Reporter: Raymond F. Catuogno, Jr.

APPEARANCES:

For the Plaintiffs John & Jane Doe:
Kenney & Conley, P.C.
100 Grandview Road
Post Office Box 9139
Braintree, Massachusetts 02185
By: J. Michael Conley, Esquire

Simmons Hanly Conroy
One Court Street
Alton, Illinois 62002
By: Jason Barnes, Esquire

For the Defendants Partners Healthcare System Inc.; The General Hospital Corporation Doing Business as Massachusetts General Hospital; Brigham Health Inc.; Dana-Farber Cancer Institute Inc.; Dana-Farber Partners Cancer Center Inc.; Dana-Farber Inc.:
Holland & Knight LLP
10 Saint James Avenue
Boston, Massachusetts 02116
By: Michael T. Maroney, Esquire
Mark Melodia, Esquire

(Court in session.)

(2:01 p.m.)

THE CLERK: Good afternoon, your Honor. Calling Docket No. 1984CV1651; John Doe versus Partners Healthcare System Incorporated. This matter is before the Court for a Rule 12 hearing.

Counsel, will you please state your name for the record beginning with plaintiff's counsel, followed by the defense counsel.

THE COURT: Good afternoon. You can hear me?

MR. BARNES: Yes, your Honor.

MR. CONLEY: Yes, your Honor. Mike Conley for the plaintiffs.

THE COURT: Okay. Welcome.

Again, who's here on behalf of plaintiffs?

MR. CONLEY: In addition to me Mike Conley, Jay Barnes is present, and -- Jay, who else is --

MR. BARNES: Your Honor, Eric Johnson is on the phone. And Mitchell Bright is here. Mr. Bright has not entered his appearance in the case. But of course I want to note his presence --

THE COURT: Okay.

MR. BARNES: -- on the call.

THE COURT: Welcome. So who will be arguing on behalf of plaintiffs?

MR. BARNES: I will, your Honor --

THE COURT: Mr. Barnes.

MR. BARNES: -- Jay Barnes.

THE COURT: Mr. Barnes. Got it.

All right. And who's here on behalf of defendants?

MR. MARONEY: Good afternoon, your Honor. Michael Maroney on behalf of defendants. And my colleague Mr. Melodia will be arguing. I'll let him introduce himself.

MR. MELODIA: Good afternoon, your Honor. Mark Melodia from Holland and Knight on behalf of all of the defendants on this motion. And I'll just note that a number of my colleagues who are not necessarily needed in the case but who are attending arguments are in attendance; Chris Iaquinto, Teresa Lahoy, Ester Clovitz, Courtney Grow and Chelsea Rogan.

THE COURT: Mm-hm. All right.

MR. MELODIA: But I'll be arguing, your Honor.

THE COURT: Got it. So counsel, for those of you who are, you know, interested but not arguing, would you be kind enough to turn off your microphones and your cameras. It does reduce the Hollywood Squares effect for me during the course of the argument. So

I appreciate that. Thank you.

Counsel, we're here -- I think we're here officially on the motion to dismiss. However, we still have the motion for preliminary injunction that I need to address which is -- and you should note I've read all the materials on the motion to dismiss and I've gone through the stack of materials that were sent to me, some of which I asked for, some of which I didn't necessarily ask for, with respect to the preliminary injunction. So I have submissions from both sides; defendant's response on the preliminary order, I received the plaintiff's response to preliminary order, and then I received a series of letters with attachments. And I've reviewed those materials.

So what I intend to do here today is I'd like to start with the motion to dismiss. And then I -- don't worry, I intend to circle back on the motion for the preliminary injunction.

So we're going to start with the motion to dismiss. All right, folks, again I've read the papers. So we've got four counts here that we're fighting over, correct? We've got a count -- first count is wiretap act, the Massachusetts Wiretap Act. Then we've got the invasion of privacy claim which is

also officially statutory in Mass. We've got the breach of fiduciary duty claim. And we have the 93A claim. And defendants are moving forward to dismiss all of those claims. Okay.

MR. MELODIA: Correct, your Honor.

THE COURT: All right. So again I've read the papers Mr. Melodia. I've -- recognizing that I've read your papers and I've reviewed the arguments, is there information that isn't in your papers that you wish to share with me or anything that you want to highlight at this point in time?

MR. MELODIA: I think there are some fundamental things, your Honor, that cut across each of the counts. And I would be happy to address each of the specific counts as well. But I do recognize that the (inaudible -- indecipherable at 2:05:10) plaintiff. But let me focus on some of the fundamental reasons that really require dismissal of this case in its entirety as reflected in the first amended complaint.

Is anybody else getting an echo? Perhaps --

THE COURT: No.

MR. MELODIA: -- somebody's not on mute.

THE COURT: No. And again, and I'll give you an opportunity to speak Mr. Melodia. I am going to -- if you're going to jump into all the fundamental

aspects, again a reminder -- so I read the papers. I read the papers. And I have questions for both sides. And again it's an -- and let me remind you as well as you address the issues this is a motion to dismiss. So I accept the factual allegations as true. There seems to be some back and forth with respect to voracity of some of the factual allegations, but I have to accept the factual allegations as true. So what we're really doing here is we're testing the legal viability of the claims. That's all that this proceeding is about. And I make no determination at the motion to dismiss stage regarding the merits of the claims, just their legal viability.

MR. MELODIA: Yes, your Honor. And this complaint is legally not viable for fundamental reasons that can assume the truth of the properly pled parts of the first amended complaint. And I say properly pled because there are some things that this court can see and take judicial notice of from the websites themselves which are I think fair game on a motion to dismiss under Massachusetts State case law.

The privacy cases always need to be about an identifiable person. And here we don't have an identifiable person. We have at most an (inaudible

-- indecipherable at 2:06:54) which as the Court knows really just identifies a machine and really identifies the random physical numbers that changes every few months. And any one of those devices can in fact be held by any number of people at any given moment using it, but doesn't identify a person.

And similarly, even the Facebook ID and the Google ID that are used to somehow identify a person, even identify a patient according to plaintiff's theory don't, because a web point visitor has to first allow, set up their browser in a way that would allow for that information to pass to Facebook and Google, and would have to have a relationship with Facebook and Google ahead of time with their own terms and condition.

So I'm just talking about a privacy case needs to be about identifiable people. And this one, even if you take the first amended complaint as true, legally and technically is not.

Second, successful privacy cases like the cases that the plaintiff cite in this case; "Pharmatrak", "Google Cookies" from the third circuit, the "Nickelodeon" case in the third circuit, each and every one of those cases had deception by the defendant at their core. And we have no deception or

secrecy here. Instead we have website privacy policies that were and are on each of these hospital websites. And each and every one of those discloses the use of cookies, and discloses (inaudible -- indecipherable at 2:08:38.)

Third, you need a private space to be intruded upon in some way in a privacy case. And here we have public websites, literally public websites that anybody with an internet connection anywhere in the world can access.

And so I think it's important, your Honor, given that you've already mentioned the preliminary injunction motion -- I'm going to reference your Honor's order from April on that motion, there's a reference in the factual summary on page one of that order that talks about the hospital websites as providing direct portals that allow for access to health records and services. That is factually incorrect. And not because I say so or because an expert says so, but because it's obvious from the face of the websites which are specifically referenced in the first amended complaint and therefore are properly considered by the Court on a motion to dismiss. The three hospital websites referenced in the first amended complaint do not

share personal and protected health information. And the only way the plaintiff's counsel confuses the issue repeatedly in the first amended complaint is by referencing information pages on each hospital website that are about the patient gateway, your Honor, about it, descriptive of it. Not --

THE COURT: Pause for a moment Mr. Melodia.

MR. MELODIA: -- allowing --

THE COURT: So the allegation is -- pause. And here's one thing -- I apologize in advance to everyone. One thing I don't like about Zoom is it's difficult -- it's more difficult to sort of modulate the back and forth between counsel and -- between me and counsel. So I apologize if at some points in time I feel like I'm barging in. But unfortunately unless I mute you, which I think is even more offensive, I have no choice but to sort of get your attention.

So what's alleged in the complaint -- and here's what I recall from our discussion around the preliminary injunction, is that it is possible -- so someone can go on what you call the informational website -- and I recognize that there's a separate patient portal. That really doesn't seem to be in dispute in this proceeding. I got that.

MR. MELODIA: Correct.

THE COURT: I think. I recognize that. So what we're talking about is what the defendants refer to as the informational websites. What plaintiffs allege is that someone can go on the informational websites. They claim -- they're representing patients; existing patients, go on the informational website, look at information, pull down information. For example, look at the information about specific medical providers, say a particular doctor at MGH or the like, and that that information gets conveyed -- it's what's alleged, gets conveyed through Facebook in such a way that Facebook can match that information perhaps with its own Facebook identifier. So Facebook can put together, do a, you know, one and one, they can conclude that that individual who has a Facebook page -- which isn't -- is not that unusual, that person is cruising for for example a breast cancer specialist or something for that, looking for information about breast cancer on the MGH website. So Facebook can say this particular person -- you have someone in the waiting room with you? Would you mind? Thank you. This particular person is looking for information about breast cancer specialists, which -- and doesn't say it for sure, but it could

lead to an inference that that person has a real concern or perhaps a diagnosis of breast cancer, which would be confidential information perhaps. So that's what I understand to be the allegations. And again, it seems to me I have to take those allegations as true for purposes of the motion to dismiss.

I understand that there are disputes about whether in fact that information gets conveyed or how useful it is to Facebook. But at this point in time I've got to accept the allegations if that information flows to Facebook that they can match it with an individual, and therefore that there is a disclosure of patient confidential information.

Don't I have to look at it that way?

MR. MELODIA: You do have to look at it in terms of taking the allegations are true, your Honor, but no, you don't have to pile supposition upon supposition, and inference and possibility upon possibility to perhaps find some probability. We're not in a, you know, (inaudible -- indecipherable at 2:13:15) state. I mean (inaudible -- indecipherable at 2:13:20) standard of pleading. And these do need to be probable allegations, and these are not. Number one, because it's not personally identifiable.

THE COURT: If there's one thing plaintiffs didn't do in this case is under-plead, okay?

MR. MELODIA: Well certainly --

THE COURT: Actually they're not guilty of under-pleading. But go ahead.

MR. MELODIA: -- well, in some senses that's true, your Honor. It's a 111 page complaint. It's over 400 paragraphs. True enough. However, literally page 67 is the only page that deals with the named plaintiffs in this case. So they absolutely did under-plead with respect to the only two people who are before this Court. And they do not state anything about themselves. They don't tell us about their browser settings. They don't tell us whether they're Google and Facebook members. They don't tell us whether they had information accessed. They don't tell us whether they took privacy protective measures like trying to block cookies and that somehow those were overcome by something the defendant did. They don't even say if they ever looked at the privacy policy or the notice of privacy practices; the NPP, which I want to make sure we talk about, which is inapplicable to this website because it only deals with protected health information as required by HIPAA and OCR.

So we know nothing actually, notwithstanding the 111 pages, about the actual named plaintiffs and their claims in this case. And ultimately they have to stand, as this court knows, on their own two feet before they can claim to represent other people with similar claims.

But let me go back to the IP address idea that somehow that identifies a person. It doesn't.

THE COURT: So you -- no, I get -- I picked up on that argument in your papers Mr. Melodia.

MR. MELODIA: Okay.

THE COURT: So I did go back and I took a look at the amended complaint because I wanted to see what was -- specifically was alleged. And I look at for example page 74 of the complaint which is part of the Count One interception of wire communications, the wiretap act claim. Paragraph 327 says "Defendants engaged in and continue to engage in an interception by aiding others including Facebook and Google to secretly record the contents of plaintiff's and class member's wire communications."

So that's what's alleged. And I read your argument about that there isn't much meat on the bone with respect to these individual plaintiffs.

MR. MELODIA: Okay.

THE COURT: Again but I look at the -- so that's why I pulled the complaint to see what allegations were made with respect to these individual plaintiffs. And it looks like they covered their bases in terms of making allegations that these plaintiffs are representative with respect to at least the complaints that are made in this amended complaint.

MR. MELODIA: Yes, I was just responding to your Honor's sense of volume. That the volume is mostly generalized pleadings discussed in almost like a white paper about the internet, as opposed to about what happened to identifiable people. But I'll move on --

THE COURT: Let me -- can I -- can we talk about the claims one at a time?

MR. MELODIA: Sure.

THE COURT: So wiretap act claim, really you have two arguments. One of the arguments is that it's not an interception, but -- and there are various cases cited, but I'm dealing with the Massachusetts statute which is Chapter 272, Section 99. And that defines an interception as among other things -- and I'm inserting some letters in here, but aiding another to secretly hear or secretly record a wire

communication.

And I'm going to come back to the secret piece for a second.

But the Massachusetts Wiretap Act alleges -- it prohibits aiding someone else in secretly hearing or secretly recording.

So doesn't that address the arguments in your papers that it's not an interception because what they're -- what's alleged in this case is that these defendants have configured their websites in such a way as to aid Facebook and Google? And I just read you the allegation in Google and others --

MR. MELODIA: But --

THE COURT: -- and secretly recording or listening and to hearing the communications between MGH and its patients.

So doesn't that, at least for purposes of this statute, qualify as an interception?

MR. MELODIA: No, it doesn't, your Honor. Putting aside the secrecy issue for the moment and just focusing on the interception, there needs to be a third party at some point while the communication is in transit between person number one and person number two. There needs to be a third person --

THE COURT: The statute doesn't say that. The

statute doesn't say that. The statute says aiding --

MR. MELODIA: Well --

THE COURT: -- aiding somebody. It doesn't say if it has to be contemporaneous or the like. It simply says aiding a third party in hearing or -- in secretly hearing or secretly recording.

MR. MELODIA: -- right. But we don't -- even by the allegation the hospital's website does not aid in the interception. It does not in any way allow Facebook to eavesdrop or get in the middle of in the way that one can intercept a passing football or intercept anything else. You need to get in the middle of a communication that is ongoing. That communication has already finished. The get communication, communication number one -- may I share my screen, your Honor? We have a couple of demonstratives that I've shown to Mr. Barnes a couple of days ago.

THE COURT: Yes. I'll let you share a screen. One moment. All right, you should have that capability now.

MR. BARNES: Your Honor, Mr. Melodia did share them with me. I have no objection -- assuming they're the same, and I assume they are going to be the same, particularly in regards to the preliminary

injunction. I would note however on the motion to dismiss, to the extent they go beyond anything in the motion itself, that's not entirely proper. But I've seen them. They're fine for the Court to consider. Particularly that we're taking up both motions here today. Thank you, your Honor.

THE COURT: Mr. Melodia?

