UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JANE DOE,

      *Plaintiff,*

v.                                                  No. 25-cv-10081-NMG

LAWRENCE GENERAL HOSPITAL,

      *Defendant.*

## REPORT AND RECOMMENDATION ON MOTION TO DISMISS

LEVENSON, U.S.M.J.

      Before the Court is a motion (Docket No. 15) filed by Defendant Lawrence General Hospital ("LGH") to dismiss the Amended Complaint[1] in this case. Judge Gorton has referred this motion to me for report and recommendation. Docket No. 28.

      LGH has submitted a Memorandum in Support of its Motion to Dismiss (Docket No. 16), a Reply in Support of its Motion to Dismiss (Docket No. 32), and a Notice of Supplemental Authority (Docket No. 38). Plaintiff has submitted an Opposition to the Motion to Dismiss (Docket No. 27), a Response to Amicus Brief (Docket No. 31), and a Notice of Supplemental Authority (Docket No. 37). In addition, the Chamber of Commerce has weighed in with an Amicus Brief in support of Defendant's motion (Docket No. 21).

---

[1] Given bulkiness of the initial removal docket from the Massachusetts Superior Court, it may be easier for a reader to refer to the copy of the Amended Complaint that Plaintiff attached to her opposition to the motion to dismiss as Exhibit 1. Docket No. 27-1 ("Complaint"). In this report I will refer to the Complaint by paragraph numbers.

I have considered these submissions, as well as the oral arguments of counsel (heard on June 10, 2025), in preparing this report.

<u>INTRODUCTION</u>

In this putative class action, Plaintiff alleges that the use of web tracking tools on LGH's public-facing website violated her rights and subjected her to unauthorized disclosure of private health information. She alleges that disclosures by the web tracking tools enabled third parties to associate her browsing activity with her identity, which enabled those third parties to infer that she was a medical patient of LGH and to draw conclusions about her medical status. Plaintiff alleges that those third parties then sent her targeted advertisements based on her private information.

While web tracking tools are widely used across a broad array of public websites, the Complaint alleges that, because LGH is a hospital and health care provider subject to the Health Insurance Portability and Accountability Act ("HIPAA"), and because the content of LGH's website involves health conditions and health treatments, LGH's use of web tracking tools, without notice to website users, was illegal and tortious.

Along with various claims based on Massachusetts statutory and common law protections of privacy rights, Plaintiff claims that LGH committed a federal crime. Plaintiff contends that LGH violated the Electronic Communications Privacy Act of 1986 ("ECPA"), a criminal statute that also provides for a private right of action for victims of illegal interception of electronic communications. 18 U.S.C. § 2511 and 18 U.S.C. § 2520 (providing a private right of action).

For the reasons set forth below, I recommend that the Court allow Defendant's motion to dismiss with respect to Count I (Violation of ECPA, 18 U.S.C. § 2511). Count I is the lone federal claim in this lawsuit, thus dismissal of Count I would leave this case with only state law claims (Counts II through VII). Principles of comity and efficiency militate against retaining

federal jurisdiction when it is clear, at an early phase of the litigation, that a case presents only questions of state law. Accordingly, I recommend that the remainder of the case be remanded to the Massachusetts Superior Court.

## I.    Background

For purposes of considering a motion to dismiss, I must accept as true the well-pleaded factual allegations of the Complaint. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Accordingly, the following description of the facts is derived from the Complaint.

### A.    *Factual Background*

#### 1.    *LGH's Use of Tracking Tools on its Website*

LGH operates a hospital in Lawrence, Massachusetts, and several outpatient service locations in communities north of Boston. Complaint ¶ 17. LGH provides healthcare across various specialties, including heart and vascular care, orthopedics, cancer care, post-COVID recovery, surgery, obstetrics and gynecology, and trauma care. *Id.*

LGH maintains the Lawrence General Website for its hospital and outpatient facilities, at https://www.lawrencegeneral.org (the "Website"). *Id.* ¶ 18. Through the public facing Website, members of the public can obtain information about the services LGH provides, including information about doctors, services, and treatments for particular medical conditions. *Id.*

The Website provides information about healthcare services and includes access to a patient portal and a bill pay portal, through which patients can access their private medical records and view and pay bills. *Id.* ¶ 19. The Complaint does not allege that LGH deployed web-tracking tools within its patient portal or bill pay portal. Indeed, Plaintiff's counsel conceded at oral argument that the web tracking tools at issue were present only on unauthenticated, public

webpages, *i.e.* public-facing webpages that do not require a user to log in with a password.[2] Docket No. 39, Transcript of Oral Argument (June 10, 2025) at 50–51 (counsel for Plaintiff agreeing with the Court that allegations of pixel tracking involved only public-facing web pages).

In her Complaint, Plaintiff characterizes the web tracking tools used on the Website as "hidden code," a semantic choice that highlights the fact that website visitors were not alerted—by a banner or other electronic notice—that such web tracking tools were in place. Complaint ¶¶ 2–4. Semantics aside, nothing in the Complaint suggests that the tools in question were unique or unusual, or that they were developed or customized by LGH. On the face of the Complaint, it is apparent that the term "hidden code" refers to widely-used[3] analytics tools, such as Google Analytics, created by Google, Inc. ("Google"), and Meta Pixel, created by Meta Platforms, Inc. ("Meta"), that can be deployed on any website.[4] Complaint ¶¶ 13, 36–38, 43, 48. These tools are used to give website operators, such as LGH, visibility into how their websites are used, and to

---

[2] I take counsel's explanation as clarifying the Complaint's vaguely worded allegation that LGH permitted third parties to intercept "access to bill payment portions of the website that confirm patient status." As allegedly used by LGH, the challenged web tools recorded the fact that a user had navigated *to* the web page from which a visitor could attempt to enter the bill pay portal, but did not record keystrokes (such as a username or password) used to gain access. *See* Complaint ¶ 96–98.

[3] Google Analytics is currently in use on 44 million websites, and 43.35% of the 10,000 highest-ranking websites use the most recent version of Google Analytics: GA4. *Latest Google Analytics 4 (GA4) Stats for 2025*, GA4.com, https://ga4.com/ga4-stats (last updated February 2025). According to W3Techs, 16.7% of all websites whose traffic analysis tools are known, use the Meta Pixel. *Usage Report of Meta Pixel broken down by Top Level Domains*, w3techs.com, https://w3techs.com/technologies/breakdown/ta-facebookpixel/top_level_domain (last updated August 6, 2025).

[4] Meta Platforms, Inc., formerly Facebook, Inc., develops and operates social media platforms, Facebook and Instagram.

target website visitors with relevant advertisements based on the nature of their visit. Complaint ¶¶ 2, 43, 55–60, 101.

It seems that these kinds of web tracking tools are used across all manner of websites. *See generally Vita v. New England Baptist Hosp.*, 494 Mass. 824, 848–49, 243 N.E.3d 1185, 1205 (2024) (interpreting the Massachusetts Wiretap Act and considering whether it would apply in the common situation when "a user browses a music or sports website, to inquire about particular songs or athletes, and the music website or sports website tracks its users, and shares that information with Internet advertisers without the user's consent . . . ."). *See also* Complaint ¶ 8 (noting that the website communications at issue in *Vita* "are similar to the communications Plaintiff alleges in this case.").

The web tracking tools that LGH deployed on its website not only provided analytical information to LGH but also enabled Google and Meta to collect data about Plaintiff's interactions with the Website. Specifically, when Plaintiff loaded the Website on her computer, the web tracking tools caused her browser to download and execute JavaScript code from third party websites (such as Google or Meta). Complaint ¶ 55. The JavaScript code then relayed to Google and Meta information about Plaintiff's browsing activity, recording what she clicked on or typed into the browser. *Id.* ¶ 57–58. The information gathered included (1) Plaintiff's public IP address, (2) the URL of the specific webpages Plaintiff viewed, (3) the titles of the visited webpages, (4) metadata describing the content of the webpages, (5) text Plaintiff entered into webforms and search fields, (6) whether and how long Plaintiff scrolled through webpages, (7) the contents of dropdown menu selections, and (9) prior webpages visited by Plaintiff prior to viewing the current webpage. *Id.* ¶ 57.

