**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>For herself and the Class,<br><br>v.<br><br>LAWRENCE GENERAL HOSPITAL,<br><br>Defendant. | **Case No. 1:25-cv-10081-NMG**<br><br>**Leave to file granted on October 29, 2025 (Doc. No. 55)** |

# SECOND AMENDED COMPLAINT

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

## Preliminary Statement

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, Lawrence General Hospital ("Lawrence General"), including but not limited to those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Specifically, Lawrence General intercepted communications between Plaintiff and other Class Members (defined below) and Lawrence General through a website maintained by Lawrence General (the "Lawrence General Website").

2. Lawrence General enabled Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies to secretly eavesdrop on healthcare

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of both Jane Doe and the minor children of Jane Doe. Ms. Doe's identity has been disclosed to counsel for the Defendant per the Massachusetts Superior Court's order of March 28, 2023.

consumers' communications with Lawrence General by injecting hidden code into the Lawrence General Website. Those third parties, including Google and Facebook, then associated the intercepted communications with the real-world identities of individuals known to Google and Facebook. Google and Facebook then used the contents of the intercepted communication for commercial purposes, such as serving personalized advertisements to healthcare consumers, including advertisements for Lawrence General, based on the contents of the secretly intercepted communications.

3. Lawrence General's purpose in intercepting and disclosing to Google, Facebook, and other companies the contents of patient communications on the Lawrence General Website was so that those third parties could sync the intercepted communications with profiles of individuals known to Google and Facebook, which would then enable Lawrence General to use Google and Facebook's advertising platforms to target those patients with advertising. That is, Lawrence General had an incentive, which it acted on, to disclose private communications to Google and Facebook to advance Lawrence General's own marketing efforts.

4. By intercepting its patients' communications for the purpose of disclosing individuals' health information to third parties for commercial gain, including later using the contents of the intercepted communication for Lawrence General's targeting of advertisements to those patients through Google and Facebook's advertising platforms, Lawrence General put its business interests over the privacy of its patients. Lawrence General intercepted communications for the purpose of committing criminal and tortious acts, including acts that violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), and Massachusetts statutory and common law torts described below.

5. Healthcare consumers' electronic communications with Lawrence General were contemporaneously intercepted, recorded, and transmitted to these third parties, and Lawrence General subsequently used the intercepted communications for targeted advertising purposes, without

the consumers' knowledge or consent. The intercepted communications and Private Information included, without limitation, requests for information on particular conditions and treatments, keyword searches, doctor searches, communications regarding bill payment pages, and access to the Lawrence General patient portal, thereby disclosing patient status to Google and Facebook. Those interceptions enabled the third parties to know that a specific patient was seeking confidential medical care and to know about the nature of that medical care. That recipient, in turn, sells Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies. Lawrence General also used Facebook's and Google's advertising platforms, which enabled Lawrence General to target advertisements to patients who had visited Lawrence General's website based on the patient communications Lawrence General intercepted and disclosed to Facebook and Google.

6. Lawrence General did not disclose to healthcare consumers that it intercepted and disclosed to third parties such as Google and Facebook the contents of their communications with Lawrence General, or that those third parties and Lawrence General used the content of the intercepted communications for targeted advertising. Lawrence General also did not seek or obtain patients' consent for such interceptions, disclosures, and subsequent advertising use of the intercepted communications. On the contrary, Lawrence General **<u>falsely</u>** told healthcare consumers, through their published online privacy policy, that it did **<u>not</u>** share such information.

7. Moreover, Lawrence General knew of the privacy implications of deploying the tracking technologies throughout its website, including on pages like the patient portal and bill payment pages, the use of which reflected patient status. As detailed below, the functionality of the tracking technologies was well-known to businesses that deployed them, and Google and Facebook expressly directed Lawrence General to obtain user consent for all tracking technologies and not to use tracking technologies on healthcare webpages. With this knowledge, Lawrence General deployed

the tracking technologies anyway, including on pages specifically designed for patients (including its patient portal). Indeed, Lawrence General deployed the tracking technologies for that very purpose: to disclose a patient's activities on its website to Google, Facebook, and other third parties so that Lawrence General and others could target those patients with advertising on those third parties' advertising platforms.

8. Lawrence General owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Lawrence General assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

9. As described more fully below, Plaintiff and Class Members have suffered injury as a result of Lawrence General's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their communications and Private Information.

10. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist*

*Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

11. In light of the Supreme Judicial Court's decision, Plaintiff previously amended her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

12. The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. Here, Lawrence General intercepted the electronic communications at issue for the purpose of committing criminal and tortious acts, including the unauthorized disclosure and subsequent use of patient communications and Private Information in violation of HIPAA and in violation of state tort laws, as described below. In committing such criminal and tortious acts, Lawrence General was motivated by its own financial self-interest in maximizing the effectiveness of its online marketing. The ECPA thus provides a private remedy for Lawrence General's interception of electronic communications, enforceable against Lawrence General.

13. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the Lawrence General Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## **PARTIES**

14. Plaintiff is a resident of Burlington, Massachusetts. Plaintiff is a patient of Lawrence General. Plaintiff regularly used the Lawrence General Website during the class period, including, for example, in late 2022 when she was obtaining treatment at Lawrence General for a specific medical condition, to (i) obtain information about Lawrence General doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; (iii) obtain information about Lawrence General's locations; and (iv) obtain and review her medical records through the website's patient portal.

15. As described below, Lawrence General implemented tracking technologies that intercepted communications between Lawrence General and healthcare consumers throughout the Lawrence General website. During the class period, Plaintiff visited specific pages on the Lawrence General Website on which Lawrence General embedded code for various tracking technologies, including Meta Pixel, DoubleClick, and Google Analytics. The pages Plaintiff visited include (i) the Lawrence General patient portal (*see* ¶¶ 113-18, *infra*, for an explanation of how Lawrence General deployed tracking technologies on the patient portal); (ii) the find-a-doctor webpage, which Plaintiff used to obtain information about a particular pathologist who wrote a report for her (*see* ¶¶ 106-10, *infra*) (explaining how tracking technologies intercepted communications on that particular page); (iii) pages for particular departments of Lawrence General Hospital, including, for example, the Laboratory Services department (*see* ¶¶ 95-100, *infra*, for an explanation of how Lawrence General

deployed tracking technologies on pages for particular departments and conditions); and (iv) the search function of the Lawrence General Website, which Plaintiff used to search for particular terms used in her pathology report (*see* ¶¶ 104-05, *infra*, for an explanation of how Lawrence General deployed tracking technologies to intercept search terms).

16. Plaintiff was unaware of and did not consent to or authorize the use of Private Information by third parties or Lawrence General enabling third parties to access and use such Information.

