UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JANE DOE,
*Plaintiff,*

v.

LAWRENCE GENERAL HOSPITAL,
*Defendant.*

No. 25-cv-10081-NMG

**REPORT AND RECOMMENDATION ON MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

LEVENSON, U.S.M.J.

INTRODUCTION

Previously, I recommended that the Court dismiss the Electronic Communications Privacy Act ("ECPA") claim in Plaintiff's First Amended Complaint. *See* Docket No. 41. Among other reasons, I concluded that there was no plausible allegation that Lawrence General Hospital ("LGH") had acted with a criminal or tortious purpose when it deployed tracking tools offered by Google and Meta on the public-facing pages of its website. Absent such criminal or tortious purpose, the mere fact that LGH had intercepted its own electronic communications did not state a claim based on ECPA. Judge Gorton dismissed the First Amended Complaint without prejudice. *See* Docket No. 49.

Plaintiff is now back with a Second Amended Complaint ("SAC"), Docket No. 56, and LGH has again moved to dismiss.

To preview the extended discussion below:

The SAC plausibly alleges that LGH's purpose in deploying tracking tools on the public-facing pages of its website was to send targeted advertisements for LGH services to persons

navigating the public website. The SAC does not, however, plausibly allege that this purpose was tortious or criminal. First, the means employed—tracking clicks and searches on public pages of LGH's website—did not implicate personal data that LGH maintained as part of its medical or billing record sets. As such, the alleged conduct did not involve data restricted from disclosure by the Health Insurance Portability and Accountability Act ("HIPAA"). Second, the end that LGH pursued—sending targeted advertisements for a healthcare provider's own services—is expressly excluded from HIPAA's definition of improper "marketing."

The SAC includes a new allegation (more a characterization of motive than an assertion of new or different facts) that Defendant's interception of wire communications was conducted "for the purpose of disclosing individuals' health information to third parties for commercial gain, including later using the contents of the intercepted communication for Lawrence General's targeting of advertisements to . . . patients through Google and Facebook's advertising platforms . . . ." SAC ¶ 4. This allegation is designed to address the deficiency in the previous complaint, which did not adequately allege that LGH acted for the purpose of committing a criminal or tortious act. Under HIPAA it is a crime to "knowingly" use "Protected Health Information" ("PHI") for "marketing" purposes and/or to "knowingly" disclose PHI to third parties. As discussed below, these quoted terms have specialized definitions under HIPAA, which Plaintiff ignores.

Plaintiff's new allegation that LGH acted with an identifiable purpose—which Plaintiff labels a criminal purpose—requires the Court to assess whether the factual allegations of the SAC plausibly track the elements of a criminal violation of HIPAA. Does unauthenticated browsing activity (that is, clicks that navigate a website, without logging in or entering other information) constitute PHI within the meaning of HIPAA? Does the SAC otherwise make out

the elements of a criminal HIPAA violation? The answer to both questions is no. The SAC does not plausibly allege that LGH maintains (as that term is used in the HIPAA regulations) information about visitors who merely click on static public webpages. Indeed, there is no allegation that LGH distinguishes between patients, visitors, and non-human bots that may navigate to the public pages of its website.[1] Thus the navigation clicks on static public webpages do not constitute PHI subject to HIPAA non-disclosure rules.

As with Plaintiff's previous complaint, conspicuously absent from the SAC is any allegation that LGH intercepted or exploited data from within its password-protected patient or bill pay portals.[2] "[T]he logical inference is that LGH's purpose was *not* to share IIHI[3] with Google and Meta." Docket No. 41 at 32. Taking at face value the factual allegations of the SAC, the SAC fails to plausibly allege that LGH disclosed PHI when it allowed Google and Meta (through those tracking tools) to see visitors' browsing/navigation clicks on static public webpages. Furthermore, there is no plausible allegation that LGH officials should have understood that visitors' clicks on the LGH public website could be deemed HIPAA-protected data; LGH cannot be said to have "knowingly" acted to disclose such data. Nor does the SAC plausibly allege that LGH "knowingly" exploited HIPAA-protected data for "marketing"

---

[1] The SAC plausibly alleges that Google and Meta possess immense databases and prodigious analytical tools that enable them to identify most users of any website that employs their tracking tools. SAC ¶¶ 84, 91.

[2] Patients who log in to LGH's patient and bill-pay portals use personal identifiers and passwords to gain access to their medical records, appointments, and bills. Although the issue is not before the Court, it seems likely that data entered by, or accessed by, patients after they log-in may constitute PHI.

[3] Technically, PHI is a subset of all Individually Identifiable Health Information ("IIHI"). In this report, when I am not discussing a specific application of one of these terms as it appears in the regulations, I will often just refer to "Information (or data) protected by HIPAA" or "HIPAA-protected information (or data)."

purposes. The SAC points only to targeted advertising of LGH's own medical services—conduct that is expressly excluded from the regulatory definition of "marketing."

While additional analysis is warranted, the outcome is the same: The SAC fails to state a federal-law claim under ECPA, and Plaintiff's remaining state-law claims should be remanded to state court.

### *A. Procedural Posture*

On August 29, 2025, I recommended that the Court allow the motion to dismiss Count I, decline to exercise its supplemental jurisdiction over the remaining Counts II through VII, and remand those remaining counts to state court. Docket No. 41. Plaintiff moved for, and was granted, additional time to file an objection. Docket Nos. 42, 45. Plaintiff filed her objection on September 19, 2025, and quickly followed with a motion to amend her complaint a second time. Docket Nos. 46, 47.

Judge Gorton accepted, in part, and rejected, in part, my Report and Recommendation. Judge Gorton dismissed the First Amended Complaint. Docket No. 49. He declined, however, to remand the matter to state court, given that Plaintiff had moved, in the meantime, for leave to amend her complaint. *Id.*

On October 29, 2025, I granted leave for Plaintiff to file her Second Amended Complaint (the SAC), which she filed on October 30, 2025. Docket Nos. 55, 56.

LGH has filed a renewed motion to dismiss, along with a supporting memorandum and a reply to Plaintiff's opposition. Docket Nos. 59, 60, 73. The Chamber of Commerce filed an Amicus brief in support of Defendant's motion to dismiss. Docket No. 64. LGH further filed two notices of Supplemental Authorities, directing the Court to recent decisions addressing use of tracking tools on hospital websites. Docket Nos. 75, 79.

Plaintiff filed an opposition, a reply to the Amicus brief filed in support of LGH, and two notices of Supplemental Authorities. Docket Nos. 69, 70, 82, 84.

***B. New Allegations in the SAC***

The SAC adds new verbiage – and, most significantly, addresses the issue of criminal purpose – but pleads little in the way of new facts.

What is unchanged is that there is no allegation that any of the web-tracking software at issue in this case was used inside the "Patient Portal" or "billing portal" of LGH's website. There is still no allegation that there was any interception of a dynamic webpage accessed by a user who had logged in and then viewed their individual patient files, treatment records, or test results; scheduled appointments; or paid bills. To Plaintiff's credit, she acknowledges as much. *See* SAC ¶ 114 ("Prior to discovery, Plaintiff cannot know with certainty whether Lawrence General used tracking technologies within the dynamically generated pages accessed after a patient logs into the patient portal, although many hospitals did so prior to the publicity and public outrage during the summer of 2022 regarding hospitals using tracking technologies on their websites and patient portals.").[4] To be sure, the SAC alleges that there were tracking tools on public webpages that led to the patient portal and bill pay functions. *Id.* ¶¶ 111–12, 116–18. But we are still talking about browsing data: information regarding which public webpages were visited and which links were clicked.