MR. MELODIA: So what we've tried to do, your Honor, is just diagram based upon the way it's described in the complaint and the way it's described in the plaintiff's expert's report, the so-called get communication; communication number one, and the so-called post communication; communication number two. And there are two distinct communications here. One is between the hospital's website and the visitor's browser -- that is the plaintiff, if the plaintiff has configured their browser in a way that allows that communication to occur. And --

THE COURT: Meaning if they allow third-party cookies?

MR. MELODIA: To allow third-party cookies, your Honor.

THE COURT: Yes.

MR. MELODIA: And so in that case there's a communication there that Facebook is not a part of.

So there is no interception or aiding and abetting. And then that communication complete --

THE COURT: So pause for a moment. Mr. Melodia, would it be possible for Facebook to gain access to that communication if for example defendants did not include Facebook, did not permit Facebook to post cookies through their website?

MR. MELODIA: -- I don't believe so.

THE COURT: You don't believe it would be possible?

MR. MELODIA: I don't believe it would be possible. But of course --

THE COURT: So isn't that -- doesn't that at least qualify as aiding?

MR. MELODIA: -- it's aiding, but not aiding a communication that is communication number two, the post communication, yes.

THE COURT: Got it.

MR. MELODIA: Aiding an interception, no.

THE COURT: But again, we're talking about --

MR. MELODIA: An interception --

THE COURT: -- an interception is defined as aiding another party in its ability to hear --

MR. MELODIA: -- hearing, hearing.

THE COURT: -- or secretly -- to hear or secretly

record. And here --

MR. MELODIA: To hear or secretly record.

THE COURT: -- yes.

MR. MELODIA: But there is no -- let me show you the next slide, your Honor, which -- okay, these are the actual communications. This is the code, your Honor, in the Smith affidavit that shows the actual communication. These are not the same communications. So you can't aid and abet somebody either hearing or recording something they don't hear or record. Communication number one is neither heard nor recorded by Facebook.

THE COURT: So you read "hear" -- and the definition of interception you mean it really has to be audibly heard as opposed to communicated --

MR. MELODIA: No.

THE COURT: -- no? I see.

MR. MELODIA: No. I accept -- I'm not taking some luddite approach to the wiretap act, even though it's been around 40 years and has not been applied to this exact scenario. Nonetheless, I'm not taking that approach. I'm saying that these are separate communications. And one way we know they're separate communications, not just a (inaudible -- indecipherable at 2:22:43) but it is the actual

separateness, the content of the communication as reflected on these slides from the Smith affidavit.

The next is you can see communication number one is over and communication number two continues. You cannot aid and abet somebody in intercepting something that is neither heard in any technological sense, or recorded by Facebook. They're simply not a part of communication number one. In the same way hospital is not a part of communication number two. So there is true separateness in the way that they're -- so in other words, using the football analogy, you know, here's -- if there's no completion, you know, if there's a completion of a transmission, a completion of a pass, and then the other team gets it, that's called a fumble. And the difference is there has -- there's a complete transmission in communication number one. And then communication number two occurs, and that is a different communication. It's a communication between the individual plaintiff; the website visitor and Google and Facebook, or any other third party. And that's the way the internet works across the internet; healthcare companies and all sorts of other companies including law firms.

So your Honor, again this whole theory, I mean

every --

THE COURT: Mr. Melodia, let me -- if you don't mind, let me jump in here and help you with your argument which is I don't buy this argument. Okay. I don't buy it. The language of the wiretap act in Mass is broad, is different than what I -- I looked at the language of some of the other jurisdictions that were cited.

So it seems to me that what you're describing is aiding. And so -- and let me just -- I'll help you along by saying you're not going to win that one. I'm not persuaded.

I want to talk briefly about the secret piece. Which is I did -- this is another situation where I went back to see what was alleged, because again I've got to -- I'm bound by the allegations of the complaint, the amended complaint. And it's alleged, at least in paragraph 327, among other places, I think, that there was a secret recording of plaintiff's wire communications by Facebook, Google and others. So again, if I'm dealing with a motion to dismiss, and I have to accept that allegation as true, why are we fighting about whether it's secret?

MR. MELODIA: Because that's a legal label, your Honor, that plaintiffs added. That's not a factual

statement. That is not something the Court has to accept as true. That is a legal conclusion. The word "secret" is in the wiretap act, and they have merely (inaudible -- indecipherable at 2:25:30) back to the Court. That is not a sufficient pleading. There is no secret here. In addition to these being -- this is the way in which the internet works. Literally this hasn't been secret for 20 years. The "Double-Click" case in 2001 acknowledged that the use of cookies and the use of tracking on websites is not secret.

In this particular case each hospital disclosed the use of cookies and disclosed tracking on the website, including references to Google analytics, as well as the pixels. So where is the secret? There can't be a secret by people who are using a free website from a device and looking at -- and clicking around. In the same way that if somebody visited a law firm website, your Honor, they don't become a client. These people don't become patients by virtue of simply clicking around on a public website. There's no secrecy going on.

THE COURT: Right, but these plaintiffs allege they are patients. They're already patients.

MR. MELODIA: It doesn't matter, your Honor. If

a client of a law firm who is a client goes on to the general website of a law firm and clicks around and searches anti-trust law, or searches breach of contract, or fraud, and then looks at attorney bios, and looks at email addresses and phone numbers for contacting, that does not make that person a client in that setting. They are not for example -- the clicking and the searching is not for example attorney/client privilege, is it? That can't be attorney/client privilege. Does the law firm have a duty all of a sudden -- for example, if they looked up breach of contract and then they missed a statute of limitations, can the law firm be sued for malpractice because they missed the statute of limitations on behalf of somebody who was a client but didn't tell the law firm in engagement that they are a client for purposes of a contract claim? No. Those --

THE COURT: See the problem with that -- actually, Mr. Melodia, that's interesting that you choose that analogy, because I've been bouncing that one around in my head for some time. And here's the problem I ran into with that analogy, which is assume for the moment that the person who's using the website is a client of the law firm. And they're

getting on and looking at some of the law firm materials about their particular legal problem, which is confidential. And the law firm then takes that communication and makes it available to Facebook, such that Facebook can then match the fact that that client of the law firm has been rummaging around the law firm's website with respect to a particular legal issue that's confidential, and can match that information with the identity of the user? So that's more like what we have here. And in those circumstances would that be deemed again -- there are a number of claims here that are made with respect to that type of activity, but it seems to me that at least again -- and I understand you have an argument with respect to disclosure, I've got that, but the allegation is it's done secretly. It seems to me that in those circumstances that's potentially a violation of the wiretap act.

Let me also mention yet again this is a motion to dismiss. You read the prologue to the wiretap act -- and the wiretap act is designed really for different circumstances I'll have to say. And so again the -- let me pull up the actual language in the act. But the preamble says, "The general court finds that organized crime exists within the Commonwealth and

that the increasing activities of organized crime constitute a grave danger to the public welfare and safety."

So I agree with you this statute I think was targeted towards a different set of problems. But what I have to deal with in this context is how does it apply here, and does plaintiff state a viable claim? And I have to say under the wiretap act, I think they do, based on the allegations of the complaint. I recognize you disagree. I recognize that. But I'm bound by what the allegations of the complaint are in a motion to dismiss. And it seems to me that they do, they state a viable claim under the wiretap act. Whether that claim will succeed or not is a completely different matter. But I'm --

MR. MELODIA: Understood, your Honor, but --

THE COURT: -- yes?

MR. MELODIA: -- the Court respectfully does not need to take as true the secrecy allegation when the secrecy is how the internet works across the entire internet. Logically, just realistically, sociologically, technically, there is no secret here. This is all public information that anybody who is using the internet ought to know and is charged with knowing. And our law all the time charges people

with knowing things they may or may not actually in fact know, but that doesn't make it secret and that doesn't make it improper. And even the "Pharmatrak" case, your Honor, which is the one case they can point to that applies to in the Federal Wiretap Act context apply, you know, these types of statutes to facts that are somewhat similar in the sense that they're happening on a website and they involve deflection of information. But they're still different. I mean "Pharmatrak", it was an anonymous party. There was absolutely no disclosure whatsoever of a PII being collected. PII being collected was name, and address, and gender, and insurance information, and medical conditions and medications. And in there -- and this is the case, the main case the plaintiffs rely upon your Honor for their wiretap act theory. In that case the court did not decide this timing issues as Mr. Barnes calls it on this -- and what I think of as separate communications, they didn't resolve the timing issue. They in fact explicitly reserved the timing issue and said the facts here do not require us to enter the debate over the existence of a real time requirement. And why was that? Because they found a simultaneous communication, which we don't have here, and an

identical communication, which we -- I showed on the screen, we don't have here. So "Pharmatrak" really doesn't get them where they need to go. Nor does the "Facebook" case out of the ninth circuit. I mean that case only --

THE COURT: Again -- again, Mr. Melodia, I don't see any simultaneous or contemporaneous requirement in the Massachusetts Wiretap Act. I don't see it. Am I missing something? Is it there? Have I just overlooked it?

MR. MELODIA: -- well I think it doesn't say the word "simultaneous", your Honor, that is true. However, what it does say is a third party needs to have heard or recorded a communication. And that didn't happen here. As alleged, it didn't happen here. There was no recording, secret or otherwise. And there was no hearing, secret or otherwise by Facebook, or Google, or any third party to communication number one, the get communication, as pled by Mr. Barnes in the complaint and as is obviously found in the Smith affidavit repeatedly.

THE COURT: Okay. Let me pause for a moment --

MR. MELODIA: So that's my point.

THE COURT: -- Mr. Melodia. I'm going to ask you to pause there. I'm going go through these claims

one at a time.

Mr. Barnes, briefly what do you have to say in response to Mr. Melodia's point that it's not the same communication?

MR. BARNES: Well, your Honor, if you have Mr. Smith's declaration -- well, do you have the complaint in front of you?

THE COURT: I do. The amended complaint, yes.

MR. BARNES: Right. If you go to paragraphs 103 and 104, they are on pages 24 and 25. Mr. Melodia says --

THE COURT: I have them.

MR. BARNES: -- Mr. Melodia says there are two separate communications here. And I want to provide just one example from the complaint to show that there are not two separate communications. Your Honor has it right. The Massachusetts law makes no distinction that the federal law does. But if you look at paragraph 103 there is the button up there at the top right screen in the screenshot that says "enroll or sign in to patient gateway."?

THE COURT: Yes.

MR. BARNES: Okay. When a patient clicks that button what happens is that's the patient's communication. That is the patient's sole

communication to Mass General Hospital in that example. It starts a transmission of data and exchange of content between Mass General and the patient's web browser. But immediately upon clicking that button the source code Mass General puts on its website redirects the content, the precise content of that button click to Facebook. And that's shown in paragraph 104. You see --

THE COURT: I see.

MR. BARNES: -- at the top of the graph where it says "EV subscribe button click", and then it says "button text enroll or sign in to patient gateway." That's not a -- the patient did nothing else to send that data to Facebook. That's entirely the result of the source code that Mass General put on its web property. And the same is true of every other communication we're talking about in this case. As it relates to the Facebook tracking pixel, your Honor, this piece of source code is set up in a way that Facebook actually gets the content of the communication in most circumstances before Mass General even receives it. And the reason for that is Facebook wants to make sure that it gets it.

I also heard Mr. Melodia say that this is only because the plaintiff's web browsers are configured

-- they had to choose to let this happen. First of all the default setting out of the box, this happens in the default setting out of the box.

Second of all, I believe we've alleged in the complaint -- I don't have the particular paragraph, we've alleged the deployment of what's called cookies syncing technology. And what cookie syncing technology means is that even if a user tried to block Facebook's cookies and tracking on a website like MGH, it happened anyway because of this cookie syncing. They've hacked -- they've figured out a way to hack their way around the browser settings that would block this tracking behavior.

So there is no separate communication of the patient. And the Massachusetts Wiretap Act is set up to protect the communications of people, not of the redirections caused by intercepting devices.

What Mr. Melodia is essentially asking this Court to do is repeal the wiretap act. Because if you think even in the context of a traditional wiretap act, right, where there's a bug on a telephone, a bug on a telephone results in the content of that communication being delivered to the recording interceptor along a separate path from the communication between the victim's phone and the

person they're speaking with's phone. The bug sends it this way. And that's exactly what this Facebook source code does. That's why they're called web bugs, your Honor.

THE COURT: Got it. All right, I think I've got it Mr. Barnes. Thank you, sir.

So Mr. Melodia, I think I've got this one, sir. I -- this is a motion to dismiss. I'm going to deny the motion to dismiss with respect to the wiretap claim. Again, a different matter whether that claim ultimately succeeds, but on a motion to dismiss I've got to -- I have to deny the motion with respect to -- that's Count One.

We talked briefly about the invasion of privacy claim. That's statutory as well. "Has to be an unreasonable, substantial or serious interference with privacy, and whether the intrusion is unreasonable, substantial or serious presents a question of fact." That's the "Polay" case from the SJC back in 2014. And again when I look at the allegations of a complaint of what the plaintiff allege is that the defendants are disclosing confidential patient medical information to third parties, including information about their medical condition. Here's what -- okay, you can -- I'll

listen to you in a moment Mr. Melodia, but here's what I saw in the complaint. And if I'm misreading it you can point it out to me. But what I see in the complaint is plaintiffs allege that the defendants are disclosing confidential patient medical information to third parties, like Facebook and Google, that the information includes information about the patient's medical condition and diagnoses, and interest in particular specialists. For example what we just discussed, the perhaps a patient's interest in a breast cancer specialist. And that they're doing it in a way that allows the third parties like Facebook to correlate that information and identify the particular user.

So again, you say that's not an unreasonable, or substantial or serious invasion of the privacy of those people. I am not sure I see it that way.

MR. MELODIA: Well, your Honor, I would never say that the disclosure of an individual's personally identifiable health information was not serious and substantial. The hospitals completely understand that. I understand that. Nobody is disputing that. But that's not what's happening. Not because --

THE COURT: But pause one moment. What's happening is a different animal.

MR. MELODIA: Okay.

THE COURT: So that's the point I'm trying to get across here --

MR. MELODIA: I get it.

THE COURT: -- is there's a huge dispute between these parties with respect to how this technology actually works and what's being transmitted. I got that. I understand that. But my point is simply I've got a motion to dismiss. So what I have to do is I have to accept plaintiff's version which is no, it is happening, it is happening. That's what plaintiffs allege. And in those circumstances if it is happening isn't that an invasion of privacy?

MR. MELODIA: Well if a true medical condition of an identified individual were being transmitted to Facebook and Google from our website that would be actionable, that would be an invasion of privacy, that would be substantial and serious. But that's not what really is alleged. They use the word medical conditions, but what they're talking about is searches, and URLs and search terms on a public website like these hospitals. And that is not actionable. That is not PHI. That is not covered by HIPAA. That is no way protected health information. PHI is defined by the law. It's also not even

personal information as defined by Massachusetts law.