In other words, the communications that are alleged to have been intercepted in this case consist of browsing data from the public-facing pages of the Website. *Id.* ¶¶ 46, 57, 121. Plaintiff alleges that some of the information that could be gleaned from such browsing data amounts to Individually Identifiable Health Information ("IIHI"), such as information about Plaintiff's doctors and treatments connected to her. *Id.* ¶ 121, 162. In particular, Plaintiff alleges that, based on the information gathered when she navigated to the patient portal and bill pay portal, Google and Meta could infer that she was in fact a patient of LGH. *Id.* ¶ 3.

### 2. Legal Notices and Warnings on the Website

Upon opening the Website, all visitors were met with a popup message, which required the visitor to consent to the use of cookies and referred them to LGH's Notice of Privacy Rights and Practices (the "Privacy Policy") for more information. *Id.* ¶ 28. The Complaint alleges that LGH's Privacy Policy was deficient. Although the Privacy Policy explained certain circumstances whereby medical information may be disclosed to third parties, it did not contain any reference to sharing information with Google and Meta, and it did not discuss cookies or the web tracking tools. *Id.* ¶¶ 26, 28.

The Website also included links to a webpage titled "Legal." *Id.* ¶ 30. This webpage stated that the Website maintained policies concerning the use of information gathered from visitors to the Website and directed visitors to the same Privacy Policy for more information. *Id.* The Privacy Policy did not disclose the use of the web tracking tools from Google and Meta and did not describe the kinds of information those tools gathered. *Id.*

### 3. Plaintiff's Interactions with the Website

Plaintiff is a resident of Burlington, Massachusetts, and is a patient of LGH. *Id.* ¶ 12. Plaintiff regularly used the Website to find information on doctors, medical procedures, and LGH locations. *Id.* She also used the website to reach LGH's patient portal where she could

access her own medical records. *Id.* Plaintiff does not detail in the Complaint how long she has been a patient, when she used the Website, or which specific pages she accessed.

Plaintiff alleges generally that she was misled regarding the confidentiality of her browsing activity by the notices LGH posted on the Website. *See id.* ¶ 4. The Complaint does not, however, allege that Plaintiff ever looked at or read the Notice of Privacy Rights or the "Legal" webpage.

Plaintiff alleges that once a visitor visited the Website, Google and Meta "could then associate" the data they collected with real world identities, and "could then use" the data for their own commercial purposes, such as serving personalized advertisements. *Id.* ¶¶ 2, 32–46. The Complaint does not, however, allege that Plaintiff has a Facebook account. Further, although the Complaint alleges that Google maintains detailed profiles of individuals, including names, dates of birth, email addresses, etc., the Complaint does not specify what information Google or Meta may possess of Plaintiff's that would have enabled them to associate Plaintiff's browsing data with her real-world identity. *See* Complaint ¶ 41.

Plaintiff alleges that, at some point after she visited the Website, she received unwanted targeted advertisements, which she attributes to the sharing of data collected by the web tracking tools regarding portions of the Website she accessed. *Id.* ¶ 138(b).

Plaintiff claims that third parties, such as Google and Meta, could infer that she was a patient of LGH based on her browsing activity, which included doctor searches and requests for information on public-facing webpages, particularly two webpages through which she could access user-authenticated information: (1) a public-facing page on which there was a button through which patients could access the log-in to the patient portal, and (2) a public-facing page on which there was a button through which patients could access the log-in to the portal for

paying hospital bills. From these pages, a user could call up the access screens for the patient and bill pay portals. *Id.* ¶¶ 3, 12, 96, 97.

Plaintiff alleges in a conclusory fashion that LGH gathered and disclosed "device identifiers" and "browser fingerprints" to third parties. *Id.* ¶ 122. However, the Complaint contains only minimal description of what these terms signify (*see id.* ¶¶ 70, 72–73) and no explanation as to whether these terms refer to anything different from the web tracking tools otherwise described in the Complaint (*id.* ¶¶ 3, 57, 58).

### B.    *Procedural Posture*

On March 27, 2023, Plaintiff filed this case as a putative class action against LGH in Superior Court for Suffolk County, Massachusetts. *See* Docket No. 14 at 8–51 (Original Complaint). The Original Complaint contained a single count alleging violation of the Massachusetts wiretap act, M.G.L. c. 272 § 99. Original Complaint ¶¶ 104–111. In October of 2024, however, the Massachusetts Supreme Judicial Court issued a decision that eviscerated the legal underpinnings of the Original Complaint. In *Vita v. New England Baptist Hosp.*, the SJC rejected the proposition that "browsing and other similar website interactions . . . hospitals' websites" constitute "'wire communication[s]'" under the Massachusetts Wiretap Act. 494 Mass. at 848. In the face of that ruling, on December 30, 2024, Plaintiff amended her complaint, adding a federal claim under ECPA, along with claims under a variety of statutory and common law privacy protection theories.

With the addition of the ECPA claim, the Complaint included a federal cause of action. And on January 13, 2025, LGH removed the case from Suffolk Superior Court to the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. *See* Docket No. 1.

As noted above, LGH has filed the present motion to dismiss, which Judge Gorton has referred to me for report and recommendation. Docket Nos. 15, 28.

## II.    Legal Standard for Motions to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (explaining that district courts "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom").

Under Federal Rule of Civil Procedure 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). "A short and plain statement needs only enough detail to provide a defendant with fair notice of what the . . . claim is and the grounds upon which it rests." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555 (2007)). But Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A complaint that merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

To show an entitlement to relief, a complaint must contain enough factual material "'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" *Ocasio-Hernandez*, 640 F.3d at 12 (citation omitted) (quoting *Twombly*, 550 U.S. at 555). "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).

Dismissal is appropriate if the complaint fails to set forth "'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *Gagliardi v. Sullivan*, 513 F.3d 301, 305 ((1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 ((1st Cir. 2005)). While the Court is required to "indulg[e] all reasonable inferences in [the plaintiff's] favor," it is not required to accept a complaint's "bald assertions" and "unsubstantiated conclusions." *Fantini v. Salem State Coll.*, 557 F.3d 22, 26 (1st Cir. 2009) (first quoting *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006); and then quoting *Gagliardi v. Sullivan*, 513 F.3d at 305).

To apply this standard, the Court "employ[s] a two-pronged approach." *Ocasio-Hernandez*, 640 F.3d at 12. To begin, the Court must "identify[] and disregard[] statements in the complaint that merely offer "legal conclusions[s] couched as . . . fact[]" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* (first and second alterations added) (quoting *Iqbal*, 556 U.S. at 663). "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible." *Id.* (citing *Iqbal*, 556 U.S. at 681). "If that factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility." *Id.* (quoting *Iqbal*, 556 U.S. at 678). The resulting inquiry demands a "context-specific" approach, asking the Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.    Analysis of Plaintiff's Claims

LGH moves to dismiss all seven of the claims that Plaintiff asserts in the Complaint. Docket No. 15. LGH argues that Plaintiff has not alleged that any of her Protected Health

Information ("PHI") was disclosed, that the complaint fails to state a claim under ECPA, and that the complaint fails to state claims under Massachusetts law for the remaining state law claims. *See* Docket No. 16.

In this case, the Court's subject matter jurisdiction depends upon the presence of a single claim under federal law, namely Plaintiff's contention that LGH violated ECPA. Given that the ECPA claim differs fundamentally from the remaining claims in the Complaint, it makes sense to address the ECPA claim first.

### A.    *Plaintiff's ECPA Claim Stands on a Different Footing Than Her Other Claims.*

Before getting under way, it is useful to consider the ways that Plaintiff's ECPA claim is distinct from the various state law causes of action in the Complaint. The state law claims all rest, in one way or another, on Plaintiff's contention that her private and sensitive personal information—namely medical and health care information of various kinds—was improperly shared with third parties. Web tracking tools may be ubiquitous on ordinary websites, but Plaintiff contends that LGH's Website is different, either because of the sensitive nature of the information being browsed, or because of the special obligations of medical care providers to protect patient confidentiality. Although Plaintiff's state law claims vary in their elements, they all rest on the alleged invasion of sensitive privacy interests.