17. Plaintiff has both Google and Facebook accounts, which facilitate Google and Facebook's matching of the communications intercepted on the Lawrence General Website with Plaintiff's real-world identity for purposes of targeted advertising (both for Lawrence General and other businesses that use Google and Facebook's advertising platforms).

18. Defendant Lawrence General is a corporation that operates in Lawrence, Massachusetts, and the surrounding area. Its functions include providing healthcare services including at its main campus in Lawrence, Massachusetts. Lawrence General maintains and controls the content of the Lawrence General Website.

## JURISDICTION

19. Lawrence General has invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through its Notice of Removal, Doc. No. 1, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 (i.e., federal question jurisdiction).

## FACTUAL ALLEGATIONS

### Lawrence General and Its Website

20. Lawrence General operates a hospital in Lawrence, Massachusetts, and several outpatient service locations, including in Lawrence, Andover, and Methuen. Lawrence General offers inpatient and outpatient care to residents near Lawrence and surrounding communities north of

Boston. Lawrence General provides healthcare across various specialties, including heart and vascular care, orthopedics, cancer care, post-COVID recovery, surgery, obstetrics and gynecology, and trauma care.

21. During the class period, Lawrence General maintained the Lawrence General Website for its hospital and outpatient facilities, found at https://www.lawrencegeneral.org/. Through that website, healthcare consumers can obtain information about the services Lawrence General provides, including information about doctors, services, and treatments provided by Lawrence General for particular medical conditions.

22. The Lawrence General Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The Lawrence General Website provides general information about Lawrence General.

(b) The Lawrence General Website provides information about healthcare services provided at Lawrence General, communicated through service-specific pages for a range of services such as "OB/GYN," "Cancer Center," "Stroke Care," and "Surgical Services," among many others.

(c) The Lawrence General Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(d) The Lawrence General Website permits healthcare consumers to access and pay bills online.

(e) The Lawrence General Website lets healthcare consumers access their private medical information online through the Patient Portal.

23. Certain pages of the Lawrence General Website are designed specifically for patients. These pages include the Lawrence General patient portal, a page permitting patients to pay their bills, and a page permitting patients to search for and contact particular Lawrence General physicians.

24. Because the Lawrence General Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors,

specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**<u>Reasonable Expectations of Users of the Lawrence General Website</u>**

25. Healthcare consumers in Massachusetts have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Lawrence General Website.

26. Users of healthcare-related websites such as the Lawrence General Website have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as Lawrence General will not share with third parties their communications with Lawrence General without their consent.

27. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Lawrence General from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as Lawrence General from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

28. Healthcare consumers would **<u>not</u>** anticipate or expect that their communications with healthcare providers, including Lawrence General, which reveal information about that individual's status as Lawrence General patients and personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

29. The expectations and understanding of users of the Lawrence General Website was informed by what Lawrence General told them about how it handles their personal information.

30. During the class period, the Lawrence General Notice of Privacy Rights and Practices specifically focused on how Lawrence General treats "medical information" about patients, including the limited circumstances in which such information may be disclosed to third parties, such as "for law enforcement" and "to coroners, medical examiners and funeral directors." Lawrence General did not disclose that it shares any information or communications (medical or otherwise) with technology or social media companies such as Google and Facebook or that those third parties and Lawrence General use the intercepted communications to serve targeted advertising upon them.

31. The same policy stated: "Except as otherwise permitted by law, all other uses and disclosures not described above will require your signed authorization." At no point has Lawrence General obtained any signed authorization from Plaintiff or other Class Members to share with technology and social media companies such as Google and Facebook the communications between Plaintiff and other Class Members and Lawrence General, or for Google, Facebook, and Lawrence General to use the intercepted communications for purposes of targeted advertising.

32. When a person visited the Lawrence General Website during the class period, a popup appeared at the bottom of the page that said: "By continuing to browse, you consent to our use of cookies. To know more, please refer to our Privacy Policy." The linked "Privacy Policy," however, was the Notice of Privacy Rights and Practices described above. That notice did not discuss cookies, and it certainly did not discuss or disclose any third-party tracking technologies such as those described in this complaint. Moreover, as described more fully below, the tracking technologies described in this complaint, such as Google Analytics and Meta Pixel, are not "cookies."

33. Disclosure of the use of "cookies" did **not** implicitly or explicitly disclose that communications are intercepted or shared with any third parties. Many cookies do not involve any

interaction with parties other than the website and website user. For example, websites often use a cookie to track when a user is logged into the website. No third-party interceptions are involved in such a use of a cookie, and the communication may remain entirely between the website user and the website. Accordingly, merely disclosing the use of "cookies" does not equal disclosure of any interception of communications by any third party (i.e., a party other than the website and the website user).

34. During the class period, the Lawrence General Website also contained a page called "Legal," which included various disclosures, such as information about the copyright of the website's contents and disclosures about Lawrence General's lack of control over the content of external websites linked from the Lawrence General Website. That "Legal" page stated: "This site maintains policies concerning the use of information gathered from site visitors. For more information, please visit the Privacy Policy, via the link provided at the base of our home page." But, the Privacy Policy referenced was the Notice of Privacy Rights and Practices, which did not discuss Lawrence General's practices or policies concerning any information they collect from visitors of the Lawrence General Website.

35. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent, or that such communications will be used for targeted advertising—an understanding reinforced by Lawrence General's deceptive statements on the Lawrence General Website. The interceptions of website users' communications with Lawrence General and the subsequent use of the intercepted communications to support targeted advertising were, therefore, truly secret and made without any consent from Plaintiff or the other Class Members.

**Third Parties Offering Tracking Technologies**

36. Plaintiff describes in this complaint various tracking technologies implemented on the Lawrence General Website that caused the secret interception, recording, and transmission of the contents of Class Members' internet communications with Lawrence General. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Lawrence General and the purposes for which interceptions are made.

37. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

38. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers. Facebook is a "real identity" platform. This means that users are permitted only one account and must use the name they go by in everyday life. To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.

39. Facebook derives most of its revenue from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising to particular individuals by building extensive behavioral profiles for each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

---

[2] Facebook rebranded its parent company as "Meta" in October 2021.

40. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

41. The express purpose of Meta Pixel is to track and disclose to Facebook a user's activities on a website, identify that individual user, and target that individual with advertising from the website owner (here, Lawrence General). For example, Facebook tells website owners to "[i]nstall the Facebook pixel if you want to retarget your website visitors." Facebook explains that "[t]he Facebook pixel is a small snipper of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when they engage with your brand, including any of Your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."[3]

42. Facebook receives and monetizes intercepted communications regardless of whether a website user has a Facebook account. Even for someone without an account with any Facebook platform (there are few such people; Facebook has over 2.9 billion users), Facebook can still combine data it obtains through the Meta Pixel with other sources (including data obtained through data brokers) to identify the individual, and Facebook then sells the intercepted communications obtained through Meta Pixel, together with identifying information, to data brokers (i.e., companies that are in the business of collecting and compiling data on individuals from various sources then reselling that data to advertisers).