---

[4] The Federal Circuit observed, some time ago, that "[t]he discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery*, not to find out if it has any basis for a claim." *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990) (emphasis in original) (citations omitted); *accord Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) ("[T]o access discovery mechanisms, a plaintiff must *first* produce a complaint that passes the plausibility test—a test that helps keep defendants from wasting time and money in discovery on 'largely groundless' claims.").

What's new in the SAC? Plaintiff has added new allegations about LGH's purpose in employing web-tracking tools. Plaintiff alleges that LGH's purpose was to use the information gleaned by Google's and Meta's analytical tools to hone LGH's advertising of its services to patients, including Plaintiff:

> 3. Lawrence General's purpose in intercepting and disclosing to Google, Facebook, and other companies the contents of patient communications on the Lawrence General Website was so that those third parties could sync the intercepted communications with profiles of individuals known to Google and Facebook, which would then enable Lawrence General to use Google and Facebook's advertising platforms to target those patients with advertising. That is, Lawrence General had an incentive, which it acted on, to disclose private communications to Google and Facebook to advance Lawrence General's own marketing efforts.
>
> 4. By intercepting its patients' communications for the purpose of disclosing individuals' health information to third parties for commercial gain, including later using the contents of the intercepted communication for Lawrence General's targeting of advertisements to those patients through Google and Facebook's advertising platforms, Lawrence General put its business interests over the privacy of its patients.
>
> ***
>
> 5. . . . Lawrence General also used Facebook's and Google's advertising platforms, which enabled Lawrence General to target advertisements to patients who had visited Lawrence General's website based on the patient communications Lawrence General intercepted and disclosed to Facebook and Google.

SAC ¶¶ 3–5.

Also new in the SAC are allegations that materials from Google and Meta included warnings about possible privacy implications of using tracking tools. *See* SAC ¶ 7 ("[T]he functionality of the tracking technologies was well-known to businesses that deployed them, and Google and Facebook expressly directed Lawrence General to obtain user consent for all tracking technologies and not to use tracking technologies on healthcare webpages."); SAC ¶ 47 (Facebook's Legal Terms on its website directed users of tracking tools – *i.e.*, website operators – to provide "'clear and prominent notice on each web page'" and not to use tracking tools "on

any webpage that 'that includes health information.'" (citation modified)); SAC ¶ 52 (Google offers an anonymizing feature that LGH did not use).

The SAC identifies examples of the kind of targeted advertisements that Google customizes for LGH, which seem designed to reach individuals whose browsing history may have suggested interest in particular services. *See* SAC ¶ 98 (showing example of a Google ad for OB/GYN services at LGH and positing that recipients of this ad "would have" included people who visited the LGH OB/GYN webpage); SAC ¶ 103 (describing LGH's targeted advertising on Facebook's advertising platforms). Importantly, the SAC only points to advertisements for services offered by LGH itself, which, as discussed below, are expressly excluded from the definition of "marketing" under the HIPAA regulations.

The SAC also adds examples of the titles of particular public webpages that Plaintiff accessed, including: the "patient portal"; "find-a-doctor webpage, which Plaintiff used to obtain information about a particular pathologist who wrote a report for her"; "pages for particular departments of Lawrence General Hospital, including, for example, the Laboratory Services department"; and "the search function of the Lawrence General Website, which Plaintiff used to search for particular terms used in her pathology report." SAC ¶ 15. The tracking tools were used on each of these public webpages. SAC ¶ 75. In addition, Plaintiff alleges that she has Google and Facebook accounts, which make it easier for Google and Meta to connect her browsing activity with her real-world identity. SAC ¶ 17.[5]

[5] The SAC alleges that there was a particular webpage with the heading "I am a Patient," which appears to include links to various webpages for information. SAC ¶ 119. The SAC does not allege that Plaintiff ever visited the "I am a Patient" page. Nor does the SAC allege that this page was a dynamic and/or authenticated web page where patients entered personal information.

The SAC alleges that Facebook and Meta tools are designed "to track and disclose to Facebook a user's activities on a website, identify that individual user, and target that individual with advertising from the website owner . . . ." SAC ¶ 41. The SAC augments the prior complaint's description of the way companies like Google and Meta use browsing data to gather information about the devices (hardware and software) that a particular website visitor is using and to create "browser fingerprints" that can be used to successfully identify particular individuals with uncanny accuracy. SAC ¶¶ 85–87.

The SAC also adds factual allegations, not particularly tailored to this case, regarding the existence of a large-scale market for consumers' personal data. SAC ¶¶ 164–71.

Also new in the SAC are various allegations that are plainly intended to address the formal elements of the ECPA offense, although they do not materially alter the facts alleged in the previous complaint. *See, e.g.*, SAC ¶ 12 (expanding on allegations that LGH's "purpose" was to violate HIPAA and to commit various state-law torts); SAC ¶ 135 (citing 45 C.F.R. § 164.508(a)(3), a HIPAA regulation requiring patient consent for a healthcare provider to use or disclose "protected health information for marketing"); SAC ¶ 141 (explaining that quotations from a partially-vacated U.S. Department of Health and Human Services ("HHS") Bulletin are intended to accentuate the point that "use of tracking technologies on healthcare provider website poses serious privacy implications and can lead to HIPAA violations").

### *C. Analysis*

I will not reiterate the analysis in my previous report and recommendation, except as needed to emphasize issues that are fairly implicated by new/additional allegations of the SAC. Nor will I attempt to wade through the dozens of decisions from around the country that have

reached varying outcomes in assessing ECPA claims against hospitals.[6] Plaintiff cites a slew of decisions that reach her desired result and asserts that these represent the "prevailing view." Docket No. 69 at 15–17 & nn.7–9. There are plenty of decisions going the other way, however, and LGH cites a number of them. *See* Docket No. 60 at 14.

With few exceptions, the cases that I have reviewed – regardless of result – feature scant discussion of the particular criminal statutes at issue in this case and the particular states of mind that are required elements of the offenses that those statutes define. In this report, I will endeavor to offer a reading of the law that proceeds, in the first instance, from the governing statutes: ECPA and HIPAA.

*1. Construction of Criminal Statutes*

At the risk of redundancy, I start by emphasizing that ECPA is a *criminal* statute, as is the HIPAA provision at issue here. This critical point seems to get lost in many of the reported decisions about hospital websites.

[6] Why all the focus on the ECPA claims against hospitals? It's not because the elements of ECPA are an easy or obvious fit for the facts in cases like this. By contrast, there are myriad state laws that protect individuals' privacy, many of which impose liability based on mere negligence. *Cf. Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 146 (D. Mass. 2024) (Saris, J.) (denying motion to dismiss, in relevant part, in diversity case involving web trackers); *Vita v. New England Baptist Hosp.*, 494 Mass. 824, 849 (2024) (dismissing claim under Massachusetts wiretap act and emphasizing that there are "other statutory and common-law causes of action to address allegedly false, misleading, or deceptive activity on the Internet, including statutory and common-law protections more directly applicable to misrepresentations or misuse of private medical information").