THE COURT: If a patient has --

MR. MELODIA: And --

THE COURT: -- has breast cancer for example. Again, obviously something that can be deeply disturbing to that patient for good reason --

MR. MELODIA: -- certainly.

THE COURT: -- there's something that they do not wish to disclose publicly. They get on the MGH website and start cruising the MGH website for information about breast cancer and about breast cancer specialists. Maybe they're looking at Dana-Farber. I don't know. But they're looking on your defendant's websites for information that will help inform them about, you know, their diagnosis, about what alternative treatment alternatives exist, who their treatment, you know, provider should be. All of that information seems to me that can be, very possibly is, confidential information, confidential patient information. That patient doesn't want other people to know that the looking for information about breast cancer diagnosis, and treatment and potential providers. But that's the kind of information that plaintiff say is shared with Facebook and that Facebook can then trace back and say we know that

this particular Facebook user is looking for a breast cancer specialist. That's what they allege. And I don't -- again, I don't think I've got the allegations wrong. That's -- whether again that's true in the real world is not a matter for me to resolve today. But that's what they allege. Isn't that enough to support a claim for invasion of privacy under Mass law?

MR. MELODIA: Not to an unidentified individual, your Honor. They may be a patient in the same way again that somebody may be a client going onto a law firm website, but they are not a patient on a public website with disclosures telling them that cookies are being used and tracking is happening. Not to mention the disclosures that they agreed to which Facebook and Google when they became users of those products to begin with. So no, your Honor, somebody -- whether they're a patient or not, that visits a general website -- they could be on Google.com, they could be on WebMD, they could be anywhere doing that search, and if their information went to Facebook and Google from any of those websites, it is not the website operator's business whether that operator is a hospital or anybody else; Google, or WebMD, or anybody else, to know that that person's a patient.

In fact, the hospitals don't know. And they don't try to know in any way who a device ID represents, because as I mentioned at the outset, a device ID could represent -- I'm sorry, not a device ID, an IP address, can represent any number of people, any number of devices. And it doesn't tell us that that person is a patient doing a search on their condition. That is not what personal health information is, protected health information is. It has to be identifiable to an individual. And that's not, because all you're doing is a search on a public website from a certain IP address that can change over time, can change that day. And it could be you, it could be somebody doing medical research for a friend or a family member, it could be somebody doing a term paper in eighth grade or in medical school. It could be a competing research facility that wants to know what's going on at Dana-Farber because they just won, you know, a Nobel Prize in that particular area, and so let's find out more about the research. That does not signify patient status.

And importantly, this idea -- I want to go back to paragraph one of three that Mr. Barnes was highlighting. That's a really important paragraph in the complaint because that shows us the page from

which the Court seems concerned that there could be a direct portal into actual patient records and the types of HIPAA protected information that does deserve full protection and is subject to HIPAA, and is subject to the notice of privacy practice; NPP that is prominently displayed as it is required to be by federal law on the website. Not because there's PHI on the website, but because that notice has to be disclosed on a website in the same way for example that you put a notice of a federal employment law like a parental leave policy. You put that on the bulletin board of the employer. That doesn't mean that everybody who walks by the parental leave policy becomes a parent and has a right to all of a sudden get leave and get paid for leave. It doesn't create a new right, nor does the NPP create rights or signify that there's PHI or patient activity going on on these websites. Instead these websites are about the services being offered in the appropriate places, in the protected places. These hospitals know how to handle HIPAA. And as your Honor pointed out in his paragraph 146 of the amended complaint makes really clear this is not about the patient gateway. This is not about what's behind a firewall. Where you get if you log in with a user name, and credentials and a

password, that's where you can make an appointment with a doctor. That's where you can communicate with a doctor. That's where your PHR or your pharmacy records are. None of this that is going on on a public website is protectable. And it's certainly not a substantial and serious privacy concern. If it is, then websites across the world -- not just for hospitals, because this basic principle would flow through to virtually every profession, every website dealing with any sort of information that if it were linked truly to an individual, an identifiable individual could be of concern. But it's not. That's the entire reason to have a general website, and then a separate distinct URL which is the patient gateway. Which I'm not sure whether that's become clear enough yet that that is a separate URL --

THE COURT: No, it's clear.

MR. MELODIA: Okay. I --

THE COURT: I promise you it's clear. And also -- I'll also tell you I think at a macro level I agree with you I think that HIPAA is a bit of a red herring in this proceeding and in these arguments, okay? I'm not persuaded that HIPAA really has much of a role to play in the analysis that I have to undertake. But I'm taking it --

MR. MELODIA: Well --

THE COURT: -- in a much more maybe mundane pragmatic level, which is I've got a complaint that alleges that take aside, ignore the patient portals, that patients who use the defendant's website for other purposes, their own personal medical purposes, that that information is in fact being shared with third parties through the website. And that -- we'll get to -- at some point in time again I want -- we need to re-circle, circle back on the question of disclosure and consent, we're going to get there. But I -- and that's what I've got is alleged here.

So Mr. Melodia I'm going to ask you to pause for a second.

MR. MELODIA: Mm-hm.

THE COURT: Mr. Barnes, two minutes, anything you want to say on this -- we're talking about invasion of privacy.

MR. BARNES: Right, your Honor. I think I want to answer that I think there is a question there in HIPAA's role and the analysis. We would agree that the Court doesn't have to ultimately reach any HIPAA question here. But HIPAA does play some role in the analysis. And let me explain why. And the first place I think to start is paragraph one where Mass

General's chief marketing officer says the trust and confidence that you have in your --

THE COURT: This is the sacred language, the sacred language that if I -- I wish I could search your complaint for sacred, I think it would pop up a number of times. Certainly plaintiff's made good use of that language. I got it.

MR. BARNES: -- right. And those are their words.

THE COURT: Yes, I understand.

MR. BARNES: And part of that is patients to a person understand -- they might not know the line and detail of the HIPAA statute and HIPAA regs, but they've got this idea that HIPAA protects their personally identifiable information from disclosure from their healthcare provider. And that idea is furthered when they show up for their first appointment and it's required by law that the HIPAA notice is provided to them. And as you noted in the previous hearing, that HIPAA notice says we never share your personal information for marketing purposes without your written authorization. And "never" is in italics. And so any time that a patient goes to these web properties they go to -- they go there with the -- they're bringing with them

this baggage so to speak, this trust and confidence that their healthcare provider is not like Zappos.com. They're not buying shoes here, Judge, they're talking to their healthcare provider. Okay? And so that colors every other disclosure that there may or may not have. And I want to -- we can get further into those disclosures later but that colors everything.

In addition to that Mr. Melodia keeps talking about public websites, oh, and basically making the argument I think that there is no privacy on public websites on the internet. Well, your Honor, the "Pharmatrak" case called that argument frivolous. Not my words. That's the first circuit's words to the argument that hey if you go on the internet you need to be wary.

The second thing is that didn't prevent the court in "Medstar" -- "Doe versus Medstar" from finding a claim, or "Doe versus Virginia Mason", or the "Google Cookie" case that I happened to argue, or the "Nickelodeon" case that I happened to be counsel for the plaintiffs on, or "Weld versus -- well, "Weld versus CVS" was not an internet privacy case, or the Facebook" internet case that the ninth circuit said was actionable on which I represented the plaintiffs.

This is squarely in the line of those cases. If anything, the conduct of the defendants here are worse.

THE COURT: Thank you.

MR. MELODIA: Your Honor, may I respond?

THE COURT: Mr. Melodia, one minute, I'll give you one minute to respond. But then we're going to keep moving.

MR. MELODIA: It's absurd to say that the conduct here was worse. The whole idea of the "Google" case in the third circuit, the "Nickelodeon" case in the third circuit, and the "Pharmatrak" decision is outright deception by the plaintiff -- by the defendants against the plaintiffs, the active hoarding of their efforts to protect their privacy and active deception; saying one thing and doing another. The only thing that plaintiffs can come up with to try to create the impression of that here is by tying us to a promise in the NPP which only applies, according to OCR, when you have PHI. So if your Honor is true to his words --

THE COURT: Believe me -- pause for a moment Mr. Melodia. I've got it. There's always a certain level of hyperbole in these arguments. Okay? And so I've got it. I heard what Mr. Barnes had to say.

Here's what we're going to do. I'm denying the motion to dismiss with respect to the invasion of privacy claim. Folks, that's a very ambiguous right in Massachusetts, but it seems to extend to confidential medical information. And the allegations of the complaint are that patient's confidential medical information is being shared probably without their knowledge or understanding with third parties. That it seems to me that at least states a viable claim for invasion of right of privacy under Massachusetts law. So I'm going to deny it.

We've got a breach of fiduciary duty claim. Here's the -- I think we can deal with this one pretty quickly.

Mr. Melodia, I read the arguments. Not a lot of ink was spilled on either side on this one. But I did. So I was interested to see actually the SJC has recognized a fiduciary obligation on the part of physicians not to disclose medical information. They did that in the "Alberts versus Devine" case. And the appeals court has picked up on that as well in the "Corper versus Weinstein" case. So --

MR. BARNES: Yes.

THE COURT: -- those cases seem to recognize yes

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**REPLY IN SUPPORT OF DEFENDANT LAWRENCE GENERAL HOSPITAL'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

## ARGUMENT

### I. Plaintiff Does Not Allege An "Interception" Took Place In Massachusetts.

As the BLS found in *Christensen v. Cox*, "nothing in the wiretap statute suggests any intention to regulate conduct outside the bounds of the Commonwealth." 2017 WL 7053911, at *7 (Mass. Super. Nov. 21, 2017). Thus, Plaintiff must allege where the supposed "recording" of her information took place, *i.e.*, where her information was allegedly routed to Facebook and Google's servers. *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 132 (3d Cir. 2022). Plaintiff does not allege where the "recording" of her information took place, so her Complaint should be dismissed.

Plaintiff argues that the place of the recording is irrelevant, and instead the relevant location is where Plaintiff was located at the time of the alleged interception. Opp., pp. 5–8. Yet, the Complaint fails to make this allegation either. Plaintiff claims it does, *see* Opp., p. 6, citing paragraphs 10 and 96 of the Complaint. But paragraph 10 merely states that Plaintiff is a "resident" of Massachusetts and has used Lawrence General's website. Compl. ¶ 10. Notably absent from this key paragraph is *where* Plaintiff was when she accessed the website—despite the fact that Plaintiff contends this allegation is critical to establish liability under the Wiretap Act. Paragraph 96 is no more helpful. That paragraph states Plaintiff's proposed class definition, namely "[a]ll Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion" of Lawrence General's website within the past three years. Compl. ¶ 96. But Plaintiff has not even alleged facts to demonstrate she could be a member of her own proposed class. Indeed, the fact that Plaintiff seeks to *certify* a group of individuals that accessed Lawrence General's website while in Massachusetts does not mean that Plaintiff herself did the same. That allegation is simply missing and is sufficient grounds for dismissal.

## II. Plaintiff Does Not Allege An "Interception."

### A. Plaintiff does not allege an "interception" at all.

In "its plain-English usage," the term "interception" means "the act or instance of receiving electronic transmissions *before they reach the intended recipient.*" *Commonwealth v. Fitzpatrick*, 24 Mass. L. Rept. 132, 2008 WL 2357239, *6 (emphasis by the court) (dismissing Wiretap Act claim for failing to allege an "interception") (citing Oxford American College Dictionary (2002)). The Complaint alleges that "tracking technologies intercept and transmit the contents of those communications to third parties before [a] webpage has even completed loading." Compl. ¶ 56. Plaintiff offers no facts to support this contention. But even if she did, when a webpage *loads* on a user's screen has nothing to do with when information *reaches* a website. Nor does it have any impact on whether or when information was "disclosed" to a website.

At bottom, Plaintiff's allegations describe two transmissions: one from Plaintiff to Lawrence General, and another from Lawrence General to Facebook and/or Google. *See* Compl. ¶ 53. That Plaintiff alleges this transmission takes place "contemporaneously" makes no difference here. What matters is that there are two separate transmissions happening, which necessarily means that Facebook and Google are not "receiving electronic transmissions *before they reach the intended recipient.*" *Fitzpatrick*, 2008 WL 2357239, *6. A contemporaneous "handoff" is still just that—a handoff, which is not an interception. *See id.* Plaintiff's Complaint should be dismissed because there is no allegation of an interception.

### B. No communication was "heard or recorded."

Plaintiff fails to allege that pixel technology "heard" or "recorded" her information, under those terms' ordinary meanings. Mot., pp. 11–12. Pixel technology cannot "hear." *See* Oxford English Dictionary (defining "hear" as "[t]o perceive, or have the sensation of, **sound**") (emphasis

supplied), available at https://www.oed.com/dictionary/hear_v?tab=meaning_and_use#1881335. And pixel technology does not "record" either. As the Supreme Judicial Court has held, "record" means to "set down in writing" or "cause (sound, visual images) to be transferred to and registered on something [by] electronic means in such a way that the thing . . . [can] be subsequently reproduced." *Com. v. Moody*, 466 Mass. 196, 209 (2013). Plaintiff simply fails to allege that pixel technology "records" information such that it reproduces her interaction with the website.

Plaintiff argues that interpreting "heard" and "recorded" according to their plain and ordinary meaning would "reflect an implausible reading" of the Wiretap Act. Opp., p. 12. But it is axiomatic that "the language of the statute is the primary source of insight into the intent of the Legislature," thus, "where the statute is clear and unambiguous, [the court's] inquiry into the Legislature's intent need go no further than the statute's plain and ordinary meaning." *Com. v. Mcneil*, 211 N.E.3d 615, 617 (Mass. 2023). Lawrence General's interpretation of "heard" and "recorded" is consistent both with those terms' plain and ordinary meaning and also with the statute's legislative intent—and the rule of lenity. *E.g.*, *Com. v. Carrion*, 431 Mass. 44, 45–46 (2000) ("[T]he rule of lenity requires the defendant be given the benefit of the ambiguity.").