Plaintiff's ECPA claim works differently. In general, a claim based on violation of ECPA does not depend upon the particular sensitivity of communications that were intercepted. It is illegal under ECPA to electronically eavesdrop on any communications, period. This is so whether the topics being discussed are mundane niceties or intimate personal confessions.

An ECPA claim does, however, require proof of something that is not part of Plaintiff's state law claims. To make out an ECPA claim, a plaintiff must show that *neither party to a communication consented* to its interception. ECPA is a one-party consent statute: If a party to a

communication intercepts, or permits a third party to intercept, that communication, there is ordinarily no violation of ECPA. *See* 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful . . . to intercept a[n] . . . electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception . . . .").

In this case, there is no dispute that Plaintiff, as the Website visitor, and LGH, as the Website operator, were both parties to the communications at issue (*i.e.* the various mouse clicks and keystrokes by which users navigate the website). Nor is there any dispute that LGH consented to the interception of those communications by Meta and Google. Plainly, one party to the communications, LGH, consented to the interception. Thus, Plaintiff's ECPA claim is foreclosed, unless the matter falls within an exception to the one-party consent rule.

At the heart of the present dispute is Plaintiff's contention that the alleged interceptions in this case fall within ECPA's crime-tort exception. As discussed below, the statute provides: "It shall not be unlawful . . . to intercept a[n] . . . electronic communication where . . . one of the parties to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act* in violation of the Constitution or laws of the United States or of any State. 18 U.S.C. § 2511(2)(d) (emphasis added).

For her part, Plaintiff contends that LGH intercepted the communications "for the purpose of committing" criminal and/or tortious acts. Complaint ¶ 158. Specifically, Plaintiff contends that the criminal or tortious purpose at issue here was LGH's improper disclosure of health care related information, in violation of HIPAA, which imposes criminal penalties for

prohibited disclosures, and as a tortious violation of Plaintiff's privacy interests. Complaint ¶¶ 10, 158.

LGH, by contrast, argues that Plaintiff has not alleged that LGH had any criminal or tortious purpose "beyond what was accomplished by the collection of her data—and that is what matters under the crime-tort exception." *See* Docket No. 16 at 12–14.[5] Absent some separate and independent purpose to commit a crime or tort, LGH argues, a mere allegation that a particular interception itself amounted to, or incidentally caused, a crime or tort does not suffice to invoke the crime-tort exception. *See* Docket No. 16 at 13–15.

To sift through the parties' opposing contentions, the Court must consider whether Plaintiff's factual allegations are adequate to make out a criminal or tortious purpose, and whether the alleged purpose is sufficient to trigger the crime-tort exception. As discussed below, this entails considering several related questions: What kind and degree of intention is sufficient to constitute the "purpose" of a party's electronic interception? To what degree must the crime or tort be separate from the interception itself?

For the reasons discussed below, I recommend dismissing Plaintiff's ECPA claim. The factual allegations of the Complaint fail to plausibly suggest that LGH had any criminal or tortious purpose in utilizing the web tracking tools. Plaintiff argues that the web tracking tools had the *effect* of disclosing sensitive medical information and even argues that such disclosures violated HIPAA. But these were not goals or objectives that LGH purposefully sought to accomplish. There is nothing in the Complaint to suggest that LGH had a conscious purpose in deploying the web tracking tools to disclose information in violation of HIPAA. At most, the

---

[5] References to page numbers refer to the PDF page number in ECF, as opposed to the page number in the footer of the document.

disclosures may have been foreseeable by-products of LGH's decision to use web tracking tools and Plaintiff's allegations may tend to show that LGH *failed to prevent* improper disclosures when it employed the web tracking tools. Such failures may suffice to make out violations of Plaintiff's privacy rights under state law, but they do not satisfy the specific intent element of the federal crime at issue here. There is no allegation that LGH acted for the purpose of violating HIPAA or for the purpose of invading Plaintiff's privacy rights.

### B.    *Count I: Alleged Violation of ECPA, 18 U.S.C. § 2511*

Class action claims against hospitals that use web tracking tools on their public websites have become prevalent in recent years, and there are dozens of reported decisions around the country addressing motions to dismiss, with varying outcomes. The parties—unsurprisingly—each point the Court toward decisions that favor their respective side. As discussed below, some of the reported cases involve circumstances that differ considerably from the matter at bar. Most notably, there are numerous decisions involving allegations that web tracking tools were deployed *within* patient portals or billing portals, which may implicate significantly greater privacy issues than tracking public web pages. Apart from differing facts, moreover, the mode of analysis differs considerably among many of the available decisions.

In the sections that follow I will outline an approach that, I believe, follows the statutory language of ECPA and I will note where that approach differs from analyses adopted by other courts.

### 1.    *Overview of 18 U.S.C. § 2511*

By its terms, ECPA is a felony statute that imposes criminal penalties upon "any person who – (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

ECPA is a direct descendant of the 1968 Federal Wiretap Act,[6] which was designed to regulate the interception of wire and oral communications, although at that time "wire communications" was understood to refer primarily to telephone transmissions conducted over wire-based infrastructure. *See United States v. Councilman*, 418 F.3d 67, 72 & n.7, 75 n.10 (1st Cir. 2005). The Act outlined, among other things, the circumstances in which law enforcement officers could intercept wire communications, and the penalties for unauthorized private interceptions of wire communications. *See id.* at 72. The Act made it a criminal offense to intentionally intercept such communications without the consent of at least one party to the communication, unless authorized by a court order. *See* 18 U.S.C. §§ 2511, 2520(d).

The Wiretap Act's focus on analog phone lines and physical wiretaps quickly became outdated as digital communications emerged, and Congress enacted the Electronic Communications Privacy Act in 1986, Pub.L. No. 99–508, 100 Stat. 1848 ("ECPA" or the "Act"), which expanded the Wiretap Act to cover non-telephonic, electronic communications, such as emails, texts, and data transmissions. *See Councilman,* 418 F.3d at 76–79. ECPA thus brought a wider range of communications under protection than simply telephone calls, although it, too, was crafted in an era before cloud computing, smartphones, and social media. *See id.*

2. *Communications*

Plaintiff claims that her "highly sensitive communications" (Complaint ¶ 1) were intercepted, while LGH argues that no "contents," as defined by ECPA, were intercepted at all (Docket No. 16 at 15–16).  Thus, it will be helpful to begin by identifying the communications that are at issue.

---

[6] Formally known as Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, tit. III, §§ 801–804, 82 Stat. 211 (codified as amended at 18 U.S.C. §§ 2510–2522).

Leaving aside the modifier "highly sensitive," Plaintiff alleges that during her visit to the Website, Google and Meta received data, including the URLs and titles of the webpages she visited, queries she may have entered, the sequence of pages that she accessed, and her IP address. Docket No. 27 at 8, 17; Complaint ¶ 152. The Complaint alleges that LGH intercepted Plaintiff's browsing data.

It seems plain that Plaintiff's browsing data constituted "electronic communications" and thus "contents" within the meaning of ECPA. ECPA covers (1) wire communication, (2) oral communication, and (3) electronic communication. *See* 18 U.S.C. §§ 2510(1), (2), and (12). The first two types of communications are defined narrowly, but the third—electronic communication—is defined broadly. *See In re Pharmatrak, Inc.* 329 F.3d 9, 18 (1st Cir. 2003) ("The ECPA adopts a 'broad, functional' definition of an electronic communication.") (quoting *Brown v. Waddell*, 50 F.3d 285, 289 (4th Cir. 1995). The definition of electronic communications includes "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric, or photooptical system." 18 U.S.C. § 2510(12). The definition of contents includes "any information concerning the substance, purport, or meaning of [electronic] communication." 18 U.S.C. § 2510(8).