[3] https://www.facebook.com/business/goals/retargeting.

43. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

44. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[4]

45. The reason why businesses such as Lawrence General Hospital deploy Meta Pixel on their website is primarily to maximize the effectiveness of the business's targeted advertising on Facebook's advertising platforms (including Facebook, Instagram, and other Facebook services). Facebook tells website owners like Lawrence General that they can use the Meta Pixel to "[o]ptimize delivery of your ad campaigns," and after the Meta Pixel is deployed, business owns can better "reach [their customers] through future Meta ads by retargeting those who have interacted with your website."[5]

46. Lawrence General has an incentive to share as much information as possible with Facebook through the tracking technologies, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of Lawrence General's advertising through Facebook platforms.

47. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through the Meta Pixel, Facebook directed Lawrence General to "provide[] robust and sufficiently prominent notice to users regarding [Meta Pixel]," including, a "clear and prominent notice on each web page where our pixels are used that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your

---

[4] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

[5] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel.

websites…and use that information to…target and deliver ads." Facebook also direct businesses not to use Meta Pixel on any webpage that "that includes health…information."[6] Despite these warnings that expressly put Lawrence General on notice about the operation of Meta Pixel and its implications for privacy, Lawrence General ignored the directions and warnings and deployed Meta Pixel with no notice to website users on pages that contain health information.

48. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

49. Google maintains detailed profiles of individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such as Gmail. Google maintains detailed profiles of individuals whether or not they have a Google account.

50. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

51. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free,"

---

[6] https://www.facebook.com/legal/terms/businesstools.

Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

52. Google Analytics has a feature that permits website owners to anonymize the data intercepted and transmitted to Google through Google Analytics. Lawrence General chose not to activate the anonymization feature, meaning that Lawrence General chose to implement Google Analytics in a fashion that permitted Google to match the intercepted communications with individuals known to Google, including Plaintiff, so that individualized advertising could be served to those individuals based on the intercepted communications.

53. Another way Google collects information to build its detailed profiles on individuals is through its "DoubleClick" "activity tags." DoubleClick was previously an independent company, founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired DoubleClick in 2007 and now operates it as an advertising division of Google. The particular DoubleClick technology that Lawrence General relevant to this case is called "activity tags." Activity tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like Meta Pixel, Google then associates the data collected through DoubleClick activity tags with particular individuals, to enable the website owner (here, Lawrence General) to serve targeted advertising to the individual and evaluate the efficacy of Lawrence General's advertising campaigns through Google's advertising programs.

54. Lawrence General used Google platforms to advertise, thus exploiting the information Lawrence General disclosed to Google through Google Analytics and Google DoubleClick, as reflected by the examples below of Lawrence General advertisements through Google's ad platform:




55. Lawrence General has an incentive to share as much information as possible with Google through DoubleClick, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of Lawrence General's advertising through Google platforms, such as the advertising examples above.

56. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through Google Analytics and DoubleClick, Google directed website owners like Lawrence General that they "must disclose [to users] the use of Google Analytics, and how it collects and processes data." Lawrence General did not do so.

57. In summary, both Google Analytics and DoubleClick intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and DoubleClick activity tags, and Google can and does use those intercepted communications for its own commercial purposes, and Lawrence General also uses the intercepted communications when it uses Google's advertising platforms for its own marketing.

**Website Tracking Technologies on the Lawrence General Website**

58. Lawrence General injected hidden code into the Lawrence General Website that intercepted healthcare consumers' communications and disclosed them to third parties. The tracking technologies permitted third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This included, for example, associating the content of the user's communications with Lawrence General with the website user's Facebook profile.

59. Lawrence General used several tracking technologies on its website, including Google Analytics, DoubleClick, and Meta Pixel. The tracking technologies are implemented through similar means.

60. Before describing how such technologies work, it is important to first define some basic technological terms.

61. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

62. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Lawrence General Website, as of the time of this complaint, is 35.173.24.203. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

63. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the

Lawrence General Website is https://www.lawrencegeneral.org/. URLs also often point to specific pages on that website. Sometimes, URLs will contain information about the particular webpage itself or the substance of the information communicated through it. Such URLs are called "descriptive" URLs. The Lawrence General Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communications made through a particular page on the Lawrence General Website. For example, the Lawrence General Website has a page specifically about the Lawrence General Cancer Care Center; that page's URL is https://www.lawrencegeneral.org/services-and-centers/cancer-care. One call tell from the URL itself the substance of the communication between Lawrence General and the healthcare consumer—that the consumer is requesting information about cancer care services from Lawrence General.

64. A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one way to associate particular communications between website users and Lawrence General with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies," each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

65. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not

visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

66. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics, DoubleClick, and Meta Pixel—work as follows. In general terms, a website owner (here, Lawrence General) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

67. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

68. When the JavaScript code causes the user's web browser to retrieve a file from the tracking technology vendor's website, the JavaScript code also causes the browser to communicate certain information to the vendor. That information includes, depending on the particular page visited, a combination of: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.lawrencegeneral.org/services-and-centers/cancer-care); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

69. The JavaScript code first acquires the content of the communications made through a particular webpage, and then, subsequently, connects to the tracking technology vendor's servers (for example, Google or Facebook servers) to disclose the content of the intercepted communications to the tracking technology vendor. Although the acquisition/interception and disclosure occur through the same JavaScript program, they are distinct events activated by different parts of the code for each tracking technology. Although distinct, sequential events, the interception and disclosure to the third party occur contemporaneously with the website communications between Class Members and Lawrence General. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

70. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party, such as Google or Facebook, can then add the content of the user's communications with Lawrence General to its collection of information it already has about the individual, which it can then use for advertising purposes.

71. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the intercepted communications with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them. Lawrence General can then use Facebook's advertising platform to

target advertising to individuals who visited its website, based on the Lawrence General Website communications intercepted and transmitted to Facebook.

72. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectable only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

73. The tracking technologies described in this complaint intercept and then transmit to third parties the contents of communications between healthcare consumers and Lawrence General contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

74. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[7] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites and patient portals, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[8] In reaction to the Markup Article, some healthcare

[7] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[8] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

providers removed Meta Pixel code from their websites completely or severely limited its use. Lawrence General, however, continued to use Meta Pixel on its website without disclosing that fact to website users until several months after the initial complaint in this action was filed.