In case the point is not obvious – ECPA is where the money is. *Cf. Sutton's Law*, Wikipedia, https://en.wikipedia.org/wiki/Sutton%27s_law (last visited July 2, 2026). In a world where internet users are inundated with targeted advertising, there are considerable challenges for a plaintiff who seeks to prove that she suffered significant compensable harm as a result of receiving some unsolicited advertisements from her health care provider. ECPA, however, allows for statutory damages of at least $10,000 per violation of 18 U.S.C. § 2520. Multiplied by the number of members in a prospective class, the figures are dazzling.

It is a truism that "criminal statutes are to be strictly construed." *See United States v. Hood*, 343 U.S. 148, 151 (1952). As the Supreme Court has noted, "this does not mean that such legislation 'must be construed by some artificial and conventional rule'. . . . We should not read such laws so as to put in what is not readily found there. But equally we should not read out what as a matter of ordinary English speech is in." *Id.* (citation omitted). To put it another way, "no offense may be created except by the words of Congress used in their usual and ordinary sense. There are no constructive offenses." *United States v. Alpers*, 338 U.S. 680, 681 (1950) (citation omitted).

The Supreme Court has emphasized that in reading criminal statutes, there is a strong presumption that mens rea is a necessary element, *viz.*, that "Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif v. United States*, 588 U.S. 225, 229 (2019).

*2. Elements of ECPA*

To make out a claim, Plaintiff must plausibly allege that LGH acted with the specific intent(s) that Congress prescribed in defining the ECPA felony. When it comes to one-party consent interceptions (*i.e.*, communications to which the defendant is a party),[7] the intent elements are two-fold:

First, the defendant must act "intentionally" with respect to the interception. In other words, the defendant must act with the "conscious objective" of causing an interception. *See In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003) (explicating the "intentional" state of mind

---

[7] As I discussed in my previous report, under federal law there is no prohibition on a party's interception of its own communications with others, *unless* such interception is conducted for the specified illegal motive, that is, "for the purpose of committing any criminal or tortious act . . . ." *See* Docket No. 41 at 17–18.

required under ECPA). As noted in my previous report, Plaintiff has plausibly alleged that, by employing Google's and Meta's tracking tools, LGH intentionally intercepted communications. That is to say, users' clicks while navigating through public webpages appear to satisfy ECPA's broad definition of "communications." *See* Docket No. 41 at 15–17. Therefore, I will not discuss this first element further in this report.

Second, the defendant must conduct the interception "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). As discussed in my previous report, proving that a defendant acted "for the purpose" of committing a crime or tort involves a heightened showing of mens rea: higher even than acting "knowingly" or "intentionally." *See Counterman v. Colorado*, 600 U.S. 66, 78–79 (2023) ("Purpose is the most culpable level in the standard mental-state hierarchy, and the hardest to prove."). As the Supreme Court has noted, to make out a claim of *purposeful* misconduct, there must be plausible factual allegations to support an inference that the actor undertook "a course of action because of, not merely in spite of," the prohibited end. *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009) (citation modified). The First Circuit has ruled that, under ECPA, a showing of "purpose" requires a showing "either '(1) that the primary motivation, or (2) that a determinative factor in the actor's motivation for intercepting the conversation was to commit a criminal, tortious, or other injurious act.'" *United States v. Cassiere*, 4 F.3d 1006, 1021 (1st Cir. 1993).[8]

[8] In my previous report, I overlooked the First Circuit's decision in *Cassiere* as a guide to interpreting the "purpose" requirement of the ECPA exception. Docket No. 41 at 36. The *Cassiere* ruling raises the threshold somewhat, so my previous report may have understated the burden that Plaintiff faces in this case.

### 3. *Plaintiff's Argument for a Different Reading of ECPA*

In taking another stab at stating a viable claim, Plaintiff argues that the ECPA requirement that defendants who intercept their own communications with others are subject to criminal prosecution only if the interception was conducted "for the purpose of committing any criminal or tortious act" should *not* be interpreted to mean that the defendant must have had in mind a conscious purpose to perform a criminal or tortious act. Plaintiff's argument is based upon another district court's decision in *Stein v. Edward-Elmhurst Health*, No. 23-CV-14515, 2025 WL 580556 (N.D. Ill. Feb. 21, 2025). That decision purports to read out of the ECPA statute any scienter requirement with regard to a defendant's "purpose" in conducting an interception.[9] Faced with a statute in which Congress explicitly required that a defendant act "for the purpose of committing any criminal or tortious act," the court in *Stein* offers a sort of deconstructionist reading of the statute while noting—anomalously—that "[t]he other reading would, in effect, import a *mens rea* element into the statute." 2025 WL 580556 at *6.

---

[9] While Plaintiff fairly quotes from the decision in *Stein*, Plaintiff is incorrect in suggesting that the reasoning in *Stein* has been adopted by Judge Burroughs in this district.

Ignoring that Judge Burroughs reached precisely the opposite conclusion as the court in *Stein*, Plaintiff writes, "Judge Burroughs recently adopted the prevailing standard in a decision addressing the same conduct as here. She endorsed *Stein v. Edward-Elmhurst Health* . . . ." Docket No. 69 at 20 (citing *McManus v. Tufts Med. Ctr., Inc.*, No. 25-CV-10008-ADB, 2025 WL 2778025, at *3 n.1 (D. Mass. Sep. 29, 2025)).

Judge Burroughs did indeed agree with *Stein* that a financial motivation and a criminal tortious motivation are not mutually exclusive. *McManus*, 2025 WL 2778025, at *3 n.1. This is a point on which I also agree, as I noted in my previous report. Docket No. 41 at 37. Judge Burroughs also agreed with the proposition advanced in *Stein* that "[a] desire to commit a crime qua crime, or a tort qua tort, isn't necessary." *McManus*, WL 2778025, at *3 n.1. Assuming this means that a defendant need not know that a particular illegal act violates a particular criminal statute or constitutes a tort, then I am, again, in agreement. *See* Docket No. 41 at 38–39. As discussed below, while Defendants ordinarily must be aware of the *circumstances* that render an act illegal, defendants generally do not need to know that there is a specific statute criminalizing such an act. *See* Section C.5.c (discussion of knowledge requirement in HIPAA).

The court in *Stein* does not explain why it would go to such pains to avoid the obvious point that ECPA includes an explicit mens rea requirement (actually, two separate mens rea requirements). Contrary to the *Stein* court's formulation, there's nothing to "import." Congress expressly required that an ECPA defendant in a one-party-consent case must act "for the purpose of committing any criminal or tortious act." To avoid the plain meaning of these words, the court in *Stein* proposes a reading that ignores the words of the statute and the order in which they appear: "Separating the adjectives from the noun might shed a little light. The purpose must be to commit an act, and that act must be criminal or tortious." 2025 WL 580556, at *6. The *Stein* court illustrates its reading with an example that exposes the peculiarity of its reasoning:

> The placement of "criminal or tortious" is telling. That phrase modifies "act," not "purpose." The statute does not require a "criminal or tortious purpose." It requires a purpose of committing an act – an act that is criminal or tortious.
>
> A person can have a purpose of committing an act that is criminal or tortious, without having a criminal or tortious purpose. Imagine changing lanes on the highway without looking, and nailing the car in the other lane. The bad driver may have acted with the purpose of committing an act – changing lanes – that was tortious (because of the lack of ordinary care). But that's different than saying that the driver acted with a tortious purpose.