**C. Any alleged interception was not done "secretly" because Plaintiff consented to the alleged conduct.**

Plaintiff complains that Facebook and Google intercepted her communications with Lawrence General. Compl. ¶ 2. But, Plaintiff consented to that very conduct, which is detailed in Facebook's and Google's terms and conditions. *See* Exs. A-1, A-2, and A-3; Google Privacy & Terms, available at https://policies.google.com/privacy?hl=en-US; *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018).[1] Lawrence General should not be liable for supposedly "aiding"

[1] This Court can consider Facebook and Google's terms and conditions when ruling on this motion to dismiss, because the Complaint's factual allegations are "linked to" and "dependent upon" them,

Facebook and Google in conduct that Plaintiff knew or should have known about. *See Com. v. Jackson*, 370 Mass. 502, 507 (1976) (finding "actual knowledge" where there are "objective manifestations of knowledge" that are "sufficiently probative of a person's state of mind").[2]

**D. There was no interception of "contents" by a "device."**

The Complaint fails to allege the interception of "contents." Mass. Gen. Laws ch. 272, § 99(B)(4). Plaintiff argues that "contents" were disclosed in the form of (1) IP addresses, (2) browser fingerprints, and (3) Facebook and Google "identification numbers." Opp., p. 15. None of these establish that "contents" were disclosed. First, the Complaint alleges that IP addresses identify *devices*, not individuals. Compl. ¶ 47. And Plaintiff even admits that IP addresses *change over time*. Opp., p. 16 n.24. Lawrence General is not aware of *any* court that has said IP addresses are personally-identifying, and Plaintiff's self-serving assertion that IP addresses are "sufficiently stable" is not enough to support such a bold assertion. Likewise, Plaintiff's allegations about browser fingerprints are not enough to establish "content" either, because that information is compiled by *Google* and *Facebook*, not Lawrence General. Compl. ¶ 67. The same is true for the alleged "identification numbers" created by Facebook and Google. *Id.* ¶¶ 65, 73.

Moreover, Plaintiff fails to allege the use of an "intercepting device." Mass. Gen. Laws ch. 272, § 99(B)(3). Under that term's ordinary meaning, the term "device" would apply only to tangible objects, not intangible code like pixel technology. *See* Mot., p. 15. Plaintiff essentially argues that anything with the ability to "record" a "wire communication" should be considered a device. Opp., pp. 18–19. But Plaintiff's interpretation would go against the statute's plain

---

which means the terms and conditions are "effectively merge[d] into the pleadings." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

[2] Moreover, Plaintiff's allegations that Lawrence General's so-called interception was "secret" is nothing more than a legal conclusion that this Court need not accept. *E.g.*, *Polay v. McMahon*, 468 Mass. 379, 382, 10 N.E.3d 1122, 1126 (2014).

language, legislative history, and common sense. Numerous courts have reached this conclusion, and this Court should do the same. *See* Mot. p. 16.

### III. Plaintiff Does Not Allege A "Wire Communication."

Plaintiff summarily concludes that any interaction she had with Lawrence General's website is a "communication" that is entitled to protection under the Wiretap Act. Compl. ¶¶ 15, 16. But at the time the Wiretap Act was enacted, a "communication" referred only to human conversations. *See* Mot., p. 19. Both case law and the statute's legislative history confirm this. *See Com. v. Gordon*, 422 Mass. 816, 833 (1996) (recognizing that "the legislative focus" of the Wiretap Act was "deterrence of interference therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool" and did *not* intend to regulate "purely administrative bookings steps following an individual's arrest"). Indeed, in *Commonwealth v. Connolly*, the court found that data from GPS devices—which is arguably more invasive than the data allegedly disclosed here—did not fall within Wiretap Act because it was not an oral or wire communication. 454 Mass. 808, 825 (2009). The same is true here. The alleged "data" disclosed does not reflect any sort of communication; if anything, it is closer to GPS data than it is to a human conversation.

Plaintiff argues that the Wiretap Act's "terms are not limited to human-to-human conversations." Opp., p. 10. But Plaintiff's argument incorrectly focuses on *who* is intercepting and *how* the interception takes place, instead of *the communication* at issue. The Wiretap Act was designed to prohibit *eavesdropping* on *human conversations*. Plaintiff proposes a gross expansion of the statute that would cast massive criminal and civil liability on countless Massachusetts businesses. Interpreting the Wiretap Act in this light would undoubtedly cause absurd results.

## CONCLUSION

Plaintiff's Complaint should be dismissed.

Dated: August 15, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

*/s/Emyr T. Remy*
Emyr T. Remy, BBO# 704156
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411
remy@shb.com

Tammy B. Webb (*pro hac vice* forthcoming)
Patrick J. Gregory (*pro hac vice* forthcoming)
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
tbwebb@shb.com
pgregory@shb.com

Anna A. Gadberry (*pro hac vice* forthcoming)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/Emyr T. Remy*
Emyr T. Remy

ML

15

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**ANNA A. GADBERRY *PRO HAC VICE***

Defendant, Lawrence General Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Anna A. Gadberry *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Lawrence General Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Gadberry possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Lawrence General Hospital in this matter.

3. The Declaration of Anna A. Gadberry is attached hereto as **Exhibit A**, indicating that (1) she is a member in good standing in every jurisdiction in which she is admitted to practice, (2) there are no disciplinary proceedings against her as a member of the bar in any

jurisdiction, and (3) the jurisdictions in which Attorney Gadberry is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B**.

WHEREFORE, Defendant, Lawrence General Hospital respectfully requests that the court grant leave for Anna A. Gadberry to appear and practice *pro hac vice* in the above-captioned matter.

Dated: September 12, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

By its attorneys,

/s/ Emyr T. Remy
Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

On August 23, 2023, counsel for Defendants communicated with counsel for Plaintiff in this matter concerning Lawrence General Hospital's intention to file this motion. Counsel for Plaintiff in this matter advised Defendants that they assent to the motion.

/s/ Emyr T. Remy
Emyr T. Remy

DOCKET NO. 2384CV00728–BLS1

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on September 12, 2023 a true copy of the above document was served by email upon:

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**DECLARATION OF ANNA A. GADBERRY**

I, Anna A. Gadberry depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy and Bacon LLP, 2555 Grand Blvd., Kansas City, MO 64108. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Lawrence General Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| Missouri | 2018 | 70953 |
| USDC, Kansas | 2022 | 79061 |
| USDC, Western Missouri | 2021 | 70953 |
| | | |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.



4882-7236-3901

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Lawrence General Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 12th day of September 2023.

*/s/ Anna A. Gadberry*
Anna A. Gadberry

# Exhibit B

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Anna A. Gadberry**
Email address: **agadberry@shb.com**
Complete Business/Mailing Address:

**Anna A. Gadberry**
**Shook, Hardy and Bacon LLP**
**2555 Grand Blvd.**
**Kansas City, MO 64108**

Board of Bar Overseers
Administrative Use Only

Date Received: 08-31-23
Amount Paid: $355.00
Date confirmation mailed: 08-31-23

Business phone: **(816) 559-0447**

RECEIVED
AUG 31 2023
Massachusetts Board of Bar Overseers Registration Dept.

Court in which pro hac vice admission is sought: **Suffolk Superior Court**

Contact number for court: **(617) 788-8175**

Party to be represented: **Lawrence General Hospital**

Docket number of case (if available): **2384CV00728– BLS1**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | Missouri | 70953 |
| Federal | USDC, KS | 79061 |
| State | USDC, MO Western | 70953 |

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

Signature (Please sign inside box above.) Date: 8/25/2023

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

ML

16

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**PATRICK GREGORY *PRO HAC VICE***

Defendant, Lawrence General Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Patrick Gregory *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Lawrence General Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Gregory possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Lawrence General Hospital in this matter.

3. The Declaration of Patrick Gregory is attached hereto as **Exhibit A**, indicating that (1) he is a member in good standing in every jurisdiction in which he is admitted to practice, (2) there are no disciplinary proceedings against him as a member of the bar in any jurisdiction,

and (3) the jurisdictions in which Attorney Gregory is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B**.

WHEREFORE, Defendant, Lawrence General Hospital respectfully requests that the court grant leave for Patrick Gregory to appear and practice *pro hac vice* in the above-captioned matter.

Dated: September 12, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

By its attorneys,

*/s/ Emyr T. Remy*
Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

On August 23, 2023, counsel for Defendants communicated with counsel for Plaintiff in this matter concerning Lawrence General Hospital's intention to file this motion. Counsel for Plaintiff in this matter advised Defendants that they assent to the motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on September 12, 2023 a true copy of the above document was served by email upon:

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**DECLARATION OF PATRICK GREGORY**

I, Patrick Gregory depose and state as follows:

1. I am an attorney with thc law firm of Shook, Hardy and Bacon LLP, 555 Mission St., Suite 2300, San Francisco, CA 94105. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Lawrence General Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| Alaska | 2017 | |
| California | 2000 | 206121 |
| Kansas | 1991 | 14886 |
| Missouri | 1990 | 40113 |
| USDC, Central California | 2006 | 206121 |
| USDC, Northern California | 2000 | |
| USDC, Kansas | 1991 | |
| USDC, Western Missouri | 1992 | |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Lawrence General Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 12th day of September 2023.

*/s/ Patrick Gregory*
Patrick Gregory

# Exhibit B

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix) **Patrick Gregory**
Email address **pgregory@shb.com**
Complete Business/Mailing Address

**Patrick Gregory**
**Shook, Hardy and Bacon LLP**
**555 Mission Street, Suite 2300**
**San Francisco, CA 94105**

Board of Bar Overseers
Administrative Use Only

Date Received 08-31-23
Amount Paid $355.00
Date confirmation emailed 08-31-23

Business phone **(415) 544-1929**

RECEIVED
AUG 31 2023
Massachusetts Board of Bar Overseers Registration Dept.

Court in which pro hac vice admission is sought **Suffolk Superior Court**

Contact number for court **(617) 788-8175**

Party to be represented **Lawrence General Hospital**

Docket number of case (if available)

Jurisdictions to which you have been admitted (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | Alaska | |
| State | California | 206121 |
| State | Kansas | 14086 |
| State | Missouri | 40113 |
| Federal | USDC, CA Central | 206121 |
| Federal | USDC, CA Northern | |
| Federal | USDC, KS | |
| Federal | USDC, MO Western | |

I certify that (check one) ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client and understand that no pro hac vice fee is due, or ( ✓ ) I have included the required pro hac vice fee.

Further, I certify under the pains and penalties of perjury that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited to legal practice in Massachusetts in the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Signature (Please sign inside box above) Date

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 9/12/2023 4:34 PM
Superior Court - Suffolk
Docket Number 2384CV00728

09.15

17

ML

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV00728–BLS1

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**TAMMY B. WEBB *PRO HAC VICE***

Defendant, Lawrence General Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Tammy B. Webb *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Lawrence General Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Webb possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Lawrence General Hospital in this matter.

3. The Declaration of Tammy B. Webb is attached hereto as **Exhibit A,** indicating that (1) she is a member in good standing in every jurisdiction in which she is admitted to practice, (2) there are no disciplinary proceedings against her as a member of the bar in any jurisdiction, and (3) the jurisdictions in which Attorney Webb is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

9-14-23 ALLOWED. H. Kazanjian, J.

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B**.

WHEREFORE, Defendant, Lawrence General Hospital respectfully requests that the court grant leave for Tammy B. Webb to appear and practice *pro hac vice* in the above-captioned matter.

Dated: September 12, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

By its attorneys,

*/s/ Emyr T. Remy*

Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

On August 23, 2023, counsel for Defendants communicated with counsel for Plaintiff in this matter concerning Lawrence General Hospital's intention to file this motion. Counsel for Plaintiff in this matter advised Defendants that they assent to the motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

DOCKET NO. 2384CV00728–BLS1

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on September 12, 2023 a true copy of the above document was served by email upon:

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Buckley
Asst. Clerk

# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**DECLARATION OF TAMMY B. WEBB**

I, Tammy B. Webb, depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy and Bacon LLP, 555 Mission Street, Suite 2300, San Francisco, CA 94105. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Lawrence General Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| California | 2003 | 227593 |
| Missouri | 1996 | 48161 |
| USDC, Central California | 2004 | 227593 |
| USDC, Southern California | 2005 | |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Lawrence General Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 12th day of September 2023.

*/s/ Tammy B. Webb*
Tammy B. Webb

# Exhibit B

Please note that ONLY THIS FORM FILLED OUT ON THE WEBSITE WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Tammy B. Webb**
Email address: **tbwebb@shb.com**
Complete Business/Mailing Address:

**Tammy B. Webb**
**Shook, Hardy and Bacon LLP**
**555 Mission Street, Suite 2300**
**San Francisco, CA 94105**

Board of Bar Overseers
Administrative Use Only

Date Received: 08-31-23

Amount Paid: $355.00

Date confirmation mailed: 08-31-23

RECEIVED
AUG 3 1 2023
Massachusetts Board of Bar Overseers Registration Dept.

Business phone: **(415) 544-1900**

Court in which pro hac vice admission is sought: **Suffolk Superior Court**

Contact number for court: **(617) 788-8175**

Party to be represented: **Lawrence General Hospital**

Docket number of case (if available): **2384CV00728– BLS1**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | California | 227593 |
| State | Missouri | 48161 |
| Federal | USDC, Central California | 227593 |
| Federal | USDC, Southern California | |
| Federal | USDC, Northern California | |
| Federal | US Court of Appeals, Ninth Circuit | |

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Tammy Webb

**Signature** (Please sign inside box above.) **Date: 08/25/2023**

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 9/29/2023 4:13 PM
Superior Court - Suffolk
Docket Number 2384CV00728

10·04

18

ML

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV00728–BLS1

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

10-3-23 ALLOWED The court is not available on Oct. 20th or 23rd but the clerk will reschedule. H. Kazanjian J.

**UNOPPOSED MOTION TO RESCHEDULE OCTOBER 5, 2023 HEARING**

Defendant Lawrence General Hospital respectfully moves to reschedule the October 5, 2023, Rule 12 hearing. In support of this Motion, the Parties state:

1. There is an in-person Rule 12 hearing scheduled for October 5, 2023, regarding Defendant's Motion to Dismiss. Dkts. 11, 12.

2. Counsel for Defendant is traveling for and participating in a hearing in Kansas City, Missouri, the same week as the October 5, 2023, hearing date and accordingly asks that it be rescheduled. Counsel for all parties are available on October 20th and October 23rd if those dates are available on the Court's calendar. Alternatively, the parties will confer with the Court's clerk to identify dates when the Court is available.

3. Counsel for Defendant conferred with Plaintiff's counsel, who does not oppose this Motion.

The Parties respectfully request that the Court reschedule the October 5, 2023.

Dated: September 29, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

*/s/Emyr T. Remy*
Emyr T. Remy, BBO# 704156
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411
remy@shb.com

Tammy B. Webb (*pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
tbwebb@shb.com

Anna A. Gadberry (*pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

Frederick S. Rudesheim, III (*pro hac vice* forthcoming)
SHOOK, HARDY & BACON L.L.P.
18000 K Street NW, Suite 100
Washington, D.C. 20006
Tel: (202) 639-5635
frudesheim@shb.com

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/Emyr T. Remy*
Emyr T. Remy

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

Date Filed 10/18/2023 1:31 PM
Superior Court - Suffolk
Docket Number 2384CV00728

10.20

Notify

19

10/24/23: Allowed (Ricciuti, J) Attest! B... Asst Clerk

kg

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT FREDERICK S. RUDESHEIM, III *PRO HAC VICE***

Defendant, Lawrence General Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Frederick S. Rudesheim, III *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Lawrence General Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Rudesheim possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Lawrence General Hospital in this matter.