Information regarding Plaintiff's browsing activity that was collected by Google and Meta was clearly "data." Plaintiff's browsing information may also qualify as "intelligence," within the meaning of the statute, although that term is more difficult to pin down. In any event, the transmissions at issue in this case constitute communications under ECPA. *See* Complaint ¶ 57–58. The browsing data also constitutes "content" within the meaning of ECPA in that it contained "information concerning the . . . meaning of that communication." In particular, the

browsing data contained information regarding the webpages Plaintiff visited and the entries she made into the public webpages. LGH's argument that this doesn't amount to "contents" (Docket No. 16 at 15–16) is unpersuasive.

### 3.    Interception

Plaintiff alleges that LGH utilized the web tracking tools to "aid[] in the interception of communications" between Plaintiff and LGH by Google, Meta and other companies.[7] Complaint ¶¶ 1–2.

ECPA defines an interception as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). LGH does not dispute that there was an interception.

### a.    One-Party Consent

ECPA forbids the secret interception of communications where no party to the communication is aware that an interception is taking place. It does not, however, forbid interception when one party is aware of, and consents to, the interception. For this reason, ECPA is commonly referred to as a "one-party consent" statute. This principle is codified in the statute's "party exception," whereby "it shall not be unlawful . . . for a person not acting under

---

[7] This formulation is not used consistently in the Complaint. At paragraph 10, the Complaint alleges that LGH itself intercepted communications, as opposed to aiding interceptions by Google and Meta. At least one decision involving a hospital website suggests that the defendant hospital itself "intercepted" a patient's browsing information. *Jarrell v. Adena Health Sys.*, No. 24-CV-00282, 2025 WL 81305, at *4 (S.D. Ohio Jan. 13, 2025) (stating that defendant healthcare services provider *intercepted* communications from plaintiff).

The difference may be more semantic than substantive; a party may be said to intercept a communication if it captures that communication surreptitiously (as when someone secretly tapes a telephone call) and then shares it with third parties. But even if the hospital itself is deemed to have intercepted a communication, that does not alter the critical point that, as a party to the communication, the hospital can—generally—consent to an interception without violating ECPA.

color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication." 18 U.S.C. § 2511(2)(d).

It is evident from the Complaint that LGH was a party to the communications in question and that LGH consented to the interception. Indeed, the Complaint alleges that LGH aided in the interception by installing the web tracking tools on its Website. Complaint ¶ 2–3.

### 4.    *Crime-Tort Exception*

Critical to the present motion, ECPA contains an exception to the party exception: the "crime-tort exception." This provision removes the protections of the party exception if the interception was made "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Plaintiff's ECPA claim rests upon the applicability of the crime-tort exception.

As discussed in the following subsections of this report, courts have differed in their understandings of the "purpose" required to trigger the crime-tort exception, and thus criminal liability under ECPA. These differences have produced widely divergent results, even within the relatively narrow context of cases about healthcare provider websites that utilize web tracking tools.

### a.    "Purpose" is an Essential Element of Plaintiff's ECPA Claim

The starting point for any statutory analysis is the language of the statute itself. ECPA provides in relevant part:

(1) Except as otherwise specifically provided in this chapter any person who--

(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

\* \* \*

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

* * *

> [(2)](d) It shall not be unlawful . . . for a person . . . to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511.

It is evident on the face of the statute that there are different state-of-mind or intent requirements for different elements of the ECPA offense. In general, the act of interception must be done "intentionally." 18 U.S.C. §2511(1)(a). For a consented-to interception to violate the statute, however, there is a separate, additional mens rea element: To be criminal, such an interception must have been done "for the purpose of committing a[] criminal or tortious act." 18 U.S.C. § 2511(2)(d).

As the Supreme Court has pointed out, in construing a criminal statute, courts must diligently review the degree of intent associated with each element. *See United States v. Bailey*, 444 U.S. 394 (1980). Moreover, in "assigning a level of culpability to each element . . . courts obviously must follow Congress' intent as to the required level of mental culpability for any particular offense." *Id.* at 406. Particularly with "complex statutorily defined crimes" courts must consider whether "the same state of mind [is] required of the actor for each element of the crime, or may some elements require one state of mind and some another?" *Id.* at 405. Quoting the American Law Institute, the Court noted: "'[C]lear analysis requires that the question of the kind of culpability required to establish the commission of an offense be faced separately with respect to each material element of the crime[.]'" *Id.* at 406 (quoting American Law Institute, Model Penal Code Comments 123 (Tent. Draft No. 4, 1955) (alterations in original).

As the Supreme Court has explained, there is a hierarchy of mens rea requirements, with "purpose" at the top. Thus, "'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." 444 U.S. at 405. More recently, the Court has spelled this out further:

> The law of mens rea offers three basic choices. Purpose is the most culpable level in the standard mental-state hierarchy, and the hardest to prove. A person acts purposefully when he "consciously desires" a result—so here, when he wants his words to be received as threats. *United States v. Bailey*, 444 U.S. 394, 404, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Next down, though not often distinguished from purpose, is knowledge. *Ibid.* A person acts knowingly when "he is aware that [a] result is practically certain to follow"—so here, when he knows to a practical certainty that others will take his words as threats. Ibid. (internal quotation marks omitted). A greater gap separates those two from recklessness. A person acts recklessly, in the most common formulation, when he "consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another." *Voisine v. United States*, 579 U.S. 686, 691, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016) (internal quotation marks omitted). That standard involves insufficient concern with risk, rather than awareness of impending harm. *See Borden v. United States*, 593 U. S. ——, ——, 141 S.Ct. 1817, 1823–1824, 210 L.Ed.2d 63 (2021) (plurality opinion).

*Counterman v. Colorado*, 600 U.S. 66, 78–79 (2023).

The Supreme Court has also cautioned against overlooking statutory language, particularly in the context of construing a federal criminal statute. When faced with construing the intent element for a criminal offense in *Ratzlaf v. United States*, the Court cautioned against treating statutory language as superfluous: "Judges should hesitate so to treat statutory terms in any setting, and resistance should be heightened when the words describe an element of a criminal offense." 510 U.S. 135, 140–41 (1994). To illustrate the point, the Court cited *Potter v. United States,* 155 U.S. 438, 446 (1894) (word "willful" used to describe certain offenses but not others in same statute "cannot be regarded as mere surplusage; it means something.").

Along similar lines, in a civil context, the Supreme Court discussed the term "purpose" at some length in *Iqbal*, addressing questions of qualified immunity from *Bivens* claims. The Court

in *Iqbal* drew a sharp distinction between "purpose" as goal or objective, as opposed to mere impact or effect:

> Under extant precedent purposeful discrimination requires more than "intent as volition or intent as awareness of consequences*." Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). It instead involves a decisionmaker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ibid.* It follows that, to state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin.

556 U.S. at 676–77 (alteration in original).

From the wording of ECPA, it is evident that the language "intercepted *for the purpose* of committing any criminal or tortious act" means that the goal or aim of the interception itself must have been to use the intercepted information to commit a crime or tort. It is not enough that a crime or tort was a mere side-effect of the interception. Indeed, the heightened intent required by the words "for the purpose" of committing a crime or tort elevates this intent requirement beyond the already-heightened requirement that the interception itself be "intentional."[8]

---

[8]  As the First Circuit has noted, the "intentional" requirement in ECPA is itself an elevated standard:

> [W]e wish to avoid uncertainty about the legal standard for intent under the ECPA on remand, and so we address that point. Congress amended 18 U.S.C. § 2511 in 1986 to change the state of mind requirement from "willful" to "intentional". Since "intentional" itself may have different glosses put on it, we refer to the legislative history, which states:

> As used in the Electronic Communications Privacy Act, the term "intentional" is narrower than the dictionary definition of "intentional." "Intentional" means more than that one voluntarily engaged in conduct or caused a result. Such conduct or the causing of the result must have been the person's conscious objective. An "intentional" state of mind means that one's state of mind is intentional as to one's conduct or the result of one's conduct if such conduct or result is one's conscious objective. The intentional state of mind is applicable only to conduct and results.