**<u>Lawrence General's Use of Tracking Technologies on the Lawrence General Website</u>**

75. During the class period, Lawrence General used various tracking technologies across the Lawrence General Website. Lawrence General injected several of those tracking technologies throughout the Lawrence General Website. For example, throughout the Lawrence General Website, Lawrence General injected hidden code that loaded both Google Analytics and Meta Pixel. Lawrence General deployed the tracking technologies on the specific webpages Plaintiff visited during the Class Period.

76. Within a few months after the initial complaint was filed in this case, Lawrence General significantly limited its use of Google Analytics, Meta Pixel, and other tracking technologies. The examples provided below of Lawrence General's deployment of Google Analytics, Meta Pixel, and other tracking technologies on the Lawrence General Website reflect such deployment around the time of the original complaint in this action. Lawrence General controls when and how it uses tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect Lawrence General's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

77. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components

(including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

78. Below is an image of the main landing page for the Lawrence General Website:




79. When a user loads the main landing page for the Lawrence General Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" stands for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

80. The image below depicts the landing page for the Lawrence General Website on the left-hand side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




81. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:




82. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Lawrence General Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.lawrencegeneral.org"); and

(b) The title of the webpage (after the letters "dt," which includes "The Merrimack Vallely's Premier Healthcare Provider | Lawrence General Hospital")[9];

[9] When transmitting the intercepted communications to Google, certain characters are converted into HTML coding. For example, the "%20" code in between each word in the webpage title represents a

(c) A numeric code (noted in the "jid" field) linking the Google Analytics data to Lawrence General's DoubleClick account to permit Lawrence General to later use the intercepted content of the communication for targeted advertising purposes on Google's advertising platforms (additional examples presented later in this complaint used other fields to achieve the same result of linking for advertising purposes).

83. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Lawrence General).

84. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Lawrence General Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with Lawrence General with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google on behalf of Lawrence General or any other businesses that use Google's advertising platforms (many do).

85. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." Browser

---

space, while "%7C" represents the "|" character. The use of these HTML codes does not prevent Google from using the contents of the communication for its own commercial purposes.

fingerprinting works by using scripts (such as the tracking technologies here) to gather many software and hardware attributes from a user's device and browser, such as their operating system, screen resolution ("sr" in the above example), resolution of their browser window ("pr" in the above example), and other numeric codes that represent unique browser and computer settings. When combined, these data points create a distinct identifier—a "fingerprint"—that uniquely identifies a user across different browsing sessions and websites, similar to a real-world fingerprint.

86. Browser fingerprints allow tracking technology providers to track users across websites, and together with other data points such as IP address and unique user numbers, permit the tracking technology provider to know that a person browsing the Lawrence General Website is the same person the identity of whom is known to that provider (i.e., Google or Facebook)

87. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[10] Browser fingerprints are also considered personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

88. Hidden code that Lawrence General has injected into its website also permits Google to intercept the same communication through Google's "DoubleClick" advertising tracker. The contents of the communication that Google intercepts are reflected below:

[10] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.




That is, the fact that the user is visiting the main page of the Lawrence General Website is intercepted and transmitted to doubleclick.net (i.e., Google DoubleClick).

89. The same landing page for the Lawrence General Website injects hidden Meta Pixel code. Lawrence General has configured its website to load Meta Pixel as a "piggyback" on the Google DoubleClick code.[11] The hidden code Lawrence General injects into its website ultimately causes the user's browser to load a JavaScript file called "fbevents.js." That JavaScript code, in turn, causes the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Lawrence General Website. Below is an example of the contents of the communication between the website user and Lawrence General, which the hidden Meta Pixel code intercepts and transmits to Facebook:[12]

[11] *See* "Can I use Meta Pixel with my third-party tracking provider to track conversions?," available at https://www.facebook.com/business/help/421433191260652 (explaining how a website "can use the Meta Pixel with your third-party tracking provider (ex: DoubleClick)," enabling "[t]he Meta Pixel [to] piggyback and fire off of the existing [DoubleClick] pixel implementation[]").

[12] Because Lawrence General has configured the Meta Pixel code to "piggyback" on Google DoubleClick, the full URL intercepted and transmitted to Facebook contains a reference to "doubleclick.net" within it, but the same intercepted communication also contains the URL of the webpage visited—www.lawrencegeneral.org.




90. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Lawrence General Website, including the URL of the webpage visited. The interception and transmission to Facebook also included information about the user's browser configuration and various codes to associate the communications with Lawrence General's advertising account with Facebook. Specifically, the "id" code in the first line above is essentially a user number of Lawrence General's advertising account with Facebook, which permitted Lawrence General to later use the intercepted communications for targeted advertising on Meta-owned platforms (including Facebook and Instagram).

91. Also, the JavaScript code for Meta Pixel causes the user's web browser to reveal the user's IP address to Facebook. This identifier permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can then use the contents of communications between the website user and Lawrence General to serve personalized advertising to the website user in the future, and Lawrence General can use Facebook's advertising platform to target advertising for Lawrence General to specific individuals.

92. Moreover, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

93. The text fields communicated to Facebook by the Meta Pixel code also include a persistent identifier for each particular user—a numeric code that is unique to a particular individual (similar to an account number). This allows Facebook to track that individual across the Lawrence General Website and further confirm that individual's real-world identity.

94. Lawrence General configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below serve to illustrate how the tracking technologies work and include both pages Plaintiff visited and other pages that other class members visited (some of the particular pages Plaintiff visited are identified in paragraphs 14-15, above). Plaintiff's communications with Lawrence General, including Private Information, were intercepted just like the examples set forth below.

95. The Lawrence General Website contains numerous subpages for specific "Services and Centers." For example, the Lawrence General Website contains a page entitled "Obstetrics and Gynecology (OB/GYN)," designed to inform the website user about OB/GYN services Lawrence General offers. By visiting this webpage, a user communicates that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicates with Lawrence General by visiting this particular webpage, Lawrence General causes the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Obstetrics and Gynecology webpage:




96. The graphic below presents the contents of the communication between the website user and Lawrence General that are secretly intercepted and transmitted to Google when the above

page loads as a result of the Google Analytics JavaScript code that Lawrence General secretly injects into the website (with highlighting added):




97. As reflected in the above screenshot, the code injected into the Lawrence General Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Obstetrics and Gynecology" webpage on the Lawrence General

Website—information that Google retains and can use for its own commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise.[13]

98. Indeed, Lawrence General has used Google's advertising platforms to target individuals who are interested in particular conditions, including Women's Health Specialists, as reflected in the below Google ad:




Given how Google Ads works, this advertisement would have been served to individuals who had shown an interest in OB/GYN services, including those people who had visited the above-discussed OB/GYN page on Lawrence General's website, on which Lawrence General deployed Google Analytics and DoubleClick tracking technologies to facilitate these kinds of advertisements targeted to such individuals.