2025 WL 580556, at *6.

The word-salad approach adopted in *Stein* would have us read "for the purpose of committing any criminal or tortious act" as if it said, "for the purpose of committing any act, however innocuous it may be—if bad things result." But that isn't what the statute says. Indeed, the *Stein* decision's lane-change illustration underscores the casuistry of the court's statutory interpretation. To point out the obvious, a driver may be subject to liability for common law negligence if she changes lanes without looking, but she probably hasn't committed a crime. And, unless she intended to hit the other car, she assuredly has not committed an offense that includes as an element that she act "for the purpose of committing any criminal or tortious act."

The approach to statutory construction in *Stein* runs directly afoul of the Supreme Court's admonition that "[t]he most important thing to be determined is the intent of Congress. The language of the statute may not be distorted under the guise of construction, or so limited by construction as to defeat the manifest intent of Congress." *Alpers*, 338 U.S. at 681–82 (citation omitted). In particular, the *Stein* court seems oblivious to the Supreme Court's commonsense teaching that statutory words should generally be considered in the order in which they appear, and that a state of mind specified in a criminal statute will generally apply to all terms that follow. *See Rehaif*, 588 U.S. at 230 ("As 'a matter of ordinary English grammar,' we normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime.") (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009)).[10]

Perhaps the oddest thing about the *Stein* decision is its assumption that a criminal statute like ECPA should be read to exclude any mens rea requirement. This is diametrically contrary to the Supreme Court's approach: "In determining Congress' intent, we start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif*, 588 U.S. at 228–29 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). Far from reading a scienter requirement *out* of Congressional enactments, the Supreme Court even "imports" (to use the *Stein* court's word) a scienter requirement into statutes that are not explicit on the point. "We apply the presumption in favor of scienter even when Congress does not specify any scienter in the statutory text." *Id.* at 229 (citing *Staples v. United States*, 511 U.S. 600, 606 (1994)). *See Liparota v. United States*, 471 U.S. 419, 426 (1985) ("[T]he failure of Congress explicitly and unambiguously to indicate

[10] I discuss these principles of construction below, in considering the HIPAA statute.

whether *mens rea* is required does not signal a departure from this background assumption of our criminal law.”).

As I noted in my previous report, the ECPA statute explicitly includes a heightened scienter requirement—“for the purpose of committing any criminal or tortious act”—that distinguishes the legally innocuous act of intercepting one’s own communications (single-party consent) from the crime of doing so for a specified improper purpose. Plaintiff’s reliance on *Stein* is no more persuasive in this iteration than it was in the last round of briefing. *See* Docket No. 41 at 24–25. The approach to statutory construction in *Stein* is logically askew and is incompatible with the Supreme Court’s guidance.

Furthermore, it is impossible to square the logic of *Stein* with the First Circuit’s ruling in *Cassiere* that under ECPA, “purpose” means that the defendant’s motivation “was to commit a criminal, tortious, or other injurious act.’” 4 F.3d at 1021. Not only is the ruling in *Cassiere* consonant with the language of ECPA, it is also binding on this Court.

*4. LGH’s Alleged Purpose*

Returning our attention to the SAC itself: What is the criminal or tortious act that is alleged to have been the purpose behind LGH’s conduct? The previous complaint included conclusory assertions—but no plausible allegations of fact—that LGH was motivated by some unexplained purpose to commit various privacy-related torts and/or to violate HIPAA.[11] *See* Docket No. 41 at 34–35.

[11] To be fair, it’s not that the previous complaint hypothesized that LGH was motivated by some malevolent desire to harm others. It’s more accurate to say that the previous complaint simply gave short shrift to the “purpose” element of ECPA and premised the ECPA claim on the notion that the various alleged torts and the alleged HIPAA violation were natural concomitants of LGH’s decision to employ the tracking tools.

Unlike the previous complaint, the SAC now explicitly identifies LGH's alleged purpose—that is, its conscious motivation—in deploying the tracking tools. The SAC alleges that LGH was motivated by a desire to send targeted advertisements to users of its website. As a matter of factual pleading, this is entirely plausible. Such a motivation comports with the facts and circumstances set forth in the SAC. Targeted advertising is a typical use-case for the kind of tracking tools at issue here, and the SAC alleges that LGH has sent targeted advertisements (albeit, not specifically to Plaintiff). *See* SAC ¶¶ 98, 103. The prior complaint touched on the targeted advertising use-case. *See* Docket No. 27-1 ¶ 101 ("[E]ven if Lawrence General wanted to use tracking technologies to optimize its website or its marketing for a website . . . "). But the SAC now explicitly identifies this as LGH's motive or purpose.

The SAC repeats Plaintiff's allegations that LGH acted for the purpose of committing various state torts, but those conclusory allegations fall short of alleging any plausible *factual* basis for supposing that LGH was motivated by a conscious desire or malign purpose to violate state tort or privacy laws. *See* Docket No. 41 at 34–35. Even assuming Plaintiff has pled allegations that plausibly support her state-law tort claims at this stage of the case,[12] that does not mechanically set up a tag-along ECPA claim. If the element of "purpose" in ECPA is to have any meaning, it must go beyond a tautological assertion that LGH's conduct amounts to a tort.[13]

[12] Because I recommend that this Court decline to exercise supplemental jurisdiction over the state-law claims, I do not decide this point one way or the other.

[13] In one case in this district involving a healthcare provider website, the court held that allegations of a complaint were sufficient to support the plausible inference that a hospital had intercepted communications on its website "for the purpose of facilitating some further impropriety—namely, violating Section 1B [the Massachusetts Privacy Statute] by disclosing Doe's private health information without her consent." *Doe v. Baystate Health Sys., Inc.*, No. 1:25-CV-10337-JEK, 2026 WL 776861, at *4 (D. Mass. Mar. 19, 2026) (citation modified).

*Footnote continues on following page.*

### 5. *The Elements of the HIPAA Crime*

Conclusory allegations that LGH's acts violated HIPAA do not satisfy the pleading standards of *Iqbal* and *Twombly*. Rather, the Court must assess the factual allegations of the SAC against the elements of the HIPAA crime to determine whether such factual allegations, taken as true, plausibly make out a HIPAA violation.

It is entirely plausible, based on the factual allegations of the SAC, that LGH's motivation in deploying the tracking tools was to send targeted ads for services that LGH provides. But drumming up business by sending targeted ads is not itself a crime. Plaintiff contends, however, that HIPAA's criminal provisions apply to LGH's conduct.

To assess Plaintiff's contention, this section of the report addresses a critical threshold question: Does the SAC plausibly allege that the information gathered by the tracking tools was HIPAA-protected data, such that its knowing disclosure would violate the statute? In concrete terms: Do clicks and searches by persons navigating LGH's public-facing static webpages constitute information that is protected by HIPAA?

---

Whatever may have been the allegations in that case, the SAC here includes no factual allegations that plausibly support an inference that LGH was actually motivated by a desire to disclose private health information. There's a big difference between disregarding (even recklessly or for the purpose of saving money) a risk that one's conduct may be tortious, and acting for the *purpose* of committing the tort. In the Supreme Court's words, the difference is in acting "'because of,' not merely 'in spite of,'" the prohibited end. *Iqbal*, 556 U.S. at 676–77.

Another recent decision in this district denied a motion to dismiss an ECPA claim based on allegations that tracking tools intercepted communications *inside* the defendant hospital's patient portal. *See Doe v. Children's Hosp. Corp.*, No. 25-cv-10343-PBS (D. Mass. July 1, 2026). That decision, too, found there were plausible allegations of a tortious or criminal purpose. As noted in my previous report, in this case the absence of any allegation that LGH deployed tracking tools inside its patient portal or billing portal powerfully undercuts any suggestion that LGH consciously set about to disclose protected health information in violation of the privacy rights of its patients. *See* Docket No. 41 at 32.