3. The Declaration of Frederick S. Rudesheim, III is attached hereto as **Exhibit A,** indicating that (1) he is a member in good standing in every jurisdiction in which he is admitted to practice, (2) there are no disciplinary proceedings against him as a member of the bar in any

jurisdiction, and (3) the jurisdictions in which Attorney Rudesheim is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B**.

WHEREFORE, Defendant, Lawrence General Hospital respectfully requests that the court grant leave for Frederick S. Rudesheim, III to appear and practice *pro hac vice* in the above-captioned matter.

Dated: October 18, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

By its attorneys,

*/s/ Emyr T. Remy*
Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

On October 4, 2023, counsel for Defendants communicated with counsel for Plaintiff in this matter concerning Lawrence General Hospital's intention to file this motion. Counsel for Plaintiff in this matter advised Defendants that they assent to the motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

DOCKET NO. 2384CV00728–BLS1

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on October 18, 2023 a true copy of the above document was served by email upon:

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**DECLARATION OF FREDERICK S. RUDESHEIM, III**

I, Frederick S. Rudesheim, III depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy and Bacon LLP, 1800 K Street NW, Suite 1000, Washington, D.C. 20006. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Lawrence General Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| Tennessee | 2017 | 035680 |
| USDC, Middle Tennessee | 2023 | |
| United States Supreme Court | 2021 | |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Lawrence General Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 18th day of October 2023.

*/s/ Frederick S. Rudesheim, III*
Frederick S. Rudesheim, III

# Exhibit B

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Frederick S. Rudesheim, III**
Email address: **frudesheim@shb.com**
Complete Business/Mailing Address:

**Frederick S. Rudesheim, III**
**1800 K Street NW**
**Suite 1000**
**Washington, D.C. 20006**

Board of Bar Overseers
Administrative Use Only

Date Received: 10-06-23
Amount Paid: $355.00
Date confirmation mailed: 10-06-23

Business phone: **(202) 639-5635**

Court in which pro hac vice admission is sought: **Suffolk Superior Court**

Contact number for court: **(617) 788-8175**

Party to be represented: **Lawrence General Hospital**

Docket number of case (if available): **2384CV00726- BLS1**

RECEIVED
OCT 6 - 2023
Massachusetts Board of Bar Overseers Registration Dept.

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Tennessee** | **035680** |
| **Federal** | **USDC, Middle Tennessee** | |
| **Federal** | **United States Supreme Court** | |

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

**Signature** (Please sign inside box above.) **Date: 9/28/2023**

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

20

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**TARA D. KENNEDY *PRO HAC VICE***

Defendant Lawrence General Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this Court pursuant to G.L. c. 221, § 46A for an Order admitting Tara D. Kennedy *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Lawrence General Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Kennedy possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Lawrence General Hospital in this matter;

3. The Declaration of Tara D. Kennedy is attached hereto as **Exhibit A**, indicating that (1) she is a member in good standing in every jurisdiction in which she is admitted to practice, (2) there are no disciplinary proceedings against her as a member of the bar in any

jurisdiction, and (3) the jurisdictions in which Attorney Kennedy is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B**.

WHEREFORE, Defendant Lawrence General Hospital respectfully requests that the Court grant leave for Tara D. Kennedy to appear and practice *pro hac vice* in the above-captioned matter.

Dated: October 25, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

By its attorneys,

*/s/ Emyr T. Remy*
Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

On October 13, 2023, counsel for Defendant communicated with counsel for Plaintiff in this matter concerning Lawrence General Hospital's intention to file this motion. Counsel for Plaintiff in this matter advised Defendant that they assent to the motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

DOCKET NO. 2384CV00728–BLS1

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on October 25, 2023 a true copy of the above document was served by email upon:

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com
*Attorney for Plaintiff*

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**DECLARATION OF TARA D. KENNEDY**

I, Tara D. Kennedy, depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy & Bacon L.L.P., 111 South Wacker Drive, Suite 4700, Chicago, IL 60606. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Defendant Lawrence General Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| State of Illinois | 2015 | 6320909 |
| U.S. Court of Appeals, Seventh Circuit | 2019 | 6320909 |
| U.S. District Court, Northern District of Illinois | 2016 | 6320909 |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Lawrence General Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 25th day of October, 2023.

*/s/ Tara D. Kennedy*
Tara D. Kennedy

# Exhibit B

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Tara D. Kennedy**
Email address: **tkennedy@shb.com**
Complete Business/Mailing Address:

**Tara D. Kennedy**
**Shook, Hardy & Bacon L.L.P.**
**111 South Wacker Drive, Suite 4700**
**Chicago, IL 60606**

Board of Bar Overseers
Administrative Use Only

Date Received: 10-25-23
Amount Paid: $355.00
Date confirmation mailed: 10-25-23

Business phone: **(312) 704-7700**

Court in which pro hac vice admission is sought: **Superior Court of Suffolk County, Massachusetts**

RECEIVED
OCT 25 2023
Massachusetts Board of Bar Overseers Registration Dept.

Contact number for court: **(617) 788-8175**

Party to be represented: **Defendant Lawrence General Hospital**

Docket number of case (if available): **2384CV00728 BLS1**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | State of Illinois | 6320909 |
| Federal | United States Court of Appeals for the Seventh Circuit | 6320909 |
| Federal | U.S. District Court for the Northern District of Illinois | 6320909 |

I certify that (check one): ( ☐ ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (☑) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

Signature (Please sign inside box above.)

Date: October 11, 2023

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-3-9

Date Filed 11/16/2023 11:16 AM
Superior Court - Suffolk
Docket Number 2384CV00728

11:20 21

ML NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV00728–BLS1

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**ASSENTED-TO MOTION FOR LEAVE TO ADMIT**
**JESSICA N. WAHL *PRO HAC VICE***

Defendant, Lawrence General Hospital, by and through its attorney of record, Emyr T. Remy, hereby moves this court pursuant to G.L. c. 221, § 46A for an Order admitting Jessica N. Wahl *pro hac vice* for the purpose of appearing and practicing in the above-captioned matter. In support of this motion, Emyr T. Remy states as follows:

1. I am counsel of record for Lawrence General Hospital in this matter, and I am a member in good standing of the bar of this court;

2. Attorney Wahl possesses detailed knowledge of specific relevant issues that will be invaluable in connection with the representation of Lawrence General Hospital in this matter.

3. The Declaration of Jessica N. Wahl is attached hereto as **Exhibit A**, indicating that (1) she is a member in good standing in every jurisdiction in which she is admitted to practice, (2) there are no disciplinary proceedings against her as a member of the bar in any jurisdiction, and (3) the jurisdictions in which Attorney Wahl is admitted grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts; and

11-20-23 ALLOWED. H. Kazanjian, J.

4. The required *pro hac vice* fee of $355 has been sent to the Board of Bar Overseers in accordance with SJC Rule 3:15. Proof of payment is attached hereto as **Exhibit B**.

WHEREFORE, Defendant, Lawrence General Hospital respectfully requests that the court grant leave for Jessica N. Wahl to appear and practice *pro hac vice* in the above-captioned matter.

Dated: November 16, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

By its attorneys,

*/s/ Emyr T. Remy*
Emyr T. Remy (BBO# 740156)
SHOOK, HARDY & BACON L.L.P
One Federal St., Suite 2540
Boston, MA 02110
Telephone: (617) 531-1677
remy@shb.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M Buckley
Asst. Clerk

**RULE 9C CERTIFICATE OF CONFERENCE WITH COUNSEL**

On November 2, 2023, counsel for Defendants communicated with counsel for Plaintiff in this matter concerning Lawrence General Hospital's intention to file this motion. Counsel for Plaintiff in this matter advised Defendants that they assent to the motion.

*/s/ Emyr T. Remy*
Emyr T. Remy

DOCKET NO. 2384CV00728–BLS1

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on November 16, 2023 a true copy of the above document was served by email upon:

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com
*Attorney for Plaintiff*

*/s/ Emyr T. Remy*
Emyr T. Remy

# Exhibit A

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**DECLARATION OF JESSICA N. WAHL**

I, Jessica N. Wahl, depose and state as follows:

1. I am an attorney with the law firm of Shook, Hardy and Bacon LLP, 2049 Century Park East, #3000, Los Angeles, CA 90067. I make this affidavit in support of my petition to be admitted *pro hac vice* as counsel to Lawrence General Hospital in this action.

2. I am an active member in good standing and currently eligible to practice law in the following jurisdictions:

| Jurisdiction | Year Admitted | Bar No. |
|---|---|---|
| California | 2018 | 321887 |
| Texas | 2016 | 24102618 |

3. There are no disciplinary proceedings pending against me as a member of the bar in any jurisdiction.

4. I am informed and believe that the bars of which I am a member grant like *pro hac vice* privileges to members of the bar of the Commonwealth of Massachusetts.

WHEREFORE, I respectfully request that I be admitted *pro hac vice* to act as counsel for Defendant Lawrence General Hospital for all purposes in this action.

Signed under the pains and penalties of perjury this 16th day of November 2023.

*/s/ Jessica N. Wahl*
Jessica N. Wahl

# Exhibit B

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Jessica N. Wahl**
Email address: **tkennedy@shb.com**
Complete Business/Mailing Address:

**Jessica N. Wahl**
**Shook, Hardy & Bacon L.L.P.**
**2049 Century Park East, #3000**
**Los Angeles, CA 90067**

Board of Bar Overseers
Administrative Use Only

Date Received: 11-03-23

Amount Paid: $355.00

Date confirmation mailed: 11-03-23

Business phone: **(424) 285-8330**

Court in which pro hac vice admission is sought: **Superior Court of Suffolk County, Massachusetts**

Contact number for court: **(617) 788-8175**

RECEIVED

NOV - 1

Party to be represented: **Defendant Lawrence General Hospital**

Docket number of case (if available): **2384CV00728–BLS1**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **California** | **321887** |
| **State** | **Texas** | **24102618** |

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Jessica N Wahl

**Signature** (Please sign inside box above.)

**Date: October 25, 2023**

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Date Filed 11/9/2023 4:27 PM
Superior Court - Suffolk
Docket Number 2384CV00728

BC

22

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| JANE DOE,<br>For herself and the Class,<br>v.<br>LAWRENCE GENERAL HOSPITAL,<br>Defendant. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION<br>CIVIL ACTION NO. ~~2834~~ 2384-CV-00728-BLS1 |

## JOINT STIPULATION AND PROPOSED ORDER TO STAY ALL PROCEEDINGS PENDING INTERLOCUTORY APPEAL IN RELATED CASES

Plaintiff Jane Doe ("Plaintiff") and Defendant Lawrence General Hospital ("Defendant," and with Plaintiff, the "Parties") move to stay this case pending completion of the appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1). In support of this joint motion, the Parties state as follows:

Plaintiff filed her Complaint on March 27, 2023. Defendant served a motion to dismiss on June 12, 2023; Plaintiff opposed the motion, and Defendant filed the Rule 9A package for the motion on August 15, 2023. The Court has not yet held a hearing on Defendant's motion.

On October 31, 2023, the Court denied the motions to dismiss in *Beth Israel* and *New England Baptist.* The Court also decided to report its decisions denying the motions to dismiss in those cases to the Massachusetts Appeals Court for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a). The issues raised in the *Beth Isreal* and *New England Baptist* appeals overlap with the issues in this case, including those presented through Defendant's pending motion to dismiss.

The Parties have conferred and agreed to stay all Superior Court proceedings in this matter pending completion of the appeals in *Beth Israel* and *New England Baptist* and that the stay should remain in place and be lifted only after the completion of those appeals.

Date Filed 11/9/2023 4:27 PM
Superior Court - Suffolk
Docket Number 2384CV00728

Accordingly, the Parties stipulate and agree, subject to the Court's approval, that:

1. All Superior Court proceedings, time standards, and deadlines in this matter should be stayed during the pendency of the appeals in *Beth Isreal* and *New England Baptist.*

2. No discovery requests or responses will be exchanged between the Parties during the pendency of the stay, including (without limitation) interrogatories, requests for the production of documents/data, or deposition notices.

3. Fourteen days after the completion of the appeals in the *Beth Isreal* and *New England Baptist* (including the exhaustion or expiration of any rights to rehearing, reconsideration, or further appellate review), this stay shall be automatically lifted, and the Parties may then proceed with further litigating the case in this Court, to the extent consistent with the outcome of the appeal.

Respectfully submitted,

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

*/s/ Emyr T. Remy*
SHOOK, HARDY & BACON L.L.P.
Emyr T. Remy (BBO# 704156)
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
remy@shb.com

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
Michael Joseph Donovan Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

Dated: November 9, 2023

The Court hereby approves the Parties' Joint Stipulation above and so orders.

[signature]
Associate Justice, Superior Court
Commonwealth of Massachusetts

Entered: Jan 19, 2024

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>For herself and the Class,<br><br>v.<br><br>LAWRENCE GENERAL HOSPITAL,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00728-BLS1<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, Lawrence General Hospital ("Lawrence General"), including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Specifically, Lawrence General aided in the interception of communications between Plaintiff and other Class Members (defined below) and Lawrence General through a website maintained by Lawrence General (the "Lawrence General Website").

2. Lawrence General aided Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies to secretly intercept healthcare consumers' communications with Lawrence General by injecting hidden code into the Lawrence General Website.

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of both Jane Doe and the minor children of Jane Doe. Ms. Doe's identity has been disclosed to counsel for the Defendant per the Court's order of March 28, 2023.

That hidden code enabled Google, Facebook, and other third parties to eavesdrop on healthcare consumers' communications with Lawrence General. Those third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals known to Google and Facebook. Google and Facebook could then use the contents of the intercepted communication for their own commercial purposes, such as serving personalized advertisements to healthcare consumers based on the contents of the secretly intercepted communications.

3. Healthcare consumers' electronic communications with Lawrence General were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent, including through tracking technologies hidden on many webpages of the Lawrence General Website that permitted third parties to intercept Private Information, including, without limitation, requests for information on particular conditions and treatments, keyword searches, doctor searches, and access to bill payment portions of the website that confirm patient status. Those interceptions enabled the third parties to know that a specific patient was seeking confidential medical care and to know about the nature of that medical care. That recipient, in turn, sells Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies.

4. Lawrence General did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with Lawrence General, nor did Lawrence General seek or obtain their consent for such interception. On the contrary, Lawrence General **falsely** told healthcare consumers, through their published online privacy policy, that it did **not** share such information.

5. Lawrence General owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore,

by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Lawrence General assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

6. Despite the privacy healthcare consumers expect when they communicate with medical providers, Lawrence General chose to put its business interests over the privacy of its patients. The unilateral disclosure of users' Private Information in this manner violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), among other statutory and common laws.

7. As described more fully below, Plaintiff and Class Members have suffered injury as a result of Lawrence General's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their Private Information.

8. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence,

breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

9. In light of the Supreme Judicial Court's decision, which Plaintiff recognizes implicates her claim here under the Massachusetts Wiretap Act, Plaintiff now amends her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

10. The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. Here, Lawrence General intercepted the electronic communications at issue in a manner that violated HIPAA. The ECPA thus provides a private remedy for Lawrence General's interception of electronic communications, enforceable against both the intercepting party and any party that aids such an interception.

11. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the Lawrence General Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

**PARTIES**

12. Plaintiff is a resident of Burlington, Massachusetts. Plaintiff is a patient of Lawrence General. Plaintiff regularly used the Lawrence General Website to (i) obtain information about Lawrence General doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; (iii) obtain information about Lawrence General's locations; and (iv) obtain and review her medical records through the website's patient portal.

13. As described below, Lawrence General implemented tracking technologies that intercepted communications between Lawrence General and healthcare consumers on nearly every page of the Lawrence General website. The webpages Plaintiff visited on the Lawrence General Website were among the webpages on which Lawrence General embedded code for various tracking technologies, including Meta Pixel and Google Analytics. *See* ¶¶ 91-95, *infra* (tracking technologies embedded on pages relating to doctors); ¶¶ 81-88, *infra* (tracking technologies embedded on pages about medical procedures).

14. Plaintiff did not consent to or authorize the use of Private Information by third parties or Lawrence General enabling third parties to access and use such Private Information.

15. Defendant Lawrence General Hospital is a corporation that operates in Lawrence, Massachusetts, and the surrounding area. Its functions include providing healthcare services including at its main campus in Lawrence, Massachusetts. Lawrence General maintains and controls the content of the Lawrence General Website.

**JURISDICTION**

16. The exercise of personal jurisdiction over Lawrence General is proper according to M.G.L. c. 223 § 3 because, among other things, Lawrence General is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of Lawrence General's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### Lawrence General and Its Website

17. Lawrence General operates a hospital in Lawrence, Massachusetts, and several outpatient service locations, including in Lawrence, Andover, and Methuen. Lawrence General offers inpatient and outpatient care to residents near Lawrence and surrounding communities north of Boston. Lawrence General provides healthcare across various specialties, including heart and vascular care, orthopedics, cancer care, post-COVID recovery, surgery, obstetrics and gynecology, and trauma care.

18. Lawrence General maintains the Lawrence General Website for its hospital and outpatient facilities, found at https://www.lawrencegeneral.org/. Through that website, healthcare consumers can obtain information about the services Lawrence General provides, including information about doctors, services, and treatments provided by Lawrence General for particular medical conditions.

19. The Lawrence General Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The Lawrence General Website provides general information about Lawrence General.

(b) The Lawrence General Website provides information about healthcare services provided at Lawrence General, communicated through service-specific pages for a range of services such as "OB/GYN," "Cancer Center," "Stroke Care," and "Surgical Services," among many others.

(c) The Lawrence General Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(d) The Lawrence General Website permits healthcare consumers to access and pay bills online.

(e) The Lawrence General Website lets healthcare consumers access their private medical information online through the Patient Portal.

20. Because the Lawrence General Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the Lawrence General Website**

21. Healthcare consumers in Massachusetts have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Lawrence General Website.

22. Users of healthcare-related websites such as the Lawrence General Website have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as Lawrence General will not share with third parties their communications with Lawrence General without their consent.

23. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Lawrence General from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as Lawrence General from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

24. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including Lawrence General, which reveal information about that individual's

personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

25. The expectations and understanding of users of the Lawrence General Website was informed by what Lawrence General told them about how it handles their personal information.

26. During the class period, the Lawrence General Notice of Privacy Rights and Practices specifically focused on how Lawrence General treats "medical information" about patients, including the limited circumstances in which such information may be disclosed to third parties, such as "for law enforcement" and "to coroners, medical examiners and funeral directors." Lawrence General did not disclose that it shares any information or communications (medical or otherwise) with technology or social media companies such as Google and Facebook.

27. The same policy stated: "Except as otherwise permitted by law, all other uses and disclosures not described above will require your signed authorization." At no point has Lawrence General obtained any signed authorization from Plaintiff or other Class Members to share with technology and social media companies such as Google and Facebook the communications between Plaintiff and other Class Members and Lawrence General.

28. When a person visited the Lawrence General Website during the class period, a popup appeared at the bottom of the page that said: "By continuing to browse, you consent to our use of cookies. To know more, please refer to our Privacy Policy." The linked "Privacy Policy," however, was the Notice of Privacy Rights and Practices described above. That notice did not discuss cookies, and it certainly did not discuss or disclose any third-party tracking technologies such as those described in this complaint. Moreover, as described more fully below, the tracking technologies described in this complaint, such as Google Analytics and Meta Pixel, are not "cookies."

29. Disclosure of the use of "cookies" did **not** implicitly or explicitly disclose that communications are intercepted or shared with any third parties. Many cookies do not involve any

interaction with parties other than the website and website user. For example, websites often use a cookie to track when a user is logged into the website. No third-party interceptions are involved in such a use of a cookie, and the communication may remain entirely between the website user and the website. Accordingly, merely disclosing the use of "cookies" does not equal disclosure of any interception of communications by any third party (i.e., a party other than the website and the website user).

30. During the class period, the Lawrence General Website also contained a page called "Legal," which included various disclosures, such as information about the copyright of the website's contents and disclosures about Lawrence General's lack of control over the content of external websites linked from the Lawrence General Website. That "Legal" page stated: "This site maintains policies concerning the use of information gathered from site visitors. For more information, please visit the Privacy Policy, via the link provided at the base of our home page." But, the Privacy Policy referenced was the Notice of Privacy Rights and Practices, which did not discuss Lawrence General's practices or policies concerning any information they collect from visitors of the Lawrence General Website.

31. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by Lawrence General's deceptive statements on the Lawrence General Website. The interceptions of website users' communications with Lawrence General were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third-Parties Offering Tracking Technologies**

32. Plaintiff describes in this complaint various tracking technologies implemented on the Lawrence General Website that caused the secret interception, recording, and transmission of the contents of Class Members' internet communications with Lawrence General. The next section

presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Lawrence General and the purposes for which interceptions are made.

33. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

34. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

35. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

36. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

37. Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

[2] Facebook rebranded its parent company as "Meta" in October 2021.

38. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

39. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[3]

40. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

41. Google maintains detailed profiles of individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such as Gmail. Google maintains detailed profiles of individuals whether or not they have a Google account.

42. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

43. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner

[3] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

44. Another way Google collects information to build its detailed profiles on individuals is through its "Doubleclick" "activity tags." Doubleclick was previously an independent company, founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired Doubleclick in 2007 and now operates it as an advertising division of Google. The particular Doubleclick technology that Lawrence General uses that is important to Plaintiff's claim is called "activity tags." Activity tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like Meta Pixel, Google then associates the data collected through Doubleclick activity tags with particular individuals to serve targeted advertising on the individual and evaluate the efficacy of Google's advertising campaigns.

45. In summary, with respect to Google, although Google Analytics and Doublclick "activity tags" are distinct products with distinct purposes (Google Analytics is used to analyze website user behavior, and Doubleclick "activity tags" are used to optimize advertising), they both function in a similar manner, and they both intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and Doubleclick activity tags, and Google can and does use those intercepted communications for its own commercial purposes.

**Website Tracking Technologies on the Lawrence General Website**

46. Lawrence General injected hidden code into the Lawrence General Website that permitted third parties to contemporaneously intercept healthcare consumers' communications with Lawrence General. The tracking technologies permitted third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This included, for example, associating the content of the user's communications with Lawrence General with the website user's Facebook profile.

47. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Lawrence General, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

48. Lawrence General used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

49. Before describing how such technologies work, it is important to first define some basic technological terms.

50. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

51. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Lawrence General Website, as of the time of this complaint, is 35.173.24.203. When they connect to the internet, particular individuals also have their

own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

52. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the Lawrence General Website is https://www.lawrencegeneral.org/. URLs also often point to specific pages on that website. Sometimes, URLs will contain information about the particular webpage itself or the substance of the information communicated through it. Such URLs are called "descriptive" URLs. The Lawrence General Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communications made through a particular page on the Lawrence General Website. For example, the Lawrence General Website has a page specifically about the Lawrence General Cancer Care Center; that page's URL is https://www.lawrencegeneral.org/services-and-centers/cancer-care. One call tell from the URL itself the substance of the communication between Lawrence General and the healthcare consumer—that the consumer is requesting information about cancer care services from Lawrence General.

53. A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one way to associate particular communications between website users and Lawrence General with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies," each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

54. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform

various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

55. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Lawrence General) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

56. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

57. When the JavaScript code causes the user's web browser to retrieve a file from the third-party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.lawrencegeneral.org/services-and-centers/cancer-care); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the

website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

58. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google or Facebook can then add the content of the user's communications with Lawrence General to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

59. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

60. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and Lawrence General contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

61. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[4] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[5] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use. Lawrence General, however, continued to use Meta Pixel on its website without disclosing that fact to website users until several months after the initial complaint in this action was filed.

**Lawrence General's Use of Tracking Technologies on the Lawrence General Website**

62. During the class period, Lawrence General used various tracking technologies across the Lawrence General Website. Lawrence General injected several of those tracking technologies into the code of all, or almost all, of the pages within the Lawrence General Website. For example, on nearly every page of the Lawrence General Website, Lawrence General injected hidden code that loaded both Google Analytics and Meta Pixel.

63. Within a few months after the initial complaint was filed in this case, it appears Lawrence General significantly limited its use of Google Analytics, Meta Pixel, and other tracking technologies. The examples provided below of Lawrence General's deployment of Google Analytics, Meta Pixel, and other tracking technologies on the Lawrence General Website reflect such deployment

[4] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[5] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

around the time of the original complaint in this action. Lawrence General controls when and how it uses tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect Lawrence General's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

64. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

65. Below is an image of the main landing page for the Lawrence General Website:




66. When a user loads the main landing page for the Lawrence General Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

67. The image below depicts the landing page for the Lawrence General Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




68. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 1119799587
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2F
ul: en-us
de: UTF-8
dt: The%20Merrimack%20Valley%27s%20Premiere%20Health%20C
are%20Provider%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1351x979
je: 0
_u: YEBAAEABAAAAACAAI~
jid: 1011789919
gjid: 1108579961
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_r: 1
_slc: 1
gtm: 45He3360n81NWGNWGJ
z: 1073209687

69. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Lawrence General Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.lawrencegeneral.org"); and

(b) The title of the webpage (after the letters "dt," which includes "The Merrimack Vallely's Premier Healthcare Provider | Lawrence General Hospital").[6]

---

[6] When transmitting the intercepted communications to Google, certain characters are converted into HTML coding. For example, the "%20" code in between each word in the webpage title represents a

70. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Lawrence General).

71. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Lawrence General Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with Lawrence General with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

72. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for

space, while "%7C" represents the "|" character. The use of these HTML codes does not prevent Google from using the contents of the communication for its own commercial purposes.

example, a person with a Gmail account) and an individual visiting the Lawrence General Website are the same.

73. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[7] Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

74. Hidden code that Lawrence General has injected into its website also permits Google to intercept the same communication through Google's "Doubleclick" advertising tracker. The contents of the communication that Google intercepts are reflected below:

```
×  Headers  Preview  Response  Initiator  Timing
▾ General
  Request URL: https://8922500.fls.doubleclick.net/
  activityi;dc_pre=CMbe67Hz3P0CFXwKaAgde0oB8g;src=
  8922500;type=lawre0;cat=homep0;ord=987040495328
  2;gtm=45He33d0;auiddc=255103174.1678847352;~oref
  =https%3A%2F%2Fwww.lawrencegeneral.org%2F?
  Request Method: GET
  Status Code: 200
  Remote Address: 142.251.40.102:443
  Referrer Policy: strict-origin-when-cross-origin
```

That is, the fact that the user is visiting the main page of the Lawrence General Website is intercepted and transmitted to doubleclick.net (i.e., Google Doubleclick).

75. The same landing page for the Lawrence General Website injects hidden Meta Pixel code. Lawrence General has configured its website to load Meta Pixel as a "piggyback" on the Google

[7] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

Doubleclick code.[8] The hidden code Lawrence General injects into its website ultimately causes the user's browser to load a JavaScript file called "fbevents.js." That JavaScript code, in turn, causes the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Lawrence General Website. Below is an example of the contents of the communication between the website user and Lawrence General, which the hidden Meta Pixel code intercepts and transmits to Facebook:[9]

[8] *See* "Can I use Meta Pixel with my third-party tracking provider to track conversions?," available at https://www.facebook.com/business/help/421433191260652 (explaining how a website "can use the Meta Pixel with your third-party tracking provider (ex: DoubleClick)," enabling "[t]he Meta Pixel [to] piggyback and fire off of the existing [Doubleclick] pixel implementation[]").

[9] Because Lawrence General has configured the Meta Pixel code to "piggyback" on Google Doubleclick, the full URL intercepted and transmitted to Facebook contains a reference to "doubleclick.net" within it, but the same interecpted communication also contains the URL of the webpage visited—www.lawrencegeneral.org.

Date Filed 12/30/2024 1:54 PM
Superior Court - Suffolk
Docket Number 2384CV00728

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

id: 716870045313145
ev: homePage
dl: https://8922500.fls.doubleclick.net/ddm/fls/r/dc_pre=CIqqyID62f0CFacHaAgduioKdw;src=8922500;type=lawre0;cat=homep0;ord=3120045665262;gtm=45He3360;auiddc=2108806055.1678746487;~oref=https%3A%2F%2Fwww.lawrencegeneral.org%2F
rl: https://8922500.fls.doubleclick.net/
if: true
ts: 1678746488494
sw: 1920
sh: 1080
v: 2.9.98
r: stable
ec: 1
o: 28
it: 1678746488276
coo: false
rqm: GET

76. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Lawrence General Website, including the URL of the webpage visited. The interception and transmission to Facebook also included information about the user's browser configuration and various codes to associate the communications with Lawrence General's advertising account with Facebook.

77. Also, the JavaScript code for Meta Pixel causes the user's web browser to reveal the user's IP address to Facebook. This identifier permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can then use the contents

of communications between the website user and Lawrence General to serve personalized advertising to the website user in the future.

78. Moreover, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

79. The text fields communicated to Facebook by the Meta Pixel code also include a persistent identifier for each particular user. This allows Facebook to track that individual across the Lawrence General Website and further confirm that individual's real-world identity.

80. Lawrence General configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes. To maintain her medical privacy, Plaintiff does not describe in this complaint the specific pages she visited, but Plaintiff visited webpages within the categories of pages described below into which Lawrence General embedded Meta Pixel, Google Analytics, and other tracking technologies. Her communications with Lawrence General, including Private Information, were intercepted similarly to the illustrative examples set forth below.