*Footnote continues on following page.*

Had Congress meant to authorize criminal prosecutions based on a standard lower than actual, conscious "purpose" it could have done so. It could have used language that focused on criminal or tortious *results* or *effects*. Instead, the crime-tort exception requires that "the *purpose* for the interception—its intended use—[be] criminal or tortious." *Sussman v. Am. Broad. Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999) (citations omitted). As one judge has noted, "[h]ad Congress intended for the act of recording itself to provide the tortious intent necessary, it could have chosen to define the exception in terms of interception of oral communications *resulting* in a tortious or criminal act." *Doe v. Kaiser Foundation Health Plan, Inc.*, 2024 WL 1589982 at *9 (N.D.C.A. 2024) (quoting *Caro v. Weintraub*, 618 F.3d 94, 99–100 (2nd Cir. 2010) (emphasis in original)).

As discussed below, Plaintiff contends that LGH acted for the "purpose" of violating HIPAA, which is itself a misdemeanor statute under which a person who "knowingly" discloses individually identifiable health information to another person is subject to fine or imprisonment. 42 U.S.C. § 1320d–6(a)(3) & (b); *see* Complaint ¶ 160. As explicated above, "purpose" is an essential element of ECPA, distinct from the minimal intent required under HIPAA, and the Complaint must therefore plead sufficient facts to satisfy this heightened intent requirement under ECPA. Here, Plaintiff fails to do so.

b.    "Separate and Independent" Requirement

In addition to the bar for intent that is set by the word "purpose," the crime or tort required by the crime-tort exception must be separate and independent from the interception

---

Since one has no control over the existence of circumstances, one cannot "intend" them.

*In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003).

itself. As the Second Circuit has noted, "to survive a motion to dismiss, a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording." *Caro*, 618 F.3d at 100. The crime-tort exception requires that the interceptor "have the intent to use the illicit recording to commit a tort or crime beyond the act of recording itself." *Id.* at 98. Similarly, the Ninth Circuit noted, in a case involving surreptitious tape recordings that were used in an allegedly defamatory newscast, "[w]here the taping is legal, but is done for the purpose of facilitating some further impropriety, such as blackmail, [the crime-tort exception] applies. Where the purpose is not illegal or tortious, but the means are, the victims must seek redress elsewhere." *Sussman,* 186 F.3d at 1202–03 (9th Cir. 1999). In other words, "the criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits." *Pena v. GameStop, Inc.*, 670 F. Supp. 3d 1112, 1120 (S.D. Cal. 2023) (quoting *In re Google Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 145 (3d Cir. 2015)).

Several of the courts that have rejected ECPA claims involving health care provider websites using web tracking tools have emphasized this point. *See, e.g., Okash v. Essentia Health*, No. CV 23-482 (JRT/LIB), 2025 WL 642913, at *3–4 (D. Minn. Feb. 27, 2025) (finding no crime or tort independent of the initial interception of data to trigger Wiretap Act liability); *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1096 (W.D. Wash. 2024) (finding crime-tort exception not triggered where plaintiff did not plead a tortious or criminal use of the intercepted data "separate from the recording, interception, or transmission").

In another session of this Court, Judge Stearns recently adopted this rationale as one of the grounds for his dismissal of an ECPA claim based on a hospital's use of web tracking tools:

> The court emphasizes that it is unconvinced that the Complaint sufficiently alleges an independent crime or tort beyond the alleged interception itself. Plaintiffs rely on an out-of-district court case for the proposition that a violation of HIPAA constitutes a "further impropriety" independent and separate from the healthcare company's interception, and thus satisfies the crime-tort exception. . . . citing *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *6 (C.D. Cal. Jan. 13, 2025). However, such a violation does not constitute an act "secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits." *Caro*, 618 F.3d at 98. Plaintiffs' allegations that CCHC violated HIPAA and various torts encompass only the simultaneous interception and disclosure of information to Facebook and Google – no data was alleged to have been independently used in a crime or tort committed by CCHC.

*Goulart v. Cape Cod Healthcare, Inc.*, No. CV 25-10445-RGS, 2025 WL 1745732, at *4 n.3 (D. Mass. June 24, 2025).

Some courts have gone in the opposite direction, ruling that violation of HIPAA can be deemed to be separate from the alleged ECPA violation because it involves a different statute. *See R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *6 (C.D. Cal. Jan. 13, 2025) ("the intent to disclose private information . . . is distinct from the interception itself."); *see also A.D. v. Aspen Dental Mgmt., Inc.*, No. 24 C 1404, 2024 WL 4119153, at *3 (N.D. Ill. Sept. 9, 2024) ("Plaintiffs plausibly allege that Aspen intended to violate the HIPAA when it transmitted Plaintiffs' information to third parties, which is distinct from the improper interception at issue in the ECPA claim."). But these decisions seem to ignore the fact that, although two statutes are involved (ECPA, for the interception, and HIPAA, for the disclosure), there is only one act: Deploying a web tracking tool that simultaneously provides analytic information to the website operator and shares data with Google or Meta.

These decisions also give short shrift to ECPA's heightened intent standard, which requires that acts be done "for the purpose" of committing a crime or tort. For instance, *Stein v. Edward-Elmhurst Health* bypassed the separation analysis by employing an analogy to jaywalking. No. 23-CV-14515, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025) (comparing jay

walking on the way to rob a bank with jay walking on the way to greet a friend). The court there

held: "A disclosure that violates HIPAA is a violation of law that is independent of a violation of

the ECPA. That's enough to conclude that the crime-tort exception applies." *Id.* The jaywalking

analogy ignores, however, that even though ECPA and HIPAA violations are two different

crimes, they may involve a single instantaneous act. To extend *Stein*'s analogy, this is not a case

of someone jaywalking with the intention of later doing something else (be it criminal or

benign); in this case we would be prosecuting someone for jaywalking "for the purpose of"

disobeying traffic signals," an oxymoron.[9] By such logic, everyone who disclosed their own

communications without permission from the other party could be prosecuted under ECPA, if

doing so violated a state's two-party consent law.

The Complaint here alleges that Plaintiff's communications were "contemporaneously

intercepted, recorded, and transmitted to these third parties." Complaint ¶ 3. In other words, the

interception that provides the basis for the alleged ECPA violation is itself the disclosure that

provides the basis for the HIPAA violation. There is no allegation that the act of disclosure was

in any respect separate or independent of the intentional act of deploying the web tracking tools.

As the Complaint makes clear, when a website operator deploys tracking tools provided by

Google or Meta, the data collected is simultaneously shared with Google and Meta.

Plaintiff has failed to plausibly plead a criminal or tortious purpose that is independent of

the interception itself. Although this is not the only defect in Plaintiff's ECPA claim, it is itself

fatal.

---

[9] There are, of course, myriad instances in which a single act or incident may violate multiple statutes (*e.g.,* a felon, who illegally possesses a firearm, robs a bank). But such routine cases do not involve crimes which have, as their mens rea element, a requirement that an act be performed "for the purpose" of committing another crime. It is this heightened level of intent, which is prescribed by the language of ECPA, that we must address.

c.      HIPAA Violations as Criminal Act Under § 2511(2)(d)

The cases that have grappled with the application of ECPA to health care provider

websites using web tracking tools have mostly focused on alleged violations of HIPAA as the

putative criminal "purpose" that could nullify the hospitals' consent to interception. HIPAA does

indeed make it a crime for a person to "knowingly and in violation of this part ... disclos[e]

individually identifiable health information to another person." 42 U.S.C. § 1320d-6(a)(3).

In many cases, courts have denied motions to dismiss when complaints have alleged that

web tracking tools were used *within* patient portals—which are designed for sharing IIHI

securely—or when complaints have alleged that the tools collected personal health care

information, such as individual patients' medical appointments, prescriptions, or billing records.