99. The same webpage contains hidden code that intercepts the user's communication with Lawrence General and transmits the same information to Facebook. The contents of the communication intercepted by Facebook when a user visits the Obstetrics and Gynecology page are depicted below:

---

[13] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.




As depicted above, Lawrence General intercepts and discloses to Facebook the contents of the communication between the website user and Lawrence General, including that the user is visiting an "Obstetrics and Gynecology" webpage on the Lawrence General Website, information that Facebook retains and can use for commercial purposes.

100. The Lawrence General Website contains dozens of similar pages on particular medical specialties and practices that Lawrence General offers. For each such page, the Lawrence General Website aids Google and Facebook's secret interception of the contents of communications with Lawrence General, similar to the above Obstetrics and Gynecology example. Plaintiff visited during the class period, pages similar to the Obstetrics and Gynecology department example above (including,

for example, the Lawrence General Laboratory Services page), and her communications were intercepted in the same manner as the above example.

101. The Lawrence General Website also contains pages for specific services offered by Lawrence General. By visiting such pages, a user signifies that the service may be relevant to them. For example, the Lawrence General Website has a webpage for community COVID testing, depicted below:




By visiting the page, the user signifies an interest in COVID testing, which could indicate the user or a person the user knows has been exposed to or is experiencing symptoms of COVID.

102. When a website user visits the COVID testing page of the Lawrence General Website, the hidden Google Analytics code that Lawrence General has injected into its website intercepts that

communication between the user and Lawrence General and transmits it to Google. The contents of the intercepted communication are depicted below (with highlighting added):




That is, hidden Google Analytics code intercepts the fact that the user is seeking "COVID-19 Community Testing" from Lawrence General Hospital, information Google retains and uses for purposes of targeted advertising to individuals known to Google, and which Lawrence General could then use and exploit to serve targeted advertising to its patients on Google's platforms.

103. Hidden Meta Pixel code that Lawrence General injected onto its website likewise intercepts communications between website users and Lawrence General concerning COVID testing. The contents of the same communication intercepted by Facebook are depicted below (with highlighting added):




That is, hidden Meta Pixel code causes the interception and transmission to Facebook of the contents of the communication that the user is seeking COVID-19 testing from Lawrence General Hospital, information Facebook retains and uses for its own commercial purposes, and which Lawrence General uses and exploits to serve targeted advertising to its patients on Facebook's advertising platforms.

104. The Lawrence General Website also includes a search function that permits individuals to search for medical or other information that is relevant to them. Plaintiff used the search function

on the Lawrence General Website during the Class Period to obtain information on particular terms used in a pathology report Lawrence General had provided to her. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Lawrence General. When an individual uses the search function, Lawrence General aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "I'm pregnant."




105. When a user performs this search on the Lawrence General Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's precise search terms and transmit them to Google. Below is the portion of the communication Google Analytics code intercepts and transmits to Google (with highlighting added):




As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google,[14] which Google can then use and commercially exploit, including by associating those search terms with the individual's real-world identity for targeted advertising purposes.

---

[14] The "%2527" text between the "I" and "m" of the search terms is HTML code for an apostrophe; therefore, Google understands the precise search terms are "I'm pregnant," notwithstanding the garbled appearance of the search terms in the screenshot above.

106. The Lawrence General Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. Plaintiff used the "Find a Doctor" feature depicted below during the Class Period. By using the "Find a Doctor" function, the user communicates to Lawrence General that the user is a current or prospective patient. The screenshot below depicts the Find A Doctor page:




107. Depicted below are the contents of the user's communication with the Lawrence General website that are intercepted and transmitted to Google via hidden Google Analytics Code, intercepting that the user is searching for a Lawrence General doctor (with highlighting added):




108. Communications on the Find-A-Doctor function are likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook can then associate the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Below is a screenshot of the contents of the communication intercepted through Meta Pixel code on the same Find-a-Doctor page (with highlighting added):




109. When a user performs a search on the Find-a-Doctor page and then views information about a particular doctor (which Plaintiff did during the Class Period), that communication between the user and Lawrence General is intercepted and transmitted to Google via hidden Google Analytics code. For example, the page below shows a nurse practitioner at Lawrence General who appears upon a search for OB/GYN doctors:




110. The screenshot below depicts the contents of the communication between the website user and Lawrence General that are secretly intercepted by and sent to Google via hidden Google Analytics code:

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decoded


v: 1
_v: j99
a: 2078935305
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Ffind-a-doctor%2Fphysician-bio%2Fkathleen%2520absalom
ul: en-us
de: UTF-8
dt: Find%20a%20Doctor%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1351x979
je: 0
_u: QACAAEABAAAAACAAI~
jid: 1882932053
gjid: 1053400170
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_r: 1
_slc: 1
gtm: 45He3360n81NWGNWGJ
z: 1773238470


That is, the fact that the user performed a find-a-doctor search and then viewed information about OB/GYN practitioner Kathleen Absalom is intercepted and transmitted to Google, which both Google and Lawrence General can then use to target advertising to the individual based on their communications with Lawrence General.

111. The Lawrence General website also contains a section permitting patients to pay bills they received from Lawrence General. The "Pay Your Bill Online" page of the Lawrence General Website is depicted below:




112. When a user visits this page, the user communicates that the user is a patient who has received medical services from Lawrence General. That communication with Lawrence General is intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication that are intercepted by and transmitted to Google are depicted below (with highlighting added):

× Headers Payload Preview Response »

▼ Query String Parameters view source view decoded

v: 1
_v: j99
a: 1665508897
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.lawrencegeneral.org%2Fyour-visit%2Fbilling-and-financial-assistance%2Fpay-your-bill
ul: en-us
de: UTF-8
dt: Lawrence%20General%20Hospital%20%7C%20Lawrence%20General%20Hospital
sd: 24-bit
sr: 1920x1080
vp: 1332x979
je: 0
_u: QACAAEABAAAAACAAI~
jid:
gjid:
cid: 1953810266.1678746488
tid: UA-23389074-1
_gid: 1593866770.1678746488
_slc: 1
gtm: 45He3360n81NWGNWGJ
z: 1408482447

As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is visiting the "Billing and Financial Assistance" page and is attempting to "pay" a "bill" owed to Lawrence General Hospital. Google retains this intercepted communication, and Google and Lawrence General may later use it for commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

113. Lawrence General also maintained a patient portal during the class period. The patient portal permits a patient to obtain medical records, view details regarding upcoming visits and medical treatments, view laboratory reports, review medications, and review discharge instructions, among other tasks. The patient portal includes several publicly accessible pages on the Lawrence General Website that are used to navigate to and log into the patient portal, as well as dynamically generated pages accessed after a user logs into the patient portal (including pages regarding a patient's medical records and medications, which, of course, are dynamically generated and unique to the patient).