To answer this question, we must consider the allegations of the SAC and look to the HIPAA statute and regulations. As discussed at some length below, the short answer is no: While virtually any kind of information that is maintained in a patient's medical or billing file *could* be protected under HIPAA, the SAC contains no plausible factual allegation that LGH maintained data about navigation clicks or searches in any HIPAA-regulated file or record set.

a. The SAC's Factual Allegations

Plaintiff contends that, because LGH is a health care provider and because it operates a public website (which is presumably intended for use by individuals, including patients), the steps that individuals take in navigating the public website amount to HIPAA-protected individually identifiable health information ("IIHI"). The primary factual allegations on which Plaintiff rests this contention are as follows:

The SAC plausibly alleges that Google and Meta have access to troves of data from myriad sources, which enable them to use information gleaned by their tracking tools to identify individuals who browse public websites. SAC ¶¶ 38–40, 49–51. The SAC further alleges that such identifications are uncannily accurate—so much so that the information gleaned from such browsing data is comparable to familiar personal identifiers, such as addresses, dates of birth, and the like. *See* SAC ¶ 87. Furthermore, as noted in my previous report, ECPA's definition of "communications" is sufficiently broad to plausibly encompass LGH's receipt of such browsing data in the course of operating its public website. *See* Docket No. 41 at 16.

Plaintiff points out that Google and Meta can infer that a particular individual has an interest in various kinds of health-related information, based on the topics that a user clicks on or searches for. For example, if a user looks up a particular ailment or medical specialty, Google and Meta could infer that the user may be interested in receiving more information about a specific medical condition (and might even surmise that the website visitor suffers from that

condition). Plaintiff posits that navigating to such a page effectively discloses that a particular website user is a patient of LGH seeking treatment for a particular condition. SAC ¶¶ 5, 69, 95, 101. Furthermore, Google and Meta could potentially draw inferences from the fact that a website user may click to navigate to a webpage with a patient portal. The inference would be that the user is a patient, since that's who would most often navigate to a patient portal. SAC ¶¶ 116–17. (There is no allegation in the SAC that the tracking tools could track whether particular users actually entered usernames and passwords to gain access to medical records, billing records, appointment information and the like.)

In short, Plaintiff plausibly contends: (a) LGH is a health care provider that operates a public website which is intended for use by individuals, including patients; (b) Google and Meta, with their tracking tools and their access to massive databases, can identify most users of public websites; (c) Google and Meta can draw inferences about users' interest in health-related topics from tracking their browsing on the LGH public website; and (d) Google and Meta can draw inferences about whether particular users are patients of LGH, if they navigate toward sign-in pages.

On the other hand, the SAC does not allege that LGH ever kept, recorded, or did anything with the clicks on its public website—except that it allowed Google and Meta to capture and record them. There is no allegation that LGH itself kept a record of users' browsing on its public website, let alone that LGH incorporated such a record in its medical and billing records for its patients.

b. The HIPAA Offense

Under HIPAA, it is a crime to knowingly "disclose[] individually identifiable health information to another person." 42 U.S.C. § 1320d-6(a)(3). Indeed, if (as alleged here) the intent

is to "use [IIHI] for commercial advantage," this is a felony punishable by 10 years in prison. 42 U.S.C. § 1320d-6(b)(3).

The pertinent criminal provisions of HIPAA read as follows:

> (a) Offense
>
> A person who knowingly and in violation of this part--
>
> > (1) uses or causes to be used a unique health identifier;
> >
> > (2) obtains individually identifiable health information relating to an individual; or
> >
> > (3) discloses individually identifiable health information to another person,
>
> shall be punished as provided in subsection (b). For purposes of the previous sentence, a person (including an employee or other individual) shall be considered to have obtained or disclosed individually identifiable health information in violation of this part **if the information is maintained**[14] by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title) and the individual obtained or disclosed such information without authorization.
>
> (b) Penalties
>
> A person described in subsection (a) shall--
>
> > (1) be fined not more than $50,000, imprisoned not more than 1 year, or both;
> >
> > (2) if the offense is committed under false pretenses, be fined not more than $100,000, imprisoned not more than 5 years, or both; and
> >
> > (3) if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both.

42 U.S.C. § 1320d-6 (emphasis added).

[14] I discuss the significance of this bolded provision in the next section of this report.

For good measure, Plaintiff also points to HIPAA regulations that prohibit "any use . . . of [PHI] for marketing" absent consent. 45 C.F.R. § 164.508(a)(3)(i).[15] Ostensibly, Plaintiff offers this prohibition as a separate avenue to establish that a disclosure violated 42 U.S.C. § 1320d-6(a).

i. HIPAA Criminalizes Disclosure of Data that is *Maintained* by a Health Care Provider

In my previous report, having concluded that Plaintiff's prior complaint did not plausibly allege LGH's purpose in deploying web trackers, I simply noted the open question as to whether clicks on public webpages constituted HIPAA-protected data, but I assumed without deciding that LGH's alleged conduct plausibly amounted to a violation of HIPAA. Docket No. 41 at 27–29 & n.10. Given that the SAC now includes plausible allegations regarding LGH's purpose, it is now incumbent on the Court to consider whether those allegations support Plaintiff's contention that such a purpose amounted to a criminal violation of HIPAA. This requires us to consider the restrictions that HIPAA places on disclosures of health information.

We'll start with the HIPAA definition of IIHI, which the HHS Regulations define as follows:

> *Individually identifiable health information* is information that is a subset of health information, including demographic information collected from an individual, and:
>
> (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
>
> (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and
>
> (i) That identifies the individual; or

[15] I discuss the HIPAA "marketing" regulation later in this report.

> (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

45 C.F.R. § 160.103.

By itself, the HIPAA definition of IIHI is very broad. Moreover, it is at least arguable that, by operating a public website, LGH could be said to have "received" (45 C.F.R. § 160.103(1)) information when users of its public website clicked to navigate the website, albeit it was not information that LGH could use in raw form. Likewise, even though clicks on a website do not themselves identify the website user as a patient, or even as a human, the language of the regulation uses broad terms to cover information when "there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103(2)(ii). This could potentially include all manner of things, far beyond names or phone numbers. In a world where companies like Google and Meta have access to massive amounts of personal data, it seems reasonable to assume that various digital artifacts (IP addresses, device identifiers, Facebook names) captured by the tracking tools could be used to identify an individual.

Although the universe of information that could potentially meet the definition of IIHI is expansive indeed, the HIPAA criminal offense does not, by its terms, extend to each and every such item of information. As highlighted above, the definitional language in the HIPAA criminal statute provides that "a person (including an employee or other individual) shall be considered to have obtained or disclosed [IIHI] in violation of this part if the information *is maintained* by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title)[16] . . . ." 42 U.S.C. § 1320d-6(a) (emphasis added). On the face of the statute, the

[16] There is no dispute that LGH is a "covered entity," as that term is defined in the regulations.

requirement that IIHI be "maintained" by the healthcare provider is an essential element of the HIPAA offense.

The term "maintain" is not separately defined in the HIPAA regulations. Rather, it is encompassed in the definition of a "designated record set":

> Designated record set means:
>
> (1) A group of records *maintained* by or for a covered entity that is:
>
>> (i) The medical records and billing records about individuals maintained by or for a covered health care provider;
>>
>> (ii) The enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or
>>
>> (iii) Used, in whole or in part, by or for the covered entity to make decisions about individuals.
>
> (2) For purposes of this paragraph, the term record means any item, collection, or grouping of information that includes [PHI] and is maintained, collected, used, or disseminated by or for a covered entity.