81. The Lawrence General Website contains numerous subpages for specific "Services and Centers." For example, the Lawrence General Website contains a page entitled "Obstetrics and Gynecology (OB/GYN)," designed to inform the website user about OB/GYN services Lawrence General offers. By visiting this webpage, a user communicates that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user

communicates with Lawrence General by visiting this particular webpage, Lawrence General causes the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Obstetrics and Gynecology webpage:




82. The graphic below presents the contents of the communication between the website user and Lawrence General that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that Lawrence General secretly injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator »

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 2056702176
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fservices-and-centers%2Fservices-for-growing-families%2Fobstetrics-and-gynecology
ul: en-us
de: UTF-8
dt: Obstetrics%20and%20Gynecology%20(OB%2FGYN)%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1351x979
je: 0
_u: QACAAEABAAAAACAAI~
jid:
gjid:
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_slc: 1
gtm: 45He3360n81NHGNNG3
z: 700604266

83. As reflected in the above screenshot, the code injected into the Lawrence General Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Obstetrics and Gynecology" webpage on the Lawrence General Website—information that Google retains and can use for its own commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise.[10]

[10] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.

84. The same webpage contains hidden code that intercepts the user's communication with Lawrence General and transmits the same information to Facebook. The contents of the communication intercepted by Facebook when a user visits the Obstetrics and Gynecology page are depicted below:




As depicted above, Lawrence General aids the secret interception and transmission to Facebook of the contents of the communication between the website user and Lawrence General, including that the user is visiting an "Obstetrics and Gynecology" webpage on the Lawrence General Website, information that Facebook retains and can use for commercial purposes.

85. The Lawrence General Website contains dozens of similar pages on particular medical specialties and practices that Lawrence General offers. For each such page, the Lawrence General Website aids Google and Facebook's secret interception of the contents of communications with Lawrence General, similar to the above Obstetrics and Gynecology example.

86. The Lawrence General Website also contains pages for specific services offered by Lawrence General. By visiting such pages, a user signifies that the service may be relevant to them. For example, the Lawrence General Website has a webpage for community COVID testing, depicted below:




By visiting the page, the user signifies an interest in COVID testing, which could indicate the user or a person the user knows has been exposed to or is experiencing symptoms of COVID.

Date Filed 12/30/2024 1:54 AM
Superior Court - Suffolk
Docket Number 2384CV00728

87. When a website user visits the COVID testing page of the Lawrence General Website, the hidden Google Analytics code that Lawrence General has injected into its website intercepts that communication between the user and Lawrence General and transmits it to Google. The contents of the intercepted communication are depicted below(with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 1325307446
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fabout-us%2Fcovid-19-testing
ul: en-us
de: UTF-8
dt: Lawrence%20COVID-19%20Community%20Testing%20Center%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1332x979
je: 0
_u: QACAAEABAAAAACAAI~
jid: 910759338
gjid: 838257554
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_r: 1
_slc: 1
gtm: 45He3360n81NWGNWGJ
z: 2058612001

That is, hidden Google Analytics code intercepts the fact that the user is seeking "COVID-19 Community Testing" from Lawrence General Hospital, information Google retains and uses for its own commercial purposes.

88. Hidden Meta Pixel code that Lawrence General injected onto its website likewise intercepts communications between website users and Lawrence General concerning COVID testing. The contents of the same communication intercepted by Facebook are depicted below (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encoc

id: 716870045313145
ev: PageView
dl: https://8922500.fls.doubleclick.net/activityi;dc
re=CIOK22SC2v0CFUAHaAgdyokHgA;src=8922500;type=lawr
0;cat=covid0;ord=359683049914;gtm=45He3360;auiddc=2
6806055.1678746487;~oref=https%3A%2F%2Fwww.lawrence
neral.org%2Fabout-us%2Fcovid-19-testing?
rl: https://www.lawrencegeneral.org/
if: true
ts: 1678748677656
sw: 1920
sh: 1080
v: 2.9.98
r: stable
ec: 0
o: 28
cs_est: true
it: 1678748677442
coo: false
rqm: GET

That is, hidden Meta Pixel code causes the interception and transmission to Facebook of the contents of the communication that the user is seeking COVID-19 testing from Lawrence General Hospital, information Facebook retains and uses for its own commercial purposes.

89. The Lawrence General Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual

uses the search function for particular symptoms, conditions, or medical specialties offered by Lawrence General. When an individual uses the search function, Lawrence General aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "I'm pregnant."




90. When a user performs this search on the Lawrence General Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's precise search terms and transmit them to Google. Below is the portion of the communication Google Analytics code intercepts and transmits to Google (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 2102699953
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fsearch-results%3Fsearchtext%3DI%2527m%2520pregnant
ul: en-us
de: UTF-8
dt: Welcome%20to%20Lawrence%20General%20Hospital%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1332x979
je: 0
_u: QACAAEABAAAAACAAI~
jid:
gjid:
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_slc: 1
gtm: 45He3360n81NMGNMGJ
z: 238244722

As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google,[11] which Google can then use for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

[11] The "%2527" text between the "I" and "m" of the search terms is HTML code for an apostrophe; therefore, Google understands the precise search terms are "I'm pregnant," notwithstanding the garbled appearance of the search terms in the screenshot above.

91. The Lawrence General Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. By using the "Find a Doctor" function, the user communicates to Lawrence General that the user is a current or prospective patient. The screenshot below depicts the Find A Doctor page:




92. Depicted below are the contents of the user's communication with the Lawrence General website that are intercepted and transmitted to Google via hidden Google Analytics Code, intercepting that the user is searching for a Lawrence General doctor (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 1998164276
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Ffind-a-doctor
ul: en-us
de: UTF-8
dt: Find%20a%20Doctor%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1351x979
je: 0
_u: QACAAEABAAAAACAAI~
jid: 2082247815
gjid: 1463799224
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_r: 1
_slc: 1
gtm: 45He3360n81NWGNWGJ
z: 1996879824

93. Communications on the Find-A-Doctor function are likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook can then associate the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Below is a screenshot of the contents of the communication intercepted through Meta Pixel code on the same Find-a-Doctor page (with highlighting added);

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encod

id: 716870045313145
ev: PageView
dl: https://8922500.fls.doubleclick.net/activityi;dc
re=CLy83b792f0CFaMKaAgdXnMDoQ;src=8922500;type=lawr
0;cat=finda0;ord=2406474706227;gtm=45He3360;auiddc=
08806055.1678746487;~oref=https%3A%2F%2Fwww.lawrenc
eneral.org%2Ffind-a-doctor?
rl: https://www.lawrencegeneral.org/
if: true
ts: 1678747423506
sw: 1920
sh: 1080
v: 2.9.98
r: stable
ec: 0
o: 28
cs_est: true
it: 1678747423326
coo: false
rqm: GET

94. When a user performs a search on the Find-a-Doctor page and then views information about a particular doctor, that communication between the user and Lawrence General is intercepted and transmitted to Google via hidden Google Analytics code. For example, the page below shows a nurse practitioner at Lawrence General who appears upon a search for OB/GYN doctors:




95. The screenshot below depicts the contents of the communication between the website user and Lawrence General that are secretly intercepted by and sent to Google via hidden Google Analytics code:

× Headers Payload Preview Response »
▾ Query String Parameters view source view decoded
v: 1
_v: j99
a: 2078935305
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Ffind-a-doctor%2Fphysician-bio%2Fkathleen%2520absalom
ul: en-us
de: UTF-8
dt: Find%20a%20Doctor%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1351x979
je: 0
_u: QACAAEABAAAAACAAI~
jid: 1882932053
gjid: 1053400170
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_r: 1
_slc: 1
gtm: 45He3360n81NWGNWG1
z: 1773238470

That is, the fact that the user performed a find-a-doctor search and then viewed information about OB/GYN practitioner Kathleen Absalom is intercepted and transmitted to Google.

96. The Lawrence General website also contains a section permitting patients to pay bills they received from Lawrence General. The "Pay Your Bill Online" page of the Lawrence General Website is depicted below:




97. When a user visits this page, the user communicates that the user is an individual who has received medical services from Lawrence General. That communication with Lawrence General is intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication that are intercepted by and transmitted to Google are depicted below (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decoded

v: 1
_v: j99
a: 1665508897
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fyour-visit%2Fbilling-and-financial-assistance%2Fpay-your-bill
ul: en-us
de: UTF-8
dt: Lawrence%20General%20Hospital%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1332x979
je: 0
_u: QACAAEABAAAAACAAI~
jid:
gjid:
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_slc: 1
gtm: 45He3360n81NWGNMG3
z: 1408432447

As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is visiting the "Billing and Financial Assistance" page and is attempting to "pay" a "bill" owed to Lawrence General Hospital. Google retains this intercepted communication and may use it for its own commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

98. In addition to Google and Facebook, Lawrence General enables or has, during the class period, enabled communications between healthcare consumers and Lawrence General to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Simpli.fi.** Simpli.fi is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Lawrence General has inserted hidden code into their website that causes communications between the user and the website to be intercepted by and transmitted to Simpli.fi. According to Simpli.fi's manuals, websites such as Lawrence General that use Simpli.fi "tags" do so by injecting hidden "snippets of HTML code" into their website that "enable Simpli.fi to record user visits to a website" and "add users to specific [advertising] audiences based on the URL(s) the users view."

(b) **Yahoo Analytics.** Yahoo Analytics is a service similar to Google Analytics. It markets itself as providing "advertising insights" based on its tracking technologies, which it uses to "recognize, associate, and collect data about visitors" to websites that inject Yahoo Analytics code. Lawrence General injected hidden Yahoo Analytics code into the Lawrence General Website during the class period. Yahoo Analytics functions similarly to Google Analytics in using hidden code to secretly intercept and transmit to Yahoo Analytics the contents of website users' communications with Lawrence General through the Lawrence General Website.

(c) **Tapad.** Tapad offers a tracking technology designed to track users across devices for advertising purposes. It uses algorithms to analyze internet and device data and predict whether two or more devices are owned by the same person. Participating websites and apps then cater their advertisements based on a collective knowledge of the user's actions across all of their devices. During the class period, Lawrence General inserted hidden Tapad tracking code that intercepted communications between website users and Lawrence General and transmitted the content of those communications to Tapad.

**<u>The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary</u>**

99. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Lawrence General Website's operation. The Lawrence General Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

100. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example,

a website can contain links to its Facebook profile or invite website users to interact with Lawrence General via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

101. Moreover, even if Lawrence General wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Lawrence General (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that Lawrence General does not share the communications with others when it does; or (iii) to claim that Lawrence General maintains the privacy of those communications when it does not.

**Lawrence General Violated HIPAA and the FTC Act.**

102. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[12]

103. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or the Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

104. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect

[12] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

105. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[13]

106. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"'; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

107. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

[13] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

108. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

109. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

110. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[14]

111. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[15]

[14] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.13.
[15] Marketing,
https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

112. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[16]

113. In other words, the HHS has expressly stated that entities like Lawrence General that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

114. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

115. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that

[16] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

116. The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

117. Lawrence General's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

118. Lawrence General is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

119. Lawrence General's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties without their authorization.

120. Lawrence General improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, and (c) patients' status as patients of Lawrence General by using tracking technologies on webpages designed for patients, including the bill payment page.

121. For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on her doctors and medical procedures, Lawrence General permitted third parties to intercept such information about Plaintiff's doctors and specific treatments connected to her, which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

122. Lawrence General improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Lawrence General disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

123. Lawrence General violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

124. Lawrence General further violated other HIPAA regulations as follows:

(d) Lawrence General failed to ensure the confidentiality and integrity of electronic PHI that Lawrence General created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(e) Lawrence General failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(f) Lawrence General failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Lawrence General in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(g) Lawrence General failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(h) Lawrence General failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(i) Lawrence General failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

125. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[17]

126. Lawrence General's undisclosed use of tracking technologies on their website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, Lawrence General's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

127. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[18]

128. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.

---

[17] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

[18] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

129. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

130. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[19]

131. Last year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[20]

---

[19] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[20] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

**Lawrence General Violated Industry Standards**

132. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

133. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

134. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

135. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

136. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[21]

137. Lawrence General, through the conduct described in this complaint, violated the AMA Code of Medical Ethics by gathering and recording information about patients that Lawrence General

[21] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

**Plaintiff and Class Members Suffered Harm from Lawrence General's Unlawful Interceptions and Disclosures of Plaintiff's and Class Member's Private Information**

138. As a direct and proximate cause of Lawrence General's unauthorized interceptions and disclosures of Plaintiff's and Class Member's Private Information, Plaintiff and Class Members have been damaged by Lawrence General's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) Lawrence General denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used Lawrence General's services or would have demanded compensation for Lawrence General's use of their Private Information if they had known of Lawrence General's practices;

(d) Lawrence General eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Member's rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) Lawrence General took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) Lawrence General's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

**Class Action Allegations**

139. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.lawrencegeneral.org between three years prior to the date of the filing of the initial complaint in this action and April 30, 2024.

140. This action is properly maintainable as a class action.

141. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

142. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Lawrence General, through the Lawrence General Website, were electronic communications under the ECPA;

(b) Whether Lawrence General inserted tracking technologies into the hidden code of the Lawrence General Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the Lawrence General Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Lawrence General and users of the Lawrence General Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Lawrence General installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and Lawrence General;

(g) Whether and to what extent Lawrence General had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether Lawrence General had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(i) Whether the promises made in Lawrence General's Notice of Privacy Rights and Practices either were or formed part of a contract between Lawrence General and Plaintiff and Class Members;

(j) Whether Lawrence General's disclosure of Plaintiff's and Class Members' IHII and PHI breached Lawrence General's promises set forth in its Notice of Privacy Rights and Practices, giving rise to liability for breach of contract;

(k) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of action to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

143. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Lawrence General Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

144. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

145. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

146. Lawrence General has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

### (Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)

147. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

148. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

149. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and Lawrence General, through the Lawrence General Website, were electronic communications under the ECPA.

150. The tracking technologies inserted into the hidden code of the Lawrence General Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the Lawrence General Website; (ii) Class Members' web browsers used to access the Lawrence General Website; (iii) Lawrence General's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the Lawrence General Website.

151. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Lawrence General and users of the Lawrence General Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

152. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Lawrence General configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Lawrence General, including by using

and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Lawrence General), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputted by healthcare consumers. Lawrence General also used tracking technologies on pages that would confirm to third parties such as Google and Facebook the user's likely status as Lawrence General patients.

153. With respect to Plaintiff, the tracking technologies revealed information regarding Plaintiff's doctors and treatments by revealing the substance of communications on Lawrence General webpages regarding such doctors and treatments.

154. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Lawrence General intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

155. Additionally, through the above-described tracking technologies, after Lawrence General intercepted communications, the intercepted information was, in turn, used by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

156. Lawrence General facilitated the interception of communications between the Class Members and Lawrence General, and Lawrence General disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

157. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

158. Lawrence General intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

159. Because of Lawrence General's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Defendant does not qualify for the party exemption.