*See, e.g., Lugo v. Inova Health Care Servs.*, No. 1:24-CV-700 (PTG/WEF), 2025 WL 905191, at

*2 (E.D. Va. Mar. 25, 2025) (defendant "used pixels on its website and Patient Portal without

users' consent"); *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *5 ("provided

personal health-related information"); *K.L. v. Legacy Health*, No. 3:23-CV-1886-SI, 2024 WL

4794657, at *2, 6 (D. Or. Nov. 14, 2024) (allegation that tracking tools were used both on the

public website and patient portal); *Gay v. Garnet Health*, No. 23-CV-06950 (NSR), 2024 WL

4203263, at *2 (S.D.N.Y. Sept. 16, 2024) (allegation that plaintiff used website "to schedule

appointments, communicate with doctors, complete patient web forms, and review medical and

billing records"); *A.D. v. Aspen Dental Mgmt., Inc.*, 2024 WL 4119153, at *13 (allegation of

disclosure of patient status, medical conditions, medical appointments and treatments, specific

medical providers); *Sweat v. Houston Methodist Hosp.*, No. CV H-24-775, 2024 WL 3070184, at

*1, 4 (S.D. Tex. June 20, 2024) (allegation of tracking pixel embedded in private patient portal);

*Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2024 WL 3455020, at *4 (N.D. Ill. July 18,

2024) (hospital "actively chose to employ the tracking technology on certain pages of its website

that were likely to contain IIHI, such as within the MyChart patient portal or on pages prompting patients to schedule appointments"); *Doe v. Regents of Univ. of California*, 672 F. Supp. 3d 813, 819 (N.D. Cal. 2023) ("[Plaintiff] alleges that [defendant] intentionally incorporated Meta Pixel on the UCSF website and password protected MyChart portal . . . .").

On the other side of the same coin, when faced with allegations—like those in this case—that involve only browsing data from publicly accessible websites, some courts have dismissed ECPA claims, finding no independent criminal or tortious purpose. *See, e.g., Okash v. Essentia Health*, 2025 WL 642913, at *4 (D. Minn. February 27, 2025) ("no obvious crime or tort sufficiently independent from the initial interception" where plaintiff dropped claim that Pixel was providing information from within the patient portal).

There are exceptions to this pattern. Some courts have concluded that even indirect or inferential disclosure of HIPAA protected information qualifies as a HIPAA violation at the motion to dismiss stage and thus have concluded that ECPA claims survive a motion to dismiss, regardless of whether there are allegations that data was intercepted within patient portals or billing portals. *See Gaige v. Exer Holding Co., LLC*, 2025 WL 559719, at *1, 5 & n.5 (C.D. Cal. Mar. 2, 2025) (finding that "the complaint sufficiently alleges an illegitimate purpose" without specifying which areas of website were tracked); *Castillo v. Costco Wholesale Corp.*, No. 2:23-CV-01548-JHC, 2024 WL 4785136, at *7 (W.D. Wash. Nov. 14, 2024) (the failure to allege that Pixel was installed in the patient portal was "immaterial" where plaintiffs alleged that defendant collected information about searches for specific drugs, health insurance coverage, and locations).

The distinction between access to patient portal information, on the one hand, and browsing data from public websites, on the other, makes sense when considering privacy

interests. When there is no access to a patient portal or bill pay portal, the assumption seems to be that no actual IIHI is implicated. As the Ninth Circuit noted in *Smith v. Facebook, Inc.*, "Information available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes—information that unequivocally provides a window into an individual's personal medical history." 745 F. App'x 8, 9 (9th Cir. 2018).

In this case, even though Plaintiff concedes that web-tracking tools were not deployed inside the patient portal, Plaintiff contends that there were, nonetheless, improper disclosures of IHII. Plaintiff points out that there were buttons on public landing pages, which Plaintiff could have clicked to access the bill pay portal, and that by doing so would have signaled to Google and Meta that Plaintiff was in fact a patient of LGH, not just a public visitor. Docket No. 27 at 13 (alleging that "LGH disclosed patient status to Google and Facebook by surreptitiously using tracking technologies on pages specific to patients—for example, the bill payment page") The chain of inference is that such buttons would normally be pushed only by someone who is a patient, so if a website user pushes one of those buttons on a public web page, this would signal that the user is a patient.[10]

There is no clear consensus as to whether such inferences are enough to make out a HIPAA violation. On the one hand, the theory that sharing browsing activity on public web pages amounts to a HIPAA disclosure is a bit like the notion that a hospital violates HIPAA if

---

[10] It is not obvious whether the information involved here meets HIPAA's definition of disclosure of IIHI. In the first place, the inference that someone is a patient is somewhat attenuated; individuals or bots who are not patients may click on the button as well, website visitors may pay bills for family members and others in their care, people may click on the link by mistake, and so forth. Secondly, the definition of IIHI refers to information that is "*created* or *received* by a covered entity such as a health care provider, health plan, employer, or health care clearinghouse . . . ." *See* 45 CFR § 160.103 (emphasis added).

28

strangers on the street can see who is walking into a clinic (the stranger could infer that those entering are patients). Such inferential "disclosures" are very different from a hospital directly disclosing a patient's identity to a third party. On the other hand, this analogy only goes so far. Presumably, individuals walking into a clinic know that they are visible to the public; many website visitors may not be aware that near-ubiquitous use of web tracking tools frequently renders our web browsing *less* private than our physical movements in public spaces. Furthermore, Plaintiff contends that LGH's privacy pages lulled her into a mistaken sense of security.

In any event, Plaintiff has alleged that a third party could infer that Plaintiff was a patient based on her click on a button to pay bills. At the motion to dismiss stage, Plaintiff is entitled to the benefit of all reasonable inferences from the facts alleged in the Complaint. Therefore, I will presume that a HIPAA violation occurred.

Even though the Court must assume that HIPAA violation(s) occurred, it is significant that the alleged HIPAA violation(s) would have been accomplished by so indirect a mechanism —with "disclosure" occurring only through such an attenuated chain of inferences. Ultimately, the question before the Court is whether the factual allegations of the Complaint make out a plausible claim that violating HIPAA was LGH's "purpose" in deploying the web tracking tools. That the alleged disclosures of IIHI were so indirect is itself an indication that accomplishing such disclosures was not LGH's "purpose."

> d.    "Knowing" vs. "Purposeful" Violations of Law

A common theme in the decisions described in the preceding subsection is the focus on *whether* a HIPAA violation actually occurred. But an undue focus on whether or not HIPAA has been violated begs the critical question for ECPA crime-tort exception: Was there a *purpose* to violate the law, independent of the interception itself?

29

As noted above, the language of the statutes in question makes clear that violation of HIPAA, a misdemeanor, requires proof only that a defendant acted "knowingly" in making an improper disclosure (42 U.S.C. § 1320d-6(a)(3)), while the ECPA felony requires two higher, and additional, states of mind: that the Defendant accomplished the interception "intentionally"; and that they did so for the "purpose" of committing a crime or tort. Given that both HIPAA and ECPA are criminal statutes, these intent requirements cannot be conflated: one describes the requisite state of mind for the misdemeanor that is the alleged objective (the HIPAA violation), while the other describes the two separate states of mind required for the felony (the ECPA violation). *Cf. Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022) (rejecting ECPA claim that "runs afoul of [the "separate and independent"] requirement by reusing the same criminal purpose . . . as both the purpose of the civil RICO claim and the independent criminal or tortious purpose of § 2511(2)(d)").

Alleging that a website operator knowingly made a disclosure of IIHI – by using web tracking tools that would permit third parties to receive such information – may suffice to allege a violation of HIPAA.[11] But this does not address the "for the purpose" element in ECPA. The mere fact that a website operator may be said to have "knowingly" disclosed IIHI, does not plausibly support an inference that the making of such disclosures was the website operator's "purpose."

---

[11] As the Complaint acknowledges, HIPAA does not provide for a private right of action for violations. Complaint ¶ 126. *See* 42 U.S.C. §1320d-5(a)(1), (d)(1). But if the "purpose" element of ECPA could be satisfied merely by showing that a website operator knowingly used web tools that share information with Google or Meta, then ECPA would provide just such a private right of action based on nothing beyond the mere "knowingly" requirement for the HIPAA misdemeanor.

e.     Plausible Inferences About LGH's Purpose in Permitting Interceptions

The Complaint contains no allegation that LGH ever entertained a conscious purpose of disclosing the identities of its patients, or their treatments, to Google or Meta. Nor can such an inference be gleaned from the well-pleaded factual allegations of the Complaint. This, however, is an essential component of ECPA's mens rea element, which expressly requires that a consented-to interception be "for the purpose" of committing a crime or tort. *See Counterman*, 600 U.S. at 79 ("A person acts purposefully when he 'consciously desires' a result[.]") (quoting *Bailey*, 444 U.S. at 404).