114. Prior to discovery, Plaintiff cannot know with certainty whether Lawrence General used tracking technologies within the dynamically generated pages accessed after a patient logs into the patient portal, although many hospitals did so prior to the publicity and public outrage during the summer of 2022 regarding hospitals using tracking technologies on their websites and patient portals. Lawrence General did, however, use the tracking technologies on pages used to navigate to and access its patient portal. A website user, by accessing those pages, signals that the user is a patient of Lawrence General, and by deploying tracking technologies on those pages, Lawrence General intercepted and disclosed to Google, Facebook, and other third parties the users' status as Lawrence General patients.

115. When a patient first clicks on a link to navigate to the patient portal, Lawrence General directs the patient to the following page:




116. When a patient navigates to this patient portal page, hidden code Lawrence General deployed on its website intercepted that communication and disclosed its substance to Google, Facebook, and other third parties. The image below depicts the information that was intercepted and then transmitted to Google when a patient visited this patient portal page:




As shown above, the tracking technologies intercepted and disclosed to Facebook that the user is visiting a "Patient Portal" and "Lawrence General Hospital," information confirming an individual's status as a Lawrence General patient, which Google and Lawrence General could later commercially exploit, including through targeted advertising.

117. Lawrence General also deployed Meta Pixel and DoubleClick on the same patient portal webpage, which resulted in disclosure of the same information to Facebook and Google, including patient status, which Lawrence General could then use for its own marketing efforts on Google and Facebook's advertising platforms.

118. Plaintiff regularly used the Lawrence patient portal during the class period, and accordingly, her communications were intercepted and transmitted to Google and Facebook, which

permitted Google, Facebook, and Lawrence General to target her with advertising based on the disclosure of her status as a patient (in combination with the other interceptions of Plaintiff's communications described above, including interceptions regarding her specific conditions, doctors, and searches on the Lawrence General Website).

119. Lawrence General also hosted a page entitled "I am a Patient," designed to provide basic information about Lawrence General to Lawrence General patients. That page is depicted below:




120. When a user visits the "I am a Patient" page, the user communicates that the user is a patient of Lawrence General. Lawrence General deployed on the "I am a Patient" page Google Analytics, DoubleClick, and Meta Pixel. Depicted below is the content of the communication intercepted and transmitted to Google when a patient visits the "I am a Patient" page:




As shown above, hidden code deployed by Lawrence General intercepts and discloses to Google the substance of the communication, that the user is visiting an "I am a Patient" page for "Lawrence General." Google can then associate that intercepted communication with the patient's real-world identity and use the intercepted communication for targeted advertising, including advertising on Lawrence General's behalf.

121. Meta Pixel code deployed on the same page intercepted and disclosed the same information to Facebook, which Facebook and Lawrence General could use later for targeted advertising.

122. In addition to Google and Facebook, Lawrence General has, during the class period, intercepted communications between healthcare consumers and Lawrence General and disclosed the intercepted communications to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Simpli.fi.** Simpli.fi is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Lawrence General has inserted hidden code into their website that causes communications between the user and the website to be intercepted by and transmitted to Simpli.fi. According to Simpli.fi's manuals, websites such as Lawrence General that use Simpli.fi "tags" do so by injecting hidden "snippets of HTML code" into their website that "enable Simpli.fi to record user visits to a website" and "add users to specific [advertising] audiences based on the URL(s) the users view."

(b) **Yahoo Analytics.** Yahoo Analytics is a service similar to Google Analytics. It markets itself as providing "advertising insights" based on its tracking technologies, which it uses to "recognize, associate, and collect data about visitors" to websites that inject Yahoo Analytics code. Lawrence General injected hidden Yahoo Analytics code into the Lawrence General Website during the class period. Yahoo Analytics functions similarly to Google Analytics in using hidden code to secretly intercept and transmit to Yahoo Analytics the contents of website users' communications with Lawrence General through the Lawrence General Website.

(c) **Tapad.** Tapad offers a tracking technology designed to track users across devices for advertising purposes. It uses algorithms to analyze internet and device data and predict whether two or more devices are owned by the same person. Participating websites and apps then cater their advertisements based on a collective knowledge of the user's actions across all of their devices. During the class period, Lawrence General inserted hidden Tapad tracking code that intercepted communications between website users and Lawrence General and transmitted the content of those communications to Tapad.

**<u>The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary</u>**

123. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Lawrence General Website's operation. The Lawrence General Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

124. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example,

a website can contain links to its Facebook profile or invite website users to interact with Lawrence General via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

125. Moreover, even if Lawrence General wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Lawrence General (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that Lawrence General does not share the communications with others when it does; or (iii) to claim that Lawrence General maintains the privacy of those communications when it does not.

**<u>Lawrence General Violated HIPAA and the FTC Act.</u>**

126. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[15]

127. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

128. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect

[15] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

129. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[16]

130. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"'; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

131. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

[16] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

132. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

133. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

134. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[17]

135. The privacy rule also expressly provides that "a covered entity must obtain an authorization [from the patient] for any use or disclosure of protected health information for marketing…."45 C.F.R. § 164.508(a)(3). That rule is directly implicated by tracking technologies in that a primary function of the tracking technologies is to permit both the tracking technology provider (for example, Google and Facebook) and the website owner (here, Lawrence General) to use the contents of the intercepted communications for marketing purposes after the interception occurs.

[17] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.16.

136. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[18]

137. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[19]

138. In other words, the HHS has expressly stated that entities like Lawrence General that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-compliant authorization.

139. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure

---

[18] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

[19] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

140. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

141. As reflected in the current version of the HHS Bulletin posted on the HHS website, a district court decision vacated a portion of the HHS Bulletin. However, the remainder of the HHS Bulletin has neither been vacated nor withdrawn, including the portions to which Plaintiff refers above. In any event, Plaintiff is not suing for violation of the HHS Bulletin as such; instead, the HHS Bulletin reflects a reasonable interpretation of HIPAA and the Privacy Rule which is relevant for its persuasive force, including for the observation that the use of tracking technologies on healthcare provider website poses serious privacy implications and can lead to HIPAA violations, including on publicly accessible pages that disclose patient status.

142. Lawrence General's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

143. Lawrence General is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

144. Lawrence General's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties, and those third parties and Lawrence General then use those intercepted communications for marketing purposes, all without their authorization.

145. Lawrence General improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, and (c) patients' status as patients of Lawrence General by using tracking technologies on webpages designed for patients, including the bill payment page, patient portal, and "I am a Patient" page.