45 C.F.R. § 164.501 (emphasis added).

As the regulations reflect, the HIPAA criminal offense applies not to IIHI in the abstract, but to PHI in context. Where, and whether, information is maintained in a record set is critical. As one guide to HIPAA explains the scope of PHI:

> What is not included in PHI depends on where information is maintained. PHI is any combination of health information and identifiers when they are maintained in the same designated record set. However, when health information and individual identifiers are maintained separately from each other, the identifiers alone are not considered [PHI] under HIPAA. For example, jdoe@yahoo.com, Stillwater MN, and auto registration AYP 197 are not included in PHI when they are not maintained with health information in the same designated record set.

*What is Considered Protected Health Information Under HIPAA?*, HIPAA J., https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last visited July 6, 2026).

To put it another way, HIPAA does not create free-floating obligations to conceal or disguise the identities of persons who happen to come into contact with a healthcare provider, whether by walking into a hospital or by navigating on that provider's public website. Rather, HIPAA governs the manner in which healthcare providers must protect the personal information that they maintain in record sets.

Information like an individual's name, date of birth, or telephone number *may* be subject to HIPAA protections, if it is part of a designated record set. *See What is Considered Protected Health Information Under HIPAA?*, HIPAA J., https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last visited July 6, 2026). But in other contexts, the same information is plainly *not* HIPAA-protected information. For instance, a health care provider plainly violates HIPAA by showing a third party a medical record that shows the name of a patient. *See United States v. Luthra*, 970 F.3d 8, 10 (1st Cir. 2020) (affirming conviction for aiding and abetting HIPAA violation where pharmaceutical sales representative was given access to patient record); *see also* Superseding Indictment 4, Dkt. No. 89, *United States v. Luthra*, No. 3:15-cr-30032-MGM (D. Mass. Aug. 1, 2017) (reciting that disclosed information "was maintained by a covered entity"). By contrast, a health care provider does not violate HIPAA by calling a patient's name in the waiting room, even though the name itself may be broadcast to others in the vicinity. *See May Physician's Offices Use Patient Sign-in Sheets or Call Out the Names of Their Patients in Their Waiting Rooms?*, U.S. Dep't of Health & Hum. Servs. (Mar. 14, 2006), https://www.hhs.gov/hipaa/for-professionals/faq/199/may-health-care-providers-use-sign-in-sheets/index.html.

There is no allegation in the SAC that LGH ever maintained website click or search information as part of any record set. There is, moreover, no logical reason to suppose that LGH

would have done so. In *Iqbal* and *Twombly* terms, there are no factual allegations in the SAC that would plausibly support such an inference. Indeed, it is difficult to imagine how LGH would or could have associated any given click on its public website with any particular patient's medical record. Given that there is no allegation that tracking tools were ever used to capture patients' portal log-in information (as discussed further below), LGH would have no way of knowing whether a particular click on a static page on its website (having the effect of navigating to particular page) was the act of: an LGH patient seeking additional information about a diagnosis, a curious non-patient looking for information, or a hostile bot scanning the website for vulnerabilities.

When we strip away the conclusory allegations of the SAC and add up the well-pleaded factual allegations, the purported HIPAA violation is illusory. This case isn't about LGH telling Google and Meta who its patients were; this case is about Google and Meta telling LGH who was using LGH's public website.

ii. No Allegation of Tracking Tools in Patient Portal

As I noted in my previous report, the absence of any allegation that LGH deployed tracking tools inside the patient portal or billing portal on its website strongly undercuts any plausible inference that LGH's purpose was to unlawfully disclose HIPAA-protected information. *See* Docket No. 41 at 32.

There is guidance from the HHS, which promulgates the HIPAA regulations, addressing the important distinction between password-protected portals and public websites. The HHS Guidance generally reinforces the distinction between static or "unauthenticated" webpages (on the one hand) and webpages that may be designed for patients to log in and enter personal information (on the other hand). *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* U.S. Dep't of Health & Hum. Servs., (June 26, 2024),

https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.[17] Thus, HHS advises that:

> The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal, generally are unauthenticated because the individual did not provide credentials to be able to navigate to those webpages. However, if the individual enters credential information on that login webpage or enters registration information (*e.g.*, name, email address) on that registration page, such information meets the definition of IIHI.

*Id.*

There is one portion of the HHS Guidance document that points in a different direction, albeit ambiguously:

> Further, visits to unauthenticated webpages do not result in a disclosure of PHI to tracking technology vendor if the visit is not related to an individual's past, present, or future health, health care, or payment for health care.
>
> - For example, if a student were writing a term paper on the changes in the availability of oncology services before and after the COVID-19 public health emergency, the collection and transmission of information showing that the student visited a hospital's webpage listing the oncology services provided by the hospital would not constitute a disclosure of PHI, even if the information could be used to identify the student.
>
> - However, if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.

*Id.*

This section of the HHS Guidance is, frankly, incoherent insofar as it suggests that one must look to the intention of the clicker to determine whether clicks on static webpages

[17] Plaintiff cites this publication obliquely, only noting that it is cited within a decision that Plaintiff quotes from. Docket No. 69 at 15. Plaintiff does not discuss it in any depth.

constitute PHI. It makes no sense to suggest that HIPAA regulations and, in turn, criminal liability, depend on unknowable qualities of an as-yet-unidentified person or bot. The HHS Guidance illustration (*viz.*, the curious student as opposed to a cancer patient) offers no clue about how a website operator could know which is which. As a practical matter, the operator of a website will have no occasion, and no ability, to ascertain who (or what) is doing the clicking; that is why website operators utilize web tracking tools such as those offered by Google and Meta. Is it a curious student? A patient of the healthcare provider? A patient of some other healthcare provider? A malicious bot?[18] Because it is impossible for LGH to answer these questions based on the website clicks themselves, such information—standing alone outside of a designated record set—cannot be said to "[r]elate[] to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual," as required by the definition of IIHI. 45 C.F.R. § 160.103(2).

As just discussed, the statutory definitions in the HIPAA statute provide that illegal disclosure of HIPAA-protected information occurs when there is disclosure of information maintained (in a record set) for health care purposes. Thus, information that LGH patients enter after using their credentials to log in stands on a different footing than clicks on the public pages of the LGH website, which do not communicate confidential healthcare information and do not connect to LGH's patient data.[19]

---

[18] What about a patient who is looking up information, not in connection with their own treatment but out of curiosity? Or a student who also happens to be a patient? Or a person who is a patient of some other health provider, not the health provider that operates the website?

[19] As discussed above, it seems likely—or at least plausible—that Google and Meta tracking tools, coupled with the massive data analytical capacities of those companies, enable those

*Footnote continues on following page.*

In contrast to the "dynamically generated pages accessed after a user logs into the patient portal," *see* SAC ¶¶ 113–16, the SAC contains no suggestion that anything changes in LGH's website when a user (or, for that matter, a hostile bot searching the internet for vulnerabilities) clicks on any given link on the public website. LGH contrasts these public webpages with the active content found inside the patient portal and billing portal, where users, once logged in, can enter their own information and can access their own medical records.