160. As alleged above, Lawrence General violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

161. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

162. Plaintiff's Private Information that Lawrence General disclosed to third parties qualifies as IIHI, and Lawrence General violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Lawrence General used the intercepted electronic communications to increase its revenues.

163. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Lawrence General specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

164. Lawrence General's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

165. Lawrence General's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Lawrence General's use of the Facebook source code was for Lawrence General's commercial advantage to increase revenue from existing patients and gain new patients.

166. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

167. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Lawrence General's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

**COUNT II**

**(Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)**

168. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

169. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

170. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

171. Lawrence General had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

172. Plaintiff and Class Members did not authorize Defendant to disclose their IHII to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment.

173. Lawrence General distributed Plaintiff's and Class Members' Private Information to unauthorized third parties to market its services and increase profits, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, Lawrence General's conduct reflected a public disclosure of private facts.

174. Additionally, Lawrence General's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive.

175. Lawrence General's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

176. Plaintiff and Class Members suffered injuries as a direct and proximate result of Lawrence General's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

177. Lawrence General's acts or omissions violate the Massachusetts Right to Privacy Act.

178. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 138, *supra*), plus costs and attorneys' fees.

**COUNT III**

**(Breach of Fiduciary Duty, on behalf of the Class)**

179. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

180. A fiduciary relationship existed between Lawrence General, a healthcare provider, and Plaintiff, a Lawrence General patient. Furthermore, Lawrence General assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff.

181. When possessing nonpublic medical information, medical providers such as Lawrence General have a duty to keep such information completely confidential.

182. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Lawrence General through its website, which included highly sensitive Private Information. Lawrence General's policies bolstered that expectation, given Lawrence General's promises to Plaintiff that Lawrence General would not disclose medical information and communications to third parties.

183. Contrary to its duties as a healthcare provider and its express promises of confidentiality, Lawrence General installed the tracking technologies to disclose and transmit to third

parties Plaintiff's and Class Members' Private Information, including information relating to their healthcare.

184. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

185. Lawrence General's secret and unauthorized disclosures of Plaintiff's Private Information constituted a breach of Lawrence General's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

186. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 138, *supra*).

**COUNT IV**

**(Negligence, on behalf of the Class)**

187. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

188. Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Lawrence General owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

189. Lawrence General breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

190. It was reasonably foreseeable that Lawrence General's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

191. Lawrence General's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between Lawrence General and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

192. In addition, Lawrence General had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

193. Lawrence General's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

194. Lawrence General's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted negligence at common law.

195. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 138, *supra*), plus costs and attorneys' fees.

## COUNT V

**(Breach of Confidence, on behalf of the Class)**

196. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

197. Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

198. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

199. When possessing nonpublic medical information, medical providers such as Lawrence General have a duty to keep such information completely confidential.

200. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Lawrence General through its website, which included highly sensitive Private Information. Lawrence General's policies bolstered that expectation, given Lawrence General's promises to Plaintiff that Lawrence General would not disclose communications on the website to third parties without Plaintiff's signed authorization.

201. In light of the special relationship between Lawrence General and Plaintiff and Class Members, whereby Lawrence General became a guardian of Plaintiff's and Class Members' Private Information, Lawrence General became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3)

to maintain complete and accurate records of what patient information (and where) Lawrence General did and does store and disclose.

202. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Lawrence General installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with Lawrence General and the contents of those communications, including Private Information.

203. Lawrence General made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

204. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Lawrence General's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Lawrence General's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

205. Lawrence General disclosed Plaintiff's and Class Members' Private Information to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

206. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

207. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 138, *supra*), plus costs and attorneys' fees.

## COUNT VI

**(Breach of Contract, on behalf of the Class)**

208. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

209. Lawrence General required Plaintiff and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the Lawrence General Website as a condition of receiving healthcare services. Plaintiff's and Class Member's provision of such Private Information provided consideration for Lawrence General's provision of services through the Lawrence General Website, including the provision of information and the use of the website to obtain medical services.

210. In so doing, Plaintiff and Class Members entered into contracts with Lawrence General (or, in the alternative, implied contracts) by which Lawrence General agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. Lawrence General's contractual promises included that, without signed authorization, it would share healthcare consumers' medical information and communications only for limited purposes and only to specified parties (which did not include technology companies for marketing purposes).

211. Plaintiff and Class Members fully performed their obligations under the contract with Lawrence General.

212. Lawrence General breached its agreement with Plaintiff and Class Members by directly breaching its promises not to share with third parties healthcare consumers' medical information and communications without consumers' signed authorization.

213. As a direct and proximate result of Lawrence General's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private

Information and have been denied the benefit of the bargain of their agreement with Lawrence General.

214. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 138, *supra,* plus costs and attorneys' fees.

**COUNT VII**

**(Unjust Enrichment, on behalf of the Class)**

215. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

216. This claim is pleaded in the alternative to Plaintiff's other causes of action.

217. Lawrence General benefits from using Plaintiff's and Class Members' Private Information and unjustly retained those benefits at Plaintiff's and Class Members' expense.

218. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

219. Lawrence General consciously collected and used this information for its own gain, providing Lawrence General with economic, intangible, and other benefits, including substantial monetary compensation.

220. Lawrence General unjustly retained those benefits at the expense of Plaintiff and Class Members because Lawrence General's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

221. The benefits that Lawrence General derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Lawrence General to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

222. Had Lawrence General informed Plaintiff that it collected and shared Plaintiff's Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of Lawrence General's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

223. The Court should compel Lawrence General to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that Lawrence General unjustly received and such other relief as the Court may deem just and proper.

**Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 30, 2024

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on December 30, 2024

*/s/ Patrick J. Vallely*
Patrick J. Vallely

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

24

ML

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**NOTICE OF FILING OF NOTICE OF REMOVAL**

PLEASE TAKE NOTICE that Defendant Lawrence General Hospital, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, filed a Notice of Removal in the above-referenced action to the United States District Court for the District of Massachusetts. A copy of the Notice of Removal is attached as **Exhibit 1**.

Date: January 13, 2025

Respectfully submitted,

*/s/ Lisa Oliver White*
Lisa Oliver White, BBO# 666841
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2620
Boston, MA 02110
Tel: (617) 531-1411
lowhite@shb.com

Tammy B. Webb*
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
twebb@shb.com

I HEREBY ATTEST AND CERTIFY ON January 17, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

Jad Sheikali*
Shook, Hardy & Bacon L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7700
jsheikali@shb.com

Anna A. Gadberry*
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

* Pro hac vice motion to be filed

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2025, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Lisa Oliver White*
Lisa Oliver White

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

Case No.: 1:25-cv-10081

## NOTICE OF REMOVAL

Defendant, Lawrence General Hospital, by and through undersigned counsel, files this Notice of Removal of this action from the Superior Court of Massachusetts, Suffolk County, Civil Action No. 2384-CV-00728-BLS1, to the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. In support of this Notice of Removal, Defendant states as follows:

## INTRODUCTION

1. Plaintiff filed the action styled *Jane Doe, for herself and the Class v. Lawrence General Hospital*, Civil Action No. 2384-CV-00728-BLS1, in the Superior Court for Suffolk County, Massachusetts, on March 27, 2023.

2. On December 30, 2024, Plaintiff filed an Amended Complaint, which added several claims, including a claim under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.* Defendant was served with the Amended Complaint on December 30, 2024.

3. A copy of Plaintiff's Original Complaint and Amended Complaint, together with all process and pleadings served upon Defendant in the state action are attached as **Exhibit A**.

## TIMELINESS OF REMOVAL

4. Pursuant to 28 U.S.C. § 1446(b)(3), this Notice of Removal is timely because it is filed within thirty (30) days of the date that Defendant received service of Plaintiff's Amended Complaint.

## NATURE OF THE CASE

5. Lawrence General Hospital is a healthcare system in Lawrence, Massachusetts. Lawrence General has a website that allows the public to view information about its services and browse other information. Plaintiff alleges that she is a user of that website.

6. Plaintiff brings the action on behalf of herself and a putative class of other individuals. Plaintiff's Amended Complaint asserts claims under the ECPA and the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, in addition to common law claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment. *See* **Exhibit A**, Pl.'s Amend. Compl. at ¶¶ 168–223.

7. Plaintiff's claims relate to Defendant's alleged use of various advertising technology on its public facing website, including Google Analytics and the Meta Pixel. *See* **Exhibit A**, Pl.'s Amend. Compl. at ¶¶ 13, 81–88, 91–95.

## GROUNDS FOR REMOVAL – FEDERAL QUESTION JURISDICTION

8. For the first time in Plaintiff's Amended Complaint, Plaintiff asserts a claim against Defendant under federal law. Specifically, Plaintiff alleges violations of the ECPA. *See* **Exhibit A**, Pl.'s Amend. Compl. at ¶¶ 11, 147–67.

9. Pursuant to 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

10. This Court has subject matter jurisdiction over Plaintiff's purported ECPA claim because it "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see also, e.g.*, *MediterraneanCoins, GmbH v. eBay.com*, 2005 WL 3096374, at *3 (N.D. Cal. Nov. 14, 2005) (recognizing that the defendant "properly removed" the case from state to federal court based on federal question jurisdiction, where the amended complaint alleged a claim under the ECPA).

11. This action is removable pursuant to 28 U.S.C. §1441(a) because it is within the original jurisdiction of this Court under 28 U.S.C. § 1331 in that it involves claims arising under the laws of the United States.

12. Further, this Court has supplemental jurisdiction over Plaintiff's state law claims because those claims "derive from a common nucleus of operative fact" such that the claims for part of the same case or controversy. 28 U.S.C. § 1367.

**PROCEDURE AND VENUE**

13. Venue lies in the United States District Court for the District of Massachusetts – Boston Division, pursuant to 28 U.S.C. § 1441(a), because the original action was filed within this District and Division. The Superior Court of Massachusetts, Suffolk County, is located within the District of Massachusetts – Boston Division. Therefore, venue is proper in this Court because it is the "district and division embracing the place where such action is pending." *See* 28 U.S.C. § 1441(a).

14. In accordance with 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders which, as of the date hereof, have been served upon Defendant in the state court action are attached to this Notice of Removal as **Exhibit A**.

15. The Civil Cover Sheet associated with this Notice of Removal is attached as **Exhibit B**.

16. In accordance with 28 U.S.C. § 1446(d), written notice of this Notice of Removal will be promptly served upon counsel for Plaintiff, and a copy will be promptly filed with the Clerk of the Superior Court of Massachusetts, Suffolk County.

17. Pursuant to Local Rule 81.1(a), within twenty-eight (28) days after the filing of this Notice of Removal, Defendant will file attested copies of all records and proceedings, as well as docket entries in the State Court Action.

18. By filing this Notice of Removal, Defendant does not waive any defenses or objections that it may have, including but not limited to, sufficiency of process, service of process, personal jurisdiction, or arbitrability of claims.

19. Defendant reserves the right to amend or supplement this Notice of Removal, and reserve all rights and defenses, including those available under Federal Rule of Civil Procedure 12.

20. WHEREFORE, Defendants respectfully request that this action be removed from the Superior Court of Massachusetts, Suffolk County to the United States District Court for the District of Massachusetts – Boston Division, pursuant to 28 U.S.C. §§ 1331, 1441 and 1446.

Date: January 13, 2025

Respectfully submitted,

*/s/ Lisa Oliver White*

Lisa Oliver White, BBO# 666841
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2620
Boston, MA 02110
Tel: (617) 531-1411
lowhite@shb.com

Tammy B. Webb*
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900

twebb@shb.com

Jad Sheikali*
Shook, Hardy & Bacon L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7700
jsheikali@shb.com

Anna A. Gadberry*
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

* Pro hac vice motion to be filed

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2025, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Lisa Oliver White*
Lisa Oliver White

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendant.

**NOTICE OF FILING AND SUPERIOR COURT RULE 9A**
**LIST OF DOCUMENTS FILED**

In accordance with Superior Court Rule 9A, the following documents, together with this Notice, have been filed with the Civil Clerk's Office:

1. Defendant Lawrence General Hospital's Notice of Filing and Superior Court Rule 9A List of Documents Filed;
2. Defendant The Lawrence General Hospital's Motion to Dismiss Plaintiff's Complaint;
3. Memorandum In Support Of Defendant Lawrence General Hospital's Motion To Dismiss Plaintiff's Complaint;
4. Plaintiff's Opposition To Defendant's Motion To Dismiss; and
5. Reply In Support Of Defendant Lawrence General Hospital's Motion To Dismiss Plaintiff's Complaint.

Dated: August 15, 2023

Respectfully submitted,

**LAWRENCE GENERAL HOSPITAL**

/s/ *Emyr T. Remy*
Emyr T. Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: 617.531.1411 | Fax: 617 531.1602

Tammy B. Webb (*pro hac vice* forthcoming)
Patrick J. Gregory (*pro hac vice* forthcoming)
tbwebb@shb.com
pgregory@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1900 | Fax: 415.391.0281

Anna A. Gadberry (*pro hac vice* forthcoming)
agadberry@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City MO 64108
Tel: 816.474.6550 | Fax: 816.421.5547

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendants.

**NOTICE OF APPEARANCE OF EMYR T. REMY**

NOTICE IS HEREBY GIVEN of the appearance of Emyr T. Remy of the firm of Shook, Hardy & Bacon L.L.P., on behalf of Lawrence General Hospital, in the above-captioned matter. Please serve copies of all pleadings, correspondence and other communications upon the undersigned at the below-stated address.

Dated: May 2, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

*/s/Emyr T. Remy*

Emyr T. Remy, BBO# 704156
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1411
remy@shb.com

DOCKET NO. 2384CV00728–BLS1

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/Emyr T. Remy*
Emyr T. Remy

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00728–BLS1**

JANE DOE, for herself and the class,

Plaintiff,

v.

LAWRENCE GENERAL HOSPITAL,

Defendants.

**NOTICE OF APPEARANCE OF ALAN Y. WONG**

NOTICE IS HEREBY GIVEN of the appearance of Alan Y. Wong of the firm of Shook, Hardy & Bacon L.L.P., on behalf of Lawrence General Hospital, in the above-captioned matter. Please serve copies of all pleadings, correspondence and other communications upon the undersigned at the below-stated address.

Dated: May 2, 2023

Respectfully submitted,

LAWRENCE GENERAL HOSPITAL

*/s/Alan Y. Wong*

Alan Y. Wong, BBO# 687618
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel.: (617) 531-1677
awong@shb.com

Case 1:25-cv-10081-NMG Document 14 Filed 02/07/25 Page 480 of 480

DOCKET NO. 2384CV00728–BLS1

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/Alan Y. Wong*
Alan Y. Wong