There are no allegations in the Complaint to suggest that LGH's purpose in deploying the web tracking tools was anything other than to gather information that would assist LGH in analyzing the traffic to its website, albeit the Complaint acknowledges this only obliquely. *See* Complaint ¶ 101 ("even if Lawrence General wanted to use tracking technologies to optimize its website or its marketing for a website"). There are, for instance, no allegations in the Complaint that LGH had a corporate interest in assisting Google and Meta, or that it was paid to disclose HIPAA protected information that Google and Meta requested.

The allegations of the Complaint fail to plausibly support an inference that LGH's purpose in deploying the web tracking tools was anything other than the usual reason why website operators use such tools: to help run their websites. *Cf. Williams v. TMC Health*, No. CV-23-00434-TUC-SHR, 2024 WL 4364150, at *4 (D. Ariz. Sept. 30, 2024) (plaintiffs failed to state a criminal, tortious purpose where complaint alleged defendants obtained personal data to increase profits and improve website analytics); *Doe v. Genesis Health Sys.*, No. 4:23-CV-04209-JEH, 2025 WL 1000192, at *9 (C.D. Ill. March 18, 2025) (dismissing ECPA claim where trackers were used for defendant's own marketing and advertising purposes).

31

To be sure, it is reasonable to infer from the allegations of the Complaint that LGH knew or should have known that Google and Meta do not make their web tracking tools available to web operators out of the goodness of their corporate hearts. In using those their tools, a web site operator necessarily shares the gathered data with Google and Meta, and LGH presumably knew this. Moreover, the Complaint alleges that LGH "controls when and how it uses tracking technologies on its own website and can change or remove tracking technologies at any time." Complaint ¶ 63.

As noted above, there are plenty of decisions in which courts have permitted ECPA claims to go forward against hospitals that deployed web tracking tools *inside* their patient portals and/or bill pay portals. It is not clear to me whether such cases have adequately distinguished between the "knowingly" standard of HIPAA and the additional "for the purpose" requirement of an ECPA claim. It could be argued, however, that when there are allegations that a hospital chose to deploy tracking tools inside non-public portals, these would support an inference that the hospital acted for the purpose of making improper disclosures of private health information.

Assuming the cases involving interceptions of data from *inside* patient portals are correctly decided, no such inferences of intent or purpose are available in this case, which does *not* involve the use of web tracking tools inside patient portals or bill pay portals. *See* Transcript of Oral Argument at 50–51. On the contrary, given the allegation that LGH "controls when and how it uses tracking technologies," the logical inference is that LGH's purpose was *not* to share IHII with Google and Meta.

The Complaint does not allege that LGH implemented the tracking tools on webpages that require passwords or other user authentication, in applications where patient records are

stored and maintained, or in applications through which direct communication between patients and their doctors take place. Indeed, there is no allegation to suggest that LGH intended to do, or did, anything other than deploy widely used website analytics and tracking tools of the kind that are used on all manner of public websites and that LGH took care to limit the tools' use to unauthenticated, public-facing webpages.

The fact that any disclosure of IIHI in this case occurred by a highly circuitous route underscores the dearth of factual allegations from which one could infer that LGH's conscious purpose in deploying the web tracking tools was to violate HIPAA. As noted above, LGH's sharing of browsing data may have enabled Google and Meta to draw inferences about whether Plaintiff was a patient, and about her medical conditions. But any such information would have to be pieced together from snippets of browsing data. If LGH's purpose had been to violate its patients' HIPAA rights, it presumably would have deployed the web tracking tools inside the patient portal or bill pay portal – but it did not do that. Nor can the factual allegations of the Complaint support a plausible inference that LGH's purpose was to identify its patients – it would have been easier, and more accurate, to simply print a list of patient names and send it to Google and Meta.

To employ the terminology of *Iqbal*, what is missing from the Complaint is any allegation, or plausible inference, that LGH deployed the web tracking tools "because of, not merely in spite of," the fact that using such tools entailed sharing data with Google and Meta.

The Complaint supports a reasonable inference that LGH was, or should have been, aware of the risk that the data collected by the tracking tools could be interpreted by Google and Meta in ways that would permit them to infer that Plaintiff was a patient of LGH and to identify the kinds of medical issues she looked up on the public website. If indeed LGH failed to exercise

due care to protect its patients' privacy, as the Complaint alleges, that may be a basis for liability under Plaintiff's state law causes of action. *Cf. Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142 (D. Mass. 2024) (Saris, J.) (denying motion to dismiss in diversity case involving web trackers); *Vita*, 494 Mass. at 849 (dismissing claim under Massachusetts wiretap act and emphasizing "other statutory and common-law causes of action to address allegedly false, misleading, or deceptive activity on the Internet, including statutory and common-law protections more directly applicable to misrepresentations or misuse of private medical information").

A colorable claim of negligence is a far cry from a plausible allegation that LGH committed a felony violation of ECPA by acting "for the purpose" of improperly disclosing its patients' private information.

f.    Additional Torts or Crimes

The Complaint alleges, in conclusory fashion, that LGH acted for the purpose of committing other crimes or torts, such as the various privacy violations alleged in Counts II -VII. Complaint ¶ 158. For each of these theories of liability, the principles discussed above foreclose liability under ECPA. As with the more developed allegations regarding HIPAA, there are no well-pleaded facts in the Complaint to support an inference that the commission of any such torts was LGH's purpose.

Notably, the various state *privacy* torts alleged in this case all depend on lack of *two*-party consent. In states with stringent privacy laws, such as Massachusetts, virtually every one-party consent interception could be said to violate the privacy interest of the non-consenting party. Indeed, many state laws provide two-party consent laws to protect against third-party disclosures of private communications. *See* Joseph F. Tower IV, *Half Baked: The Need for Clarity on the Party Exemption to the Wiretap Act for Private Actors Using Tracking Cookies*,

56 Suffolk U. L. Rev. 175, 189 n.91 (2023) (noting the fourteen states that provide all-party consent wiretapping statutes). It may be that state privacy laws protect against various disclosures of private medical information unless the *patient* consents, so Plaintiff's state tort claims might survive. But to make out an ECPA claim, it is not enough to allege that there was a disclosure of information (be it highly private or not) based on one-party consent. The express provisions of ECPA plainly provide for single-party consent. *Cf. United States v. Kovolas*, 1998 WL 452218, at *4 (D. Mass. July 27, 1998) (Young, J.) ("If state law were to render tortious conduct defined by the very act of recording that Congress sought to permit, the provisions of section 2511(2)(d) would be rendered meaningless.").

For the reasons discussed above, the mere fact that a crime or tort was allegedly committed and may have been a foreseeable effect of an interception, is not enough. To meet the "for the purpose" element, there must be allegations supporting an inference that LGH "consciously desire[d]" to violate HIPAA by sharing confidential patient information. *Counterman*, 600 U.S. at 79 (quoting *Bailey*, 444 U.S. at 404).

Accordingly, the crime-tort exception to the party exception is inapplicable to Plaintiff's ECPA claim.

### 5.    *Alternative Glosses on "Purpose"*

Given the sheer number of cases involving web tracking tools on health care provider websites, it is unsurprising that the case law in this area is not wholly consistent. Not only do factual allegations vary from case to case, but the courts' reasoning varies as well. Given that my focus on the separate intent requirements of HIPAA and ECPA differs slightly from other courts' approach, it may be useful to note some of the points of difference.

a.    Primary Motivation

Several courts have dismissed ECPA claims on the basis that the defendant's "primary motivation" or "determinative factor" for the interception was not to commit a criminal or tortious act. Indeed, this was a key rationale for Judge Stearns' decision in *Goulart*,[12] 2025 WL 1745732, at *3. *See also In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022) ("[u]nder this exception, plaintiffs must allege that either the 'primary motivation or a determining factor in [the defendant's] actions has been to injure plaintiffs tortiously.'" (quoting *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021))); *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 514–15 (S.D.N.Y. 2001) (same)).