146. For example, by using tracking technologies on the webpages Plaintiff visited—including the pages used to access the patient portal, pages containing information on her doctors and medical procedures, and pages communicating the results of text searches Plaintiff performed, Lawrence General permitted third parties to intercept information about Plaintiff's doctors and specific treatments connected to her, her status as a patient, and specific terms she communicated to Lawrence General, which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

147. Lawrence General improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Lawrence General disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

148. Lawrence General also improperly used patient communications and PHI for marketing purposes without patient authorization by using the intercepted communications for its own targeted advertising through Google and Facebook's advertising platforms.

149. Lawrence General violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical

policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

150. Lawrence General further violated other HIPAA regulations as follows:

(d) Lawrence General failed to ensure the confidentiality and integrity of electronic PHI that Lawrence General created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(e) Lawrence General failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(f) Lawrence General failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Lawrence General in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(g) Lawrence General failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(h) Lawrence General failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(i) Lawrence General failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

151. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[20]

152. Lawrence General's undisclosed use of tracking technologies on its website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private

[20] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

right of action, Lawrence General's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

153. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[21]

154. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

155. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

156. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate

[21] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[22]

157. In 2022, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[23]

**Lawrence General Violated Industry Standards**

158. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

159. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

160. AMA Code of Ethics Opinion 3.1.1 provides:

---

[22] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[23] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

161. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

162. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[24]

163. Lawrence General, through the conduct described in this complaint, including the disclosure of patient communications to third-party technology and advertising companies and Lawrence General's own subsequent use of the intercepted communication for marketing purposes, violated the AMA Code of Medical Ethics by gathering and recording information about patients that Lawrence General failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

---

[24] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

**Plaintiff and Class Members Suffered Harm from Lawrence General's Unlawful Interceptions and Disclosures of Plaintiff's and Class Members' Private Information**

164. An economic market exists for consumers' personal data—including the kind of data that Lawrence General has collected and disclosed from Plaintiffs and Class Members.

165. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[25]

166. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[26] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[27]

167. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[28] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[29]

168. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because it is not generally available to third-party data marketing companies due to the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath.

[25] https://ig.ft.com/how-much-is-your-personal-data-worth/
[26] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[27] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[28] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[29] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

Even with these restrictions, however, a multi-billion-dollar market exists to sell and purchase such private medical information.[30]

169. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings[31] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smartphones.[32]

170. Many other companies and apps, such as DataCoup, Nielsen Computer, Killi, and UpVoice, also offer consumers money in exchange for access to their personal data.[33]

171. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Lawrence General has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs' and the Class Members' property.

172. As a direct and proximate cause of Lawrence General's unauthorized interceptions and disclosures of Plaintiff's and Class Members' Private Information, and its subsequent commercial exploitation of that information through targeted advertising derived from the intercepted

---

[30] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[31] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app

[32] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[33] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

communications, Plaintiff and Class Members have been damaged by Lawrence General's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) Lawrence General denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used Lawrence General's services or would have demanded compensation for Lawrence General's use of their Private Information if they had known of Lawrence General's practices;

(d) Lawrence General eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Members' rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) Lawrence General took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) Lawrence General's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

## Class Action Allegations

173. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.lawrencegeneral.org between three years prior to the date of the filing of the initial complaint in this action and April 30, 2024.

174. This action is properly maintainable as a class action.

175. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

176. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Lawrence General, through the Lawrence General Website, were electronic communications under the ECPA;

(b) Whether Lawrence General inserted tracking technologies into the hidden code of the Lawrence General Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the Lawrence General Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Lawrence General and users of the Lawrence General Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Lawrence General installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and Lawrence General;

(g) Whether and to what extent Lawrence General had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether Lawrence General had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(i) Whether the promises made in Lawrence General's Notice of Privacy Rights and Practices either were or formed part of a contract between Lawrence General and Plaintiff and Class Members;

(j) Whether Lawrence General's disclosure of Plaintiff's and Class Members' IHII and PHI breached Lawrence General's promises set forth in its Notice of Privacy Rights and Practices, giving rise to liability for breach of contract;

(k) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of action to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

177. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Lawrence General Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

178. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

179. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

180. Lawrence General has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

### (Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)

181. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

182. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

183. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between

Plaintiff and other Class Members and Lawrence General, through the Lawrence General Website, were electronic communications under the ECPA.

184. The tracking technologies inserted into the hidden code of the Lawrence General Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the Lawrence General Website; (ii) Class Members' web browsers used to access the Lawrence General Website; (iii) Lawrence General's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the Lawrence General Website.

185. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and then disclose to Google, Facebook, and other third parties the contents of communications between Lawrence General and users of the Lawrence General Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

186. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Lawrence General configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Lawrence General, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Lawrence General), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words

used in searches inputted by healthcare consumers. Lawrence General also used tracking technologies on pages that would confirm to third parties such as Google and Facebook the user's likely status as a Lawrence General patient, including its bill payment page, pages used to access the patient portal, and the "I am a Patient" page.

187. With respect to Plaintiff, the tracking technologies revealed information regarding Plaintiff's doctors and treatments by revealing the substance of communications on Lawrence General webpages regarding such doctors and treatments, and also revealed Plaintiff's status as a Lawrence General patient by intercepting her communications accessing the Lawrence General patient portal.

188. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Lawrence General intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

189. Additionally, through the above-described tracking technologies, after Lawrence General intercepted communications, the intercepted information was, in turn, used by Lawrence General and by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

190. Lawrence General intercepted communications between the Class Members and Lawrence General, and Lawrence General disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception and the subsequent use of the intercepted communications for marketing purposes.

191. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

192. Lawrence General intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the statutory and common law torts detailed in the counts of this complaint that follow this ECPA count. Before engaging in such criminal and tortious acts, Lawrence General was warned not to use tracking technology on webpages with health information without informed consent, which Lawrence General did not obtain. In committing such criminal and tortious acts, Lawrence General was motivated by its own financial self-interest in maximizing the effectiveness of its online marketing. Lawrence General's financial motivations demonstrate that its purpose was to commit a criminal or tortious act, as Lawrence General had an incentive, which it acted on, to disclose sensitive patient communications and PHI to Google and Facebook to advance its own marketing on Google and Facebook's advertising platforms.

193. Because of Lawrence General's simultaneous, hidden duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Defendant does not qualify for the party exemption.

194. As alleged above, Lawrence General violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

195. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision

> of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

196. Plaintiff's Private Information that Lawrence General disclosed to third parties, which both Lawrence General and the third parties later used for marketing purposes, qualifies as IIHI, and Lawrence General violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Lawrence General used the intercepted electronic communications to increase its revenues.

197. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Lawrence General specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

198. Lawrence General's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

199. Lawrence General's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Lawrence General's use of the Facebook source code was for Lawrence General's commercial advantage to increase revenue from existing patients and gain new patients.

200. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

201. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Lawrence General's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher,

plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

**COUNT II**

**(Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)**

202. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

203. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

204. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

205. Lawrence General had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

206. Plaintiff and Class Members did not authorize Lawrence General to disclose their communications with Lawrence General to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment, nor did Plaintiff and Class Members authorize Lawrence General to later commercially exploit the improperly disclosed communications for marketing purposes, including targeted advertising to Lawrence General patients.

207. Lawrence General disclosed Plaintiff's and Class Members' private communications to unauthorized third parties in order to market its own services and increase profits, and those third parties can and did provide to or permit the use of the same information by numerous other third

parties (including advertisers and data brokers). Therefore, Lawrence General's conduct reflected a public disclosure of private facts.

208. Additionally, Lawrence General's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive because of both the disclosure of private communications and the later use of those communications for marketing purposes.

209. Lawrence General's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

210. Plaintiff and Class Members suffered injuries as a direct and proximate result of Lawrence General's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

211. Lawrence General's acts or omissions violate the Massachusetts Right to Privacy Act.

212. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraphs 164-72, *supra*), plus costs and attorneys' fees.

**COUNT III**

**(Breach of Fiduciary Duty, on behalf of the Class)**

213. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

214. A fiduciary relationship existed between Lawrence General, a healthcare provider, and Plaintiff, a Lawrence General patient. Furthermore, Lawrence General assumed the role of a fiduciary by undertaking to collect the Private Information of and communications with Plaintiff made through the Lawrence General Website.

215. When possessing nonpublic medical information, medical providers such as Lawrence General have a duty to keep such information completely confidential.

216. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Lawrence General through its website, which included highly sensitive Private Information and other private communications. Lawrence General's policies bolstered that expectation, given Lawrence General's promises to Plaintiff that Lawrence General would not disclose medical information and communications to third parties.

217. Contrary to its duties as a healthcare provider and its express promises of confidentiality, Lawrence General installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information and communications, including information relating to their healthcare.

218. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

219. Lawrence General's secret and unauthorized disclosures of Plaintiff's Private Information and private communications and subsequent use of those communications for marketing purposes constituted a breach of Lawrence General's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

220. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraphs 164-72, *supra*).

**COUNT IV**

**(Negligence, on behalf of the Class)**

221. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

222. Upon accepting, storing, and controlling the Private Information and private communications of Plaintiff and the Class, Lawrence General owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information and private communications.

223. Lawrence General breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information and private communications from unauthorized disclosure.

224. It was reasonably foreseeable that Lawrence General's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information and private communications through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

225. Lawrence General's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information and private communications arose due to the special relationship between Lawrence General and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

226. In addition, Lawrence General's duty is informed by state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

227. Lawrence General's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information and communications; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

228. Lawrence General's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information and communications constituted negligence at common law.

229. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraphs 164-72, *supra*), plus costs and attorneys' fees.

## COUNT V

### (Breach of Confidence, on behalf of the Class)

230. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

231. Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

232. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

233. When possessing nonpublic medical information, medical providers such as Lawrence General have a duty to keep such information completely confidential.

234. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Lawrence General through its website, which included highly sensitive Private Information. Lawrence General's policies bolstered that expectation, given Lawrence General's promises to Plaintiff that Lawrence General would not disclose communications on the website to third parties without Plaintiff's signed authorization.

235. In light of the special relationship between Lawrence General and Plaintiff and Class Members, whereby Lawrence General became a guardian of Plaintiff's and Class Members' Private Information, Lawrence General became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Lawrence General did and does store and disclose.

236. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Lawrence General installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with Lawrence General and the contents of those communications, including but not limited to Private Information.

237. Lawrence General made these disclosures for its own commercial purposes, including the later use of the disclosed information for Lawrence General's own targeted advertising on Google and Facebook platforms, without Plaintiff's or Class Members' knowledge, consent, or authorization.

238. The unauthorized disclosures and subsequent marketing use of Plaintiff's and Class Members' communications, including Private Information, were intentionally caused by Lawrence

General's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' communications, including Private Information, occurred because of Lawrence General's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

239. Lawrence General disclosed Plaintiff's and Class Members' communications, including Private Information, to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

240. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

241. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraphs 164-73, *supra*), plus costs and attorneys' fees.

**COUNT VI**

**(Breach of Contract, on behalf of the Class)**

242. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

243. Lawrence General required Plaintiff and Class Members to provide personal information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the Lawrence General Website as a condition of receiving healthcare services. Plaintiff's and Class Members' provision of such personal information provided consideration for Lawrence General's provision of services through the Lawrence General Website, including the provision of information and the use of the website to obtain medical services.

244. In so doing, Plaintiff and Class Members entered into contracts with Lawrence General (or, in the alternative, implied contracts) by which Lawrence General agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. Lawrence General's contractual promises included that, without signed authorization, it would share healthcare consumers' medical information and communications only for limited purposes and only to specified parties (which did not include technology companies for marketing purposes).

245. Plaintiff and Class Members fully performed their obligations under the contract with Lawrence General.

246. Lawrence General breached its agreement with Plaintiff and Class Members by directly breaching its promises not to share with third parties healthcare consumers' medical information and communications without consumers' signed authorization.

247. As a direct and proximate result of Lawrence General's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private Information and have been denied the benefit of the bargain of their agreement with Lawrence General.

248. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraphs 164-73, *supra,* plus costs and attorneys' fees.

## COUNT VII

**(Unjust Enrichment, on behalf of the Class)**

249. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

250. This claim is pleaded in the alternative to Plaintiff's other causes of action.

251. Lawrence General benefits from using the content of Plaintiff's and Class Members' communications with Lawrence General, including Private Information, and unjustly retained those benefits at Plaintiff's and Class Members' expense.

252. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable communications, including Private Information, that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

253. Lawrence General consciously collected and used this information for its own gain, providing Lawrence General with economic, intangible, and other benefits, including substantial monetary compensation.

254. Lawrence General unjustly retained those benefits at the expense of Plaintiff and Class Members because Lawrence General's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

255. The benefits that Lawrence General derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Lawrence General to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

256. Had Lawrence General informed Plaintiff that it collected and shared Plaintiff's communications, including Private Information, with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of Lawrence General's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

257. The Court should compel Lawrence General to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that Lawrence General unjustly received and such other relief as the Court may deem just and proper.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 30, 2025

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on October 30, 2025

*/s/ Patrick J. Vallely*
Patrick J. Vallely