To phrase this in terms of the applicable regulations—and in terms of the pleading standards of *Iqbal* and *Twombly*—there is no factual allegation in the SAC that plausibly supports an inference that LGH maintained raw web-browsing history from its public website in any HIPAA record set such as "medical records [or] billing records about individuals." 45 C.F.R § 164.501. Nor is there any factual allegation that suggests LGH used such information "to make decisions about individuals." *Id.*

In short, the SAC does not plausibly allege that, by allowing Google and Meta to capture clicks and searches on its public webpages, LGH disclosed HIPAA-protected information that it maintained in any record set.

c. HIPAA Criminalizes *Knowing* Disclosures

HIPAA criminalizes only "knowing" conduct. So, what is it that a Defendant must know to be guilty of the HIPAA offense?

As I noted in my previous report, an actor may act *knowingly*, regardless of whether he is aware that there is a particular criminal statute which his conduct violates. Docket No. 41 at 38–39. This fits with the general rule that, absent special circumstances, actual familiarity with the

---

companies to make accurate predictions about the identities of individuals clicking on a website and about those individuals' interests (including interests that may lead to inferences about their health conditions or their status as patients).

law is not an element of a criminal offense. That said, the "knowing" standard *does* require that the actor be aware of the factual and regulatory circumstances that render his conduct illegal. As the Supreme Court has emphasized, "the existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 436 (1978) (citation modified); *see Morissette v. United States,* 342 U.S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.").

The Supreme Court's decisions construing statutes that require "knowing" conduct provide the essential template for considering the "knowingly" requirement of the HIPAA offense. To generalize, the Supreme Court has repeatedly ruled that when a criminal statute requires a defendant to act "knowingly" with respect to the non-jurisdictional elements of an offense, the required state of mind includes awareness of the facts and circumstances of the conduct that is forbidden.

When conduct would otherwise appear innocent, proof of knowing conduct with respect to a regulatory violation entails proving that defendants know enough about the regulatory scheme to understand that their conduct is forbidden. Thus, in *Liparota*, the Court considered a prosecution for food stamp fraud under a statute punishing "whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations." 471 U.S. at 420 (alteration in original) (quoting 7 U.S.C.

§ 2024(b)(1)).[20] That case posed the question: What mental state, if any, must the Government prove in order to establish that a defendant acted in violation of the statute? *Id.* at 423. In *Liparota*, it was not enough to prove merely that the defendant knew he possessed food stamps, while he was unauthorized to do so under the relevant statute and regulations. Instead, the Court read the statute to require proof that the defendant was aware that his conduct ran afoul of regulatory requirements: "[T]he Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations." 471 U.S. at 433.

The principle that a person must know the facts and circumstances that render his conduct illegal arises in various factual settings, and the Supreme Court has repeatedly reinforced that proof of "knowing" conduct means showing that a defendant knew the pertinent facts and circumstances that differentiate his conduct from otherwise innocent behavior. Thus, in a prosecution involving a rifle that had been modified to fire automatically, it was not sufficient for the government to prove that the defendant knew he possessed a gun and also to prove that the gun could in fact fire automatically. The government had to prove that the defendant "knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun." *Staples,* 511 U.S. at 602.[21] Although the government was not required to prove

---

[20] The statutory language at issue in *Liparota* is not identical to the language of HIPAA, which criminalizes conduct by one who acts "knowingly and in violation of this part . . . ." 42 U.S.C. § 1320d-6. The Court in *Liparota* made clear, however, that its decision did not turn on a minute parsing of the statutory language. *See* 471 U.S. at 428–29 (rejecting an argument that was based on differences in placement of the word "knowing" or "knowingly" in adjacent provisions of the statute).

[21] In *Staples*, the statute did not include the word "knowingly," but the Court concluded that such a requirement was implicit in the ordinary application of a criminal statute. *See id.* at 605–06, 619.

that the defendant knew it was a crime to possess a machine gun, it was not enough to prove merely that the defendant knew he possessed a gun (which happened to meet the definition of machinegun). *Cf. X-Citement Video, Inc.*, 513 U.S. at 79 (Stevens, J., concurring) ("In my opinion, the normal, commonsense reading of a subsection of a criminal statute introduced by the word 'knowingly' is to treat that adverb as modifying each of the elements of the offense identified in the remainder of the subsection.").

More recently, the Court considered the mens rea requirement for a firearm offense in which the relevant circumstances included both a purely factual matter (possession of a firearm) and a legal/regulatory component (the defendant's status as an alien unlawfully in the United States). *See generally Rehaif*, 588 U.S. at 229. For purposes of this case, the most significant aspect of the *Rehaif* decision is the Court's guide to parsing statutory language "when Congress includes a general scienter provision in the statute itself." *Id.* at 229–30. In *Rehaif*, the Court began its discussion by citing the Model Penal Code for the proposition that "when a statute 'prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears.'" *Id*. at 229 (quoting MODEL PENAL CODE § 2.02(4) (A.L.I. 1985)). The Court then followed the MPC's approach: "As 'a matter of ordinary English grammar,' we normally read the statutory term '"knowingly" as applying to all the subsequently listed elements of the crime.'" *Id.* at 230 (quoting *Flores-Figueroa*, 556 U.S. at 650). The Court emphasized that "the defendant's status [as an alien without legal residence] is the 'crucial element' separating innocent from wrongful conduct" and concluded that proof of a "knowing" violation required proof of knowledge as to that key element. *Id.* at 233.

The decision in *Rehaif* spells out the point that, for some statutory violations, the government must prove that a defendant knew about circumstances that involve legal or regulatory dimensions. The Court rejected the government's contention that requiring proof that the defendant knew he was in the country unlawfully would contradict the maxim that "'ignorance of the law' . . . is no excuse." *Id.* at 234. The Court noted that the "ignorance is no excuse" principle applies to the extent that a person may be convicted even if he is "unaware of the existence of a statute proscribing his conduct." *Id.* (quoting W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1(a) (2d ed. 1986)). But the prosecution must nonetheless prove that the defendant had knowledge as to any legal or regulatory circumstances that comprise elements of an offense. *Id.*

Citing its prior decision in *Liparota* as an example, the *Rehaif* Court explained that ignorance of the law may indeed be an excuse,[22] if the existence of particular legal or regulatory circumstances is an element of the charged offense:

> In contrast, the maxim does not normally apply where a defendant "has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct," thereby negating an element of the offense. *Ibid.*; see also Model Penal Code § 2.04, at 27 (a mistake of law is a defense if the mistake negates the "knowledge . . . required to establish a material element of the offense").

588 U.S. at 234 (alteration in original).

In short, there is a strong presumption that criminal offenses will require proof of mens rea. This is particularly so when the statute in question, like the HIPAA statute, requires proof that a defendant acted "knowingly." And "knowingly" means knowing about the facts and circumstances that render the conduct illegal. As both logic and Supreme Court precedent

[22] It may be more precise to say: The knowledge element of the offense may be unproven.

suggest, the criminal provisions of HIPAA require proof that LGH knew it was disclosing materials that were protected by HIPAA (although LGH need not have known it was a crime to do so).[23]

Given that clicks on an unauthenticated, public webpage do not appear to constitute IIHI that is protected from disclosure under HIPAA, it can hardly be inferred that LGH acted in "knowing" violation of the HIPAA statute. Indeed, given that HHS Guidance strongly suggests that HIPAA does *not* prohibit disclosure of unauthenticated webpage data, the SAC does not plausibly allege facts that can support a claim that LGH intercepted electronic communications for the purpose of committing a "knowing" disclosure of HIPAA-protected data. Furthermore, as discussed in my previous report, LGH is alleged only to have deployed tracking tools on public webpages—and not within the patient portal or billing portal where authenticated users would enter or access personal information. The natural inference is that LGH intended to *avoid* disclosing HIPAA-protected information—and thus did not knowingly violate HIPAA. *See* Docket No. 41 at 32.