While "purpose" plainly means a "conscious desire" to obtain an objective, the emphasis on finding a "primary" or "dominant" purpose is problematic. First, those are not the words of the statute. Second, as a practical matter, there can be multiple motivating factors for an act, and it may be challenging to identify which purpose(s) were "primary." And third, reading into the ECPA statute a framework that would address such mixed-motive scenarios opens up a host of additional considerations. *Cf. Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92–95 (2003) (reviewing history of divided judicial decisions and subsequent Congressional enactments regarding "mixed-motive" discrimination under Title VII). As the Ninth Circuit noted in *Sussman*, an interception "could be for both a legitimate purpose (news gathering) and also an unlawful or tortious purpose (airing private intimate conduct). The existence of the lawful purpose would not sanitize [an interception] that was also made for an illegitimate purpose." 186 F.3d at 1202.

---

[12] As noted above, a second factor in Judge Stearns' decision, which I find compelling, was the plaintiff's failure to allege tortious conduct *independent* of the interception itself.

b.    Monetary Gain

In conjunction with a "primary motivation" analysis, some courts have held that a defendant's intention to earn profits belies any criminal or tortious purpose. In some instances, this reliance on monetary motivation seems to be another way of stating that a defendant did not act for the purpose of committing a crime or tort. But the reasoning and choice of words is confusing, at best. For instance, one court has held that "the crime-tort exception is inapplicable where a defendant's primary motivation is to make money rather than to injure plaintiffs tortiously or criminally." *Roe v. Amgen Inc.*, No. 2:23-CV-07448-MCS-SSC, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024). Other courts have used similar language. *See, e.g., R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901 (C.D. Cal. 2024) ("Generally, '[a]lleged interceptions fall within the tort or crime exception only where the primary motivation or a determining factor in the interceptor's actions has been to injure plaintiffs tortiously, ... [and] cannot apply where the interceptor's purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money.'") (quoting *In re Google Inc. Gmail Litigation*, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014)) (alterations in original).

A purpose to make money, while at times a valid distinction, doesn't hold up to pressure testing. The underlying motivation for many crimes and torts is to make money. *See R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *7 (discussing an interception for the purpose of blackmail, for which often the end goal is money); *Lugo*, 2025 WL 905191, at *8 ("Indeed, many crimes and torts are committed for financial gain."). The "broad theory that the presence of a primary financial motive inoculates a defendant from liability under the ECPA is wrong." *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 382 (S.D.N.Y. 2024).

c.    Purpose to Harm

Several courts have interpreted the crime-tort exception as applying only if the purpose of the interception was to "harm" the recorded party. *See United States v. McHugh*, 57 F. Supp. 3d 95, 100 (D. Mass. 2014) ("An impermissible purpose is properly confined to situations where the recording party intended to harm the recorded party, either through blackmail, threats or public embarrassment."). *See also In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 515 (S.D.N.Y. 2001) (reviewing legislative history of "for the purpose" language in ECPA).

The statute does not, by its terms, require proof of intent to "harm." Undoubtedly many crimes and torts themselves encompass such a requirement, so demonstrating that there was an intention to commit a crime or tort will often entail demonstrating an intent to harm. ECPA, however, requires only a criminal or tortious "purpose" for an interception and says nothing about harm or injury. § 2511(2)(d). Indeed, the relevant language in ECPA comes from a Senate amendment that originally included "criminal, tortious *or injurious*" purposes. *Id.* (emphasis added). Given that the word "injurious" did not make it into the final version as enacted, it seems anomalous to read the statute as if had.

d.    Knowledge of the Law

In *Kurowski v. Rush Sys. for Health*, the defendant hospital argued that it should escape liability under ECPA if it did not know that its alleged violations of HIPAA were illegal. *See* 2024 WL 3455020, at *3 ("[Defendant] interprets the 'purpose' requirement of the crime-or-tort exception as requiring a party to have knowledge that its intended use of the intercepted information is illegal."). Although the court recognized that healthcare providers must deal with "uncertainty regarding the outer limits of what HIPAA protects," it found that a party violates HIPAA by knowingly making a prohibited disclosure, regardless of whether the party is aware of the law. *Id.* at *6. As a construction of HIPAA, this makes sense; violation of HIPAA is a

misdemeanor that requires only that the defendant act "knowingly." On the other hand, there is language in the *Kurowski* decision that could be read as conflating the general intent requirement of HIPAA ("knowingly") with the heightened intent standard in ECPA ("for the purpose"). *See id. at \*4–5.*

### C.    Counts II–VII Should be Remanded to the Massachusetts Superior Court

This case was removed to this Court on the basis that the Complaint included a claim under federal law, Count I, the ECPA claim. Docket No. 1. If the Court dismisses that federal claim there is scant reason to entertain this matter further in this Court.

As a matter of jurisdictional authority, the state law claims in the Complaint are properly before this Court under the doctrine of supplemental jurisdiction. The controlling statute states in relevant part:

> . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). As the Court of Appeals has pointed out, § 1367 essentially codifies the holding of *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), that supplemental jurisdiction extends to state law claims arising from a "common nucleus of operative fact" such that a plaintiff would be expected to assert all claims in a single proceeding. *See Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1175–76 (1st Cir. 1995). Plainly the "common nucleus" standard is satisfied in this case, since the same factual allegations supply the foundation for both the ECPA claim and the state law claims in the Complaint.

With the dismissal of Plaintiff's sole federal claim the calculus is different, and the court should reassess its exercise of jurisdiction. *See Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998) ("If . . . the court dismisses the foundational federal claims, it must reassess its

jurisdiction, this time engaging in a pragmatic and case-specific evaluation of a variety of considerations that may bear on the issue.").

As the First Circuit has pointed out, "this praxis is not compelled by a lack of judicial power. . . . In an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims." *Rodriguez*, 57 F.3d at 1177. Comity interests, however, bear heavy weight in this analysis. "[T]he balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation." *Camelio*, 137 F.3d at 672.

This case was originally filed a couple of years ago, and there is reason to suppose the remand to the Massachusetts courts will engender some additional time and expense. But while the case is chronologically old, we are truly at the beginning stages: No answer has yet been filed as to the Complaint (nor was there an answer to the Original Complaint); no discovery has been taken; and no factual disputes have yet been joined.

There are no apparent efficiencies in holding on to this case. There is no reason to suppose that this Court would be in a position to wrap up the remaining claims more effectively or efficiently than the Massachusetts Superior Court. As noted above, Defendant has the best of the arguments with respect to the ECPA claim, but Plaintiff may have stated viable claims for relief under Massachusetts privacy law, which would open a variety of questions that pertain solely to Massachusetts law. It is for the courts of Massachusetts to consider the merits of the Complaint's claims under Massachusetts privacy laws.

I note that Judge Stearns, in *Goulart v. Cape Cod Healthcare, Inc.*, reached the same conclusion, remanding all remaining claims to state court after dismissal of the ECPA claim. 2025 WL 1745732, at *4.

<u>CONCLUSION</u>

For the forgoing reasons, I recommend that the Court allow Defendant's Motion to dismiss Count I.

I further recommend that the Court decline to exercise its Supplemental Jurisdiction over Counts II–VII pursuant to 28 U.S.C. § 1367(c) and remand those claims to the Suffolk County Superior Court, a division of the Trial Court of the Commonwealth of Massachusetts.

/s/ Paul G. Levenson

Paul G. Levenson

Dated: August 29, 2025            U.S. MAGISTRATE JUDGE

<u>NOTICE OF RIGHT TO OBJECT</u>

In accordance with Rule 3 of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, the parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b) or Federal Rule of Criminal Procedure 59(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Sec'y of Health & Hum. Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).