---

[23] Although neither party refers to it, I note that there is a Department of Justice opinion letter from 2005 that concludes that the term "knowingly" in 42 U.S.C. § 1320d-6 "requires only proof of knowledge of the facts that constitute the offense." *Scope of Crim. Enf't Under 42 U.S.C. § 1320d-6*, 29 Op. O.L.C. 76 (2005). This letter is maddeningly vague as to whether such "facts" include the pertinent regulatory circumstances—*i.e.*, that one is disclosing matters that are subject to HIPAA protections. The opinion letter goes to considerable lengths to distinguish *Liparota*, but it predates the Supreme Court's further gloss on *Liparota* in *Rehaif.* The opinion leans heavily on the Supreme Court's decision in *Bryan v. United States*, 524 U.S. 184 (1998), a decision that focused on the meaning of the term "willfully." *Bryan*, however, cannot be understood as negating the presumption that mens rea is ordinarily required for criminal liability. On the contrary, the Court in *Bryan* concluded that "the willfulness requirement of [18 U.S.C.] § 924(a)(1)(D) does not carve out an exception to the traditional rule that ignorance of the law is no excuse; *knowledge that the conduct is unlawful* is all that is required." 524 U.S. at 196. (emphasis added).

d. HIPAA Regulations Prohibiting "Marketing"

As a separate ground for asserting that LGH acted for the purpose of committing a criminal act, Plaintiff points out that HIPAA regulations expressly prohibit use of HIPAA-protected personal information for "marketing." As noted above, the Complaint alleges that targeted advertisements regarding LGH's OB/GYN services "would have been served" to individuals who had been identified via Google's and Meta's tracking tools. SAC ¶¶ 98–99. As Plaintiff phrases it in opposing the motion to dismiss, "LGH's primary purpose in deploying tracking technologies on its website was to use the contents of illegally intercepted communications to target LGH advertising to its patients through Google and Facebook's advertising platforms." Docket No. 69 at 10.

The critical flaw in Plaintiff's argument is that HIPAA's regulations reflect a specialized definition of marketing, one that focuses on marketing by third parties and that *excludes* health care providers' promotion of their own services. Targeted advertisements of LGH's services, as described in the SAC, do not meet the definition of "marketing" within the meaning of the HIPAA regulations.

In broadbrush fashion, Plaintiff asserts that "HIPAA also prohibits 'any use . . . of [PHI] for marketing.'" Docket No. 69 at 15. Plaintiff supports this assertion with a citation to 45 C.F.R. § 164.508(a)(3)(i). That regulation provides, in relevant part, that "a covered entity must obtain an authorization for any use or disclosure of [PHI] for marketing . . . ." 45 C.F.R. § 164.508(a)(3)(i).

What Plaintiff omits is that the HIPAA regulations define the term "marketing." Indeed, the regulation uses the words "[m]arketing does not include" to exclude precisely the kinds of communications that Plaintiff identifies in the SAC. The regulation reads as follows:

> Marketing:
>
> (1) Except as provided in paragraph (2) of this definition, marketing means to make a communication about a product or service that encourages recipients of the communication to purchase or use the product or service.
>
> (2) Marketing does not include a communication made:
>
> > (i) To provide refill reminders or otherwise communicate about a drug or biologic that is currently being prescribed for the individual, only if any financial remuneration received by the covered entity in exchange for making the communication is reasonably related to the covered entity's cost of making the communication.
> >
> > (ii) For the following treatment and health care operations purposes, except where the covered entity receives financial remuneration in exchange for making the communication:
> >
> > > (A) For treatment of an individual by a health care provider, including case management or care coordination for the individual, or to direct or recommend alternative treatments, therapies, health care providers, or settings of care to the individual;
> > >
> > > (B) To describe a health-related product or service (or payment for such product or service) that is provided by, or included in a plan of benefits of, the covered entity making the communication, including communications about: the entities participating in a health care provider network or health plan network; replacement of, or enhancements to, a health plan; and health-related products or services available only to a health plan enrollee that add value to, but are not part of, a plan of benefits; or
> > >
> > > (C) For case management or care coordination, contacting of individuals with information about treatment alternatives, and related functions to the extent these activities do not fall within the definition of treatment.
>
> (3) Financial remuneration means direct or indirect payment from or on behalf of a third party whose product or service is being described. Direct or indirect payment does not include any payment for treatment of an individual.

45 C.F.R. § 164.501.

The HHS website includes an FAQ page directly addressing this point:

> **Is it marketing for a covered entity to describe products or services that are provided by the covered entity to its patients, or to describe products or services that are included in the health plan's plan of benefits of the health plan?**
>
> **Answer:**
>
> No. The HIPAA Privacy Rule excludes from the definition of "marketing" communications made to describe a covered entity's health-related product or service (or payment for such product or service) that is provided by, or included in a plan of benefits of, the covered entity making the communication.
>
> Thus, it would not be marketing for a physician who has developed a new anti-snore device to send a flyer describing it to all of her patients (whether or not each patient has actually sought treatment for snoring). Nor would it be marketing for an ophthalmologist or health plan to send existing patients or members discounts for eye-exams or eye-glasses available only to the patients and members. Similarly, it would not be marketing for an insurance plan to send its members a description of covered benefits, payment schedules, and claims procedures.

*Is it Marketing for a Covered Entity to Describe Products or Services That Are Provided by the Covered Entity to Its Patients, or to Describe Products or Services That Are Included in the Health Plan's Plan of Benefits of the Health Plan?*, U.S. DEP'T OF HEALTH & HUM. SERVS. (Dec. 20, 2002), https://www.hhs.gov/hipaa/for-professionals/faq/281/is-it-marketing-to-describe-services-provided-by-a-covered-entity/index.html (emphasis in original).

Simply put, the allegations of the SAC do not include facts that would support Plaintiff's theory that LGH was engaged in improper "marketing" as that term is defined in the HIPAA regulations.

## CONCLUSION

The factual allegations of the Second Amended Complaint do not make out a plausible claim that LGH's deployment of tracking tools on its public website involved a criminal disclosure of HIPAA-protected data. Nor do they make out a plausible claim that LGH's targeted advertising of its own services violated HIPAA's regulations on marketing. Still less does the

Second Amendment Complaint plausibly allege that LGH's purpose was to commit a knowing violation either of HIPAA or of state privacy or tort laws. There is, accordingly, no viable federal claim here.

For the forgoing reasons, I recommend that the Court **allow** Defendant's Motion to Dismiss the Second Amended Complaint, Count I.

For the reasons set forth in my previous report, I further recommend that the Court decline to exercise Supplemental Jurisdiction over Counts II–VII pursuant to 28 U.S.C. § 1367(c) and that the Court **remand** those claims to the Suffolk County Superior Court, a division of the Trial Court of the Commonwealth of Massachusetts.

/s/ Paul G. Levenson
Paul G. Levenson
U.S. MAGISTRATE JUDGE

Dated: July 29, 2026

NOTICE OF RIGHT TO OBJECT

In accordance with Rule 3 of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, the parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b) or Federal Rule of Criminal Procedure 59(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Sec'y of Health & Hum. Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).